UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

GAMCO GLOBAL SERIES FUNDS, INC.,
GABELLI CAPITAL ASSET FUND, THE
GABELLI VALUE FUND INC., THE GABELLI
ASSET FUND, THE GAMCO MATHERS FUND,
THE GABELLI GLOBAL MULTIMEDIA TRUST
INC., THE GABELLI EQUITY TRUST INC., THE
GABELLI CONVERTIBLE AND INCOME
SECURITIES FUND INC., and GAMCO
INTERNATIONAL GROWTH FUND, INC.,

                 Plaintiffs,

    vs.

VIVENDI, S.A.,

                 Defendant.

---------------------------------------------------------------X

  

**09 CV 7962**

**JURY TRIAL DEMANDED**



# COMPLAINT FOR VIOLATIONS
## OF THE FEDERAL SECURITIES LAWS

**ENTWISTLE & CAPPUCCI LLP**
Vincent R. Cappucci
Harold F. McGuire, Jr.
Shannon L. Hopkins
280 Park Avenue
26th Floor West
New York, New York 10017
Tel: (212) 894-7200

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................ 2

JURISDICTION AND VENUE ......................................................................................... 7

THE PARTIES.................................................................................................................... 8

BACKGROUND ............................................................................................................... 11

DEFENDANT'S FALSE AND MISLEADING STATEMENTS
AND OTHER RELEVANT PERIOD EVENTS........................................................... 13

    A.    Fourth Quarter 2000................................................................................. 13

    B.    First Quarter 2001 ................................................................................... 15

    C.    Second Quarter 2001............................................................................... 17

    D.    Third Quarter 2001 ................................................................................. 21

    E.    Fourth Quarter 2001 ............................................................................... 27

    F.    Vivendi's Financial Condition Continues to Erode ............................... 39

        1.    Second Quarter 2002................................................................. 39

        2.    Third Quarter 2002 ................................................................... 49

    G.    The True Nature of Vivendi's Financial Position is Disclosed ............................ 55

    H.    Developments Following The Relevant Period .................................... 59

VIVENDI'S MOUNTING LIQUIDITY CRISIS........................................................... 71

VIOLATIONS OF U.S. AND FRENCH ACCOUNTING STANDARDS ................................ 72

APPLICABILITY OF PRESUMPTION OF RELIANCE:
FRAUD ON THE MARKET DOCTRINE ................................................................... 79

SCIENTER ...................................................................................................................... 80

NO SAFE HARBOR ....................................................................................................... 81

COUNT I .................................................................................................................................... 82

For Violation of Section 10(b) of the Exchange Act and
Rule 10b-5, Promulgated Thereunder .......................................................................................... 82

JURY DEMAND .................................................................................................................... 84

This Complaint for violations of the federal securities laws is brought by plaintiffs, GAMCO Global Series Funds, Inc., Gabelli Capital Asset Fund, The Gabelli Value Fund Inc., The Gabelli Asset Fund, The GAMCO Mathers Fund, The Gabelli Global Multimedia Trust Inc., The Gabelli  Equity Trust Inc., The Gabelli Convertible and Income Securities Fund Inc., and GAMCO International Growth Fund, Inc. (the "Plaintiffs"), by and through their attorneys and alleges the following upon information and belief, except as to those allegations concerning the Plaintiffs, which are alleged upon personal knowledge.  Plaintiffs' information and belief are based upon, among other things, an extensive investigation conducted by and through their attorneys, which included, *inter alia*, a review and analysis of:  (a) direct communications between Plaintiffs and Defendant; (b) public filings made by Vivendi Universal, S.A. ("Vivendi" or the "Company")[1] with the Securities and Exchange Commission ("SEC"); (c) securities analysts' reports concerning Vivendi; (d) press releases and other publications which the Defendant distributed or caused to be distributed to the investing public; (e) news articles and shareholder communications concerning Vivendi; and (f) other publicly available information concerning the Company and/or the Company's Chairman and Chief Executive Officer ("CEO"), Jean-Marie Messier ("Messier"), and the Company's Chief Financial Officer ("CFO"), Guillaume Hannezo ("Hannezo").  Plaintiffs believe that further substantial evidentiary support exists for the allegations herein and will be obtained after a reasonable opportunity for discovery. Many of the facts supporting the allegations contained herein are known only to the Defendant or are solely within the Defendant's control.

---

[1]   On April 20, 2006, Vivendi changed its name from Vivendi Universal, S.A. to Vivendi S.A. following the sale of an 80% stake in the Vivendi Universal Entertainment unit.

## NATURE OF THE ACTION

1.      Plaintiffs bring this action to recover material monetary losses incurred as a result of their transactions in the Company's ordinary shares, which trade on the EuroNext S.A. (the "Paris Bourse") under the symbol "EX FP," and the Company's American Depository Receipts ("ADRs"), which trade on the New York Stock Exchange under the symbol "V," during the period between October 30, 2000 and August 14, 2002 (the "Relevant Period"). Plaintiffs' damages were a result of Defendant's violations of the federal securities laws. Vivendi operates music, television and film, publishing, Internet, telecommunications, and environmental services businesses.[2]

2.      Vivendi engaged in a variety of improper asset and revenue inflating practices immediately prior to and during the Relevant Period, allowing the Company to artificially inflate its reported assets, revenue, income and earnings per share ("EPS") at the end of each of the Company's quarterly reporting periods. Such financial manipulation made Vivendi's publicly filed financial statements and other communications regarding the Company's financial performance and condition materially false and misleading.

3.      Prior to and during the Relevant Period, Messier, Vivendi's Chairman and CEO, led the Company on a $77 billion acquisition binge that, according to published reports, resulted in the Company amassing approximately $21 billion in debt, all in an attempt to turn the once

---

[2]   The Company's specific divisions include: Universal Music Group ("UMG"), which includes: Polydor, Universal Publishing Group, MCA Records, Island Def Jam Music Group, Motown Record Company and others; Vivendi Universal Games ("VUG"); Vivendi Universal Entertainment ("VUE"), which includes: Universal Studios, Inc., Universal Pictures, Universal Television, Canal Plus, USA Networks, Universal Studios Recreation Group, which owns Hard Rock Hotels, Islands of Adventure, Universal Studios Theme Parks and Spencer Gifts among other businesses; Cegetel Group ("Cegetel"); Maroc Telecom ("Maroc") and Universal Music Mobile, among other telecom businesses; Vivendi Universal Net ("VUNet"), which oversees: Flopside, MP3.com, Uproar, RollingStone.com, eMusic and other of Vivendi's Internet services and businesses; and Vivendi Environment, S.A. ("Vivendi Environment").

profitable French water company into an international media conglomerate. As part of Messier's acquisition binge, the Company completed a three-way, $46 billion merger ("Merger") with Seagram Company Limited ("Seagram") (the parent of Universal Studios and Universal Music) and Canal Plus, S.A. ("Canal Plus") (one of Europe's largest cable TV operators) in October 2000.

4.      In the period leading up to the October 2000 Merger and thereafter throughout the Relevant Period, Vivendi reported strong revenue and earnings, and portrayed itself as a company that was generating sufficient cash flow to satisfy its obligations on the debt it had amassed in connection with its acquisition spree. As a result of Defendant's repeated earnings announcements and assurances concerning the Company's growth and its ability to meet its massive debt obligations, the price of Vivendi's ADRs and ordinary shares were maintained at artificially inflated levels throughout the Relevant Period.

5.      However, as Defendant knew but did not disclose, Vivendi's operations and financial condition were dramatically weaker than what its public statements portrayed. For example, immediately prior to and during the Relevant Period, Vivendi bid aggressively for several large companies, often significantly overpaying for them. Subsequent events (unbeknownst to investors) confirmed that these acquired entities could not generate sufficient cash flow to justify their high acquisition cost, with the result that Vivendi's balance sheet was bloated with tens of billions of dollars of inflated "goodwill" which had been materially impaired and should have been written down. The failure of the Vivendi conglomerate to generate earnings in line with its publicly-touted estimates further threatened the Company's liquidity, given that the Company needed to generate massive amounts of cash flow from operations to satisfy its obligations on approximately $21 billion worth of debt.

3

6.      To conceal the deteriorating state of Vivendi's newly constructed corporate empire, Vivendi engaged in a variety of improper asset and revenue-inflating practices during and immediately prior to the Relevant Period that enabled the Company to artificially inflate its reported assets, revenue, income and EPS at the end of the Company's quarterly reporting periods, rendering Vivendi's publicly filed financial statements and other communications regarding the Company's financial performance complained of herein materially false and misleading.

7.      Defendant's misrepresentations and/or omissions of material fact during the Relevant Period included, *inter alia*, the following:

(a)      Misstating the true nature of Vivendi's cash position and the Company's ability to manage its enormous debt obligations created by Messier's acquisition spree;

(b)      Failing to disclose the serious liquidity problems the Company was experiencing as a result of its enormous debt obligations and the Company's inability to generate sufficient cash flows from its acquired businesses; and

(c)      Misstating Vivendi's earnings in its public filings with the SEC and elsewhere as a result of failing to timely record writedowns of goodwill and other intangible assets associated with, *inter alia*, the acquisition of U.S. Filter Corp. ("U.S. Filter") in April 1999 and the acquisition of a 49% stake in Elektrim Telekomunikacja Group ("Elektrim") in December 1999, long after the Defendant knew that such intangible assets were carried at values greater than their true value.

8.      Defendant's false and misleading statements during the Relevant Period artificially inflated Vivendi ADRs to a split-adjusted high of $75 per ADR, and its ordinary shares to €81 per share.  The Defendant also misrepresented that Vivendi's recent mergers were

4

successful and the Company was enjoying the full benefit of the synergies produced by the transactions. These positive but materially false statements allowed the Company to continue to undertake additional acquisitions during its $77 billion buying spree between 1998 and 2001 (using its increasingly inflated common stock as currency to finance many of its acquisitions).

9.      Defendant's motive to inflate the price of Vivendi shares increased during the Relevant Period as a result of Messier's decision to make a massive bet on the Company's behalf that Vivendi shares would rise when he caused the Company to sell put options on Vivendi shares in late 2000 and 2001, obligating Vivendi to buy back tens of millions of its shares at fixed prices in the future. If Vivendi's share price decreased, the Company would lose as much as $1.4 billion based on the put obligations. As Vivendi's stock price fell, its put option positions declined further, placing additional pressure on the Defendant to continue its fraudulent scheme to offset further losses.

10.      In late June 2002, news leaked from the Company that its debt was at alarmingly high levels, causing Vivendi's ADRs to decline in price from $30 per ADR to below $20 per ADR. Vivendi's ordinary shares trading on the Paris Bourse also declined. Details concerning the Company's debt, including certain triggers and maturity dates, were still not disclosed at this point. In any event, Messier reassured the market and the Company's shareholders that liquidity was not a problem. However, as ratings agencies continued to downgrade the Company's debt throughout the summer of 2002, the ADRs and ordinary shares declined further, reaching decade-record low levels.

11.      Ultimately, on July 3, 2002, Messier was forced to resign as Chairman and CEO. Upon this announcement and the revelations regarding the actual state of the Company's finances, Vivendi ADRs and ordinary shares collapsed, falling as low as $13.40 and €13.90,

respectively, on July 3, 2002, on huge volumes of 7.4 million ADRs and 43.6 million ordinary shares. This collapse wiped out billions of dollars in Vivendi shareholder value and caused Plaintiffs, in particular, to suffer substantial losses.

12.     Subsequent to these events, *Bloomberg L.P.* reported on July 9, 2002 that the Commission des Operations de Bourse (the "COB"), the French equivalent of the SEC, was reviewing statements released by Vivendi to the public to ensure "they abide by our rules." The French regulators raided Vivendi's Paris headquarters as part of its investigation into Vivendi's financial disclosure over the past 18 months.

13.     On August 14, 2002, Vivendi reported a massive loss of $12 billion (€12.3 billion) for the first half of the year and said it would sell $10 billion in assets to attempt to alleviate its massive debt levels. On the same day, Standard & Poor's slashed Vivendi's long-term corporate credit to junk status, or below investment grade. Following these disclosures, Vivendi's common stock and ADRs dropped 25% to as low as €11.89 and $11.66, respectively. The closing price of $11.66 per share on August 14, 2002 for Vivendi's ADRs represented a decline of more than 79% from their inflated levels at the beginning of 2002, when the ADRs traded in the $55 range. Likewise, the closing price of €11.89 per share on August 14, 2002 for Vivendi's ordinary shares represented a decline of more than 81% from their inflated levels in early 2002, when the shares traded at approximately €64 per share.

14.     The Company's ADRs continued to decline, trading as low as $9 per share on August 16, 2002, levels not seen since June of 1994, while Vivendi's ordinary shares also closed at a low on August 16, 2002 of €9.3 per share.

15.     On November 4, 2002, the U.S. Attorney's Office for the Southern District of New York announced that it had opened a preliminary criminal investigation into Vivendi. The

U.S. Attorney also noted that it was coordinating with an ongoing, informal SEC investigation of Vivendi. Following this announcement, shares of Vivendi continued to fall. On November 19, 2002, Vivendi disclosed the SEC investigation had become a formal investigation.

16.     As fully described herein, Defendant's violations of the federal securities laws and the resulting decline in the Company's ordinary shares and ADRs, caused Plaintiffs to sustain substantial financial losses.

**JURISDICTION AND VENUE**

17.     Plaintiffs' claims arise under §10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78(j)(b) and Rule 10b-5 promulgated thereunder.

18.     Jurisdiction is conferred by §27 of the Exchange Act, and 28 U.S.C. §1331.

19.     Under the "effects test" of extraterritorial jurisdiction, this Court may properly exercise subject matter jurisdiction over the claims of American investors that purchased or acquired Vivendi securities on both the United States markets and the foreign markets. Using the "effects test" for determining federal jurisdiction over a securities fraud case focuses on the impact of the alleged fraud within the United States. Under this test, a federal court has subject matter jurisdiction over a defendant if the defendant's conduct abroad had a "substantial" impact within the United States. If the conduct has an impact on stock registered and listed on an American national securities exchange and is detrimental to the interests of American investors, that impact is considered to be "substantial." The Defendant's fraudulent conduct tainted the market for Vivendi securities traded worldwide and affected the ability of investors to trade Vivendi securities within a true efficient market.

20.     Regardless of the Court's ability to exercise subject matter jurisdiction over Vivendi based on its conduct abroad and the application of the "effects test," this Court may also exercise jurisdiction over the Company based on its conduct within the United States. Vivendi

does substantial business in the United States and has various businesses headquartered in the United States such as UMG and VUE, as well as other divisions headquartered outside the United States, which generate substantial revenues in the United States. In fact, many of Defendant's false and misleading statements disseminated to the investing public were initially made in the United States. As alleged herein, the Company filed Forms 20-F and 6-K with the SEC which contained false and misleading statements and/or omitted material information concerning the Company's earnings and overall financial condition.

21.     Moreover, venue is proper in this District pursuant to §27 of the Exchange Act.

22.     Vivendi maintains dual headquarters at: (i) 800 Third Avenue, New York, New York 10022 and (ii) 42 Avenue de Friedland, 75380, Paris, Cedex 08, France. In addition, Messier, Vivendi's former CEO, maintained a residence in New York City during the Relevant Period, and ran the Company, in substantial part, from the Company's New York City office. Many of the acts giving rise to the violations of law complained of herein occurred in this District, including the preparation and dissemination of false press releases and false financial statements filed with the SEC and reported to the financial community.

## THE PARTIES

23.     Plaintiff GAMCO Global Series Funds, Inc. ("GAMCO Global"), with offices located in Rye, New York, offers the following four open-end investment portfolios (each a "Fund"): (i) The GAMCO Global Telecommunications Fund; (ii) The GAMCO Global Growth Fund; (iii) The GAMCO Global Opportunity Fund; and (iv) The GAMCO Global Convertible Securities Fund. GAMCO Global is managed by Gabelli Funds, LLC ("Gabelli Funds"), an SEC registered investment advisor. Each of the Funds in the GAMCO Global series of Funds acquired Vivendi ADRs and Vivendi ordinary shares prior to and during the Relevant Period and suffered losses as a result of their investments in Vivendi securities.

8

24.     Plaintiff Gabelli Capital Asset Fund ("GCAF") is an open-diversified, management investment company managed by Gabelli Funds with offices located in Rye, New York.  GCAF acquired Vivendi ADRs and Vivendi ordinary shares prior to and during the Relevant Period and suffered losses as a result of its investments in Vivendi securities.

25.     Plaintiff The Gabelli Value Fund Inc. ("GVFI") is an open-ended equity mutual fund managed by Gabelli Funds with offices located in Rye, New York.  GVFI acquired Vivendi ADRs and Vivendi ordinary shares prior to and during the Relevant Period and suffered losses as a result of its investments in Vivendi securities.

26.     Plaintiff The Gabelli Asset Fund ("GAF") is an open-ended equity mutual fund managed by Gabelli Funds with offices located in Rye, New York.  GAF acquired Vivendi ADRs and Vivendi ordinary shares prior to and during the Relevant Period and suffered losses as a result of its investments in Vivendi securities.

27.     Plaintiff The GAMCO Mathers Fund ("GMF") is an open-ended equity mutual fund managed by Gabelli Funds with offices located in Rye, New York.  GMF acquired Vivendi ADRs and Vivendi ordinary shares prior to and during the Relevant Period and suffered losses as a result of its investments in Vivendi securities.

