UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GAMCO INVESTORS, INC., <br>                       Plaintiff, <br> v. <br> VIVENDI, S.A. (SUED AS VIVENDI UNIVERSAL, S.A.), <br>                       Defendant. | 03 Civ. 5911 (SAS) |
| GAMCO GLOBAL SERIES FUNDS, INC., GABELLI CAPITAL ASSET FUND, THE GABELLI VALUE FUND INC., THE GABELLI ASSET FUND, THE GAMCO MATHERS FUND, THE GABELLI GLOBAL MULTIMEDIA TRUST INC., THE GABELLI EQUITY TRUST INC., THE GABELLI CONVERTIBLE AND INCOME SECURITIES FUND INC., AND GAMCO INTERNATIONAL GROWTH FUND, INC. <br>                       Plaintiffs, <br> v. <br> VIVENDI, S.A., <br>                       Defendant. | 09 Civ. 7962 (SAS) |

**DEFENDANT'S TRIAL MEMORANDUM OF LAW**

CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019

*Attorneys for Defendant Vivendi, S.A.*

February 11, 2013

## TABLE OF CONTENTS

**Page #**

I. Did Plaintiffs purchase Vivendi ADRs without regard to whether their market price was an accurate measure of their intrinsic value? ................................................. 2
   A. Applicable Law ............................................................................................ 2
   B. Summary of Facts ........................................................................................ 3

II. Would Plaintiffs have purchased Vivendi ADRs had they known Vivendi's alleged true liquidity condition? ............................................................................... 6
   A. Applicable Law ............................................................................................ 6
   B. Summary of Facts ........................................................................................ 7

III. If Plaintiffs relied on the efficiency of the market, was such reliance reasonable under the circumstances here? ............................................................................... 9
   A. Applicable Law ............................................................................................ 9
   B. Summary of Facts ........................................................................................ 9

IV. Conclusion ............................................................................................................ 13

# TABLE OF AUTHORITIES

**Cases**                                                                               Page(s)

Ashland Inc. v. Morgan Stanley & Co., Inc., 652 F.3d 333 (2d Cir. 2011) ................ 1

Basic v. Levinson, 485 U.S. 224 (1988) ................ 2

Brown v. E.F. Hutton Group, Inc., 991 F.2d 1020 (2d Cir. 1993) ................ 9

Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336 (2005) ................ 2, 6

Erica P. John Fund, Inc. v. Halliburton Co., U.S. , 131 S.Ct. 2179 (2011) ................ 1, 2, 5

GAMCO Investors, Inc. v. Vivendi, S.A., _ F. Supp. 2d _, 03 Civ. 5911 (SAS), 2013 WL 132583, at *3 (S.D.N.Y. Jan. 10, 2013) ................ 1, 2

In re Safeguard Scientifics, 216 F.R.D. 577 (E.D. Pa. 2003) ................ 6

Kline v. Wolf, 702 F.2d 400 (2d Cir. 1983) ................ 5

Lawrence v. Philip Morris Cos., Inc., No. 94 Civ. 1494, 1999 WL 51845, at *4 (E.D.N.Y. Jan. 9, 1997) ................ 5

Starr ex rel. Estate of Sampson v. Georgeson Shareholder, Inc., 412 F.3d 103 (2d Cir. 2005) ................ 7

Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc., 546 F.3d 196 (2d Cir. 2008) ................ 2, 3

**Statutes & Rules**

Section 10(b) of the Securities Exchange Act of 1934 ................ 1

To sustain a private claim for securities fraud under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, a plaintiff must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation". GAMCO Investors, Inc. v. Vivendi, S.A., _ F. Supp. 2d _, 2013 WL 132583, at *3 (S.D.N.Y. Jan. 10, 2013) ("Summary Judgment Opinion" or "SJ Op.") (citing Ashland Inc. v. Morgan Stanley & Co., Inc., 652 F.3d 333, 337 (2d Cir. 2011) and Erica P. John Fund, Inc. v. Halliburton Co., _ U.S. _, 131 S.Ct. 2179, 2184 (2011)).