28.     Plaintiff The Gabelli Global Multimedia Trust Inc. ("GGMTI") is a non-diversified, closed-end management investment company managed by Gabelli Funds with offices located in Rye, New York.  GGMTI acquired Vivendi ADRs and Vivendi ordinary shares prior to and during the Relevant Period and suffered losses as a result of its investments in Vivendi securities.

29.     Plaintiff The Gabelli Equity Trust Inc. ("GETI") is a close-end, nondiversified management investment company managed by Gabelli Funds with offices located in Rye, New

9

York. GETI acquired Vivendi ADRs and Vivendi ordinary shares prior to and during the Relevant Period and suffered losses as a result of its investments in Vivendi securities.

30.     Plaintiff The Gabelli Convertible and Income Securities Fund Inc. ("GCISFI") is a closed-end fixed income fund managed by Gabelli Funds with offices located in Rye, New York. GCISFI acquired Vivendi ADRs and Vivendi ordinary shares prior to and during the Relevant Period and suffered losses as a result of its investments in Vivendi securities.

31.     Plaintiff GAMCO International Growth Fund, Inc. ("GIGFI") is an open-ended equity mutual fund managed by Gabelli Funds with offices located in Rye, New York. GIGFI acquired Vivendi ADRs and Vivendi ordinary shares prior to and during the Relevant Period and suffered losses as a result of its investments in Vivendi securities.

32.     Defendant Vivendi has dual headquarters in New York City and Paris. Vivendi's media and communications business is divided into five business segments: Music, Publishing, TV and Film, Telecoms and Internet. The Company's Music business segment is conducted through UMG, which develops, acquires, manufactures, markets and distributes music in 63 countries around the world. The publishing business segment is an international enterprise focusing on: educational and literary publishing, games, and consumer press. This segment provides content across several mediums including print, multimedia, the Internet and Personal Digital Assistants ("PDAs"). Vivendi's TV and film business segment produces and distributes motion pictures, television and home video DVD products and has ownership interests in a number of international cable and pay-TV channels. This segment also engages in merchandise licensing, film property rights and operates theme parks and retail stores around the world. The Company's telecom business segment provides a broad range of telecommunications services, including mobile and fixed telephone communications, Internet access and data services. The

10

Internet business segment also manages Internet initiatives and online ventures for Vivendi Universal, and develops e-commerce, e-services and thematic portals that offer access to the Internet via a variety of devices, including mobile phones, PDAs, interactive TV and computers. Vivendi also currently holds a 20% interest in Vivendi Environment, an international environmental services company.

33.    The Defendant is liable for making materially false and misleading statements or for failing to disclose adverse material information which would be relevant to investors. Vivendi engaged in a fraudulent scheme to allow it to maintain its credit ratings so that the Company could continue to incur more debt and carry out Messier's acquisition spree as well as artificially inflate the value of Vivendi's securities.

## BACKGROUND

34.    Vivendi was created in 1853 as a water utility.  In June 1996, Messier became chairman of Compagnie Generale des Eaux, the predecessor company of Vivendi.  At that time, the Company's ADRs were trading between $30 to $35 per ADR and its ordinary shares were trading at approximately €27 per share.  In March 1998, Compagnie Generale des Eaux purchased Havas S.A. (a publishing company), and in May 1998 the Company changed its name to Vivendi Universal, S.A. as a result of Vivendi's changing business focus.

35.    Under Messier's direction, Vivendi soon began acquiring several companies, continuing to diversify the Company and transform it into a media enterprise.  Between early 1998 and early 1999, Vivendi acquired approximately ten companies and acquired interests in approximately another 15 companies, some of which Vivendi already had interests in.  Over the next year, Vivendi continued its acquisition spree, acquiring approximately an additional ten companies in part or entirely, as discussed below.

11

36.    For example, in March 1999, Vivendi purchased U.S. Filter for $6.2 billion. Messier's growth strategy required the acquisition of large companies which resulted in the Company accumulating large amounts of debt. Indeed, Vivendi raised approximately €5.7 billion to finance the U.S. Filter acquisition, through an issue of convertible bonds. Vivendi paid 46.5 times operating profit for U.S. Filter, based on U.S. Filter's 1998 earnings.

37.    In December 1999, Vivendi increased its investment in the Polish conglomerate, Elektrim, to $1.2 billion, or a 49% interest, including a cash payment of $250 million, and the conversion of an earlier loan of $615 million for shares of the Polish company.

38.    In June 2000, Vivendi announced the acquisition of Seagram for $34 billion. The principal owners of Seagram were Edgar Bronfman, Jr. and his family, who then became the largest shareholders of Vivendi. By the end of 2001, Messier knew that his strategy, and ultimately his job, depended on favorable financial results. Thus, while Messier continued his acquisition spree throughout 2001, it was crucial that the Company report favorable financial results and maintain its debt ratings.

39.    By the end of this trail of acquisitions, Vivendi was encumbered with over $27 billion in further debt, pressuring the Company to maintain favorable, positive credit ratings and a strong stock price.

40.    During the Relevant Period, Vivendi's ADRs traded as high as $75 per ADR, while the ordinary shares traded at approximately €70 per share. If the Company's actual financial structure had been revealed, its ADRs and ordinary shares would have collapsed, its credit ratings would have been downgraded, and the Company's ability to obtain financing would cease, thereby preventing Vivendi from continuing its acquisitions along Messier's plan to turn the water company into a media "giant."

12

## DEFENDANT'S FALSE AND MISLEADING
## STATEMENTS AND OTHER RELEVANT PERIOD EVENTS

**A.**    **Fourth Quarter 2000**

41.    On October 30, 2000, Vivendi issued a Registration Statement and Prospectus,
filed on Form F-4 (the Registration Statement used in connection with business combinations
and exchange offers involving foreign private investors) with the SEC ("October 2000 Form F-
4"), in connection with the Merger of Vivendi, Seagram and Canal Plus. This document was
signed by Messier. The October 2000 Form F-4 consisted of over 700 pages plus exhibits and
contained, among other information, historical .financial statements and balance sheets for
Vivendi, Canal Plus, and Seagram.

42.    In its October 2000 Form F-4, Vivendi presented historical financial statements
for Fiscal Year 1999 and for the first half of Fiscal Year 2000. Vivendi reported net income of
$509,100,000 for the first half of fiscal 2000, and net income of $254,600,000 for the
comparable period in 1999. The Company also reported shareholders' equity of
$11,957,900,000 and total assets of $73,611,400,000 as of June 30, 2000. Shareholders' equity
and total assets were reported at $10,776,500,000 and $82,101,900,000, respectively, for the
period ending December 31, 1999. These financial statements proved to be inaccurate and
contained materially false and misleading information.

43.    The historical financial statements and balance sheets contained in the October
2000 Form F-4 were materially false and misleading because the Company failed to timely
writedown certain overvalued assets and goodwill from previous investments and acquisitions,
namely the Elektrim investment and U.S. Filter acquisition. Had Vivendi properly written down
its impaired assets associated with its $6.2 billion acquisition of U.S. Filter and its $1.2 billion

13

investment in Elektrim, which were later revealed to be valued at $2.6 billion and $300 million respectively, the Company's shareholders' equity would have been reduced by nearly 30%.

44.     According to a November 1, 2000 article in the French newspaper, *Le Figaro*, Vivendi, under U.S. Generally Accepted Accounting Principles ("GAAP") (referred to herein as "U.S. GAAP"), witnessed its interim net profit (before goodwill write-downs) more than double. Under the French standards, it rose 81%. The article also reported the Company's debt ratio showed a "spectacular" improvement.

45.     On December 5, 2000, Vivendi was the second most traded company on the Paris exchange and closed over 5% higher at €74 per share, while the Company's ADRs closed 5.5% higher at $65.94 per ADR in anticipation of the Merger. The Company's ordinary shares similarly closed higher by 5% at €74 per share.

46.     On December 6, 2000, Vivendi announced the creation of Vivendi Universal by the Merger of Vivendi, Canal Plus and Seagram which was approved by 96.6% of the Company's shareholders.

47.     On December 8, 2000, Vivendi issued a press release announcing the completion of the Merger. The Company announced that Vivendi Universal would be a "global communications giant." The December 8, 2000 press release further stated that the shareholders of then Vivendi, Seagram and Canal Plus "massively approved" creation of the new combined company.

48.     On December 22, 2000, Vivendi announced it had purchased a 35% stake in Maroc, Morocco's national telecom operator, and planned to increase its stake in Maroc in the future. The deal cost Vivendi approximately $2.1 billion (€2.3 billion). The Maroc deal was touted as taking full advantage of Vivendi's technology expertise in telecommunications and

14

giving Vivendi Environment, Vivendi's environmental services subsidiary, a strong position to compete within Morocco.

**B.    First Quarter 2001**

49.    In a February 6, 2001 press release, the Company stated that its subsidiary, Flipside Inc., was acquiring Uproar Inc., for approximately $140 million (€149 million). Vivendi indicated that this acquisition was consistent with its overall strategy and would make Vivendi the "overall leader in online games and an overall leader in entertainment and the Internet."

50.    On February 12, 2001, Vivendi published its preliminary revenues for 2000. According to the press release, Vivendi Universal's preliminary total revenues for 2000 totaled €41.7 billion ($38.6 billion), with media, communications and environmental services accounting for $37 billion (€40 billion), a global 36.5% increase over 1999.

51.    In a March 6, 2001 *Financial Times* article, Messier expressed Vivendi's commitment to competing within the Internet sector and noted that a shake-out within the Internet sector created chances for takeovers.

52.    On March 9, 2001, Vivendi issued a press release in which it reported "better than expected" Fourth Quarter and 2000 results. The press release stated:

> Vivendi Universal announced today that on a pro forma basis for calendar 2000, the Company reported 7.2 billion euros in EBITDA (earnings before interest, taxes, depreciation and amortization) for the period ending December 31, 2000, up 48 percent from 1999. Results reflect strong performance across the Company's business units - Media and Communication and Environmental Services. Actual EBITDA for the 12 months ended December 31, 2000, was 6 billion euros versus 4.3 billion euros in 1999.
>
> The pro forma results were driven by growth in all business segments with the exception of Internet, in which development costs related to business expansion continued to have a negative impact on earnings.

15

Messier made the following comments regarding the Company's Fourth Quarter and Full Year 2000 earnings:

> The strong results that Vivendi Universal has generated for calendar 2000 **provide a very solid foundation for the Company's growth prospects in 2001**. The robust performance of Vivendi Universal's business segments clearly reflects the fast pace and clear momentum that we have established as Vivendi Universal enters 2001. The Company's unique combination of content and distribution assets paves the way for enormous growth opportunities. We have our management teams and plans in place as we moves [sic] to execute the growth strategies. The management team, in particular, has been focused on the day-to-day operational performance and increased productivity of each of the Company's business units. **I am very confident that, for Media and Communications, we will reach our revenue growth target of 10 percent and our aggressive EBITDA growth target of 35 percent for the period 2000-2002 and achieve superior returns for Vivendi Universal shareholders**.
>
> We are ideally positioned to provide the global consumer with seamless connectivity and competitively superior content and services -- anywhere, any time and over any device or platform. **Our businesses are strong, our management is focused and growth prospects are real and immediate**.

(Emphasis added).

53.    As reported by *The Financial Times* on March 10, 2001, Messier stated that the integration of Seagram was proceeding well and that the new Company would meet its revenue and cost savings targets, which have been set as a 10% revenue growth target and a 35% growth target for EBITDA for the period 2000-2002. Messier further stated the Company would be able to achieve its cost savings target of €420 million for 2002.

54.    On March 12, 2001, as reported in *La Tribune*, Messier stated Vivendi had exceeded expectations:

> Vivendi Universal SA (VU) has announced its results for 2000, which were in line with forecasts, and has confirmed its objectives for 2001. Presenting his group's results for the year, VU chairman

> Jean-Marie Messier commented: "When we merged, it was said
> that our aims were too ambitious. Well, we have exceeded them!"

55.     The statements Defendant disseminated to the public referenced in ¶¶ 49-54
above, were each materially false and misleading because, *inter alia*, the Company engaged in
improper accounting practices, which materially overstated Vivendi's reported earnings.  In
particular, (a) Vivendi failed to disclose that it was suffering from a growing liquidity crisis,
which would require the restructuring of its debt obligations in order to avoid bankruptcy; (b)
Vivendi failed to properly account for billions of dollars of impaired goodwill in connection with
the series of investments and acquisitions the Company was undertaking; (c) the Company failed
to timely write-down certain overvalued assets it obtained in such transactions; and (d) Vivendi
overstated its revenue from certain multi-year contracts.

## C.     Second Quarter 2001

56.     In an April 23, 2001 press release, Vivendi announced "Very Strong" First
Quarter 2001 results.  The press release highlighted Vivendi's growth within the Media and
Communications business segments.  Specifically, the press release stated:

> Revenues increased 13.4% to €5 billion, excluding Universal
> Studios Group (USG) Filmed Entertainment, for media and
> communications businesses.  Total revenues grew approximately
> 10% to €5.9 billion;
>
> - EBITDA grew 112% to €900 million for media and
>   communications businesses;
>
> - The Company is ahead of cost-saving target of €200
>   million for 2001, with early wins in the quarter representing
>   an annual impact of more than €140 million;
>
> - Management reiterates its confidence in meeting its 2001
>   revenue growth target of 10% (excluding USG Filmed
>   Entertainment) and 35% EBITDA growth.

17

The press release also highlighted increased performance within the Company's individual media businesses:

- **Music** EBITDA increased 15% to €180 million reflecting strong market share and a revenue increase of 3%;

- **Telecoms** EBITDA increased more than 3 fold to €433 million and revenues were up 30%;

- **TV and Film** EBITDA more than doubled to €284 million. Revenues were up 3%, excluding USG Filmed Entertainment;

- **Publishing** EBITDA increased 16% with revenues up 5.5%.

Messier made the following statements in the press release:

> All [of Vivendi's] results meet or exceed our key operating targets. We created significant momentum by delivering solid first quarter 2001 results in EBITDA, which more than doubled, and by generating double digit revenue growth.
>
> The results show the focus and dedication of all our management teams in executing the unique promise of Vivendi Universal around its global strategy. **This is a great beginning. With our momentum, our targets and the drive of our executive team, I am extremely confident that, for Media and Communications, we will reach our annual EBITDA and revenue growth targets of 35% and 10%, respectively in 2001 and 2002 and achieve superior returns for Vivendi Universal shareholders.**
>
> **We are also ahead of targets for the synergies which indicate that the path of integration between our teams is great**. My only focus is and remains execution of this compelling media merger.

(Emphasis added).

57.     Following the release of its First Quarter 2001 financial results on April 23, 2001, Vivendi hosted an analyst conference call. During the call, Messier and other members of the Company's management stated that Vivendi's favorable financial results were due to the

strengths of its business lines and reiterated that the Company was on track for 10% full year sales growth, excluding its Universal Studios unit.

58.     Following the release of the Company's financial results on April 23, 2001, Vivendi's ADRs closed at $66.10 and continued to rise over the next several days.  Similarly, the Company's common stock jumped €2 to close at €76.40 on April 24, 2001 and continued upward throughout that week.

59.     On May 18, 2001, Vivendi issued a press release announcing its total revenue information for the First Quarter of 2001.  The press release stated in part:

> Vivendi Universal revenue for first quarter of 2001 totaled 12.6 billion euros, a global 34.5% increase over the first quarter of the prior year.

60.     The statements Defendant disseminated to the public referenced in ¶¶ 56-57, 59 above, were each materially false and misleading because, *inter alia*, the Company engaged in improper accounting practices, which materially overstated Vivendi's reported earnings.  In particular:  (a) Vivendi failed to disclose that it was suffering from a growing liquidity crisis, which would require the restructuring of its debt obligations in order to avoid bankruptcy; (b) Vivendi failed to properly account for billions of dollars of impaired goodwill in connection with the series of investments and acquisitions the Company was undertaking; (c) the Company failed to timely write-down certain overvalued assets it obtained in such transactions; and (d) Vivendi overstated its revenue from certain multi-year contracts.

61.     On May 20, 2001, in another acquisition pursuant to Messier's desire to transform Vivendi into an entertainment conglomerate, the Company announced it had acquired the online music site MP3.com for $372 million (€422 million).  The deal represented a 60% premium for MP3.com.

62.     On June 1, 2001, Vivendi announced that it was acquiring the education

publisher, Houghton Mifflin, in a transaction valued at approximately $2.2 billion (€2.6 billion),

including $500 million (€591 million) of debt from Houghton Mifflin.  The Company further

asserted that this (as with other acquisitions) was consistent with its business strategy to make all

its content businesses world leaders.  Later, a July 9, 2001 press release stated that this

acquisition would allow Vivendi to "undertake immediate synergies in production/logistics and

corporate restructuring" with Vivendi's U.S. publishing operations.  Finally, at the close of the

Houghton Mifflin deal on August 2, 2001, Messier made the following comments:

> This very strategic acquisition is another step in Vivendi
> Universal's plan to achieve world leadership in key content
> segments . . .   Thanks to our ability to finance this deal through the
> sale of other valuable, yet non-strategic assets in our publishing
> portfolio, **the acquisition will not impact our balance sheet and
> will be accretive to our shareholders**.

(Emphasis added).