On August 10, 2012, the Court entered an Opinion and Order collaterally estopping Defendant Vivendi, S.A. ("Vivendi") from contesting, as to GAMCO Investors, Inc. ("GAMCO"), the Section 10(b) elements of falsity, materiality, scienter, and loss causation. In re Vivendi Universal, S.A. Sec. Litig., _ F. Supp. 2d _, 2012 WL 3264382 (S.D.N.Y. Aug. 10, 2012). On January 29, 2013, the Court entered an Order estopping Vivendi from contesting the same elements as to the Mutual Funds Plaintiffs.[1] Order, GAMCO Investors, Inc. v. Vivendi, S.A., 03 Civ. 5911 (SAS) (Jan. 29, 2013), ECF No. 118. The parties have stipulated as to the amount of damages that would be awarded should Plaintiffs prevail at trial. Stipulation and Order dated February 8, 2013, GAMCO Investors, Inc. v. Vivendi, S.A., 03 Civ. 5911 (SAS), ECF No. _. In this action, the only remaining issue to be determined is whether defendant

---

[1] The term "Mutual Funds Plaintiffs" refers to GAMCO Global Series Funds, Inc., Gabelli Capital Asset Fund, The Gabelli Value Fund, Inc., The Gabelli Asset Fund, The Gabelli Global Multimedia Trust, Inc. and The Gabelli Equity Trust, Inc. The GAMCO Mathers Fund, The Gabelli Convertible and Income Securities Fund, Inc. and GAMCO International Growth Fund, Inc. are no longer pursuing any damages in this action, and the claims of those funds will therefore be dismissed.

1

Vivendi has successfully rebutted the presumption of reliance relied upon by Plaintiffs in this case.

That remaining issue can be decided one of three ways, each one being sufficient for Vivendi to prevail:

I. Did Plaintiffs purchase Vivendi ADRs without regard to whether their market price was an accurate measure of their intrinsic value?

II. Would Plaintiffs have purchased Vivendi ADRs had they known Vivendi's alleged true liquidity condition?

III. If Plaintiffs relied on the efficiency of the market, was such reliance reasonable under the circumstances here?

I.  **Did Plaintiffs purchase Vivendi ADRs without regard to whether their market price was an accurate measure of their intrinsic value?**

   A.  **Applicable Law**

To prove reliance, the plaintiff must show that but for the material misleading statement or omission, it would not have transacted in the security. Id. This is sometimes referred to as "transaction causation". Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 341 (2005). In Basic v. Levinson, 485 U.S. 224, 247 (1988) ("Basic"), the Supreme Court held that, under certain circumstances, a plaintiff is entitled to a rebuttable presumption that it relied on the efficiency of the market. The presumption means that investors rely on the market price of a security as an accurate measure of its intrinsic value. See SJ Op., 2013 WL 132583 at *4 (citing Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc., 546 F.3d 196, 200 n.4 (2d Cir. 2008) ("Teamsters"). Plaintiffs plead such reliance in this case.[2] This presumption of

---

[2] GAMCO's Amended Complaint ¶ 214, GAMCO Investors, Inc. v. Vivendi, S.A., 03 Civ. 5911(SAS) (July 15, 2009), ECF No. 70; Mutual Funds Plaintiffs' Complaint ¶ 223, GAMCO Global Series Funds, Inc. v. Vivendi, S.A., 09 Civ. 7962(SAS) (Sept. 16, 2009), ECF No. 1.

2

reliance can be rebutted by any showing that "severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or [plaintiff's] decision to trade at a fair market price". Id. at 248-49. Specifically, the defendant can rebut the presumption of reliance by showing either that "the alleged misrepresentation did not impact the market price" or that "the investor did not 'rely on the market price of [the] securit[y] as an accurate measure of [its] intrinsic value'". SJ Op., 2013 WL 132583 at *4 (citing Teamsters, 546 F.3d at 200 n.4).