63.     By the end of June 2001, Vivendi's debt had more than doubled from $3.7 billion

(€3.4 billion) six months earlier to $9.3 billion (€8.6 billion).

64.     The statements Defendant disseminated to the public referenced in ¶ 62 above,

were each materially false and misleading because, *inter alia*, the Company engaged in improper

accounting practices, which materially overstated Vivendi's reported earnings.  In particular:  (a)

Vivendi failed to disclose that it was suffering from a growing liquidity crisis, which would

require the restructuring of its debt obligations in order to avoid bankruptcy; (b) Vivendi failed to

properly account for billions of dollars of impaired goodwill in connection with the series of

investments and acquisitions the Company was undertaking; (c) the Company failed to timely

write-down certain overvalued assets it obtained in such transactions; and (d) Vivendi overstated

its revenue from certain multi-year contracts.

### D.    Third Quarter 2001

65.    On July 2, 2001, Vivendi filed its Annual Report on Form 20-F with the SEC for

the Fiscal Year 2000. This document was signed by Hannezo. The 2000 Annual Report

contained the following information:

> Net cash flow from operating activities reflects funds generated
> from operations and changes in operating assets and liabilities.
> Net cash flow from operating activities was €2.5 billion in 2000,
> an improvement of €1.7 billion over 1999. The improvement was
> mainly due to an increase in earnings primarily generated by our
> Telecoms, Publishing and Environmental Services businesses. **We
> expect operating cash flow to increase as a result of the
> continuing development of our Media and Communications
> businesses and from a reduction in interest costs resulting from
> planned disposals. In addition, we expect the array of
> Seagram content assets to increase demand for our access
> services, and therefore to increase the net cash generated by
> our access operations.** Also, we believe that Seagram's
> businesses – particularly its recorded music business – will
> generate strong cash flow, consistent with their historical
> performance.
>
> Net cash flow from investing activities consists of acquisitions and
> divestitures of intangible and tangible assets, acquisitions of
> businesses, investments in companies accounted for using the
> equity method and net differences of other investments and
> marketable securities. Net cash used in investing activities was
> €1.5 billion in 2000 compared to €12.9 billion in 1999. The
> significant decrease primarily reflects fewer strategic acquisitions
> paid for in cash in 2000 compared to 1999. Purchase of
> investments were €3.1 billion in 2000, €8.8 billion lower than in
> 1999. Capital expenditures were €5.8 billion in 2000, €0.7 billion
> higher than 1999. Proceeds from the disposal of investments and
> fixed assets were €69 billion in 2000 compared to €4.5 billion in
> 1999, mainly attributable to the divesture of non-core real estate,
> construction assets and GPU power generation plants.
>
> Net cash flow used for financing activities was €0.6 billion in 2000
> compared to net cash provided by financing activities of €13.7
> billion in 1999. The year-on-year variance was primarily due to
> the merger with Seagram and Canal Plus. In July 2000, the sale of
> 37% of Vivendi Environment through an IPO contributed to an
> increase in financing transactions of €3.8 billion.

Our total capital expenditures for 2000 were €5.8 billion, compared to €5.1 billion in 1999. Our 2000 capital expenditures were primarily in connection with our Telecoms (€1.1 billion), TV & Film (€0.8 billion) and Environmental Services (€2.6 billion) businesses. In addition, we, invested €32.5 billion in the acquisition of other companies in 2000, principally related to the merger of Vivendi, Seagram and Canal Plus (a non-cash transaction of €29.5 billion).

Capital expenditures are expected to remain at similar levels over the next years in order to maintain existing facilities, continue research and development and promote the launch of new products and services.

**We believe our access to external capital resources together with internally generated liquidity will be sufficient to satisfy existing commitments and plans, and to provide adequate financial flexibility.** We expect to fund future capital requirements of our content business from future cash flows generated by operations. **Regarding our Telecoms and Internet businesses, we expect to fund our future substantial capital expenditure requirements (including our €4.95 billion bid for a UMTS license in France) through additional incurrence of debt.** We expect that Vivendi Environment will finance its capital requirements from its net cash flows and existing external financing and, if necessary, a moderate increase in indebtedness.

(Emphasis added).

66.     In its Form F-4 dated July 9, 2001 filed with the SEC for the proposed stock-swap merger between MP3.com and Vivendi, Vivendi offered MP3.com holders an exchange of each MP3.com share (subject to certain limitations) for either $5.00 cash or $5.00 worth of Vivendi ADRs, based on an exchange ratio equal to $5.00 divided by the average share closing price of Vivendi ADRs on the New York Stock Exchange for the five consecutive trading days ending on the day before the special meeting to vote on the MP3.com/Vivendi Merger, or August 26, 2001. Based on this calculation, the transaction was completed at an exchange ratio of .0904 on August 28, 2001. The Vivendi ADRs issued in connection with the MP3.com Merger were registered pursuant to a Registration Statement on Form F-4 MEF, filed with the SEC on or about August

22

28, 2001, which incorporated by reference the Registration Statement on Form F-4/A previously

filed with the SEC on or about July 26, 2001.  The July 26, 2001 Registration Statement listed

Vivendi's total assets as of the end of 2000 as approximately $133 billion (€151 billion) and

stated as follows:

> Under French GAAP, goodwill may be recorded as a reduction of
> shareholders' equity when the acquisition has been paid for with
> equity securities, whereas goodwill is recognized as an asset under
> U.S. GAAP.  **Significant mergers that do not meet the U.S.
> GAAP criteria for pooling have been accounted for in Vivendi
> Universal's consolidated financial statements using a method
> pursuant to which goodwill is computed as the difference
> between the consideration paid and the net historical book
> value acquired**.  For U.S. GAAP purposes, these transactions are
> considered purchases.

(Emphasis added).

       67.    On July 23, 2001, Vivendi announced "Very Strong" Second Quarter 2001 results

in a press release which stated in part:

- In the course of the first half of 2001, Vivendi Universal
  achieved three quarters of its full-year target of incremental
  EBITDA (nearly 800 million € excluding Maroc Telecom,
  relative to the company's target of slightly more than 1
  billion€).

- In the first half of 2001, revenues increased to 12.4 billion
  € (up 15%), and EBITDA grew to 2.2 billion€ (up 77%
  over 2000 comparable period).

- During a strong second quarter, revenues increased 16% to
  6.6 billion euros, and EBITDA grew 57% to 1.3 billion€.

- Excluding Maroc Telecom, revenue growth was 8%, and
  EBITDA growth was 35% for the second quarter.  For the
  first half of 200I, revenues were up 11% and EBITDA was
  up 62%.

Messier made the following comments in the July 23, 2001 press release:

> **The results produced by Vivendi Universal in the second
> quarter are well ahead of market consensus . . . .** They confirm
> the robustness of our businesses, with limited exposure to
> advertising; the benefits of a truly global position; and the fast
> progress of the reorganization and implementation of our recent
> merger.
>
> **With three quarters of the 'aggressive' incremental EBITDA
> target for the full year 2001 already achieved in the first half of
> the year, I can only re-emphasize our confidence. We will at
> last meet our stated targets.**

Messier also specifically urged the investing public to buy Vivendi's securities, despite the true

nature of the Company's debt-laden financials resulting from his spending spree:

> **Obviously, our current stock price does not fully reflect this
> situation in terms of EBITDA multiples or Enterprise Value to
> EBITDA to growth. With the highest growth rates of the
> industry and the lowest multiples, our stock is definitely an
> attractive investment today.**
>
> The first half has been a period of total operational focus in each of
> our businesses, while completing significant achievements in the
> implementation of the merger, reorganization and execution of our
> strategy.

(Footnotes omitted) (Emphasis added). Messier's comments regarding the Company's stock

price directly solicited investors to purchase Vivendi securities based on the Company's

performance within its industry.

68. Following the release of Vivendi's earnings results, the Company hosted an

analyst conference call. During the call, Messier and other members of the Company's

management stated that Vivendi was able to achieve strong financial results despite the down

market, and was gaining market share within its industry. Management also indicated that the

Company was still on track to achieve strong growth in revenues and earnings in 2001, including

its forecast of EBITDA growth of 35%. These statements failed to disclose that Vivendi was

incurring a huge debt load from its series of acquisitions.

69.     Following the release of Vivendi's Second Quarter 2001 results, the prices of the Company's securities reacted favorably. On July 23, 2001, Vivendi's ADRs rose nearly 5% to close at $55 per ADR, while Vivendi's ordinary shares rose to €63.10 per share.

70.     The statements Defendant disseminated to the public referenced in ¶¶ 65-68 above, were each materially false and misleading because, *inter alia*, the Company engaged in improper accounting practices, which materially overstated Vivendi's reported earnings. In particular: (a) Vivendi failed to disclose that it was suffering from a growing liquidity crisis; which would require the restructuring of its debt obligations in order to avoid bankruptcy; (b) Vivendi failed to properly account for billions of dollars of impaired goodwill in connection with the series of investments and acquisitions the Company was undertaking; (c) the Company failed to timely write-down certain overvalued assets it obtained in such transactions; and (d) Vivendi overstated its revenue from certain multi-year contracts.

71.     While the Company touted its financial successes, in truth, Vivendi was facing several problems, which were never disclosed to the market until it was too late, thereby damaging Vivendi investors, including Plaintiffs. The Company's statements contained in its annual filing which describe the Company's "adequate financial flexibility" were materially false and misleading as Vivendi's acquisitions greatly increased the Company's debt and almost forced the Company into a liquidity crisis.

72.     By July 2001, much of Messier's acquisitions were faltering, while Vivendi Environment, which Messier divested a year earlier to create room for his series of media acquisitions, continued to grow and shine. Since its divesture in July 2000, Vivendi Environment grew 50%, and according to a July 23, 2001 *FT MarketWatch.com* article, Vivendi Environment "far outshines Messier's fancy American acquisitions."

25

73.     On August 2, 2001, Vivendi announced it had completed the acquisition of

Houghton Mifflin.   Messier made the following comments regarding the merger with Houghton

Mifflin:

> This very strategic acquisition is another step in Vivendi
> Universal's plan to achieve world leadership in key content
> segments.  It puts us in an extremely competitive position to
> capitalize on the growth of the education sector by leveraging the
> content and technologies of both companies across all of Vivendi
> Universal.  **Thanks to our ability to finance this deal through
> the sale of other valuable, yet non-strategic assets in our
> publishing portfolio, the acquisition will not impact our
> balance sheet and will accretive to our shareholders**.

(Emphasis added).

74.     Messier continued to describe the Company's acquisitions as being funded

through various forms of financing, without ever disclosing to the market the considerable

amount of debt the Company was incurring.

75.     In early September 2001, while rumors circulated that Vivendi's earnings would

be disappointing, Messier categorically denied any problems.  Moreover, the Company reiterated

its targets for 2001 and 2002.

76.     On September 25, 2001, Vivendi issued a release announcing "Strong First Half

2001 Results" and "Solid Outlook for 2002" which further touted the Company's financial

condition.  The press release highlighted Vivendi's purported ability to excel during the

economic downturn:

> **Despite the slowdown in the economy, particularly in the U.S.,
> which has negatively impacted all U.S. activities that are
> focused on industrial clients, such as water and waste
> management, the company has seen growth in these segments,
> and the results are in line with the company's expectations**.
> For the first half of 2001, revenues were up 11% to 13.9 billion
> euros; EBITDA was up 12% to 1.76 billion euros; operating
> income was up 13% to 0.97 billion euros.

26

(Emphasis added).  Messier further emphasized Vivendi's ability to grow amidst uncertainty in the financial markets as well as within its own industry:

> Should the recent tragedy result in a further period of uncertainty and maybe recession, **Vivendi Universal will continue to deliver growth and will benefit from strong defensive qualities**. . . .

(Emphasis added).

77.     Also on September 25, 2001, Messier told reporters that he was confident Vivendi would meet its 2001 objectives, specifically a 10% increase in revenue and a minimum 35% increase in EBITDA growth.  At this time, Messier also disclosed a complex plan by which Vivendi would group its 23% stake in BSkyB, with Deutsche Bank, in an arrangement which would release cash for Vivendi and help the Company meet regulatory demands in Europe.  This deal had been referred to as "mostly an accounting move" rather than an actual sale of Vivendi's stake in BSkyB.

78.     The statements Defendant disseminated to the public referenced in ¶¶ 73-77 above, were each materially false and misleading because, *inter alia*, the Company engaged in improper accounting practices, which materially overstated Vivendi's reported earnings.  In particular:  (a) Vivendi failed to disclose that it was suffering from a growing liquidity crisis, which would require the restructuring of its debt obligations in order to avoid bankruptcy; (b) Vivendi failed to properly account for billions of dollars of impaired goodwill in connection with the series of investments and acquisitions the Company was undertaking; (c) the Company failed to timely write-down certain overvalued assets it obtained in such transactions; and (d) Vivendi overstated its revenue from certain multi-year contracts.

### E.     Fourth Quarter 2001

79.     On October 30, 2001, Vivendi issued a press release announcing its Third Quarter 2001 results.  Highlighting the Company's financial results, the press release stated in part:

- Strong third quarter results with revenues up 24% to 7.3 billion euros and EBITDA (earnings before interest, taxes, depreciation and amortization) up 90% to 1.5 billion euros, versus 2000 comparable results of Vivendi Universal, including Seagram and Canal Plus.

- Organic revenue growth, which excludes the impact of 2001 acquisitions and disposals, was 8% in the third quarter and 10% year-to-date, in line with 2001 growth target.

- EBITDA organic growth is very strong, reaching 36% in the third quarter and 52% year-to-date. It represents the achievement in nine months of close to 100% of the full year 2001 incremental EBITDA growth target.

- On a pro forma basis, third quarter revenue growth was 8%, and EBITDA growth was 30%. Year-to-date revenues increased 9%, and EBITDA increased 46%.

- Company reaffirms confidence in achieving its growth targets: 10% revenue growth and 35% organic EBITDA growth in 2001.

Messier made the following comments regarding the Company's growth and position in the

market and its industry:

Our third quarter results for the media and communications businesses, with 24% revenue and 90% EBITDA growth, including organic growth of 8% and 36% respectively, are obviously strong despite the tough environment. They reflect both our higher potential for growth and greater resiliency to recessionary environments compared to many of our peers.

Indeed Vivendi Universal's media and communications businesses have achieved higher growth rates and have a greater potential for growth than most of our peers for two major reasons:

- Our strong creative and market leadership positions allow us to increase or maintain our market share in all of our content businesses, including music, movies, education and games.

- Our distribution activities position us on the forefront of the interactive technologies of the future-digital TV, mobile, and Internet. These activities are still significantly below their maximum penetration rates and provide a huge

28

potential for significant double-digit growth of our
subscriber base in the coming years.

Messier further touted the Company's media and communications businesses and these

businesses' ability to perform in a distressed market:

> **Vivendi Universal's media and communications businesses are
> presently less vulnerable to recessionary environments than
> many of our peers because of our strong defensive qualities**,
> including:

> - Our truly global presence: 60% of our revenues are
>   generated in Europe, 30% in North America and 10% in the
>   rest of the world (52%, 40% and 8%, respectively,
>   including USA Networks);

> - Over 44% of our revenues are generated from
>   subscriptions, which have the highest resiliency to a
>   recession. This is a higher stake than any of our peers.

> - A very small proportion of our revenues are generated from
>   advertising and theme parks, activities that are the most
>   vulnerable to an economic downturn. Advertising
>   generates approximately 1% of our revenues (after
>   adjusting for recent acquisitions and divestitures), and
>   theme parks generate less than 3% of our revenues. This is
>   a lower stake than any of our peers.

> **Having the highest resiliency and lowest sensitivity to a
> recessionary environment explains our ability to outperform
> most of our peers**.

> Vivendi Universal's media and communications businesses are not
> immune to the effects to [sic] a recession. But, in challenging and
> uncertain environments, which can negatively impact businesses in
> all industries, Vivendi Universal offers within the media and
> communications industry both the highest potential for growth
> going forward and the best ability to resist a difficult economic
> environment.

> **An early look at the fourth quarter indicates that we are on
> track to meet our targets. I continue to express my confidence
> in achieving 10% revenue growth and 35% EBITDA growth in
> 2001 at a constant asset base**. This, combined with some
> expansions in the company's asset base (*i.e.*, Maroc Telecom and

29

> Houghton Mifflin), should result in full-year Media and
> Communications EBITDA slightly above 5 billion euros.

(Footnotes omitted) (Emphasis added).

80.     Subsequent to issuing its results, Vivendi hosted a conference call to discuss the

results and the Company's business and prospects. During the call, Messier and other members

of the Company's management stated that the Company was able to achieve strong financial

results even in a down market and was gaining market share within its industry. Vivendi also

reaffirmed that it was on track to achieve strong growth in revenues and earnings in 2001.

81.     Following the release of these favorable earnings results, and Defendant's

statements, on October 31, 2001, Vivendi's ADRs rose 5% to close at $46.63 per ADR.

Vivendi's ordinary shares rose by over 5% to close on the Paris Bourse at €51.90 per share.

82.     The statements Defendant disseminated to the public referenced in ¶¶ 79-80

above, were each materially false and misleading because, *inter alia*, the Company engaged in

improper accounting practices, which materially overstated Vivendi's reported earnings. In

particular, (a) Vivendi failed to disclose that it was suffering from a growing liquidity crisis,

which would require the restructuring of its debt obligations in order to avoid bankruptcy; (b)

Vivendi failed to properly account for billions of dollars of impaired goodwill in connection with

the series of investments and acquisitions the Company was undertaking; (c) the Company failed

to timely write-down certain overvalued assets it obtained in such transactions; and (d) Vivendi

overstated its revenue from certain multi-year contracts.