It is not enough for a plaintiff to have merely considered the market price of the security in question in their purchase decisions[3]. Since every investor presumably pays "the market price", every investor who purchased a security on the open market, under such theory, would always be regarded as having relied upon the integrity of market price in making the purchase, because at some point she would have had to "consider" the market price when she made the purchase at the market price. But that is not what the presumption means. See SJ Op., 2013 WL 132583 at *10 (The cases cited by GAMCO "do not imply that, absent insider information, the fraud on the market presumption is irrebuttable as against any investor who purchased a security at market value"). To be entitled to the presumption of reliance on the efficiency of the market price, the plaintiff has to have relied on the market price as "an accurate measure of [the security's] intrinsic value". SJ Op., 2013 WL 132583 at *4 (citing Teamsters, 546 F.3d 196 at 200 n.4).

B. **Summary of Facts**

During the Relevant Period, GAMCO was a wholly owned subsidiary of Gabelli Asset Management, Inc. ("GBL") and an investment advisor that "provide[s] investment advice

---

[3] GAMCO's Summary Judgment Reply Memorandum, GAMCO Investors, Inc. v. Vivendi, S.A., 03 Civ. 5911(SAS) (Dec. 12, 2012), ECF No. 112 ("GAMCO Reply Br.").

to a broad array of clients". (Undisputed, see Joint Pre-Trial Order ¶ 5, Undisputed Facts ("JPTO").) GAMCO was an advisor to the Mutual Funds Plaintiffs. (Alpert Dep. 18:20-23.) GBL's Chairman and CEO was Mario Gabelli. (Undisputed, see JPTO.) Gabelli & Company was the research arm of GBL and performs research for GAMCO and other parts of the GBL organization including the Mutual Funds Plaintiffs. (Jamieson Dep. 33:4-10.) GBL held daily morning meetings during which Gabelli & Company securities analysts presented to portfolio managers the results of their research on the companies they covered. (Woodson Dep. 38:6-39:7.) Vivendi was the subject of some of these meetings. (Rittenberry Dep. 30:15-17.) Plaintiffs' portfolio managers made the decisions about what stocks to buy and sell based on research provided by Gabelli & Company analysts. (Woodson Dep. 25:12-23, 38:6-20.)

     In making their purchase decisions, Plaintiffs did not rely on the market price as an "accurate measure of [securities'] intrinsic value". Rather, they used a company's Private Market Value ("PMV"), which is the value an informed industrialist would pay to own the assets of the company in a private transaction. (Woodson Dep. 141:5-9; Gabelli Dep. 31:3-13.) Plaintiffs' analysts calculated PMVs using a template created by Mario Gabelli, in which the analyst breaks down a company into business segments and values each segment based on what the analyst thinks a reasonable buyer would pay for that segment as a separate entity in the private market. (Rittenberry Dep. 53:22-54:12, 55:17-25.) The market price of a security is not a factor in Plaintiffs' calculation of a company's PMV. (Rittenberry, 57:10-18; Alpert Dep. 100:6-8.) Plaintiffs consider that a company's PMV, not the market price, represents the "real true intrinsic value" of the company's securities. (Woodson Dep. 125:24-126:1; Alpert Dep. 72:6-9.) In fact, Plaintiffs in their publications and testimony refer to the stock market as "Mr. Market", who was described as "irrational[]", "emotional" and subject to "euphoria and

4

depression". (Exs. D, F, N; Woodson Dep. 125:16-126:4). Plaintiffs' core investment philosophy is to purchase securities whose market prices are at substantial discounts to their intrinsic PMVs if there is also a "catalyst" that might cause the market prices to rise to the PMVs in the future, typically a period of between two and five years. (Exs. J, G, BD, BE; Rittenberry Dep. 108:3-7; Alpert Dep. 71:17-22.) The bigger the difference between market price of a security and its intrinsic value (i.e., PMV), the more likely Plaintiffs would purchase the security. (Rittenberry Dep. 257:21-24.) In addition to GAMCO, all the Mutual Funds Plaintiffs that purchased Vivendi ADRs were value-oriented funds that used the PMV methodology in making investment decisions. (Alpert Dep. 67:7-69:8; Exs. E, AQ, AR.)

Plaintiffs specifically relied on the PMV methodology in purchasing Vivendi ADRs. Plaintiffs calculated Vivendi's PMV, (Rittenberry Dep. 34:2-5, 48:24-49:21; see, e.g., Ex. S), and concluded that Vivendi was trading below its PMV, (Rittenberry Dep. 36:16-37:7; Jamieson 334:6-335:9; Woodson Dep. 123:5-126:4). In fact, Plaintiffs repeatedly used Vivendi in presentations to shareholders and actual and prospective customers as an illustration of a company whose securities were trading at substantial discounts to their PMVs. (Exs. G, N, T.)