83.     As Messier's acquisition spree continued, on December 11, 2001, the Company

disclosed it was negotiating a deal with USA Networks, Inc. ("USA Networks").

84.     Shortly thereafter, on December 14, 2001, The *Associated Press* reported that

Vivendi made an eight-year, $1.5 billion (€1.7 billion) investment in EchoStar Communications

("EchoStar").  In return for the $1.5 billion investment, Vivendi received a 10% stake in

EchoStar.  On December 23, 2002, Vivendi sold its entire stake in EchoStar back to EchoStar for

$1.07 billion (€1.04 billion), representing a loss of nearly $500 million from Vivendi's

investment in EchoStar.

      85.     On December 17, 2001, the Company announced that it was acquiring USA

Networks for $10.3 billion.  Within the press release issued by the Company announcing the

deal, Messier commented on the benefits to Vivendi shareholders from the USA Networks deal

and the Company's outlook for the future based on the "success" of its various acquisitions:

> **In addition, this strategic move will significantly benefit**
> **Vivendi Universal shareholders, because of its significant**
> **value-accretion at every level-EBITDA, net income and free**
> **cash flow.**  By using mainly non-core, consolidated assets to
> acquire this control, we are strongly positioned to enhance
> performance and value to Vivendi Universal shareholders.
>
>            \*   \*   \*
>
> **At the end of just one year following our merger with Seagram**
> **and Canal+, we have put the pieces together in fulfilling our**
> **strategy.**  In one short year, we have focused on integration and
> addressing our relative distribution weakness in the U.S. - and here
> we are today.  **We expect that 2002 will be a year of growth,**
> **without further change in perimeter**.

(Emphasis added).

      86.     During a press conference with Barry Diller, Chairman of USA Networks, on

December 17, 2001, Messier reaffirmed the Company's 2002 prospects and emphasized the

benefits of the USA Networks deal to the Company's shareholders:

> At the end of the day, this transaction is not putting pressure on
> Vivendi Universal.  On the reverse, what it allows us to do is to
> increase our [EBITDA] target for 2002 by more than ten percent.
> It's to increase our net income in 2002 by roughly 200 million
> dollars.  It's to increase the net free cash flow of the group in 2002
> by, let's say three hundred and fifty million dollars.  **At every level**
> **of the [P&L] and of the cash flow that you may look at, this**
> **transaction is very positive to VUE shareholders year one**.

* * *

> As far as the global [debt] ratio of the group is concerned, our
> target is to have in '02 a [debt] to [EBITDA] ratio well below three
> times and especially we are focusing to reach that target ahead of
> the end of the first half of 2002. . . . **So, no cleaning of balance
> sheet because the balance sheet is clean** . . . .

(Emphasis added).

87.     Again, Messier touted the success of the Company's acquisitions without

disclosing the negative effect these transactions had on the Company by burdening the Company

with enormous debt levels. Messier's comments made during the December 17, 2001 press

conference and the Company's press release on the same day specifically stated that the

Company would continue to grow and meet its targets. Vivendi's balance sheet was "clean."

88.     As a result of the Company's press release and the positive statements made by

Messier regarding the USA Networks deal, Vivendi's securities traded higher on both the New

York and Paris Exchanges. On December 17, 2001 Vivendi's ADRs advanced approximately

7% to close at $52.10 per share, while the Company's ordinary shares rose similarly by nearly

7% to close on the Paris Bourse at €57.35 per share.

89.     The statements Defendant disseminated to the public referenced in ¶¶ 85-87

above, were each materially false and misleading because, *inter alia*, the Company engaged in

improper accounting practices, which materially overstated Vivendi's reported earnings. In

particular: (a) Vivendi failed to disclose that it was suffering from a growing liquidity crisis,

which would require the restructuring of its debt obligations in order to avoid bankruptcy; (b)

Vivendi failed to properly account for billions of dollars of impaired goodwill in connection with

the series of investments and acquisitions the Company was undertaking; (c) the Company failed

to timely write-down certain overvalued assets it obtained in such transactions; and (d) Vivendi

overstated its revenue from certain multi-year contracts.

32

90.     As reported by the *Associated Press* on February 6, 2002, even after Vivendi's

share value decreased throughout the beginning of 2002, Messier defended the Company, stating

that "our share price is today out of sync with our performance and is the victim of rumors (or)

manipulation." Messier further touted the Company's financial performance and viability

following the string of expensive acquisitions it had undertaken. "[Vivendi is] the only media

group not to have issued a profit warning on our operating performance, and **that will not**

**change**." (Emphasis added).

91.     On February 11, 2002, Vivendi issued a press release announcing its Fourth

Quarter 2001 results.  The release stated in part that the Company's

> Media and Communications businesses reported pro forma
> revenue growth of 9% for the year ended December 31, 2001,
> reaching 28.9 billion euros.  **Revenue growth was 10% using the**
> **2000 parameter excluding Universal Film, exactly in line with**
> **management estimates given 12 months ago**.

(Emphasis added).  Messier made this following comments regarding the Company's financial

results and further emphasized the Company's 2002 targets:

> Achieving the highest level of growth in our industry is a big
> differentiation of Vivendi Universal, and the operating
> management deserves recognition for fulfilling their growth
> objectives and outperforming their peers in a difficult year.  **Our**
> **2001 results give us confidence that we can achieve our growth**
> **targets again in 2002**.

(Emphasis added).

92.     The statements Defendant disseminated to the public referenced in ¶¶ 90-91

above, were each materially false and misleading because, *inter alia*, the Company engaged in

improper accounting practices, which materially overstated Vivendi's reported earnings.  In

particular, (a) Vivendi failed to disclose that it was suffering from a growing liquidity crisis,

which would require the restructuring of its debt obligations in order to avoid bankruptcy; (b)

Vivendi failed to properly account for billions of dollars of impaired goodwill in connection with

the series of investments and acquisitions the Company was undertaking; (c) the Company failed

to timely write-down certain overvalued assets it obtained in such transactions; and (d) Vivendi

overstated its revenue from certain multi-year contracts.  As discussed above, and further alleged

herein, Vivendi did not achieve its 2002 growth targets.  Knowing the amount and the terms of

the debt incurred by the Company as a result of his acquisition spree, Messier could not

reasonably have made the above statements without also knowing they were materially false and

misleading.

     93.     On March 5, 2002, Vivendi reported its financial results for the full year 2001.

The press release briefly discussed a charge for impairment to goodwill, which Vivendi stated

was a result of its change to U.S. GAAP, then focused on several positive statements about

Vivendi's liquidity, as well as highlighting the Company's success in meeting its operating

goals.  The press release described its write-down to goodwill as follows, in part:

> **Under French GAAP**
>
> - This results in a **non-cash, one-time charge of 12.64
>   billion euros** of amortization of goodwill in certain
>   acquired assets, following the decline in the market in the
>   last two years.  This charge will be comprised of:
>
>     - 6 billion euros for Canal+
>     - 3.1 billion euros for Music
>     - 1.3 billion euros each for Universal Studios Group
>       and international Telecoms properties
>     - 0.6 billion euros for Vivendi Environment and 0.3
>       billion euros for Internet
>
> - This approximate 13 billion euro non-cash impact on net
>   income will be coupled with a non-recurring financial or
>   goodwill amortization of approximately 1 billion euros and
>   recurring amortization, **resulting in a total charge in
>   French GAAP of 15.7 billion euros, leading to a net,**

> **non-cash loss for Vivendi Universal of 13.6 billion euros in 2001**.
>
> - **This is a non-cash charge that has no impact on value.**
>
> - As a consequence, the net results in the future will be improved by **much less likely non-recurring amortization and by a 340 million euro-a-year decrease of recurring amortization** for Media & Communication businesses.
>
> ### Under U.S. GAAP
>
> - The consequences of rule FAS 142 will be taken in the first quarter of 2002. The methodology of calculation, as defined in FAS 142, may lead to a slightly higher impairment. In any case, differences in book value and minority interest, under US GAAP, will mechanically lead to a higher, non-cash, figure by 2.6 billion euros.
>
> - As a consequence, **the net results will under US GAAP increase annually by 1.7 billion euros, representing the elimination of the periodic amortization of goodwill**.

The remainder of the press release focused primarily on the Company's media and communications businesses:

> Revenues: €28.115 billion, representing **10%** pro forma revenue growth
>
> EBITDA: €5.036 billion, representing **34%** pro forma EBITDA growth
>
> Operating Income of €1.838 billion representing **89%** pro forma growth
>
> Operating Free Cash Flow of €2.026 billion, **ahead of guidance** (1.2 to 1.5 billion euros) and up **2 billion euros** over 2000
>
> Synergies for costs alone reached more than **500 million euros cash savings, ahead of guidance**, including €293 million of EBITDA savings, €114 million of CAPEX savings both recognized in 2001 and €173 million of treasury savings on a 12-month basis.

35

- Debt in **French GAAP** was **14.6 billion euros** for the Media and Communications activities as of December 31, 2001.

- **In U.S. GAAP**, it was 19.1 billion euros at the same time.

- The Company's 2002 goal is to sustain its current triple-B rating of the group which under U.S. GAAP, would be **equal to or less than three times EBITDA, and to reach a 2.5 times EBITDA ratio by the mid-term**.

In the March 5, 2002 press release, Vivendi also assured the market of the veracity of the

Company's accounting:

> Vivendi Universal's double financial reporting (French and U.S. GAAP) and **full disclosure** of those items fully demonstrates the Company's **transparency and conservative** business practices . . .

Vivendi also reaffirmed its targets for 2002 and continued to tout its ability to meet its targets,

even in difficult environments:

- After having been the only large media company **not to modify any of its guidance for the year 2001**, Vivendi Universal reiterates its confidence in the strength of its businesses and their performance and their ability to grow. **For 2002**, no other new guidance will be expressed, apart from the company's full confidence to reach for its Media and Communications businesses:

  – **Around 10% organic growth** for all Media and Communications businesses in Vivendi Universal as of January 1, 2002

  – **EBITDA of close to 6 billion euros (pre-USA Networks and pre-Stream)** representing a 20% improvement on 2001 guidance and a 16% improvement on effective pro forma reached in 2001.

  – **Operations and managerial priorities for 2002 are mainly**:

    - Focus on **organic growth** to achieve higher growth than industry in both a slow and recovery environments.

36

- Focus on **new revenue stream** -- (both cross content and content to distribution) for which 2002 will be year one of many initiatives.  They are all leveraging our ability to sell "way of life" to young people, not only products.

- Focus on **cash management** -- both through traditional management (through receivables, working capital return) and by addressing, on a two-year period basis, two cash-flow drains on the company:  Canal and the Internet operations.

- Focus on the integration of **Vivendi Universal Entertainment (VUE)**.  Thanks to the integration of TV and Films assets in one single entity and thanks to alliances like EchoStar, VUE has now the means to define a **path of strong internal growth** for the coming years. VUE will report separately from Canal+.

- Focus on the digital migration of Canal+ subscribers, and **integration of the Canal+ position in Italy and Poland** in order to optimize cash-flow recovery.

- Focus on **major criteria for each of the other businesses involved in content creation**:

  - **Music**:  except for an expected weak first quarter, the quality of the 2002 slate of releases is expected to result in an increase in market share, and for EBITDA to grow faster than revenue;
  - Games:  pursue the break-through on consoles and create growth of more than 20%;
  - **Education/Trade in Publishing**:  confirm the excellent results of 2001;

As in distribution, focus on:

  - **Telecom**:  Pursue the growth trend with high margin results successfully achieved in 2001;
  - **Internet**:  Maintain the focus on the on-line sale of the Company's key products, and keep on developing on a multi-access

> approach at the lowest possible cost of
> capital.
>
> • Keep **management sharply focused** -- by
>   bonus schemes well balanced between
>   operational cash flow, EBITDA and synergy
>   targets. In parallel, keep and develop strong
>   stock-option incentive plans.

94. In the March 5, 2002 press release, Messier made the following comments regarding the Company's performance and its accounting:

> I am very pleased with the excellent operating results that have been achieved. These results confirm the strength of Vivendi Universal's businesses across the board despite a very difficult global economic environment.
>
> The strength of our asset portfolio has been evident in a difficult year, as we did not have a need to issue any profit warnings. Our asset strength and our ability to deliver results will allow us to maintain momentum in 2002, while sharply focusing on operating cash flow, EBITDA growth and synergy targets.
>
> We stay fully committed to conveying full transparency in our financial results. Vivendi Universal is not only transparent but is the only media and communications not to change its numbers and targets, it underscores its commitments to accurate, conservative and consistent reporting in every area of its operations.
>
> Finally, with the momentum we have created, coupled with the fundamentally strong operating results that have been generated by our businesses, our priority for 2002 is internal growth. Our target organic growth for all our Media and Communications businesses for 2002 is approximately 10%. EBITDA is expected to reach about 6 billion euros, not taking into account the USA Networks and Stream transactions.

(Footnotes omitted) (emphasis in original).

95. Vivendi blamed the impairment to goodwill on the Company's accounting change, but did not explain that if the Company was as profitable as indicated in the March 5, 2002 press release, such a large impairment charge would not be necessary.

96.     Following the earnings announcement by Vivendi and the comments made by Messier, the Company's ADRs rose by 4% on the New York Stock Exchange to close on March 5, 2002 at $42.92 per ADR, while its ordinary shares closed higher by €1 on the Paris Bourse at €48.68 per share on March 6, 2002.

97.     The statements Defendant disseminated to the public referenced in ¶¶ 93-95 above, were each materially false and misleading because, *inter alia*, the Company engaged in improper accounting practices, which materially overstated Vivendi's reported earnings.  In particular:  (a) Vivendi failed to disclose that it was suffering from a growing liquidity crisis that would require the restructuring of its debt obligations in order to avoid bankruptcy; (b) Vivendi failed to properly account for billions of dollars of impaired goodwill in connection with the series of investments and acquisitions the Company was undertaking; (c) the Company failed to timely write-down certain overvalued assets it obtained in such transactions; and (d) Vivendi overstated its revenue from certain multi-year contracts.

### F.     Vivendi's Financial Condition Continues to Erode

#### 1.     Second Quarter 2002

98.     By Spring 2002, it was clear that Messier's acquisitions would have to stop as debt levels were getting so enormous that any additional debt could not be supported.  Messier's most important job thereafter was to assure the markets that Vivendi's debt levels were manageable.

99.     While under fire for Vivendi's falling share price, Messier fired Canal Plus' Chairman in an attempt to restore Messier's reputation prior to the April 24, 2002 shareholder meeting.  Messier stated publicly on April 16, 2002, that "I am ready to take the bet that the resolution of the Canal Plus management crisis will go hand in hand with strengthening of the cohesion of Vivendi Universal's management team."

39

100.    On April 24, 2002, Vivendi issued a press release announcing its results for the First Quarter of 2002.  Messier, made the following comments about Vivendi's performance during the First Quarter of 2002, the Company's target moving forward and liquidity position:

> **The hard numbers in the first quarter show that Vivendi Universal has a winning strategy, and demonstrate our commitment to excellent management and delivering operating results quarter after quarter**.  In the first quarter, each operating segment delivered its revenue targets, and most segments over-delivered EBITDA and operating free cash flow compared with their budgets.
>
> Owing to our strong performance in the quarter, we are lowering our estimate of year-end Debt/EBITDA ratio to less than 3x by December 31, 2002.
>
> In a difficult environment, Vivendi Universal's businesses gained market share.  Cash management improved dramatically.
>
> **Our highest priority remains building value for Vivendi Universal's employees and shareholders**.

101.    The Company further emphasized its purportedly strong cash flow position, reiterating the information contained in the April 24, 2002 press release by issuing a supplemental press release on the Company's website on April 29, 2002:

- Consolidated revenue grew 12% pro forma to €13.2 billion ($11.9 billion).

- Consolidated Operating Income grew 11% pro forma to €781 million, excluding goodwill amortization.

- Earnings Per Share (EPS) before the cumulative effect of an accounting change was €0.5.

102.    Messier made the following comments in the supplemental April 29, 2002 release regarding the Company's financial results and continued to promote Vivendi's targets to the investing community:

> **The consolidated financial results for the quarter demonstrate that Vivendi Universal is delivering on the strategy, goals and**

40

> **targets that we have articulated to our shareholders**.  In the first
> quarter of 2002, both Media & Communications and Vivendi
> Environment delivered their targets.
>
> The Media & Communications financial results released last week,
> coupled with our consolidated results issued today, are testimony
> to **our ability and conviction to deliver strong results in
> operations, cash flow, EBITDA and net income**.

(Emphasis added).  Messier's comments also highlighted that the Company purportedly lowered

its debt levels:

> **We are lowering our estimate of Media & Communications
> year-end Debt EBITDA ratio to less than 3x by December 31,
> 2002.**
>
> In a very difficult economic environment, characterized by many
> market uncertainties, Vivendi Universal's global business gained
> market share.  **In addition, strong improvement was achieved in
> cash management, debt reduction, synergies, management
> development and revenue growth**.