The evidence clearly shows that during the period October 30, 2000, through August 14, 2002 (the "Relevant Period"), Plaintiffs relied on the PMV methodology and only on that methodology in making purchase decisions with respect to Vivendi ADRs, and did not rely on Vivendi ADRs' market price as "an accurate measure of their intrinsic value".

II.  **Would Plaintiffs have purchased Vivendi ADRs had they known Vivendi's alleged true liquidity condition?**

A.  **Applicable Law**

To establish reliance, Plaintiffs must show that but for the materially misleading statement or omission, they "would not have transacted in the security". SJ Op., 2013 WL 132583 at *3; Dura Pharmaceuticals, 544 U.S. at 341.

Plaintiffs' argument that Vivendi must show that the Plaintiffs would have purchased Vivendi ADRs at the same price had it known of the fraud, (GAMCO Reply Br. at 8-9), is misplaced. Plaintiffs cited only one decision in this Circuit for such requirement. (GAMCO's Reply Memorandum of Law at 9 (citing Lawrence v. Philip Morris Cos., Inc., No. 94 Civ. 1494, 1999 WL 51845, at *4 (E.D.N.Y. Jan. 9, 1997)). But Kline v. Wolf, 702 F.2d 400 (2d Cir. 1983), the Second Circuit decision cited by Lawrence for support, in fact held that the defendant need only show that "even if [plaintiff] had known of the alleged misrepresentation, [it] would still have purchased the stock". Kline, 702 F.2d at 403; see also Dura Pharmaceuticals, 544 U.S. at 341 (the fraud on the market presumption "nonconclusively presum[es] that that plaintiffs have relied upon [the] misrepresentation as long as they would not have bought the share in its absence). Price is not mentioned in either of these cases.

Plaintiffs' post-disclosure purchases of the security in question are relevant in evaluating whether they would have purchased the security had they known about the fraud. See In re Safeguard Scientifics, 216 F.R.D. 577, 582 (E.D. Pa. 2003). The cases cited by GAMCO concerning post-disclosure purchases (GAMCO's Reply Br. at 10-12) only "hold that post-disclosure purchases of securities do not necessarily rebut the fraud on the market presumption as a matter of law". SJ Op., 2013 WL 132583 at *10 (emphasis in the original). As this Court

6

noted, they "do not imply that post-disclosure purchases are never relevant to the plaintiff's reliance". Id.

B.  **Summary of Facts**

In the Class Action, relied upon by Plaintiffs here for collateral estoppel purposes, Vivendi was found to have "misstated or omitted its true liquidity risk". (Class Trial Verdict Form, Table A.) However, Vivendi's liquidity condition or its liquidity risk were not part of and did not affect Plaintiffs' decisions to purchase Vivendi ADRs. Plaintiffs purchased Vivendi ADRs during the Relevant Period because they believed that they were trading below the company's "real true intrinsic value", the PMV. (Jamieson 334:6-335:9, Rittenberry Dep. 36:16-37:7; Woodson Dep. 123:5-126:4.) Andrew Rittenberry, Plaintiffs' analyst responsible for calculating Vivendi's PMV and offering investment recommendations about Vivendi, believed that Vivendi had a "liquidity crisis" "[i]n the spring of 2002" but it did not affect his investment recommendation on Vivendi. (Rittenberry Dep. 126:11-17, 133:6-10.) In fact, he believed that "in terms of what the asset value of the company is, [Vivendi's supposed liquidity crisis] doesn't affect it in any way whatsoever". (Rittenberry Dep. 133:11-17.) As explained by Rittenberry, Mario Gabelli is a "very long-term investor" who would not be concerned with "noise" such as a company's liquidity condition. (Rittenberry Dep. 157-14-15, 158:12-23.)