(Emphasis added).  The supplemental press release also emphasized Vivendi's media and

communications businesses, repeating information contained in the April 24, 2002 press release:

> **A strong surge of operational free cash flow, up 159% to 1.4
> billion euros, well ahead of expectations**;
>
> Strong operating results in the first quarter: revenue organize
> growth of 13% to 6.8 billion euros; EBITDA growth, up 18% to
> 1.1 billion euros; and solid operating income growth, up 37% to
> 408 million euros.  All were significantly ahead of budget;
>
> **Net debt fell from approximately 19 billion euros to
> approximately 17 billion euros.**

(Emphasis added).

     103.    Recognizing the exorbitant amount of debt the Company had amassed attempting

to transform itself into a media giant, Vivendi began to divest various business units.  In April

2002, the Company sold control of its business and health publications units for $1.07 billion.

An April 18, 2002 *Associated Press* article reported that Vivendi would use the proceeds from the sale to lower the Company's debt by $889 million.

104.     The statements Defendant disseminated to the public referenced in ¶¶ 99-102 above, were each materially false and misleading because, *inter alia*, the Company engaged in improper accounting practices, which materially overstated Vivendi's reported earnings.  In particular: (a) Vivendi failed to disclose that it was suffering from a growing liquidity crisis, which would require the restructuring of its debt obligations in order to avoid bankruptcy; (b) Vivendi failed to properly account for billions of dollars of impaired goodwill in connection with the series of investments and acquisitions the Company was undertaking; (c) the Company failed to timely write-down certain overvalued assets it obtained in such transactions; and (d) Vivendi overstated its revenue from certain multi-year contracts.

105.     On May 3, 2002, Moody's lowered its rating on the Company's long-term debt to Baa3, the lowest possible investment guide.  According to Moody's, "the Ratings Action reflects Moody's continuing concerns that Vivendi . . . might not be able to reduce debt as quickly and comprehensively as planned."

106.     Later on May 3, 2002, the Company attacked the downgrade of the Company's senior debt and further reaffirmed Vivendi's ability to meet its financial targets for 2002:

> The company believes that [the Moody's] decision does not fully take into consideration the currently poor market conditions and the fact that the agency does not take into account immediately the whole of the debt reduction program planned by Vivendi Universal.
>
> The decision has no impact on Vivendi Universal's cash situation. It does not trigger any renegotiation clauses or advance repayments of bank credit lines.  In addition, Vivendi Universal's use of commercial paper in the current amount of 1.6 billion euros is well covered by back-up lines of more than 3 billion euros, the availability of which will not be affected by the rating change.

> **Vivendi Universal affirms that it has every confidence in its
> ability to meet its operating targets for 2002, as proved by its
> first-quarter results**. The company is totally determined to carry
> through its debt reduction program in order to make a rapid return
> to a comfortable position with a Baa2 rating.

(Emphasis added).

107.    While Vivendi claimed that "poor market conditions" were responsible for the

Company's poor performance leading to the Moody's downgrades, Vivendi and its management

had previously emphasized that the Company was immune to market turmoil and would continue

to grow regardless of outside factors.

108.    On May 7, 2002, Standard & Poor's cut its rating on the Company's short-term

debt to A-3 from A-2 and revised its outlook on the Company from "stable" to "negative," citing

concerns over Vivendi's falling share price, which would trigger the Company to make payments

on its credit facilities, complicating Vivendi's plan to reduce its debt.

109.    Following the Standard & Poor's downgrade, Vivendi shares hit a new four-year

low.  Shares of the Company fell to half their value since the beginning of 2002.  If the

Company's credit ratings were lowered to BBB, or an equivalent with a negative outlook, the

Company would be forced to repay up to $826 million (€900 million) of long-term debt.

Vivendi would have to pay an additional $4.1 billion (€4.5 billion) if any of its ratings were

lowered to below investment grade or "junk status." Standard & Poor's grouped Vivendi along

with the beleaguered Dynegy and Tyco, as companies most susceptible to a liquidity crisis in the

event of a reduction in their credit-ratings.

110.    As of May 2002, Vivendi's securities value had dropped over 30% over the prior

three months.

111.    On May 28, 2002, the Company filed its Annual Report on Form 20-F with the

SEC for the Fiscal Year ended December 31, 2001.  This document was signed and certified by

Hannezo.  The Form 20-F filed on May 28, 2002 contained the following information along with

Vivendi's consolidated financial statements:

> *Net Cash Flow from Operating Activities* -- Net cash flow provided
> by operating activities totaled €4.5 billion in 2001, an increase of
> €2 billion from 2000.  The increase was attributed to operating
> earnings generating incremental cash flow of €1.1 billion and
> improvements in working capital of €1.5 billion, partially offset by
> approximately €600 million of cash payments made for the
> settlement of restructuring and merger-related liabilities.  **Of the
> improvements in working capital, €0.8 billion was generated
> by Vivendi Environment primarily due to the implementation
> of a receivables securitization program**.

> *Net Cash Flow from Investing Activities* -- Net cash flow provided
> by investing activities was €4.3 billion in 2001 compared to net
> cash flow used for investing activities of €1.5 billion in 2000.
> Contributing to cash from investing activities was €9.4 billion from
> the sale of our spirits and wine business and €4 billion from the
> disposal of our investment in BSkyB, partially offset by capital
> expenditures for tangible and intangible assets net of sales
> proceeds of €4.9 billion and the acquisitions of Houghton Mifflin
> for €2.0 billion and Maroc Telecom for €2.4 billion.  In 2000, net
> cash used for investing activities was €1.5 billion compared to
> €12.9 billion in 1999.  The significant decrease primarily reflects
> fewer strategic acquisitions paid for in cash in 2000 compared to
> 1999.

> *Net Cash Flow from Financing Activities* -- In 2001, net cash flow
> used for financing activities was €7.5 billion, the principal
> components of which included a €5.9 billion repayment of long-
> term borrowings and other liabilities, a €1.7 billion decrease in
> short-term borrowings, the purchase of treasury stock for €4.3
> billion and cash dividends paid of €1.4 billion, partially offset by
> €5.2 billion proceeds from the issuance of long-term borrowings
> and other liabilities and €0.6 billion net proceeds from the issuance
> of common stock.

(Emphasis added).

     112.    The Form 20-F filed on May 28, 2002 also briefly described the Company's

liability in connection with certain put options sold by Vivendi in 2000 and 2001.  The Form 20-

F stated:

> Except for one put sold in 1998, Vivendi Universal in 2001 sold
> puts to banks on 19.7 million ordinary shares at exercise prices
> ranging from €60.40 to €80.00 in 2002 and 3.1 million ordinary
> shares at an exercise price of 50.50 in January 2003. As of April
> 30, 2002, approximately 16 million of these puts remain
> outstanding . . .Vivendi Universal's contingent liability relating to
> the puts is approximately €1.1 billion to settle the 16 million puts
> outstanding for cash at an average of €69 per put and
> approximately €540 million to settle the 16 million puts
> outstanding for cash by paying the banks the difference between
> the average of €69 per put and the market price per ordinary share
> of Vivendi Universal as of April 30, 2002.

113.    Betting on its future performance, the Company sold put options which obligated

Vivendi to purchase over 22.8 million shares of Company stock in the future. As the Company's

stock price decreased, the put options became an increasingly risky enterprise, however, Vivendi

never disclosed these liabilities to the market until the May 28, 2002 filing, which then offered

only a cursory description. Earlier, on April 15, 2002, Vivendi issued its annual report on Form

6-K for the year 2001 containing a translation of its 2001 year end financial statements. This

translation only made a reference to Vivendi's put obligations:

> In connection with the sale of puts on its shares, Vivendi Universal
> had a commitment, at December 31, 2001, to buy 19.7 million
> shares at exercise prices ranging from €60.40 to €80.00 in 2002
> and 3.1 million shares at an exercise price of €50.50 in January
> 2003.

Months later, in a June 7, 2002 *Economist* article, Hannezo confirmed that Vivendi was using

cash each month to buy out the costly put options. This only added to the Company's liquidity

problems. Ultimately on August 14, 2002, Vivendi disclosed the impact the put obligations had

on the Company. (*See* ¶ 147).

114.    On May 29, 2002, the Company's Board of Directors held a meeting in which it

created a new governance committee, chaired by Vice Chairman Edgar Bronfman, Jr.

45

115.    A press release issued by Vivendi after the Board of Directors meeting stated the Company's Board had convened and "carried out a detailed examination of [the Company's] operating and financial targets for 2002, and outlook for 2003.  The strategy is based on the active continuation of the debt reduction program and the internal growth of the Company' s businesses." The press release also noted that, "the Board wishes to see the senior management team pursue the work of implementation of its strategy without interference."

116.    From April 2002 through mid-May, 2002, Vivendi's ADRs declined from approximately $35 per ADR to approximately $29 per ADR.  Its ordinary shares declined from approximately €36 per share to approximately €31 per share, as concerns increased about the Company's debt levels.

117.    On May 30, 2002, Vivendi issued a press release which indicated its cash position was "comfortable" in an attempt to salvage its falling stock price and distract investors from the recent credit rating downgrades.  The press release gave investors no warning of the Company's debt problems or mounting liquidity crisis and stated:

> Vivendi Universal confirms having obtained agreement from the banks to delete the clauses that linked the availability of credit lines to a rating level.  The Company's bank credit line is, therefore, no longer dependent on rating agencies' decision.
>
> **Additionally, the Company has no reason to anticipate or fear any further deterioration in its credit rating**.
>
> Vivendi Universal has also confirmed that, after payment of the dividend and the acquisition of USA Networks, its available credit lines that have not been used to date amount to almost 3.5 billion euros.  Also, its use of commercial paper is limited to about 1 billion euros, and the reimbursement of expected debts during the coming months is limited.
>
> **This cash situation, which, the Company believes, is comfortable - even assuming an extremely pessimistic market - will enable the Company to continue its debt reduction**

46

**program with confidence and with a view to creating the best
possible value for its shareholders**.

(Emphasis added).

118.    In a move to reduce its excessive amount of debt, on June 8, 2002, the Company

disclosed that it was in negotiations to sell its Italian pay-TV operations to NewsCorp. for $1.4

billion (€1.5 billion), although NewsCorp, stated the deal was only valued at approximately $950

million (€1 billion).

119.    On June 24, 2002, Vivendi's ordinary shares closed at €18.75, a 13-year low,

while its ADRs dropped 17% to close at $19.80 per ADR.  Vivendi's securities were down 70%

for the year by this point.

120.    On June 25, 2002, for the fifth time in 2002, a member of Vivendi's Board of

Directors, Bernard Arnault, resigned.  Arnault reportedly sought clarification of the Company's

strategy from Messier on several occasions during the Relevant Period.

121.    Also on June 25, 2002, the Company reiterated its earlier statements concerning

the positive steps it had taken to reduce debt and reaffirmed that its cash position was not in

jeopardy.  The Company also reconfirmed its operating targets for 2002.  The press release

stated, in part:

- The active implementation of a debt-reduction plan has enabled Vivendi Universal to collect over €5.1 billion during the first half of the year, to which can be added the disappearance of its financial risk on BSkyB shares (€2.5 billion) and the imminent sale of the B2B health activities

- **As a consequence, net debt will be lowered in 2002 and senior management's target (under U.S. definition) is to bring it down from about €19 billion to €15 billion**.

- Vivendi Universal has €3.3 billion available in unused credit lines, an amount that well exceeds its commercial paper of €912 million.

47

- Early repayment clauses in loan agreements apply to less than €170 million and the various bank covenants will all be complied with at both June 30 and December 31, 2002.

- The Company will also continue its policy of increasing the average length of its debt.

(Emphasis added).

122.    Following the release of the June 25, 2002 announcement, on June 26, 2002, Messier commented on Vivendi's financial condition during an investor conference call as follows:

> I have read, I held in the markets all certainties, question, rumors in the current environment relating to views, view for yourselves, views for your accounting and I seen that in those circumstance. **The best that we can do is to show you [that] there is no hidden liability that's you have all the information to come back.**

(Emphasis added).

123.    The statements Defendant disseminated to the public referenced in ¶¶ 106-07, 111-113, 115, 117, 121-22 above, were each materially false and misleading because, *inter alia*, the Company engaged in improper accounting practices, which materially overstated Vivendi's reported earnings.  In particular:  (a) Vivendi failed to disclose that it was suffering from a growing liquidity crisis; which would require the restructuring of its debt obligations in order to avoid bankruptcy; (b) Vivendi failed to properly account for billions of dollars of impaired goodwill in connection with the series of investments and acquisitions the Company was undertaking; (c) the Company failed to timely write-down certain overvalued assets it obtained in such transactions; and (d) Vivendi overstated its revenue from certain multi-year contracts. The press release issued by the Company on May 30, 2002 was materially false and misleading because, as evidenced by disclosures made less than three months later in August 2002, there is no way that the Company or its management could have reasonably believed Vivendi's cash

position was even remotely "comfortable." Since this time, Vivendi is still selling assets in an

attempt to fend off a liquidity crisis, (*See* ¶¶ 153, 159, 163, 166-169, 172, 177, 181, 186-91).

### 2.    Third Quarter 2002

124.    On July 1, 2002, Moody's further downgraded Vivendi's debt to junk status.

125.    Following the Moody's downgrade, Vivendi's ADRs fell 20% to close at $17.86

per ADR on July 2, 2002 and Vivendi's ordinary shares fell 25% to close on the Paris Bourse at

€17.80 per share on extremely heavy trading.  Adding to the Company's problems, on July 2,

2002, an article in *Le Monde* reported that Vivendi attempted to "massage" its accounts in

October 2001 through a complex deal involving shares of BSkyB.  However as Le Monde

reported, the $1.5 billion scheme was blocked by French regulators.  The story raised fears

regarding the Company's accounting, which sent European markets spiraling.  Vivendi's trading

was halted repeatedly throughout the day as the stock continued to decline.  The Associated

Press reported that at various points during the day, Vivendi's stock was down over 40% on the

French exchange, hitting a 14-year low.  Banks which were exposed to Vivendi bonds also

suffered, each closing on average down over 8% for the day.

126.    Also on July 2, 2002, *Bloomberg L.P.* reported that Messier "told employees in an

e-mail that while he may have gone `too fast, too far,' there are `no hidden risks' in the

Company's accounting."

127.    On July 3, 2002, Messier was forced to resign amid the Company's mounting

debt levels and falling stock price.  Vivendi ADRs and ordinary shares collapsed upon these

revelations, falling as low as $13.40 and €13.90, respectively, on unusually high trading volume

of nearly 7.4 million ADRs and 43.6 million common shares.

128.    Vivendi's ADRs closed even lower on July 3, 2002, to $15.66, representing a

30%, two-day decrease in the Company's market value in the United States.

129.   An article appearing in the *The Wall Street Journal* on July 3, 2003 supported the

fact that Messier's June 26, 2002 statement concerning the Company's liquidity was false.

Specifically, the article reported that the Company's new management, led by Vivendi's new

Chairman and CEO Jean-René Fourtou ("Fourtou"), had assessed the Company's cash position.

The article stated:

> As recently as June 26, Mr. Messier and Vivendi's board insisted
> that the Company's cash situation was comfortable. In a news
> release issued that day, the board emphasized that it had access to
> 3.3 billion€ in untapped backup bank credit lines to complement
> one billion€ in funds raised through treasury bills. "This treasury
> security, combined with asset sales and possible bond issues,
> enables the company to approach its repayment deadlines over the
> next 12 months with confidence," the news release said.
>
> But last Wednesday, after the management shuffle, **Vivendi's
> board put out a very different statement that, among other
> things, acknowledged "a short-term liquidity issue."** In the
> statement, the board revealed that Vivendi must repay creditors
> €1.8 billion by the end of the month and disclosed that €3.8 billion
> in credit lines were up for renegotiation. **Based on the detailed
> statement, credit analysts immediately surmised that Vivendi
> could face a cash shortfall of €2.7 billion by year-end.** Moody's
> Investors Service already has cut its ratings on some of Vivendi's
> €19 billion in debt to junk status.

(Emphasis added). *The Wall Street Journal* further reported that credit analysts "surmised that

Vivendi could face a cash shortfall of €2.7 billion by year end."

130.   Even on his last day as head of Vivendi, Messier continued to defend the

Company's financial condition. In an article appearing in *The Columbian* on July 3, 2002,

referencing an article appearing earlier in Le Figaro, Messier stated: "There are no

underestimated liabilities. There are no overvalued assets," Messier said. "Our results are true,

genuine and complete."

131.   Later on July 5, 2002, the Canadian newspaper, *Globe and Mail Metro* reported:

50

> With new management in place, **Vivendi Universal SA finally admitted what its ousted chairman and chief executive officer, Jean-Marie Messier, had strenuously denied in recent weeks: The media-and-utility conglomerate is in danger of a cash crunch.**
>
> Based on a detailed liquidity statement Vivendi put out late Wednesday, credit analysts estimate that Vivendi could face a cash shortfall of 2.7 billion euros ($2.64-billion U.S.) by the end of the year, expanding to as much as 5.5 billion euros by the middle of 2003, unless it can quickly secure a new multibillion-euro credit line from its lenders.
>
> \*   \*   \*
>
> This grim outlook contrasts with Mr. Messier's recent assurance that the "treasury situation" at Vivendi-owner of Universal Studios, Universal Music Group, USA Networks and minority stakes in a host of other assets-was "comfortable even in the most pessimistic market hypotheses."

(Emphasis added).