Further, according to Plaintiffs' expert Dr. Blaine Nye, in testimony considered by the class action jury, Vivendi's alleged true liquidity condition began to be revealed on January 7, 2002, and continued to be revealed through August 14, 2002 (undisputed, see JPTO), yet Mario Gabelli still believed that Vivendi was undervalued by June 3, 2002, and noted that "[his] view of [Vivendi's] assets ha[d] not changed" by July 1, 2002 (Ex. AJ; Gabelli Dep. 169:19-170:7.) In fact, Rittenberry never gave a "sell" recommendation on Vivendi securities during the Relevant Period, even when Vivendi's allegedly misstated or omitted liquidity risk

7

was being revealed to the market. (Rittenberry Dep. 34:14-25, 36:16-37:7.) The evidence clearly shows that Plaintiffs would have purchased Vivendi ADRs had they known of Vivendi's alleged true liquidity condition. In fact, even if the law requires a defendant to show that the plaintiff would have purchased the securities <u>at the same price</u> in order to rebut the presumption of reliance, Vivendi would be able to carry that burden: Because Vivendi's liquidity condition—the very information alleged to have been misstated or omitted—did not affect and would not have affected Plaintiffs' private market valuation of Vivendi, Plaintiffs would still have purchased Vivendi ADRs at the same price.

That point is further supported by the fact that Plaintiffs actually increased their investments in Vivendi ADRs after Vivendi's alleged true liquidity condition began to be revealed. (<u>See</u> JPTO; Exs. AV, AW, AX, AY.) In fact, Plaintiffs made their largest one-day purchase of Vivendi ADRs on July 2, 2002, which according to Dr. Nye, was one of the days on which Vivendi's alleged true liquidity condition was being revealed to the market. (Exs. AV, AW, AX, AY.) This further confirms not only that Vivendi's liquidity condition did not affect Plaintiffs' private market valuation of Vivendi ADRs, but that they would have purchased, and did purchase, Vivendi ADRs at market price even after they knew of Vivendi's alleged true liquidity condition.

III.  **If Plaintiffs relied on the efficiency of the market, was such reliance reasonable under the circumstances here?**

   A.   **Applicable Law**

   In addition to taking advantage of the presumption of reliance, the plaintiff must also show that its reliance was reasonable. SJ Op., 2013 WL 132583 at *3 (citing Starr ex rel. Estate of Sampson v. Georgeson Shareholder, Inc., 412 F.3d 103, 109-10 (2d Cir. 2005). "An investor may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth." Id. at *3 (quoting Brown v. E.F. Hutton Group, Inc., 991 F.2d 1020, 1031-32 (2d Cir. 1993) ("Brown")). The Second Circuit considers the following list of relevant factors in evaluating whether a plaintiff's reliance is reasonable:

> (1) The sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of longstanding business or personal relationship; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.

Id. at *4 (quoting Brown, 991 F.2d at 1031-32).

   B.   **Summary of Facts[4]**

   GAMCO is a sophisticated investor with strong industry knowledge and research capabilities. As an investor advisor, GAMCO employed between 150 and 200 people during the Relevant Period to research and manage its securities on behalf of its clients. (Jamieson Dep. 15:11-18, 39:20-40:2.) Mario Gabelli is a sophisticated investor, and is particularly knowledgeable about various industries including cable broadcasting. (Gabelli Dep. 11:6-8, 11:12-12:3.) Rittenberry, the GBL analyst who tracks Vivendi and other major companies in the

---

[4] Vivendi does not have any evidence—and therefore will not contend—that Plaintiffs in fact possessed non-public corrective information about Vivendi's alleged misstatements.

9

media industry, described his responsibility as to "be an expert in [the media] industry; what's going on in the industry, what's going on at all the companies, what the dynamics are within the industry" and to "report those and discuss those with . . . clients of the broker/dealer and the principal client who is GAMCO". (Rittenberry Dep. 24:18-25:4.) His goal of being an expert in the media industry was to "understand the industry better than the average investor on Wall Street" and to "understand the dynamics in the industry and the company better than the average investor". (Rittenberry Dep. 25:12-18.)