132.    The statements Defendant disseminated to the public referenced in ¶¶ 129-30 above, were each materially false and misleading because, *inter alia*, the Company engaged in improper accounting practices, which materially overstated Vivendi's reported earnings.  In particular: (a) Vivendi failed to disclose that it was suffering from a growing liquidity crisis, which would require the restructuring of its debt obligations in order to avoid bankruptcy; (b) Vivendi failed to properly account for billions of dollars of impaired goodwill in connection with the series of investments and acquisitions the Company was undertaking; (c) the Company failed to timely write-down certain overvalued assets it obtained in such transactions; and (d) Vivendi overstated its revenue from certain multi-year contracts.

133.    As discussed herein, Vivendi would have been forced to file for bankruptcy had the Company not undertaken a sale of its assets to produce enough cash for the Company to meet is obligations and continue to run its businesses.  (*See* ¶¶ 148-49).

51

134.    Following its July 1, 2002 downgrade of the Company's long-term debt to junk status, Moody's warned on July 8, 2002 that "the longer it takes for Vivendi Universal to arrange additional committed funding, the more strained its financial condition is likely to become."

135.    On July 9, 2002, *Bloomberg L.P.* reported that the COB was reviewing statements released by Vivendi to ensure "they were consistent with French regulations." French regulators had raided Vivendi's Paris headquarters as part of an investigation into whether Vivendi had disclosed relevant information to investors over the prior 18 months. Similarly, on July 10, 2002, *The Wall Street Journal* reported that the COB raided Vivendi's corporate headquarters in Paris as part of a formal investigation into the Company's financial disclosures dating back to the beginning of 2001. As reported by *The Wall Street Journal*:

> The COB is keen to determine when Vivendi's board became aware of the Company's short-term liquidity problems and whether it communicated that information in a timely manner to investors, according to one person familiar with the matter. "It's not an accounting issue, it's a disclosure issue," this person said. Vivendi disclosed its cash problems only last Wednesday, after its board met to formally accept Mr. Messier's resignation and appoint Mr. Fourtou in his place.

136.    *The Financial Times* reported on July 12, 2002 that Hannezo had earlier on July 9, 2002, handed in his resignation. On July 15, 2002, *The Wall Street Journal* reported that Hannezo would stay at Vivendi until a replacement had been chosen for him.

137.    According to a July 17, 2002 press release, Jacques Espinasse was chosen to replace Hannezo. He was hired as Vivendi's new CFO and Senior Executive Vice President. Hannezo was retained on a six-month contract as special adviser to Vivendi's new Chairman and CEO, Fourtou.

138.    As the truth regarding the Company's financial and cash position began to emerge, Vivendi's common stock and ADRs dropped in value. On July 16, 2002, the ADRs

52

closed at $15.38 per ADR representing a loss of 42% of the ADRs value from the month prior.

Similarly, ordinary common shares closed at €15.50 per share, representing a drop of

approximately 44% from a month earlier prior to Vivendi's disclosures regarding the Company's

liquidity problems and enormous debt levels.

139.    On July 23, 2002, Vivendi reported that rather than sell its money-losing French

Pay-TV station, Canal Plus, it would restructure the unit in an attempt to lighten the Company's

heavy debt load amassed during Messier's acquisitions.

140.    The Associated Press reported on July 24, 2002, that Vivendi would have to

"dispose of significant assets to be able to reduce its debt of €19 billion, which debt level was

amassed by Messier through the series of acquisitions undertaken during his tenure as the

Company's chairman." In a statement made by Jean-Renee Fourtou, Messier's replacement,

Fourtou stated that:

> Vivendi Universal is determined to set an example in terms of
> corporate governance and transparency... [We] want the
> information that we give to our shareholders, employees and all
> our partners in general to be not only measured, but be very
> precise.

141.    Vivendi had accumulated so much debt during Messier's tenure as the head of

Vivendi that the Company, in attempting to unload assets and reduce its debt, will likely have to

settle for bids for lower than the actual value of its assets. According to reports issued by the

Company in early August 2002, Fourtou planned to sell at least $9.9 billion (€10 billion) of

assets. Among the assets up for sale are the Company's publishing units, including Houghton

Mifflin Co., which it acquired for $2.2 billion one year earlier.

142.    On August 5, 2002, Fourtou, indicated that the Company was seeking a buyer for

the French portion of its telephone and internet information service, Scoot.

143.   On August 12, 2002, Vivendi's shares fell as much as 5.2%, resulting in notably the largest drop on the CAC 40 Index that day.  The Company's ADRs also dropped.  The poor performance of the Company's securities was largely the result of an article published in the French newspaper, *Le Tribune*, which reported the Company might report asset write-downs during its upcoming earnings announcement.  The article quoted some analysts as expecting "accounting adjustments" of as much as $4.9 billion (€5 billion).  Such a substantial write-down would cause Vivendi to report a loss for the period.  Securities analysts speculated that Fourtou would reduce the value of the $77 billion of acquisitions to anywhere between $489 million (€500 million) and $5.8 billion (€6 billion).

144.   Vivendi was engaged in a fraudulent scheme to artificially inflate the Company's ADR and ordinary share prices through improper accounting practices which materially overstated Vivendi's reported earnings.  Among the Company's fraudulent accounting practices, Vivendi did not disclose that it was suffering from a growing liquidity crisis which would force the Company to restructure its debt obligations, and sell off several assets and business units, in order to remain solvent and avoid bankruptcy.  The Company also failed to timely write-down its goodwill and overvalued assets resulting from its investments and acquisitions.  In fact, as described herein, Vivendi's financial statements did not disclose the true nature of the Company's financial position, nor were the Company's statements regarding its earnings targets accurate.  Furthermore, Vivendi was not able to "weather" the lowdown and reduced earnings seen across the media industry as management would have the public believe.  Rather, Vivendi concealed its true financial condition until it was ultimately disclosed to the investing public to the shock of everyone that followed the Company.

**G.**    **The True Nature of Vivendi's Financial Position is Disclosed**

145.    On August 14, 2002, the Company's new management, led by Fourtou, disclosed

that Vivendi suffered a $12 billion (€12.3 billion) net loss for the first half of 2002, which

represented a €11.32 per share loss for the six-month period.  Vivendi also disclosed that it

would take an additional $10.8 billion (€11 billion) goodwill write-down of impaired assets, and

put aside $3.3 billion (€3.4 billion) in reserves.  The $10.8 billion (€11 billion) impairment was

described as follows: $3.9 billion (€3.8 billion) relating to Canal Plus Group; $3.4 billion (€3.5

billion) relating to Music, $2.5 billion (€2.6 billion) relating to Vivendi Universal Entertainment

and $1.08 billion (€1.1 billion) relating to Telecom and Internet.  Vivendi also announced that

the Company planned to sell $10 billion (€10.2 billion) in assets to reduce its enormous debt

levels.

146.    Unlike the Company's March 5, 2002 announcement, Vivendi did not blame the

write-down to goodwill on an accounting change, but rather on the downturn in the markets as

follows:

> **Goodwill Amortization**:  Goodwill continues to be amortized
> under French GAAP.  Goodwill amortization declined 17% to 642
> million euros in the first half, primarily owing to impairment
> charges taken at the end of 2001.

> **Goodwill Impairment**:  In light of deteriorating economic
> conditions since December 2001 and the impact of higher
> financing costs for the company, management has recorded a
> preliminary impairment charge of approximately 1I billion euros as
> of June 30, 2002.  The 11 billion impairment is the sum of 3.8
> billion euros relating to Canal+ Group, 3.5 billion relating to
> Music, 2.6 billion relating to VUE and 1.1 billion relating to
> Telecom and Internet.  This adjustment reflects management's
> opinion of the fair value of the core assets on a permanent ongoing
> concern basis within Vivendi Universal.

147.    Also on August 14, 2002, Vivendi disclosed the impact of its put obligations on

Vivendi's first half 2002 earnings.  Specifically, the Company disclosed that:

As at June 30, 2002 and December 31, 2001, Vivendi Universal had outstanding obligations on 13.9 million and 22.8 million shares respectively. The average exercise prices were €69 and €70 respectively, giving a potential commitment of €953 million and €1,597 million respectively. These put options are only exercisable on the specific date of the option and expire at various dates during 2002 and the first quarter of 2003.

The cost to Vivendi Universal during the first half of 2002 by option holders exercising their rights amounted to €239 million.

148.    As reported in the *Associated Press* on August 14, 2002:

Vivendi Universal, the teetering French media conglomerate, reported a massive loss of $12 billion for the first half of the year and said it will sell $10 billion in assets as it seeks to pare debt, including the U.S. publisher Houghton Mifflin. Adding insult to injury, a ratings agency downgraded the Company's debt to junk.

The sale of Houghton Mifflin, which the company only bought last year for $1.7 billion, appeared to mark a first step toward breaking up the entertainment and media empire built up by Vivendi's former chairman, Jean-Marie Messier, in a whirlwind of costly acquisitions. In all, Vivendi said it hopes to dispose of at least $9.8 billion worth of assets - half of them within nine months, the rest within two years.

"We are facing a liquidity problem," said chairman Jean-Rene Fourtou, who took over July 3 after Messier's ouster. Fourtou said he would "try to avoid any fire sale, but we have negotiations that could be concluded very soon if the price was lowered."

149.    This second substantial write-down in five months may have been necessary as Vivendi, throughout its acquisition binge, acquired an equal, if not greater, amount of debt as it did assets. As a result, the Company was forced to incur a series of write-downs, which exposed Vivendi's true financial condition.

150.    In light of the foregoing announcements, on August 14, 2002, debt-rating agency Standard & Poor's slashed Vivendi's long-term corporate credit to "junk status" or below investment grade, making matters worse for the Company.

151.    During an August 14, 2002 conference call with analysts, Fourtou commented on

the Company's financials and debt level, stating:

> **In the short term, due to the structure of our debt, we are
> facing a liquidity problem . . . in spite of the value of our assets.**
> That's why the first thing I did upon my arrival was to negotiate
> . . . a new bank facility of 1 billion euros.  This new money has not
> yet been used.  As announced in July, we are presently negotiating
> a new facility of 3 billion euros which will include the first
> 1 billion euros.  We have reached a framework for agreement with
> the same seven banks and we expect this new facility to be signed
> by the end of August.  **This will allow Vivendi to buy the time
> necessary to implement the best conditions for the necessary
> sale of businesses.**
>
> We are committed to sell assets for a minimum amount of 10
> billion euros in the two years to come, 5 billion euros of which will
> be completed during the next nine months.

152.    Fourtou also made the following comments regarding Vivendi's first half of 2002

results:

> Despite good progress in revenue and operating income growth,
> Vivendi's net income before exceptional items and amortization of
> goodwill is a loss of 0.06 euros per share.  **I would like [to]
> underscore that this negative income is the result of a loss
> coming from the businesses that Vivendi owns more than 50%
> of, offset in part by positive results from the companies
> Vivendi owns less than 50% of.  This represents a challenge as
> Vivendi can not access the cash flow generated by companies it
> owns less than 50% of.**
>
> These accounts are presented under French GAAP without a
> reconciliation to US GAAP; I apologize for that the 1st quarter
> results were presented in US GAAP and I know that this may
> create some problems for you.  A reconciliation to US GAAP will
> be given to you in September with the half year audited figures.  In
> the future, we shall present our figures in French GAAP on a
> quarterly basis with a reconciliation into US GAAP.

(Emphasis added).

153.    As reported on August 14, 2002 by the *Associated Press*, analysts had anticipated

total write-downs of between $4.9 billion (€5 billion) and $9.8 billion (€10 billion) to reflect the

drop in value of media assets and holdings, not the significantly higher figure announced by the

Company.  The *Associated Press* further reported:

> Vivendi Universal, the teetering French media conglomerate, reported a massive loss of $12 billion for the first half of the year and said it will sell $10 billion in assets as it seeks to pare debt, including the U.S. publisher Houghton Mifflin.  Adding insult to injury, a ratings agency downgraded the Company's debt to junk.

> The sale of Houghton Mifflin, which the company only bought last year for $1.7 billion, appeared to mark a first step toward breaking up the entertainment and media empire built up by Vivendi's former chairman, Jean-Marie Messier, in a whirlwind of costly acquisitions.  In all, Vivendi said it hopes to dispose of at least $9.8 billion worth of assets - half of them within nine months, the rest within two years.

> **"We are facing a liquidity problem,"** said chairman Jean-Rene Fourtou, who took over July 3 after Messier's ouster.  Fourtou said he would "try to avoid any fire sale, but we have negotiations that could be concluded very soon if the price was lowered."

(Emphasis added).

154.    As a result of the August 14, 2002 disclosures, Vivendi common stock closed at

€11.89, down more than €4 (or approximately 25%) from its close the previous day.  This

decline represented more than an 81% drop from the stock's value in January 2002.  Similarly,

Vivendi's ADRs declined by $3.67 to close at $11.66 per ADR, which represented a decline of

more than 79% from their inflated levels at the beginning of 2002 when the ADRs traded in the

$55 range.  Likewise, the closing price of €11.89 per share on August 14, 2002 for Vivendi's

ordinary shares represented a decline of more than 81% from their inflated levels in early 2002,

when the shares traded at approximately €64 per share.

155.    On August 15, 2002, Standard & Poor's and Moody's expressed concerns over

the cash shortage Vivendi was facing.  Specifically, Standard & Poor's noted that, "the liquidity

gap may arise sooner than expected if Vivendi doesn't manage to secure credit lines."

58

156.     Under these same concerns, Moody's stated that if the Company could not arrange for new financing from its lenders shortly, Vivendi would encounter "severe short-term liquidity problems and with that, do further ratings downgrades by several notches." Accordingly, Moody's cut the Company's senior debt three steps to Bl.  Likewise, Standard & Poor's lowered its rating two grades to BB.  Standard & Poor's also noted it was considering lowering Vivendi's rating to CCC if the Company did not get the necessary financing.

157.     Pressure from Vivendi's cash situation also affected Vivendi Environment bonds as Vivendi Environment's debt fell 11%.  Vivendi Environment bonds suffered due to their structure and terms as a result of Vivendi's financial crisis, as Vivendi Environment could be forced to immediately redeem the bonds if requested by investors under a default by Vivendi.

158.     Based on the information alleged above, Vivendi's financial results and information repeated during the Relevant Period were materially false and misleading when made and omitted material information concerning the Company's financial information, as Vivendi's financial statements included in its Forms F-4, Forms 6-K and Forms 20-F filed with the SEC and in the Company's press releases were not a true and fair representation of Vivendi's financial and business results and were presented in violation of the principles of fair reporting, as well as International Accounting Standards, International GAAP and SEC rules.  The materially false and misleading statements made and issued during the Relevant Period, as discussed in this Complaint, resulted in Plaintiffs acquiring Vivendi's ADRs and common stock at artificially inflated prices, thus causing the damages complained of herein.

**H.     Developments Following The Relevant Period**

159.     On September 25, 2002, *Bloomberg L.P.* reported that the Company had sold its Telepiu unit for $980 million or €1 billion and had plans to sell its publishing unit, as well as a portion of its games division; all part of the Company's attempt to lower the $18.6 billion (€19

billion) of debt created by Messier's spending spree. Fourtou announced a target amount of asset sales of $11.8 billion (€12 billion) over the next 18 months. *Bloomberg L.P.* also reported that Vivendi had sold its Canal Plus Technologies unit to Thomson Multimedia AS for $186 billion (€190 billion) as a further reorganization of Vivendi's failing pay TV business.

160.    The uncertainty in the market continued to push Vivendi's market value lower. At the end of September 2002 Vivendi's ADRs had not traded above $13 per ADR. Similarly, Vivendi's ordinary common shares stayed within the €13 price range or below at the end of September 2002.

161.    On October 5, 2002, *Bloomberg L.P.,* citing a Le Figaro report, reported that Messier had been interrogated by the COB regarding the Company's financial disclosures.

162.    As the Company's financial problems became more apparent and continued to mount, Vivendi announced on October 10, 2002, that its Paris Headquarters would eliminate 152 jobs, in another attempt to lower its debt.

163.    Vivendi confirmed on October 15, 2002, that it would issue approximately $1 billion (€1.01 billion) of bonds backed by revenue from its Universal movie units ticket sales. The bond offering, underwritten by J.P. Morgan Chase & Co. and Bank of America Corp., was designed to reduce a $1.6 billion (€1.62 billion) loan made to Vivendi by the banks. The announcement was positively received by the market as the Company's shares closed above $13 for the first time in over a month, but this recovery did not last as the Company's stock slumped again to finish the month lower.

164.    On September 27, 2002, the *AFX News* reported, following a report in *Le Figaro*, that:

> Fourtou acknowledged that Vivendi would have had no choice but
> to declare bankruptcy within 10 days if Messier had not resigned.

60

165.    Facing concerns that the Company would not be able to honor its commitment under a €1.9 billion or $1.85 billion convertible bond offering, Vivendi issued a statement on October 17, 2002 that it would, in fact, be able to fulfill its obligations to the bondholders, attempting to reassure the investing public.

166.    On October 18, 2002, Vivendi disclosed that its banks had refused to provide a credit line to allow the Company to buy more of the French phone company, Cegetel, of which Vivendi already owned 85% at the time.  Vodafone Group PLL ("Vodafone") offered Vivendi €13.1 billion ($12.7 billion) for its stake of Cegetel, putting pressure on Vivendi to make a counter-offer or sell.