Furthermore, Plaintiffs had private communications with Vivendi, including Vivendi's CEO, Jean-Marie Messier, and CFO, Guillaume Hannezo, during the Relevant Period. In February 2001, Mario Gabelli and Marc Gabelli had a meeting with Messier. (Undisputed, see JPTO.) Marc Gabelli wrote to Messier afterwards that "the meeting served well in crystallizing [Messier's] strategy". (Ex. I.) Mario Gabelli wrote to Messier afterwards that Messier "shared with us the silhouette of the long-term issues that Vivendi faces". (Ex. Y.) Mario Gabelli and Marc Gabelli also met Messier at the Allen & Company Conference in Sun Valley in 2001. (Ex. R.) On April 30, 2002, Mario Gabelli, Marc Gabelli and Rittenberry had a private meeting with Messier and Hannezo. (Exs. AG, AH.) Mario Gabelli wrote to Messier afterwards that "Andy Rittenberry, Marc Gabelli and I have many questions about Vivendi's strategy in an ever-changing world and are delighted that the door is open to us to ask about it". (Ex. AH.) Lastly, Rittenberry listened to Vivendi conference calls, attended Vivendi's investor conferences and communicated with Vivendi's investor relations personnel Eileen McLaughlin and Laura Martin over the phone and via emails during the Relevant Period. (Rittenberry Dep. 23:8-23; 192:19-194:4.) During his communications with McLaughlin and Martin, Rittenberry asked questions such as "why was [Vivendi's] EBITDA up X percent last quarter" and "you said

10

on the conference call about your guidance, why – what is your guidance again", and had them "walk [him] through some of the things on [Vivendi's] balance sheet and tell [him] why certain things are moving up and down and why this jump versus that jump". (Rittenberry Dep. 195:15-25.)

As a result, Plaintiffs had extensive knowledge about Vivendi. For example, Rittenberry was able to "d[i]g out" Vivendi's debt numbers from its filings when he initially "couldn't get the numbers to add up". (Exs. AC; Rittenberry Dep. 198:15-24.) He later explained to Eileen McLaughlin, "I do not think anyone was misled in any way. Anyone who knows that their [sic] is a difference in the US and French GAAP should have dug into the filings, talked to you guys for 5 minutes and figured out the answers". (Ex. AD.) Similarly, before February 1, 2002, Rittenberry already knew that Vivendi did not have access to the entire cash flow of certain of its subsidiaries. (Rittenberry Dep. 265:4-6.) He commented on his "Vivendi Model": "[T]hese jokers only have minority positions in some units yet they consolidate all of it and act like they have access to the cash flow, which of course they don't. They only have voting control." (Ex. AB.)

Even though there is no evidence that Plaintiffs in fact possessed non-public corrective information about Vivendi's misstatements, Plaintiffs, as sophisticated investors who had extensive knowledge of Vivendi and private communications with Vivendi's management, could have discovered Vivendi's alleged true liquidity condition through minimal due diligence, assuming that it would have made any difference to their purchase decisions. It would have been easy for Mario Gabelli and Andrew Rittenberry to have explored that issue with Vivendi's CEO and CFO in one of their private meetings, but there is no evidence that they even raised the subject. Plaintiffs' failure to utilize GAMCO's sophistication, resources and access to Vivendi

11

to discover Vivendi's alleged true liquidity condition, through minimal due diligence, renders their purported reliance on Vivendi's alleged misstatements by virtue of the presumption of reliance on the efficiency of the market unreasonable.

IV.     **Conclusion**

For the above reasons, Vivendi has successfully rebutted the presumption of reliance. The reliance element of Plaintiffs' claims under Section 10(b) of the Securities Exchange Act and Rule 10b-5 is not established, and consequently, Plaintiffs' claims must fail.

Dated:  February 11, 2013
        New York, New York

                                        Respectfully submitted,

                                        CRAVATH, SWAINE & MOORE LLP,

                                        By  /s/ Paul C. Saunders
                                            Paul Saunders
                                            Of Counsel
                                            Daniel Slifkin
                                            Timothy G. Cameron
                                            Members of the Firm

                                        Worldwide Plaza
                                        825 Eighth Avenue
                                        New York, NY 10019
                                        (212) 474-1000
                                            dslifkin@cravath.com
                                            tcameron@cravath.com
                                            psaunders@cravath.com

                                        *Attorneys for Defendant Vivendi, S.A.*

13