167.    Other reports emerging on October 18, 2002 stated that in an attempt to cut costs, Vivendi was considering pulling out of Viventures Partners ("Viventures"), a venture capital firm Messier created in 1998.  Viventures would likely be dissolved if Vivendi, the fund's largest investor, pulled out.  Such a move would likely frustrate the fund's partners, Goldman Sachs Group, Inc., Cisco Systems, Inc., Proctor & Gamble Co. and IBM Corp.

168.    By October 21, 2002, the last day that Vivendi would accept bids for its publishing arm, which included Houghton Mifflin, it looked like the unit would only be valued between €2-2.5 billion ($1.9-2.4 billion), far lower than what Vivendi originally had hoped.  A year earlier, Vivendi paid $2.2 billion (€2.3 billion) for Houghton Mifflin, which makes up only a portion of the Company's publishing unit, and the publishing unit as a whole had sales of over €4.7 billion ($4.6 billion).  The publishing unit contributes 16% to the Company's media business revenue.  Shares of Vivendi fell following news on the lowered price the Company could hope to receive for selling the unit.

61

169.    On October 23, 2002, the Company abandoned plans to sell its publishing unit entirely and agreed to sell some of its European and Latin American publishing units to Lagardere SCA for €1.25 billion or $1.22 billion instead.  News of the abandoned sale of the entire publishing unit caused the Company's common stock to drop as much as 9.6% on the French exchange.  Vivendi's ADRs similarly lost over 6% on the American exchange.

170.    While Vivendi still wanted to find a buyer for Houghton Mifflin, many analysts recognized that the Company had little bargaining power to negotiate a higher price for this portion of its publishing unit.

171.    On October 29, 2002, the Paris prosecutor's office announced it would begin investigating the Company's financial accounts in connection with a suit filed by shareholders against the Company, in July of 2002.  The investigations were said to be focusing on Vivendi's financial results for 2000 and 2001, as well as its financial projections for 2001 and 2002.  The action and the investigation focus specifically on the time period while the Company was under Messier's control.  Under Messier's control, Company's stock declined over 91% from a record split-adjusted price $145 (€150) in March 2000 to $13.6 (€13.9) at the time of Messier's departure in July 2002.  Similarly, the Vivendi ADRs traded as high as the split-adjusted price of $138.75 in March 2000 to fall as low as $13.40 on July 3, 2002, representing a 90% swing in value.

172.    On October 31, 2002, Vivendi announced it had reached an agreement to sell Houghton Mifflin to a buyout group for $1.75 billion (€1.8 billion), approximately $450 million (€457 million) Is than it bought the publisher for a year earlier.  Upon announcement of this deal, shares of Vivendi's ADRs fell to $12.12 per ADR.  Its common stock closed at €12.30 per share on November 1, 2002.

173.    Also on October 31, 2002, as more information about the Company's problems

and true financial condition continued to emerge throughout Fall 2002, *The Wall Street Journal*

reported that over a year earlier in 2001, Hannezo claims to have attempted to curb Messier's

acquisition spree and was very concerned about Vivendi's growing rapidly debt levels.

According to the article entitled "Damage Control: How Messier Kept Cash Crisis At Vivendi

Hidden For Months - Media Giant Was At Risk Well Before Investors knew; Now Criminal,

Civil Probes - Aide's Vision of 'Death Seat'" a December 13, 2001 memo from Hannezo to

Messier read as follows:

> I've got the unpleasant feeling of being in a car whose driver is
> accelerating in the turns and that I'm in the death seat, . . . All I ask
> is that all of this not end in shame.

The October 31, 2002 article also highlighted the Company's problems, including the lack of

financial controls:

> The company itself barely kept up with its chairman's aggressive
> spending.  Disorganization and inadequate staffing in Mr.
> Hannezo's finance departments routinely resulted in its being three
> months behind in assessing cash and debt levels, according to
> people familiar with the situation.

*The Wall Street Journal* article further reported that Hannezo, although claiming to have tried to

control Messier's spending, never alerted Vivendi's Board of Directors of any of these problems.

In fact, the mismanagement of Hannezo's department often facilitated Messier's reckless

spending:

> Mr. Hannezo never alerted the board of his concerns about Mr.
> Messier, nor did he attempt to resign, according to current and
> former executives and directors.  Moreover, the disorganization of
> Mr. Hannezo's department was one reason Mr. Messier had such
> wide latitude, according to current and former executives and
> directors.

63

As the article described, Vivendi's Board of Directors continued to support Messier's acquisition

strategy without fully realizing the damage being done to the Company:

> Mr. Messier, a former top investment banker with Lazard LLC, was famously fond of deal making. But now it turns out he pursued many more deals than had been publicly known. **More important, he spent billions of dollars buying back Vivendi stock on the market last year without consulting his CFO or the board, according to people familiar with the situation. Trying to prop up the stock price, he instead only sent Vivendi's debt soaring**.
>
> The board signed off on Mr. Messier's acquisitions. But it did so without knowing the full extent of his spending spree, current and former board members say. That is because Mr. Messier didn't tell the board about his single biggest expenditure: the purchase of 104 million Vivendi shares, or nearly 10% of the Company's equity, on the stock market during 2001. His purpose was to prop up the share price. The cost: $6.3 billion.
>
> Shareholders had earlier approved a resolution allowing Vivendi to buy back up to 10% of its shares. But current and former directors say they expected to hear beforehand about such massive purchases.
>
> \* \* \*
>
> Mr. Hannezo opposed the stock purchases as a waste of cash . . . .This resulted in Mr. Messier trying to circumvent his CFO on the buybacks. The ex-chairman placed his stock orders by phone with two mid-level employees in the finance department, Hubert Dupont Lhotelain and Francois Blondet, according to a person familiar with the matter . . .
>
> In early December 2001, the CFO finally intervened by forbidding his subordinates to take Mr. Messier's phone calls, the person familiar with the situation says. Mr. Hannezo set up a formal process to slow Mr. Messier down, requiring that the chairman request buybacks in writing, along with some justification.
>
> \* \* \*
>
> By December, the buybacks had taken their toll: Vivendi was running out of cash, according to Mr. Hannezo's memo to the COB.

64

(Emphasis added).

174. The October 31, 2002 *Wall Street Journal* article also discussed Hannezo attempts

to prevent Messier from gambling with the Company's share price and options:

> Shareholders had earlier approved a resolution allowing Vivendi to
> buy back up to 10% of its shares. But current and former directors
> say they expected to hear beforehand about such massive
> purchases.
>
> Mr. Messier had a special incentive to boost Vivendi's share price
> with the buybacks: He had made a massive bet on the Company's
> behalf that Vivendi shares would rise by selling "put options" to
> banks in late 2000. The options committed Vivendi to buy back
> tens of millions of its shares at fixed prices in the future. If
> Vivendi's share price were to fall, the company could lose as much
> as $1.4 billion on the options. Even with the buybacks, the share
> price fell in the end. So far, the put options have cost Vivendi
> $900 million.
>
> Mr. Hannezo opposed the stock purchases as a waste of cash,
> regardless of the options. This resulted in Mr. Messier trying to
> circumvent his CFO on the buybacks. The ex-chairman placed his
> stock orders by phone with two mid-level employees in the finance
> department, Hubert Dupont Lhotelain and Francois Blondet,
> according to a person familiar with the matter.
>
> In early December 2001, the CFO finally intervened by forbidding
> his subordinates to take Mr. Messier's phone calls, the person
> familiar with the situation says. Mr. Hannezo set up a formal
> process to slow Mr. Messier down, requiring that the chairman
> request buybacks in writing, along with some justification.

Ultimately, Messier's "gambling," as reported by *The Wall Street Journal*, had set in motion the

Company's liquidity crisis:

> By December, the buybacks had taken their toll: Vivendi was
> running out of cash, according to Mr. Hannezo's memo to the
> COB. An immediate disaster was averted when Vivendi sold a 9%
> stake in Vivendi Environment, its utility unit. And after months of
> regulatory delay, Vivendi also received an $8.15 billion payment
> from Pernod Ricard SA and Diageo PLC for Seagram's liquor
> business, which had been put up for sale after the Seagram
> acquisition.

65

> In the meantime, the rating agencies were threatening a
> downgrade. After Mr. Hannezo's Dec. 13 "death seat" note, Mr.
> Messier decided to raise even more cash. In early January, the
> company abruptly sold stock valued at $3.2 billion - about half of
> the shares Mr. Messier had bought back earlier.

175.   On November 4, 2002, the U.S. Attorney's Office for the Southern District of

New York announced it had opened a preliminary criminal investigation into Vivendi. The U.S.

Attorney also noted that it was coordinating with an ongoing, informal SEC investigation of

Vivendi. Following this announcement, shares of Vivendi continued to fall.

176.   *The Wall Street Journal* reported on November 5, 2002:

> The U.S. Attorney's Office is coordinating its probe with U.S.
> Securities and Exchange Commission, which already has been
> conducting an informal inquiry into Vivendi, the company said in a
> statement.

> The main focus of the U.S. attorney's investigation, which is in its
> early stages, remains unclear, as does whether it will lead to any
> charges being filed. But one of the issues that has come under
> scrutiny by French authorities is the accuracy and timeliness of
> Vivendi's financial disclosures under its former chairman, Jean-
> Marie Messier, who was ousted in early July. France's stack-
> market watchdog, the Commission des Operations de Bourse,
> launched a probe at that time and is looking to see whether Mr.
> Messier may have misled his board and investors with overly rosy
> assessments of Vivendi's financial health, according to people
> familiar with that probe.

> The U.S. probe also may encompass accounting, as the Paris
> public prosecutor's office has included accounting in its own
> investigation. Among other issues, the Paris prosecutor's office
> said it would seek to establish whether Vivendi published "false
> accounts for the fiscal years that ended on Dec. 31, 2000 and Dec.
> 31, 2002."

177.   On November 7, 2002, Vivendi announced it might sell its stake in its water unit,

Vivendi Environment, as part of its ongoing plan to reverse the problems caused by Messier's

spending spree. Vivendi planned to sell 20% of Vivendi Environment, half of its interest, to a

small number of investors, giving buyers an option to buy the remainder of the unit. A

November 10, 2002 *Bloomberg L.P*, report stated that this sale would help improve the share

value of Vivendi Environment, which hit an all-time low of $17.70 and closed at $18.10 on

September 24, 2002 amid uncertainty over Vivendi's plan to sell off assets to lower its debt

levels. Many investors charged that Vivendi hindered the Vivendi Environment's expansion and

financing. In the past, the Company offloaded $16.1 billion (€17 billion) of debt into Vivendi

Environment when it first sold part of its interest in the water unit in July 2000, Vivendi

Environment has lost 32% of its value since its initial public offering.

178.    On November 19, 2002, Vivendi disclosed that the SEC investigation into the

Company was now a formal investigation. Following this disclosure, shares of the Company's

common stock declined to €11.18 per share and its ADRs declined similarly by nearly 3% to

close at $11.26 per ADR.

179.    *Bloomberg L.P.* reported that on November 21, 2002, the Company had to agree

to return almost a quarter of the proceeds from its recent notes sale to spur demand among

investors. This requirement left Vivendi with approximately $741 million (€740 million) in

proceeds from the sale of the notes. The money paid back to investors represented the interest

that would accrue over the life of the three-year notes.

180.    Also, on November 21, 2002, a group led by investor Marvin Davis, confirmed it

was negotiating to acquire all of Vivendi Universal's entertainment assets. The Company

rejected a $20 billion (€20 billion) offer made by the Davis Group, but not before the shares of

Vivendi and its ADRs improved significantly, the common shares that trade abroad rose over

21% to close at €13.80 per share while the ADRS rose nearly 20% to close at $14.00 per ADR.

During the month prior to the Davis Group's offer, Fourtou rejected two offers, totaling $22

billion (€22 billion), which represented a 54% premium on the Company's total market value.

181.    On November 25, 2002, Vivendi completed the sale of its 20.4% stake in utility

arm Vivendi Environment to a group of French, Italian, and U.S. Investors for 1.86 billion euros

($1.85 billion).  Vivendi also agreed to sell the rest of its 40.8% stake to the investor group by

late 2004.  The investors are mainly French companies, such as insurers AGFA, a unit of

German insurer Allianz, and AXA; banks BNP Paribas and Credit Agricole lndosuez, and utility

Electricite de France.  The agreement meant that Vivendi, which began as a water company, will

become a pure media business, completing its transformation away from its roots.

182.    *The New York Times* reported on December 13, 2002 that French investigators

searched the Paris offices of Vivendi and Messier's home as part of their ongoing investigation

into the Company's accounting practices.  Investigations in September 2002 uncovered

documents that indicate Messier attempted to pressure its auditor into accounting for the sale of

shares of BSkyB to inflate the Company's 2001 earnings by approximately $1.4 billion (€1.37

billion).  The investigations also reportedly focus on whether or not Messier and other former

executives knew the Company was in a liquidity crisis but did not convey such information to

Vivendi's shareholders.  A December 13, 2002 *Financial Times* article regarding the

investigations quoted a recent interview with Messier in which he stated in defense of Vivendi

and more specifically his tenure as the Company's Chairman and CEO, that "Vivendi Universal

is not Enron."

183.    Also on December 13, 2002, the *Associated Press* reported, based on an article in

Le *Monde*, that Hannezo during 2001 underestimated its debt problem:

> Electronic mail seized in an investigation of alleged financial
> irregularities at Vivendi Universal and other documents show
> escalating tension amid a growing debt crisis that led to the fall of
> flamboyant Chairman Jean-Marie Messier.
>
> Board member Edgar Bronfman Jr. of Canada's Seagrams empire,
> which was purchased by Vivendi in 2000, warned Messier in an e-

mail that he could be courting danger with his "very costly personal shows," according to Friday's edition of the newspaper *Le Monde*.

And former Financial Director Guillaume Hannezo, in a note to France's stock exchange watchdog, said Messier had turned Vivendi into a "permanent deal machine," while an "urban guerrilla atmosphere" gripped a divided board, the newspaper said.

Hannezo, the former finance director, said in his 20-page report to the COB that 2001 was marked by the "accumulation of a series of errors," including underestimating that the debt problem, according to *Le Monde*.

Hannezo, a key figure in the COB investigation, speculated that Vivendi could have been spared its debt mountain in 2001 "had it resolved to sell before buying . . . Unfortunately, it oriented itself toward the inverse choice, satisfying itself with potential riches," he wrote . . . Vivendi's shares have tumbled around 75 percent this year.

184.    On December 16, 2002, the European edition of *The Wall Street Journal*, reported that French authorities searched offices of Canal Plus, Vivendi's cable network.

185.    The *Financial Times* reported on December 18, 2002 that on December 17, 2002, Vivendi reached an agreement to sell its 10% stake in Echostar back to the direct satellite provider for $1.07 billion in cash. This deal marks a substantial loss for the Company.

186.    On December 24, 2002, Vivendi announced it had received approximately $3.1 billion (€3 billion) in cash for selling its interest in a North American satellite operator and part of its interest in Vivendi Environment. Vivendi collected €1.86 billion for the sale of half of its 40.8% interest shareholding in Vivendi Environment at a price of €22.5 per share.

187.    On December 31, 2002, Vivendi announced it had completed the sale of U.S. publishing company Houghton Mifflin for $1.66 billion (€1.7 billion). Vivendi had acquired Houghton Mifflin for $2.2 billion (€2.6 billion). This transaction as apart of Vivendi's necessary

sale to alleviate its debt levels and deal with the looming liquidity crisis, represented an approximately $600 million or €900 million loss to the Company.

188.    In a move which some analysts believed would pave the way for a sale of Vivendi's U.S. entertainment assets and cut the Company's debt, Vivendi and Barry Diller of USA Interactive announced on January 8, 2003 that they were considering redrawing their media partnership. Vivendi and USA Interactive would possibly form a new partnership to operate the Company's United States assets.

189.    On January 13, 2003, Vivendi announced it would sell its 49% stake in Elektrim as the Company continued to unload assets to alleviate its huge debt load resulting from Messier's acquisition spree.

190.    *Bloomberg L.P.* reported on January 15, 2003 that the $7.2 billion or €6.8 billion of assets sold since July 2002, are still not enough to restore Vivendi's credit rating above junk status. Moody's and Standard & Poor's have both stated they would downgrade Vivendi further if the Company does not sell more assets, freeing up more cash to battle Vivendi's liquidity crisis.

191.    On March 21, 2003, The *Financial Times* reported that Vivendi had appointed investment bankers to find a purchaser of its interest in Maroc, which is currently valued at approximately $1.7 billion (€1.6 billion). The Maroc sale is part of the Company's overall continuing asset disposal program to help reduce Vivendi's debt.

192.    Liberty Media Corporation ("Liberty Media") and other related entities (collectively referred herein as Liberty Media) filed a complaint (the "Liberty Media Complaint") in this District on March 28, 2003 against Vivendi, Messier, Hannezo and Universal Studios, Inc. ("Universal Studios"). The Liberty Media Complaint asserts common law claims

70

for breach of contract, breach of warranty, unjust enrichment, fraud, fraudulent concealment and

negligent misrepresentation, as well as claims for violations of Sections 10(b) and 20(a) of the

Exchange Act.  Liberty Media holds a 3.6% interest in Vivendi.

193.   The Liberty Media Complaint stems from the December 2001 deal by which

Liberty Media agreed to exchange a large portion of its then 21% interest in USA Networks, Inc.

for 37.6 million Vivendi ADRs.

194.   Most recently, on March 30, 2003, *The Financial Times* reported that the SEC had

requested additional documents from the Company regarding various accounting issues.

### VIVENDI'S MOUNTING LIQUIDITY CRISIS

195.   During the Relevant Period, Defendant repeatedly made material misstatements

and omissions concerning the Company's liquidity.  Despite the Company's assurances that

Vivendi was financially strong, Vivendi's implementation of a strategy of growth through

acquisition caused the Company to overpay for businesses, and saddled it with huge amounts of

debt that were not offset by the operations of the acquired businesses.  These heavy debt loads

made it nearly impossible for the Company to meet its obligations and almost forced the

Company into bankruptcy.

196.   One of the central reasons for the Company's liquidity problems was its inability

to generate sufficient cash flows from its acquired businesses.  As cash flows from the acquired

businesses continued to fall short of expectations, Vivendi's liquidity problems increased and

became more problematic.  This failure caused the Company to engage in various GAAP

violations to conceal its actual financial results.

197.   Also as discussed herein, Messier's undisclosed massive stock buy-back program,

which caused the Company to expend over $6.3 billion in cash, severely strained the Company's

financial resources and added to the mounting liquidity issues plaguing the Company.  (*See* ¶
112, 147, 173).

198.    During the Relevant Period, the Defendant also misled investors regarding
liabilities in connection with put options sold by the Company, which ultimately cost Vivendi
hundreds of millions of dollars, further adding to the Company's liquidity problems.  In late
2000 and 2001, the Company wagered on the future success of its business by selling put options
to raise cash to fund executive compensation.  These options obligated Vivendi to purchase in
the future a minimum of 22.8 million of its own shares, or approximately 2% of the outstanding
Vivendi common stock, at an average price of €69.  As the Company's share price dropped in
2001 and early 2002, the Company never disclosed that it was in danger of losing hundreds of
millions of dollars in connection with the options.  The Defendant only made limited disclosures
of these put option obligations in spring 2002.  (*See* ¶ 112).

199.    As *The Wall Street Journal* reported on October 31, 2002, Vivendi's acquisition
spree, together with the factors described above, left the Company with depleted resources and in
severe danger of failing.  (*See* ¶ 173-74).  On May 14, 2002, *Bloomberg L.P.* reported that
Vivendi was nearly insolvent by the end of 2001.  Throughout the Relevant Period, the
Defendant denied the existence of a liquidity crisis.  It was later disclosed that the Company
would have been forced to declare bankruptcy if Messier did not resign and the Company did not
make drastic changes to its business strategy.  (*See* ¶ 164).

### VIOLATIONS OF U.S. AND FRENCH ACCOUNTING STANDARDS

200.    Throughout the Relevant Period, Vivendi filed financial statements with the SEC,
which the Company represented to have been prepared in conformity with GAAP in France
("French GAAP").  The SEC allows foreign private issuers, such as Vivendi, to prepare their
primary financial statements in accordance with a comprehensive body of GAAP other than U.S.

GAAP, provided that an understanding of such financial statements is facilitated via a reconciliation to U.S. GAAP.

201.    The SEC requires that each annual financial statement filed on Form 20-F and all annual and interim financial statements included with a registration statement be reconciled to U.S. GAAP. Vivendi's 1999, 2000, and 2001 annual financial statements filed on Form 20-F, represented to have been prepared under the standards of French GAAP and were reconciled with U.S. GAAP. In addition, Vivendi's 2001 Form 20-F, which was previously discussed, which was signed and certified by Hannezo, represented that, beginning in 2002, the Company's financial information would be changed to be accounted for under U.S. GAAP and reconciled to French GAAP.

202.    GAAP are the principles recognized within the accounting profession as the conventions, rules, and procedures, which define accepted accounting practice at a particular time. According to Financial Accounting Standards Board ("FASB") Statement of Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is to provide accurate and reliable information concerning an entity's financial performance during the period being presented.

203.    Financial results should indicate what they are purported to represent. FASB Statement of Concepts No. 2, ¶ 63.

204.    SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.

205.    Vivendi' s financial statements and earnings announcement released during the Relevant Period were materially false and misleading and were presented in violation of U.S.

GAAP and SEC rules and regulations, based on the Company's failure to timely record appropriate impairments for goodwill and concealed the Company's mounting liquidity problems. Defendant caused Vivendi's employees to engage in improper accounting practices, and/or knowingly acquiesced in and condoned such improper practices. (*See* ¶ 173 discussing Hannezo's inability to control the Company's accounting and the insufficiencies of Vivendi's accounting department).

206.    Goodwill represents the fair market value of acquired net assets of a business subtracted from the price paid for those assets. In other words, goodwill is the difference between the fair value of a business and the amount paid for that business.

207.    Goodwill should be checked for its actual value and written-down if carried at levels in excess of its true market value. By not properly recording impairments to goodwill when they were required, Vivendi overstated its results of operations and financial position and also defrauded the investing public regarding its cash flows from its various acquisitions and investments.

208.    Vivendi failed to record impairment for goodwill even as the value of its acquired assets declined over two years prior to the time it recorded a $15 billion charge in March 2002 thereby inflating its balance sheet and overall financials for over two years.

209.    One example of Vivendi's inappropriate treatment of goodwill can be seen in the Canal Plus acquisition transaction. In this instance, Defendant knew or should have known that the anticipated cash flows expected from the acquisition could never support the valuation attributed to those assets. Evidence of this can be seen by a complaint filed by Canal Plus in the United States District Court for the Northern District of California in March involving an entity

74

known as NDS Group PLC ("NDS"), whose business caused Canal Plus to suffer losses of over a billion dollars, thereby lowering the value to Vivendi of this acquired asset.

210.    Despite Defendant's knowledge of the problems with Canal Plus' business, Vivendi did not disclose this to the market and reported its results for the quarter ended March 31, 2002, the Company stated that Canal Plus' revenue fell due to lower advertising revenue, not the NDS problem.

211.    Following the departure of Messier and Hannezo, Vivendi took an additional $3.7 billion (€3.8 billion) impairment for the value of Canal Plus' goodwill at the and of the first half of 2002 under French GAAP *see* ¶¶ 145-46 *supra*), even though Canal Plus reported revenue growth of 8% for this period.  This seemingly improper and unnecessary impairment to goodwill further emphasizes that the impairment recorded for the value of Canal Plus' goodwill should have been taken much earlier than during the last six months of 2002.

212.    Vivendi also artificially inflated its revenue by including all of its investments within its consolidated financial statements in its Form 20-F filed with the SEC, regardless of the percentage of the Company's ownership of these investments.

213.    Vivendi often included the financial information for companies in which it only possessed a nominal interest in.  For example, Vivendi included as part of its 1999, 2000 and 2001 financial statements information regarding Cegetel, even though Vivendi owned less than 50% of that enterprise.  Additionally, in Vivendi's 2001 financial statements, the Company included financial information for Maroc, which Vivendi only held less than a 40% interest.

214.    This inclusion of companies which Vivendi did not hold controlling interests in as part of the Company's consolidated balance sheet did not give the investing public a true

75

representation of Vivendi's financial condition and was a violation of GAAP and SEC
regulations.

215.    Vivendi also made inadequate disclosures about its $16.7 billion (€17 billion) in
off balance sheet liabilities which distorted its liquidity omitting material information from its
earnings announcements and public filings.  These liabilities, which were not adequately
disclosed included:  Broadcasting Rights ($2.7B, €2.8B); Creative Talent and Employment
Agreements ($885M, €900M); Operating Leases ($4.6B, €4.7B); Real Estate Defeasances
($689M, €700M); Potential Vendor Financing at Xfera Joint Venture ($1.8B, €1.9B); Public
Service Contracts ($197M, €200M); Liability to Rondor Music ($295M, €300M); Cegetel
Buyback of Telecom Development ($98M, €100M); Bank Facility and Theatre Rental
Guarantees at Cinema Corporation ($393M, €400M); Put Option on Vivendi Shares (as much as
$1.1B, €1.2B); and Replacement Cost of Fixed Assets at Vivendi Environment ($2.3B, €2.4B).
These totaled more than $16.7 billion (€17 billion) and fraudulently portrayed the Company to
the investing community to be in a much stronger cash position than it actually was.

216.    Vivendi also inflated its earnings and obtained over $904 million (€1 billion) in
proceeds as the result of a transaction involving the sale of an interest in Vivendi Environment.
Specifically, in December of 2001, Vivendi sold 32.4 million shares of Vivendi Environment for
$1.1 billion (€1.2 billion), generating pre-tax capital gains of $105 million (€116 million).
However, according to Vivendi's Form 6-K filed with the SEC in April of 2002, Vivendi
Environment issued one free warrant for each share held, with every seven warrants giving
holders the right to a new share of Vivendi Environment at €55/share until March of 2006.  As a
result of the warrant issue, Vivendi's consolidated equity interest in Vivendi Environment
remained steady at 63%, both before and after the transaction.  Absent this transaction, Vivendi's

76

2001 income before exceptional items, income taxes, goodwill amortization, equity interest and minority interest would have been €1.751 billion as compared to its reported €1.867 billion.

217.    Vivendi also inflated its reported earnings in 2001 and future periods as a result of creating excessive reserves for closure, exit and consolidation activities via adjustments to the goodwill attributable to its various acquisitions during 2000 rather than to expenses.  In conjunction with the Company's year 2000 acquisitions of Seagram and Canal Plus, in 2001 Vivendi increased its reserves for exit activities by €400 million by increasing the goodwill attributable to these acquisitions.  These excess reserves could be used to inflate the Company's future earnings, further distorting its financials and artificially inflating the market value of the Company's securities.

218.    Typically, when a company increases a reserve or makes payments for severance or other costs, the company records an expense on its profit and loss account (*e.g.*, provision for restructuring) and credits the reserve account that amount.  However, in Vivendi's case, the increase in the Company's accruals for exit costs were achieved without any corresponding effect on the Company's reported profits.  Instead of reporting an expense, Vivendi increased the goodwill attributable to the Company's year 2000 acquisitions and increased the Company's reserves by a like amount.

219.    Although it is not unusual for companies to make accounting adjustments to acquired assets and liabilities, the magnitude of Vivendi's adjustments in 2001 and for 2002 were staggering and could not have been done in the everyday course of its accounting practices.

220.    Due to these accounting improprieties, Vivendi presented its financial results and statements in a manner which violated International Accounting Standards, including the following fundamental accounting principles:

(a)     that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (*See* APB No. 28, ¶ 10);

(b)     that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (*See* FASB Statement of Concepts No. 1, ¶ 34);

(c)     that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances on those resources and claims to those resources (*See* FASB Statement of Concepts No. 1, ¶ 40);

(d)     that financial reporting should provide information about how management of a business enterprise has discharged its stewardship responsibility to shareholders for the use of the business resources entrusted to it was violated. To the extent that management offers securities of the business to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (*See* FASB Statement of Concepts No. 1, ¶ 50);

(e)     that financial reporting should provide information about a business' financial performance during a period was violated. Thus, although investment and credit decisions reflect investors' expectations about future business performance, those expectations are commonly based at least partly on evaluations of past business performance (*See* FASB Statement of Concepts No. 1, ¶ 42);

(f)     that financial reporting should be reliable in that it represents what it purports to represent and that information should be reliable as well as relevant in a notion that is central to accounting (*See* FASB Statement of Concepts No. 2, ¶¶ 58-59);

78

(g)   that nothing is omitted from the information that may be necessary to ensure that it truly represents underlying events and conditions (*See* FASB Statement of Concepts No. 2, ¶ 79); and

(h)   that conservatism should be used as a reaction to uncertainty and risk to ensure that uncertainties and risks inherent in business are adequately considered by investors (*See* FASB Statement of Concepts No. 2, ¶¶ 95, 97).

221.   The foregoing accounting improprieties caused Vivendi to issue financial statements that materially falsified its financial performance, damaging the Plaintiffs.  By filing materially false and misleading financial statements with the SEC in violation of U.S. GAAP, Vivendi repeatedly disseminated financial statements which were presumptively misleading and inaccurate.

222.   The undisclosed material adverse information which was concealed by the Company during the Relevant Period is exactly the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practices, is expected by investors and securities analysts to be disclosed.  The foregoing accounting improprieties caused Vivendi to issue financial statements that were materially false and misleading and/or omitted material information, thereby depriving Plaintiffs of making educated investments decisions during the Relevant Period based on the Company's true financial condition.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

223.   Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)     Defendant made false and misleading statements of material fact, and failed to disclose material facts, during the Relevant Period;

(b)     The misstatements and omissions were material;

(c)     The securities of the Company traded in efficient and open markets (excluding the effects of fraud); the Company was followed by numerous major analysts; the Company's securities met the requirements for listing, and Vivendi's ADRs were listed and actively traded on the New York Stock Exchange and Vivendi's ordinary shares were listed and actively traded on the Paris Bourse; and

(d)     The misstatements and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities as well as the true nature of Vivendi's financial condition.

(e)     Plaintiffs purchased or otherwise acquired its Vivendi securities between the time Defendant misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the omitted facts.

(f)     Based upon the foregoing, Plaintiffs are entitled to a presumption of reliance upon the integrity of the market price for the Company's securities.

## SCIENTER

224.    Vivendi, through its senior executives, acted with scienter in that it knew that the financial statements it issued and disseminated were materially false and misleading, or that the statements therein were made and distributed with reckless disregard for facts. that Vivendi either knew or should have known.  Vivendi knew or recklessly disregarded the fact that such misleading statements would be distributed and disseminated to the investing public, and knowingly substantially participated in and/or acquiesced in the issuance and dissemination of such statements in violation of the federal securities laws.  The Company either knew that such

statements were false and misleading or acted with reckless disregard of such falsity since, its

executives knew of (or alternatively had free and unfettered access to materials that would have

revealed) the improper accounting with respect to Vivendi's goodwill and other intangible assets

and resultant earnings inflation. If the Company's executives did not have actual knowledge of

the misrepresentations and omissions alleged, then they were reckless in failing to obtain such

knowledge by deliberately refraining from taking those steps necessary to discover whether

statements disseminated by Vivendi were true.

225.    Vivendi also had substantial economic motives to conceal the true facts regarding

its accounting and financial reporting. By concealing such facts, the Company's executives

enabled themselves to increase Vivendi's executive compensation via stock options by financing

Vivendi's stock option plan via the sale of put options on Vivendi shares. In addition, Vivendi

was motivated to maintain its share price at an artificially high level so as to complete the Canal

Plus, Seagram, and MP3.com acquisitions at favorable exchange ratios.

## NO SAFE HARBOR

226.    The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false statements pleaded in this complaint.

Many of the specific statements pleaded herein were not identified as "forward-looking

statements" when made. To the extent there were any forward-looking statements, there were no

meaningful cautionary statements identifying important factors that could cause actual results to

differ materially from those in the purportedly forward-looking statements. Alternatively, to the

extent that the statutory safe harbor does apply to any forward-looking statements pleaded

herein, Defendant is liable for those false forward-looking statements because at the time each of

those forward-looking statements was made, the particular speaker knew that the particular

forward-looking statement was false, and/or that the forward-looking statement was authorized

81

and/or approved by an executive officer of Vivendi who knew that those statements were false when made.

## COUNT I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5, Promulgated Thereunder

227.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

228.    This Count is asserted against Vivendi and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder.

229.    During the Relevant Period, Defendant directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which it knowingly or recklessly engaged in acts, practices, and courses of business which operated as a fraud and deceit upon the Plaintiffs, and made various deceptive and untrue statements of material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to the Plaintiffs.  The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce Plaintiffs to purchase or otherwise acquire Vivendi securities during the Relevant Period at artificially inflated prices.

230.    During the Relevant Period, Defendant, pursuant to said scheme, plan, and unlawful course of conduct, knowingly and recklessly issued, caused to be issued, participated in the issuance of, the preparation and issuance of deceptive and materially false and misleading statements to the investing public as particularized above.

231.    As a result of the dissemination of the false and misleading statements set forth above, the market price of Vivendi securities was artificially inflated during the Relevant Period. In ignorance of the false and misleading nature of the statements described above and the

deceptive and manipulative devices and contrivances employed by said Defendant, Plaintiffs relied, to their detriment, on the integrity of the market price of the stock in purchasing or otherwise acquiring Vivendi common stock and ADRs.  Had Plaintiffs known the truth, they would not have purchased or otherwise acquired said shares or would not have acquired the shares at the inflated prices that were paid.

232.   Plaintiffs have suffered substantial damages as a result of the wrongs herein alleged in an amount to be proved at trial.

233.   By reason of the foregoing, Defendant directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that it:  (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the Plaintiffs in connection with their acquisitions of Vivendi securities during the Relevant Period.

WHEREFORE, Plaintiffs pray for judgment as follows:

(A)   Awarding compensatory damages in favor of the Plaintiffs against the Defendant for the damages sustained as a result of the wrongdoings of the Defendant, together with interest thereon;

(B)   Awarding Plaintiffs their fees and expenses incurred in this action, including reasonable allowance of fees for its attorneys, and experts; and

(C)   Granting such other and further relief as the court may deem just and proper.

83

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: September 16, 2009

ENTWISTLE & CAPPUCCI LLP

By: _____

Vincent R. Cappucci
Harold F. McGuire, Jr.
Shannon L. Hopkins
280 Park Avenue, 26th Floor West
New York, New York 10017
Telephone: (212) 894-7200

*Attorneys for Plaintiffs*

84