```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   GAMCO INVESTORS, INC., et al.,

 4                 Plaintiffs,

 5          v.                           03 Civ. 5911 (SAS)
                                         09 Civ. 7962 (SAS)
 6   VIVENDI, S.A. and
     VIVENDA UNIVERSAL, S.A.,
 7                                       Conference
                  Defendants.
 8
     ------------------------------x
 9
                                         New York, N.Y.
10                                       February 18, 2013
                                         10:00 a.m.
11
     Before:
12
             HON. SHIRA A. SCHEINDLIN
13
                                         District Judge
14

15
             APPEARANCES
16

17
     ENTWISTLE & CAPUCCI
18        Attorneys for Plaintiffs
     BY:  VINCENT R. CAPPUCCI
19        EVAN T. RACITI
          ARTHUR NEALON
20        ASHLEY GRAHAM

21
     CRAVATH, SWAINE & MOORE LLP
22        Attorneys for Defendants
     BY:  PAUL C. SAUNDERS
23        TIMOTHY CAMERON
          MARGOT A. MILLER
24        XIAO LIU

25
```

1              (Case called)

2              MR. CAPPUCCI:  Vincent R. Cappucci for the plaintiffs.

3              MR. NEALON:  Arthur Nealon for the plaintiffs.

4              MR. RACITI:  Evan Raciti for the plaintiffs.

5              MS. GRAHAM:  Ashley Graham for the plaintiffs.

6              MR. ALPERT:  Bruce Alpert.

7              MR. SAUNDERS:  Paul Saunders for the defendant.

8              MR. CAMERON:  Timothy Cameron, your Honor, for the

9    defendant.

10             MR. BUSHNELL:  George Bushnell, in-house counsel for

11   Vivendi.

12             MS. MILLER:  Margot Miller for the defendant somebody

13   for the defendant.

14             MR. LIU:  Xiao Liu for the defendants.

15             THE COURT:  Good morning everyone.  I hope my staff

16   told you I'd like to have opening statements.  Mr. Cappucci?

17             MR. CAPPUCCI:  Good morning, your Honor.  May it

18   please the Court.  Vincent R. Cappucci for the plaintiffs.  I

19   first would like to extend our thanks on behalf of my myself

20   and my colleagues and our client for the Court opening its

21   doors on a federal holiday.

22             THE COURT:  I was going to thank you all for coming

23   today and getting this done so I can do what I have to do later

24   in the week.  Thank you.

25             MR. CAPPUCCI:  We appreciate the resources and

1   acknowledge the hard work of the Court.

2          A little background is required at this juncture, your

3   opinion.  Obviously, this trial is on the limited issue of

4   reliance and whether defendant Vivendi has presented evidence

5   or will present evidence to rebut the presumption of reliance.

6   That is the only issue before the Court.

7          But I would be remiss if I did not remind the Court

8   that this is against the backdrop of an extensive trial in the

9   class action case where the jury returned a verdict finding

10  that Vivendi made 57 false and misleading statements about its

11  businesses in the marketplace in this relevant period of 2000

12  to 2002.

13         Your Honor is, of course, further familiar with the

14  issues particular to this case by reason of it adjudicating the

15  motions on summary judgment.  I'm not going to go into that

16  order and recite the observations of the Court.  The Court is,

17  obviously, skilled in these issues.

18         One point was made by Vivendi which has been

19  withdrawn, and there was an argument in the brief that our

20  client had access to and/or knowledge of corrective nonpublic

21  information from meetings or correspondence with Vivendi which

22  they had presented and argued in their papers.  That has been

23  withdrawn.  There is now a concession by Vivendi that there is

24  no such evidence.  Vivendi does not contend that plaintiffs

25  possessed any nonpublic corrective information about Vivendi's

1    relative statements or representations during the relevant

2    period.

3              Again, your Honor, this is relevant, particularly in

4    view of the Court's observation that in a situation where you

5    are not dealing with material nonpublic information, it was

6    difficult to envision where the plaintiff would not rely on

7    market price.

8              Your Honor, if I may perhaps preview some of the

9    evidence.  It will be shown, contrary to the arguments which my

10   colleagues -- learned colleagues, with great resources, as you

11   can see today -- have presented.  It will be shown that the

12   Gabelli entities indeed relied on market price and indeed

13   relied on the integrity of market price for each of their

14   transactions in the Vivendi ADRs.  Of course, the ADRs are the

15   only issue in this case, not the ordinary shares.

16             Market efficiency, your Honor, has been stipulated to.

17   It has been stipulated to by the parties.  The evidence will

18   show that Mr. Mario Gabelli, the senior portfolio manager who

19   made principally most, if not all, of these investment

20   decisions and was responsible for, as you will see from the

21   testimony, responsible for the overall portfolio decisions to

22   invest in Vivendi, that he believed that the market price

23   reflected all material public information concerning the

24   company and that the market price efficiently processed this

25   information into price.

1          We have stipulated to market efficiency.  But you're

2     going to hear from our clients that they believed indeed that

3     the market served as a vehicle to impound and process all the

4     information.  He believed that, they believed that.  That will

5     be shown.  There no question about that.

6          Indeed, in that regard, our clients never would have

7     purchased the securities of this company or any company had

8     they believed the market price was artificially inflated.  For

9     that purpose they relied on the price as to be free of that

10    artificial inflation.  Beyond that, they would not have

11    invested in this company had they believed there would have

12    been a fraud.  Without describing the fraud, they certainly

13    would not go into a crooked dice game, a crooked crap game, as

14    the cases refer to.

15         As the cases speak and what is important here, the

16    Gabelli entities never assumed that the market price was

17    incapable of being efficient, was not an efficient digesting of

18    public information.  It is important to know that they relied

19    on that, as I said before.

20         Counsel is going to rest his entire argument, your

21    Honor, on a financial model.  It's called PMV.  You heard about

22    it in the briefing on the summary judgment.  You're going to

23    hear, unfortunately, your Honor, quite a bit about it today, I

24    would suppose, from Andrew Rittenberry the junior analyst at

25    Gabelli.

 1           These are worksheets.  Unfortunately, we are going to

 2   have to walk you through the model and show you what's there.

 3   The significance of PMV has been completely overblown, if not

 4   misunderstood, by Vivendi.  Its importance in the investment

 5   decision has been overblown, if not completely misunderstood.

 6           There is no evidence or testimony that PMV was used

 7   side by side in decisions to purchase securities, that a PMV

 8   number was there, market price was there, and our clients

 9   looked at the two on an investment-by-investment basis.  Simply

10   not the case.

11           The very importance of this model, the evidence was

12   never developed in the depositions your Honor.  Unfortunately,

13   you're going to have to hear about that.  The Court I hope will

14   appreciate that PMV is simply a projected model, a projected

15   model of what a hypothetical unknown industrialist would pay

16   for the businesses, almost as if there was a takeover, your

17   Honor.

18           It assumes that the industrialist is sitting here

19   today.  If that industrialist is not sitting here today, the

20   model is speculative.  The model is understood to be

21   hypothetical, yet the way it is being presented by my

22   colleagues here is if that person, the Henry Kravis, is sitting

23   here, and therefore the imputed values and the projections that

24   we assume, and the multiples, that it is all a given, it is all

25   truthful, and it's going to happen today.  That's simply not

1   the case.

2           It is a projection out.  It's a projection of what

3   could happen, what may happen.  In fact, it looks at a 2- to

4   5-year horizon as the evidence will show.  Mr. Gabelli

5   testified at his deposition that PMV is not a determinant, and

6   you will hear from him what role that played in his investment

7   decision.

8           Your Honor, this is not a case like Basic, where the

9   false information was already in the marketplace and/or where

10  the plaintiff knew about the misrepresentation and traded on

11  that information nonetheless.  It is a very different case.

12  Indeed, our client relied on price.

13          Your Honor, much fanfare has been made about the word

14  "intrinsic."  We need to talk a little bit about that.  I need

15  to preview the significance of that.  Your Honor is, of course,

16  aware of the decisional authority which uses the word

17  "intrinsic value."  I'm not going to go into that analysis.

18          All I'm going to ask is let's find out if the use of

19  the terminology "intrinsic value" in the loose marketing

20  materials that refer to that word and present it in some of the

21  documents that the Court will be shown today, let's make sure

22  that's the same term and the same term of art that's being used

23  in the case law.  Let's find out what the witnesses believe

24  that term to mean, if they all mean the same thing.  That's

25  going to be important.

 1          I think what you are going to find, your Honor, is

 2     that the meaning of "intrinsic" in terms of the way some of the

 3     Gabelli folks use that term, it means in built-in value over

 4     time.  It's almost a seed that will grow into a tree, what will

 5     happen to this company intrinsically, not the intrinsic value

 6     today at a given time at the point of the transaction.

 7          That is important, your Honor.  We would appreciate

 8     and hope that the Court will listen very carefully to that

 9     testimony to clarify the terminology.  We are going to be very

10     concerned about the questions that are asked using that word.

11     They may object.

12          Another point that is made in the papers and the

13     submissions which I will expect my learned colleague to present

14     today is the issue of our client's access to management.  Yes,

15     there are letters in the record, your Honor, where my client

16     Mr. Gabelli so politely applauds Mr. Messier and thanks him for

17     meetings.  Yes, there are indications that were on conference

18     calls.  Your Honor, this is completely typical.  It is not

19     special.

20          There was no special access.  We were one of so many,

21     of so many who were given the same invitations.  Companies

22     typically have days upon which they invite investors in,

23     one-on-ones.  The conference calls that our clients run, you

24     will hear, on a quarterly basis, there could be 500 people on a

25     call.

 1            When Vivendi had some of its calls, they gave the

 2     phone number out.  Your Honor has a vast experience going back

 3     to the IPO cases, I know.  I'm just saying it's got to be put

 4     in context.  They have characterized the special access.  The

 5     evidence will show it wasn't special.  It's typical, it's

 6     ordinary.

 7            Frankly, your Honor, for them to question our due

 8     diligence after all of these market resources, no one uncovered

 9     this fraud.  No one uncovered this fraud.  Despite all these

10     industry analysts, sophisticated institutions, news agencies

11     globally that were following this company, no one uncovered it.

12     But because we had three meetings, we should have uncovered it?

13     Why would they have told us something different?  Why would

14     they not have said the same things?  I think we are at least

15     deserving of that presumption because there is no evidence that

16     we had special access.

17            Lastly, your Honor, Mr. Saunders and his colleagues I

18     assume are going to present evidence about our trading later in

19     the period as it is suspect, why would we do it.  Let's look at

20     what happened here.  We come into this stock at the end of year

21     2000 as a result of the Seagram's merger.  Basically, your

22     Honor, a year passes.  Vivendi is reporting terrific, great

23     results.

24            2002 is the critical year where things start to really

25     unwind.  The corrective disclosure period is from January 7th

1    to August 14th.  It's 8 months.  There are 10 corrective

2    disclosures and/or significant events in that period.  6 of

3    them happened, and we really don't do anything.  As the price

4    is coming down and coming down and coming down, we don't do

5    anything.

6          But a month before the end of the relevant period

7    there's a management change.  New management come in, and

8    there's buying.  You're going to hear from Mr. Gabelli why they

9    did it, what his recollection is as to why they went in and

10   bought significantly.

11         But understand you had a major price drop, your Honor,

12   enormous price drop, and you had events I think which would

13   support a renewed investment decision.  If we have to put it in

14   the record, we'll look to what Vivendi was saying before it

15   talked about the full truth.  Even as late as July of '02, one

16   month before the end of the relevant period, they are making

17   positive statements:  We have enough cash for another year,

18   business is strong, assets are great, and there's going to be

19   transparency.  That's new management.

20         There is a lot there.  We would ask the Court to

21   listen carefully.

22         In conclusion, the parties have stipulated as to

23   damages.  Your Honor is aware of that.  It has the February 8th

24   of this year stipulation and order, and it has applied the LIFO

25   and market netting methodology.  Those numbers are before the

D2isgam1                       Opening - Mr. Cappucci

1    Court.

2         We thank you again for your indulgence and look

3    forward to a very productive two days.

4         THE COURT:  Thank you, Mr. Cappucci.

5         Mr. Saunders.

6         MR. SAUNDERS:  Thank you, your Honor.  Good morning

7    and may it please the Court.

8         As Mr. Cappucci said, because of collateral estoppel

9    and because we have stipulated with respect to the amount of

10   damages that could be awarded in the event the Court rules in

11   plaintiffs' favor, the only issue to be tried in this case is,

12   as he said, reliance.  That is sometimes referred to as

13   transaction causation in the cases.

14        This Court has stated the test to be applied as

15   follows, and I quote --

16        THE COURT:  Which decision are you quoting from?

17        MR. SAUNDERS:  I'm quoting from your decision on

18   summary judgment.

19        THE COURT:  This most recent one?

20        MR. SAUNDERS:  Yes.

21        THE COURT:  OK.

22        MR. SAUNDERS:  "To prove reliance," and I'm quoting,

23   "the plaintiff must show that but for the material misleading

24   statement or omission, he would not have transacted in the

25   securities."  So, the starting point for the analysis and for

1     our presentation is that reliance is a but-for test:  But for

2     the misrepresentation, the plaintiff would put have purchased

3     the security in question.

4            This Court then goes on to note that there are two

5     ways in the case law to prove reliance.  First, that a

6     plaintiff was aware of the company's statements,

7     misrepresentations, and engaged in the relevant transaction

8     based upon that specific misrepresentation.  We don't have that

9     here.  There's no allegation of what I would call direct

10    reliance in this case.

11           Then this Court went on to say, again quoting, "Under

12    certain circumstances the plaintiff is entitled to a rebuttable

13    presumption that she relied on the integrity of the market

14    price of the security.  Specifically, an investor who bought

15    stock at the market price may avail herself of the presumption

16    that," and these are the key words, "she relied on the

17    integrity of the price set by the market if the market is

18    efficient."

19           This Court went on to explain, quoting from the

20    Teamsters case in the Second Circuit, "The fraud on the market

21    theory involves two rebuttable presumptions:  First, that the

22    misrepresentation affected the price of the securities traded

23    on an open market, and second," and this is the key issue to be

24    tried in this case in our submission, and I'm quoting,

25    "investors relied on the market price of securities as an

 1    accurate measure of their intrinsic value."  That's from your

 2    Honor's opinion on the summary judgment.  In the summary

 3    judgment opinion you were quoting the Second Circuit in the

 4    Teamsters case.  You could have quoted a couple of other Second

 5    Circuit cases as well.

 6            We take those propositions of law as our starting

 7    point in this case.  We will prove that GAMCO did not rely on

 8    the market price of the Vivendi ADRs in question as an accurate

 9    measure of their intrinsic value.  We will prove the opposite.

10            We will prove that GAMCO only purchased Vivendi ADRs

11    when their market price was lower and, in their words, trading

12    at a discount to the price that GAMCO calculated as

13    representing the true intrinsic value of the stock.  GAMCO

14    called that price the private market value.  You're going to

15    hear a lot about that in this case.

16            We don't expect the plaintiffs to deny, and I don't

17    think Mr. Cappucci denied, that GAMCO in fact calculated the

18    private market value for the stocks that it purchased in

19    general and in particular for the Vivendi ADRs.  What Mr.

20    Cappucci said in his opening was that they relied on the market

21    price.  What he did not say, and what I don't think his

22    witnesses will say, is that they relied on the market price as

23    an accurate measure of the intrinsic value of the security in

24    question.  That is what the presumption requires.

25            I'm going to demonstrate very, very briefly, your

1    Honor, during the course of this opening, very briefly, from

2    GAMCO's own documents as to which there is no objection, how

3    GAMCO went about using the private market value, how they

4    calculated it, and how they went about using that as the

5    decision point to purchase Vivendi ADRs.  That is, they would

6    only purchase if the private market value price was

7    significantly higher than the public market price.

8         Before I do that, your Honor, I ought to say just a

9    brief word about the plaintiffs.  There are basically two

10   categories of plaintiffs in this case.  We have the GAMCO

11   investor accounts, individual accounts for which GAMCO was the

12   money manager and had complete discretion to decide what

13   securities to buy.  I'll refer to those as the GAMCO investors.

14   The corporate structure of the Gabelli enterprises is a little

15   bit hard to follow, at least for me.

16        The second category of plaintiffs are mutual funds.

17   There are six mutual funds who remain as plaintiffs in this

18   case.  The investment research for both categories of

19   plaintiffs was prepared by an entity called Gabelli & Company,

20   and in particular with respect to Vivendi was performed by an

21   investment analyst named Andrew Rittenberry.  He is in fact in

22   court today and he is going to be our first witness.  Mr.

23   Rittenberry performed the analysis, calculated the private

24   market value for Vivendi ADRs, and he would then make a buy,

25   sell, or hold recommendation.

D2isgam1g      Opening - Mr. Saunders

 1        During the relevant period, which is from October 30,

 2   2000, to August 14, 2002, Mr. Rittenberry never made a sell

 3   recommendation with respect to Vivendi, either ordinary shares

 4   or ADRs.  Why?  Because I think he will tell your Honor, as he

 5   told us in his deposition, that his analysis showed that during

 6   that entire period the Vivendi private market value that he

 7   calculated as the intrinsic value for Vivendi -- I'm going to

 8   use those words deliberately -- was always higher than the

 9   public market price, and that's why he never recommended to the

10   portfolio managers that they sell Vivendi stock.

11        Mario Gabelli, who founded the GAMCO enterprise and is

12   still the chief executive officer and the chief investment

13   officer for many of the portfolios managed by the Gabelli

14   enterprise, attended the Columbia Business School after

15   college.  When he went to Columbia, he was exposed to a theory

16   of investing that has since become known as value investing.

17        It was a theory propounded by two legendary professors

18   at Columbia Business School, who I don't think Mr. Gabelli had

19   the opportunity to study under, since they were there long

20   before he went to Columbia.  Their names were Benjamin Graham

21   and David Dodd.  You're going to hear some more about the

22   Graham and Dodd method of value investing.  I think it would be

23   fair to say that Graham and Dodd are considered today the

24   fathers of value investing.

25        In short, their theory, and it's important because Mr.

1    Gabelli later adopted their theory, their theory was that the

2    stock market, public market, which they called Mr. Market, was

3    fickle and irrational and that the stock prices on the public

4    market did not necessarily reflect the true values of the

5    securities in question.

6           Rather, they concluded that the intrinsic value of a

7    company's stock, something that a private investor, the

8    industrialist that Mr. Cappucci was talking about, would in

9    fact pay for the company.  That was a far more stable and more

10   accurate representation, in their view, of the intrinsic value

11   of the security.

12          Mr. Gabelli studied under professors at Columbia who

13   had studied under Graham and Dodd, and he took their notion and

14   he refined it either further.  He created this notion that we

15   have heard about called the private market value, and he came

16   up with a way, a template, for calculating the private market

17   value of a security in which he was interested in possibly

18   investing.

19          His documents, what Mr. Cappucci said notwithstanding,

20   throughout -- I'm going to show your Honor some of these --

21   referred to the private market value as the intrinsic value of

22   the security, their words.

23          What Mr. Gabelli then did was to add something to the

24   Graham and Dodd analysis.  He said to himself, and he'll say I

25   think in court tomorrow, if the private market value is higher

1    than the public market price, how do I know the public market

2    price is ever going to go up to the private market value?  If I

3    buy, how do I know it's ultimately going to reach what I think

4    is the true intrinsic value of the security?

5          He said in order to do that, he needed to come up with

6    something that would unlock the true intrinsic value of the

7    security and, in his words, to surface the true intrinsic value

8    so that the public market price would rise to the private

9    market value that he calculated.  He called that something a

10   catalyst, his word.  A catalyst is something that he thought

11   would unlock or surface the private market value so that the

12   market price would rise to that level.

13         In fact, he was so proud of that phrase "private

14   market value with a catalyst" that he trademarked it.  It is a

15   trademark.  I hope I'm not infringing his trademark even by

16   referring to it.  He trademarked that phrase, it was so

17   important.  That was the key to his investment methodology.

18         Your Honor, if I might take just a moment and display

19   just a few pages, three or four pages from the document that

20   you are going to see that will demonstrate the points that I

21   just made and will illustrate the GAMCO investment methodology.

22   I have prepared a book.  With your permission, if I may

23   approach, I can hand it up to your Honor and to the clerk and

24   to Mr. Cappucci.  Thank you.

25         In the book that I just handed to your Honor, there is

 1   a table of contents that describes what is behind each tab.

 2   These are not the entire exhibits.  These are only just a few

 3   pages from exhibits as to which there is no objection.

 4         The first exhibit is Exhibit G behind tab 1.  This is

 5   an excerpt from a PowerPoint presentation that was used at an

 6   internal planning session at Gabelli, at the GAMCO companies,

 7   in Greenwich in January 2001, at the Greenwich library.  This

 8   was an internal presentation, but the record will show that

 9   everybody in the GAMCO enterprise was invited to attend this

10   planning session.

11         Just a few pages of this you will see, your Honor.

12   The first page says that the Gabelli Asset Management Company

13   has a unique approach to mispriced equities.  If I can pause

14   just for a second on that phrase.  "Mispriced equities," I

15   think the evidence will show, means equities that are trading

16   in the public market below their private market value.  Mr.

17   Gabelli came up with a unique approach to those mispriced

18   entities.  He claimed to be expert in identifying the

19   catalysts, as this page says, and so forth.

20         If your Honor will look at the next page from

21   Exhibit G, you see again this is from the GAMCO document, the

22   evolution, according to Mr. Gabelli, of value investing.  He

23   starts at the bottom with Graham and Dodd, who I just spoke

24   about.  He adds Warren Buffett as another disciple of value

25   investing, and then he puts himself at the top.  Under Gabelli,

1   he has private market value and catalyst, because that is the

2   core of their investment methodology.

3          The next page then talks about methodology, focus on

4   cash generating franchise businesses.  That was an idea that

5   was brought to the table by Mr. Buffet.  Second, calculate the

6   private market value.  Third, analyze earnings per share and

7   cash flow.  Fourth, evaluate management.

8          And the fifth, identify catalysts to realize returns.

9   You see some examples of what a catalyst might be.  It could be

10  a takeover.  It could be an impending change in regulation.  It

11  could be a change in management, something that would unlock

12  this private market value.

13         What you don't see in this methodology is any

14  reference to the public market price as an accurate measure of

15  the intrinsic value of the security.  It's not there.

16         If you look at the next page.  You're going to hear

17  testimony about this chart, and I'm going to give you a very,

18  very brief run-through about how I think the evidence will

19  demonstrate this chart works.

20         On the left-hand side you see a great big sort of

21  sideways square which is labeled "Universe of Companies."  I

22  think that that means all of the companies traded on the public

23  stock exchanges.  That's the universe from which a candidate

24  might be selected.

25         Once a candidate is selected for analysis, the first

 1  step in the process, at the very top of this chart, is "analyze

 2  PMV of company."  That's something that Mr. Rittenberry would

 3  do.  He would look at the company, take available public

 4  information, and calculate the private market value, which is

 5  primarily asset-based, what are the assets worth, primarily but

 6  not entirely, and what would a knowledgeable industrialist pay

 7  for the company.

 8           Underneath that you see a diamond shape, and it says

 9  "PMV" question mark.  I think the evidence will show that what

10  that means is that if the private market value is higher than

11  the public market price, you continue the analysis.  If it's

12  not, you go over to the left, which says "monitor the company"

13  and stop.  That is, you don't go any further.

14           If the private market is in fact higher than the

15  private market price, the analysis continues.  The investment

16  analyst or others might visit the company.  Mr. Rittenberry did

17  and Mr. Gabelli did visit Vivendi.  Then the analyst would look

18  to see whether or not there was a catalyst.  If the catalyst

19  was not present, the analysis stopped, they are done.  But if

20  the catalyst is present and if the private market value is

21  higher than the public market price, the stock is added to the

22  buy list.  That's what happens at the bottom.

23           Then, you see on the left-hand side of the buy list

24  there is an arrow going up that says "surface values."  I think

25  the evidence will show that what that means, your Honor, is

1    that if the catalyst actually came into play and the intrinsic

2    value was in fact surfaced, the price would go back up, the

3    market price would go up to equal the private market value, and

4    at that point they sell, because there is no reason to continue

5    the investment after that.

6            If you look at the document behind page 2, tab 2, your

7    Honor, that's a page from Defendants' Exhibit Z.  That's a page

8    from the annual report of one of the mutual funds.  In the

9    middle of the page you see a reference to Mr. Market.  This is

10   again prepared by Gabelli.  This is an annual report prepared

11   for investors, describing how they go about investing in stocks

12   and what they do.  There is a description, a quote, from

13   Professor Benjamin Graham about Mr. Market and what Mr. Market

14   means.

15           The key part of this page is the last paragraph under

16   the heading "Mr. Market."  This is Mr. Gabelli talking.  This

17   is from an article that he wrote for a magazine, which I have

18   to admit, your Honor, I have never actually read or ever

19   actually even seen, called Cigar Aficionado, of which I am not

20   one.

21           Mr. Gabelli wrote, "It is our and every prudent

22   investor's job to try to determine the intrinsic value of an

23   individual company or the market as a whole.  At any given

24   point in time, intrinsic value is largely a function of

25   earnings and interest rates.  Whether stocks trade at, above,

1    or below intrinsic value is a function of investor psychology.

2    Mr. Market is the code name the traditional value investor uses

3    to personify investor psychology."

4            The evidence will also show that they and Mr. Gabelli

5    refer to Mr. Market as irrational and sometimes euphoric and

6    sometimes depressed.  But what is missing from this is any

7    indication that the public market price is thought by the

8    Gabelli enterprises to be an accurate measure of the intrinsic

9    value of the security in question.

10           Under tab 3 there is another description from

11   Exhibit N of the investment process used by the Gabelli

12   entities.  This is taken from a presentation that was given to

13   Gabelli stockholders at an annual meeting at the Pierre Hotel

14   in May of 2001.  The first page simply describes investment

15   process.  That's what was being described to the stockholders.

16   The second page simply says analysts follow stocks on an

17   industry basis, which they did.

18           The third page says, and I quote, "Identify intrinsic

19   value of each business."  It doesn't say look at the stock

20   price, the public market price, to get the intrinsic value.  It

21   says do something else to identify the intrinsic value.

22           The next page is EBITDA, earnings before interest,

23   taxes, depreciation, and amortization.  And, following that,

24   PMV, which I think we know now to be private market value.

25           Then it says "Investment process.  Select stocks with

1    a 2-year 50 percent return potential."  The significance of

2    that, your Honor, and Mr. Gabelli and Mr. Rittenberry and Mr.

3    Woodson will all reinforce this point, is that GAMCO was a

4    long-term investor.  They didn't pay attention to short-term

5    ups and downs in the stock market.  They were a long-term

6    investor.

7              That's one of the reasons why the evidence will show

8    they weren't concerned about Vivendi's liquidity crisis.  They

9    said that is a crisis that is a short-term phenomenon, we are a

10   long-term investor.  I think actually some of the documents say

11   between 2 and 5 years, not just 2 years.  But they wanted a 50

12   percent return potential within a period of at least 2 years

13   and I think sometimes between 2 and 5 years.

14             The next page describes what might be an industry

15   catalyst.  I mentioned that before.  The next page, the last

16   page, I think, in my submission, this is the most critical

17   document that I could show to your Honor to illustrate the

18   point that I'm making.  The document is headed "PMV v. Mr.

19   Market:  The Graham and Dodd Approach."

20             You see on this chart a solid line and then a dotted

21   line.  The evidence will show that the solid line is the

22   private market value and that the dotted line is the public

23   market price of the particular security in question.  If the

24   public market price is below the private market value, the

25   solid line, they buy.  If the catalyst occurs and the public

1    market price rises to meet or exceed the private market value,

2    they sell.  That is the key to the GAMCO investment

3    methodology.  This is from their documents.

4         The point of all this is that what is missing from

5    this analysis is any indication that Gabelli, GAMCO, ever

6    relied on the public market price as an accurate measure of the

7    intrinsic value of the securities in question.  Their analysis

8    was exactly the opposite.

9         Now, not only did they describe to their investors

10   that this is how this methodology worked in theory, but they

11   went one step further.  Believe it or not, they actually used

12   Vivendi as an example that they showed to their stockholders of

13   how this methodology works in practice.  Under tab 4 you see

14   another page from the very same presentation given to the

15   shareholders in May of 2001.

16        The evidence will show that this page demonstrates

17   that the number at the top of the page, E73, is 73 Euros, and

18   that was the market price of the Vivendi common stock on

19   whatever day that is being measured on this chart occurred.

20        Then this chart shows how the private market value

21   would be computed.  Content.  Vivendi had content, media

22   content, movies, television shows, and so forth.  That was

23   valued at 36 billion.  Connectivity, cellular telephone

24   companies, your Honor has heard all about those, 39 billion.

25   Other, 37 billion.  Leading to a private market value.  111

1   Euros divided by the number of shares outstanding yields a

2   private market value of 100 Euros.

3           Again, this is the document they showed to their

4   investors, which showed that as a result of this methodology,

5   this would be a buy, Vivendi would be a buy.  There is another

6   page in the same document, which I won't take the time to show

7   you, which shows the opposite.  It shows an example of a

8   company whose public market price is above the private market

9   value, and that would be don't buy or sell.

10          We would submit that the evidence will show very, very

11  clearly that the GAMCO investors did not rely on the public

12  market price as an accurate measure of the intrinsic value of

13  the security.  Their investment methodology and their practice

14  was exactly the opposite.

15          In your Honor's opinion you observed that one fact

16  that might inform whether or not an investor relied on the

17  public market price as an indication of true value is what the

18  pattern of purchases shows.  I think in the GAMCO brief they

19  made the argument that only one-third of their purchases were

20  made after the corrective disclosures began to be made.  We

21  have gone back and looked at that.

22          Your Honor, under tab 5 is a document that we created,

23  to which I think there is no objection if used for illustrative

24  purposes only, and that is the only reason we are doing this.

25  The dates in the left-hand column are the dates that Dr. Nye

 1    testified in the class action constituted the dates on which

 2    the disclosures began to be made starting in January of 2002

 3    and ending in August of 2002.  The middle part of this is just

 4    taken from Dr. Nye's chart in the class action.

 5          What we did is simply add on to the right-hand side of

 6    this the purchases that were made by GAMCO on these dates.  I

 7    think there should be a summary page.  If you look behind tab

 8    6, there is a summary page.  We have broken the purchases down

 9    into three periods:  Purchases made before Dr. Nye's first

10    disclosure date; second, purchases made between Dr. Nye's first

11    and last disclosure date; and finally, purchases made on or

12    after Dr. Nye's last disclosure date.

13          What your Honor will see from this chart is that, if

14    my math is right, your Honor, the mutual funds increased their

15    purchases by over a hundred percent and the GAMCO investor

16    accounts increased their purchases by over 200 percent during

17    the period after the disclosures began to be made.  I can give

18    that to your Honor only because your Honor noted in your

19    opinion that that was one fact that might inform your Honor's

20    decision.

21          Your Honor, that concludes my opening statement.  I'm

22    happy to answer any questions.  If not, we will proceed.

23          THE COURT:  Thank you.  Ready to proceed.

24          MR. SAUNDERS:  Your Honor, it might be helpful before

25    we call the first witness simply to move into evidence the

1  defendants' exhibits as to which there is no objection.  I have

2  a list of those which I can hand up to your Honor's clerk.

3           THE COURT:  I probably have it in the pretrial order.

4           MR. SAUNDERS:  The exhibits have changed as a result

5  of discussion.  I have a list that I'm happy to hand your

6  Honor.

7           THE COURT:  All right.

8           MR. CAPPUCCI:  Your Honor, is it possible that we do

9  this on a per exhibit basis?

10           THE COURT:  No.  I prefer this method.  I usually do

11  this at trials.  Have you looked at this two-page --

12           MR. CAPPUCCI:  Yes, your Honor.  I believe there are

13  objections.  These are not agreed to.  There are objections, I

14  believe, to these exhibits.

15           THE COURT:  To which ones?

16           MR. CAPPUCCI:  I'm sorry.  Stipulated.  These are OK.

17           THE COURT:  All right.

18           MR. SAUNDERS:  There are other exhibits as to which

19  there is an objection.

20           MR. CAPPUCCI:  I was under the impression he was

21  moving all his exhibits.

22           THE COURT:  No, no.

23           MR. CAPPUCCI:  Sorry.

24           THE COURT:  Rather than read all these exhibit labels

25  into the record, I think I'll mark this two-page list as Court

1   Exhibit 1, and all of the exhibits in Court Exhibit 1 are now

2   received in evidence.

3               (All exhibits in Court Exhibit 1 received in evidence)

4               MR. SAUNDERS:  May I move into evidence for

5   illustrative purposes only the charts to which I referred

6   during my opening?

7               THE COURT:  Sure.  But some of them are going to be

8   actual evidence.

9               MR. SAUNDERS:  All but the last two are actual.

10              THE COURT:  That is confusing.  The last two, which

11  were for illustration only, are received solely for that

12  purpose.  The remainder will come in as evidence.

13              MR. CAPPUCCI:  Thank you, your Honor.

14              MR. SAUNDERS:  Your Honor, we call as our first

15  witness Mr. Andrew Rittenberry.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

D2isgam1                                                                    29

 1              THE COURT:  Please remain standing.  Raise your right

 2      hand.

 3       ANDREW RITTENBERRY,

 4           called as a witness by the Defendant,

 5           having been duly sworn, testified as follows:

 6              THE COURT:  All right.  One moment.

 7              Mr. Cappucci, are you all set?

 8              MR. CAPPUCCI:  Yes.  Thank you, your Honor.

 9              THE COURT:  All right.  We're ready to go.

10              MR. SAUNDERS:  Your Honor, in order to help move

11      things along, I have another binder that I've prepared of the

12      exhibits to which I intend to -- about which I intend to

13      examine Mr. Rittenberry.  And with your Honor's permission, I

14      would hand up a set to your Honor and one to the witness.

15              THE COURT:  Okay.

16              MR. SAUNDERS:  And of course one to Mr. Cappucci.

17              THE COURT:  Okay.

18              MR. SAUNDERS:  And we have an extra copy for the

19      clerk.

20              THE COURT:  Oh good.  Thank you.

21              MR. SAUNDERS:  And one for me.

22              May I proceed, your Honor.

23              THE COURT:  Please.

24                                   - - - - -

25

1    DIRECT EXAMINATION

2    BY MR. SAUNDERS:

3    Q.  Mr. Rittenberry, would you please tell us very briefly

4    about your educational and employment background.

5    A.  Yeah.  I attended the University of Virginia.  Worked on

6    the sell side for a company called Robinson Humphrey in

7    Atlanta, Georgia.  I attended Columbia Business School.  I

8    graduated in the year 2000.  Began employment at Gabelli, I

9    believe, in July 2000.  I worked there for about

10   three-and-a-half years.  And I moved to a company called

11   Jennison Associates here in New York City.  I work there today.

12   I'm a managing director on the value team at Jennison

13   Associates.

14   Q.  So you haven't been employed by Gabelli in any capacity

15   since middle -- early 2004, is that correct?

16   A.  Correct.

17   Q.  All right.  By which Gabelli entity were you employed

18   during that period?

19   A.  I believe Gabelli & Company.

20   Q.  And is it correct that Gabelli & Company, among other

21   things, performed investment analysis for other Gabelli

22   investments?

23   A.  Yes.

24   Q.  And is it correct that your job was that of an investment

25   analyst?

Daiey v89                         Bitterberry - direct

1    A.   Yes.

2    Q.   Could you tell the Court very briefly what an investment

3    analyst does in general, or in particular what you did at

4    Gabelli & Company?

5    A.   I was essentially assigned to follow the media industry and

6    the cable television industry globally and keep track of all

7    the company -- Gabelli -- sorry, the other side of the firm,

8    Gabelli's holdings in that industry, and also just to keep

9    track of general trends in the industry overall and communicate

10   those to the people making the investment decisions at Gabelli.

11   Q.   So, did you actually make the investment decisions

12   yourself --

13   A.   No.

14   Q.   -- as an investment analyst?

15   A.   No.

16   Q.   So what would you do as an investment analyst?

17   A.   I would essentially follow the industry, talk to the

18   portfolio managers about what's going on in the industry, if

19   they had questions, and I would build the models that the firm

20   used to analyze private market value.

21   Q.   And at the end of the analysis would you make a

22   recommendation to the portfolio managers?

23   A.   If they asked, it was a verbal recommendation.  Verbal

24   recommendation, yes.

25   Q.   And that recommendation would either be buy, sell or hold?

1    A.   Yes.

2    Q.   Now, did there come a time -- withdrawn.

3         What was your title at Gabelli & Company during this

4    period?

5    A.   I believe it was vice president.  I can't remember

6    actually.

7    Q.   Did you get a promotion during this period?

8    A.   I did, yes.  I'm not sure when.

9    Q.   So did there come a time when you were asked to cover

10   Vivendi as one of the companies that you analyzed?

11   A.   Yes.

12   Q.   And did that occur early in your tenure at Gabelli &

13   Company?

14   A.   I believe so, yes.

15   Q.   And did you begin --

16        MR. SAUNDERS:  I'm doing a little bit of leading, your

17   Honor.  I hope that's all right.

18   Q.   Did you begin analyzing Vivendi before the merger with

19   Seagram's?

20   A.   No.  I believe it was after.  I'm not sure when that merger

21   closed.

22   Q.   In December of 2000, if that helps you.

23   A.   Okay, yeah.  I started looking at after it was announced

24   but before it closed.  I guess that's the answer.

25   Q.   And then throughout all of 2001 and throughout all of 2002,

1   you continued to follow Vivendi, did you not?

2   A.  Yes.  Yes.

3   Q.  Were you the only analyst who followed Vivendi during that

4   period?

5   A.  As far as I know.

6   Q.  Now, who had responsibility for calculating the private

7   market value of Vivendi during this period?

8   A.  I did.

9   Q.  Did you at the end of the day make recommendations to

10  others inside the GAMCO enterprises about Vivendi as a

11  potential investment?

12  A.  Yes.

13  Q.  And what was your recommendation during the period from the

14  end of 2000 until the middle of 2002?

15  A.  It was either buy or hold.  I'm not sure when, when it was

16  buy, when it was hold.  I think I discussed that at my

17  deposition.

18  Q.  If I could use the phrase relevant period to be from the

19  period October 30, 2000, to August 14, 2002, will you

20  understand what I'm referring to?

21  A.  Yeah.

22  Q.  During the relevant period did you ever recommend to anyone

23  at GAMCO that it sell Vivendi common stock or ADRs?

24  A.  Not that I recall.

25  Q.  Not that you recall?

1   A.  Not that I recall.

2   Q.  Did your analysis make a distinction between ADRs on the

3   one hand and ordinary shares on the other hand of Vivendi?

4   A.  No, other than that they -- one traded in one currency,

5   another one traded in another currency.  So --

6   Q.  Except for that, your analysis was the same for both?

7   A.  Yes.  Yes.  Yes.

8   Q.  Perhaps you could explain to the Court very, very briefly

9   what an AES or ADR is?

10  A.  An ADR is a share of a foreign security that trades in the

11  United States.  In dollars, reference to a foreign security

12  that trades in another currency.

13  Q.  Did you make recommendations with respect to Vivendi

14  directly to Mr. Gabelli during the relevant period?

15  A.  Yes.

16  Q.  Do you remember him ever disagreeing with any of your

17  recommendations?

18  A.  No.  I don't recall one way or the other, would probably be

19  a better answer.

20  Q.  Now, during the relevant period, did you believe that the

21  public market price of Vivendi, ADRs, was an accurate measure

22  of their intrinsic value?

23          MR. CAPPUCCI:  Objection to form, your Honor.  Use of

24  the term intrinsic.  Lacks foundation.

25          THE COURT:  Well, I don't know if it lacks foundation.

1    I can't help but notice the use of the word in Gabelli's own

2    materials in the opening statement.

3            MR. CAPPUCCI:  Let him ask the witness if he has an

4    understanding of the term.

5            THE COURT:  He could do that, or he could show him the

6    very exhibits I was shown, which are Gabelli documents that use

7    the word.

8            MR. SAUNDERS:  I will do that, your Honor.

9            THE COURT:  Yes.  Here we go.  I'm going to show you

10   Defendant's Exhibit N, which is a PowerPoint slide show, ask

11   you to look at it for a minute, about four or five pages.  Take

12   a look at that.

13           THE WITNESS:  Can you repeat the question?  I

14   apologize.

15           THE COURT:  All I asked was to take a look at that,

16   just for a minute.  It's a PowerPoint slide show of Gabelli, as

17   you see.

18           Have you looked at it?

19           THE WITNESS:  Yeah.

20           THE COURT:  Wait.  Stick with it.  Can you see on the

21   third page, it says identify intrinsic value of each business?

22           THE WITNESS:  Yes.

23           THE COURT:  You've certainly seen that word used in

24   Gabelli documents, right?

25           THE WITNESS:  Yes.

1          THE COURT:  What does it mean?

2          THE WITNESS:  In this instance here, I believe it's

3    referring to the private market value.  We usually talked about

4    private market value, you know, versus intrinsic value.  That

5    wasn't a phrase we used very often.

6          THE COURT:  Versus intrinsic value.

7          THE WITNESS:  We just talked about private market

8    value.  And you know that's what I -- I never heard it

9    described as intrinsic value.

10         THE COURT:  You see it on the slide.

11         THE WITNESS:  I see that, but I don't remember

12   discussing that.

13         THE COURT:  So that has no meaning to you, is that

14   what you're saying?

15         THE WITNESS:  No, it does.  I'm just saying we didn't

16   talk about that regularly.  But I would assume this is

17   referring to private market value.

18         THE COURT:  Okay.  So you're saying now you think

19   they're interchangeable?

20         THE WITNESS:  That's what that appears to be referring

21   to.

22         MR. CAPPUCCI:  Your Honor, he hasn't answered the

23   question.  He has not answered your question.

24         THE COURT:  That's really for me to decide.  He

25   answered the question.  You may not like the answer.  It may

1   not be clear to you, but I heard an answer.

2           Mr. Saunders, you're welcome to continue the question.

3           MR. SAUNDERS:  Your Honor, let me put the question

4   that I asked before there was an objection.

5   BY MR. SAUNDERS:

6   Q.  Mr. Rittenberry, during the relevant period, did you

7   believe that the public market price of Vivendi ADRs was an

8   accurate measure of their intrinsic value?

9           MR. CAPPUCCI:  Note my objection.

10          THE COURT:  Overruled.

11  A.  Meaning private market -- interchangeable with private

12  market value?  I do not believe that public price approximated

13  the private market value of the securities.

14  Q.  All right.  Now, how did you learn how to compute the

15  private market value of a particular company or stock?

16  A.  You know, basically just trial by fire.  Kind of, you know,

17  learning from other analysts at the firm and talking to

18  Mr. Gabelli about the process.

19  Q.  What exactly --

20  A.  There was not a formal training process.

21  Q.  All right.  In your understanding, what exactly is a

22  private market value?

23  A.  My understanding is that -- and as I calculated it, the

24  private market value -- essentially what we do is look at each

25  business the company was in.  And -- you know, as long as that

 1   business was reported separately in the financial statements.

 2   And we would look at what we thought an informed industrialist

 3   in the same industry would have paid for that asset; if that

 4   asset was to be, you know, put into an auction and there was a

 5   corporate buyer in the private markets, what they would pay for

 6   that business.  And, you know, we summed all those pieces up

 7   and subtracted the liabilities.  So that's, you know, what --

 8   essentially what the firm is worth, if it was sold in pieces.

 9   Q.  Well, why wouldn't you just look at the public market

10   price?

11   A.  I don't know.  That's not what I was -- what I was taught

12   to do.

13   Q.  Taught where?

14   A.  That's not -- that wasn't our -- that's not what I was -- I

15   was assigned to compute the private market value.

16           THE COURT:  When you say -- he said taught where.  You

17   mean at Gabelli?

18           THE WITNESS:  At Gabelli, yes.

19   Q.  Could you look at Exhibit G in the book of exhibits.

20   A.  Yeah.

21   Q.  Now, in my opening statement I referred the Court to a

22   couple of pages from this document.  And in particular, I would

23   ask you to look at -- beginning on page 055.

24           MR. CAPPUCCI:  Your Honor, I object.  There's no

25   foundation the witness ever saw the document.

D9iexiv89                    Rittenberry - direct

```
 1            THE COURT:  I'm sorry.  Is there an objection to

 2    Exhibit G in evidence?

 3            MR. CAPPUCCI:  Not to the extent -- it's a corporate

 4    document, but he hasn't laid the foundation as to whether the

 5    witness has ever seen the document.  And it's 100 pages long.

 6            THE COURT:  It's 100 pages long.  Well --

 7            MR. CAPPUCCI:  So there's a risk of out-of-context

 8    testimony.

 9            THE COURT:  I don't know.  If it's in evidence, do we

10    know when this document was prepared?  It obviously is a

11    program.  It has an agenda.  It says, annual planning seminar

12    January 13, 2001.

13            Were you at the company at that time?

14            THE WITNESS:  I was.

15            THE COURT:  You were.  Were you part of this annual

16    planning seminar at the Greenwich Library?

17            THE WITNESS:  Unfortunately I was.

18            THE COURT:  So you saw this hundred-page document at

19    the time?

20            THE WITNESS:  I'm not sure I saw it or not --

21            THE COURT:  Well, you attended?

22            THE WITNESS:  I was in attendance.

23            THE COURT:  Then I'm sure you saw it, don't you think?

24            THE WITNESS:  Probably.

25            THE COURT:  Foundation is laid.  Let's get to page 55.
```

1  BY MR. SAUNDERS:

2  Q.  Page 55 --

3            THE COURT:  Hold on I got to get there, too.

4            Does that start with evolution of value investment?

5            MR. SAUNDERS:  Yes, your Honor.

6            THE COURT:  Have you gotten to page 55?

7            THE WITNESS:  Yes.

8  BY MR. SAUNDERS:

9  Q.  I guess I should ask, before I ask any more questions, did

10  you prepare any part of this document before the meeting?

11  A.  Not to my knowledge.

12  Q.  Do you know who did?

13  A.  No.

14  Q.  With respect to this page, under Graham and Dodd it says --

15            MR. CAPPUCCI:  Hold on.  Got it.

16  Q.  Do you know who Graham and Dodd are?

17  A.  Yes.

18  Q.  Who are they?

19  A.  They were professors at Columbia Business School back in

20  the 1920s, I believe.

21  Q.  And do they have any relationship with value investing?

22  A.  Yeah.  They're essentially the -- some of the original

23  thinkers that laid out the tenets of value investing.

24  Q.  What exactly is value investing?

25  A.  You know, buying a security that is -- you know, depending

1    on how you determine what it's worth, you know, that it trades

2    at a discount to what you think it's worth temporarily, that

3    it's going to be -- and that discount is going to narrow over

4    time, and the investor is going to make money as the discount

5    between market price and whatever source of -- whatever your

6    estimation of value is is those two numbers moved together.

7    And if that discount narrows, you're going to make money as a

8    value investor.

9    Q.  So just to make sure the record is clear, when you say

10   discount, are you referring to the difference between the

11   public market price of a security on the one hand and what you

12   would calculate as its true value or intrinsic value --

13   A.  Yeah.

14   Q.  -- or private market value on the other hand?

15   A.  Yes.

16   Q.  So if there's a difference, you would call that difference

17   a discount?

18   A.  Yes.

19   Q.  And a discount would apply if the private market value was

20   higher than the public market price, right?

21   A.  Yes.

22   Q.  Okay.  So under Graham and Dodd, it says invest in

23   businesses, not in stocks.  Did you -- while you were at

24   Columbia or Gabelli, did you ever come to have any

25   understanding of what that meant?

1   A.  I mean, it's just the basic statement that you should --

2   when you invest, you should buy a good business, not -- you

3   know, not necessarily a story.  And you're not just -- you

4   know, you're not buying -- you're not trading in stocks for

5   the -- you know, without the underlying business fundamentals

6   behind you, behind your investment thesis.

7   Q.  When you were at Gabelli, did you ever hear the phrase

8   Mr. Market?

9   A.  Yes.

10  Q.  And what did you understand that to mean?

11  A.  You know, I think you discussed it in your opening

12  statement.  You know, essentially that the market is sometimes

13  irrational over certain time periods, and, you know, that

14  provides the opportunity for a value investor, when those --

15  when the -- however you determine value, what that is and what

16  Mr. Market says it is are often not the same number.  And that

17  provides opportunity.

18  Q.  Would Mr. Market be the public stock market?

19  A.  Yes.

20  Q.  So when you say irrational, you mean that the public stock

21  market price might be different from what you calculate as the

22  true value of a stock?

23  A.  Yes.

24  Q.  And at the very top of the page we're looking at, it says

25  Gabelli private market value and catalyst.  Could you explain

Deitelzweig - Rittenberry - direct

1   to her Honor what a catalyst is, to make sure my description of

2   it was correct?

3   A.  Yeah.  I mean, a catalyst could be any number of things,

4   but essentially what you described in your opening, that's some

5   dynamic that the investor thinks is going to help surface value

6   over time.

7   Q.  By surface --

8   A.  Surface value meaning narrow the discount between the

9   current market price and the value, what you perceive to be the

10  value in the stock.

11  Q.  So surfacing the value would be basically something that

12  would cause the public market price to rise to the level of the

13  value that you computed?

14  A.  Yes.

15  Q.  If you look at page 57 of this Exhibit, I showed her Honor

16  this page during my opening.  Perhaps you could just take us

17  through this very briefly to make sure that my description of

18  what this page represents was correct.

19       MR. CAPPUCCI:  Your Honor, I'm sorry to interrupt.

20  I'm not getting a live feed.  I don't want to interrupt the

21  live testimony.  Can my tech guy kneel down here while we're

22  conducting the examination?

23       THE COURT:  Sure.

24       MR. CAPPUCCI:  Thank you very much.  I'm sorry.

25  A.  It's basically just a general schematic that lays out the

1    rough investment process that we went through as analysts at

2    Gabelli.

3    Q.  All right.  So on the left-hand side, the sideways square

4    says universe of companies.  Would that be all of the companies

5    on the stock market?

6    A.  Yeah.  I mean, whatever -- whatever universe you chose, but

7    that's -- as an analyst, my universe was media, the media

8    industry.

9    Q.  All right.  So then the --

10   A.  Publicly traded securities in the media industry.

11   Q.  First box on this value investment process document says,

12   analyze PMV of company.

13   A.  Yes.

14   Q.  And we've talked about that.  And that is something that

15   you would do as the analyst for Vivendi at Gabelli?

16   A.  Yes.

17   Q.  Now, in the next box it says PMV, question mark.  What is

18   your interpretation of that box?

19   A.  This looks like a decision tree, so I assume it's -- if the

20   discounts of the PMV is material, then you would do further

21   research.  If not, you would just monitor it so you understand

22   what's going on in the industry.  Or it might be a future

23   opportunity.

24   Q.  So would it be fair to say that that box represents what

25   would happen if the private market value was either higher or

1    lower than the market price?

2    A.   Yes.

3    Q.   And if the private market value that you computed for given

4    security was lower than the private market -- than the public

5    market price, what does this decision tree indicate that you

6    would do in that case?

7    A.   Sorry.  Can you repeat that?  Just make sure --

8    Q.   If the private market value was lower than the public

9    market price for a given security, according to this decision

10   tree, what would you do?

11   A.   You'd stop and do nothing.

12   Q.   Stop and do nothing?

13   A.   Yeah.

14   Q.   You wouldn't buy the stock?

15   A.   Correct.

16   Q.   All right.  So just to be clear, so that if your

17   calculation --

18   A.   I wasn't making an investment -- I wasn't making investment

19   decisions, though.  I would consider this in my analysis but --

20   Q.   You were making recommendations?

21   A.   Yes.

22   Q.   You were making recommendations, correct?

23   A.   Yes.

24   Q.   All right.  So let me just limit my question to what kind

25   of recommendation you would make.  Your -- if your calculation

1   of the private market value was the same as the public market

2   price, you would not recommend that Gabelli buy the stock,

3   correct?

4   A.   Correct.

5   Q.   You would only recommend that Gabelli buy the stock if the

6   private market value was higher than the public market price,

7   right?

8              MR. CAPPUCCI:  Objection to form.

9              THE COURT:  What's the objection?

10             MR. CAPPUCCI:  Foundation.  What time?

11             THE COURT:  He doesn't -- oh, no, he does.

12             You recommend?  You make recommendations?

13             THE WITNESS:  Yes.

14             THE COURT:  Made?

15             THE WITNESS:  Yes.

16             THE COURT:  Yes.  So I don't see the lack of

17   foundation.

18             MR. CAPPUCCI:  Are we talking about individual or

19   general recommendations?

20             THE COURT:  General recommendations.

21             MR. CAPPUCCI:  Okay.

22             THE COURT:  You want the question repeated?

23             THE WITNESS:  Please.

24             THE COURT:  I think the question was, you would only

25   recommend that Gabelli buy the stock if the private market

1   value was higher than the public market price, right?

2            THE WITNESS:  Yes.

3            MR. SAUNDERS:  All right.

4   BY MR. SAUNDERS:

5   Q.  Now, going further --

6   A.  I would say also materially higher, not -- you know, if

7   this -- if the -- this counter private market value is

8   5 percent, it's still going to be doing nothing, it has to

9   be -- it has to be a material discount --

10            THE COURT:  Okay.

11  A.  -- to private market.

12  Q.  Or significant discount, would you say?

13  A.  Significant -- well, material or significant, either one.

14  Same.  Same definition in my --

15  Q.  All right.  And I take it you apply that methodology when

16  you made recommendations with respect to Vivendi ADRs?

17  A.  Yes.

18  Q.  Now, continuing with this decision tree on page 57,

19  Exhibit G, there's a -- on the right-hand side a PMV, question

20  mark.  There's a diamond that says visit company.  Would it be

21  correct to say that this chart illustrates what would happen if

22  you computed that the private market value was significantly

23  higher than the public market price?

24  A.  Yes.

25  Q.  And so?

 1  A.  You might visit the company anyway, just to monitor it, but

 2  that doesn't -- that doesn't matter necessarily.

 3  Q.  Did you, in fact, visit Vivendi during the time that you

 4  were an investment analyst at Gabelli?

 5  A.  Yes.

 6  Q.  And first in the chart, looking only at the chart, why

 7  would the -- why would you visit the company if the private

 8  market value is higher than the public market price?

 9  A.  I visited because Mr. Gabelli told me -- I went with him to

10  visit basically, but we probably would not visit them if we

11  thought the private market value was higher than the -- I mean,

12  the stock -- the stock -- private market value was lower than

13  the stock price.

14  Q.  You would only visit if the private market value was higher

15  than the market price?

16  A.  Yeah.

17  Q.  You did, in fact, visit Vivendi during the relevant period?

18  A.  Yes.

19  Q.  With Mr. Gabelli?

20  A.  Yes.

21  Q.  Did you meet privately with Mr. Messier during that period?

22  A.  What's your definition of "privately"?

23  Q.  You, Mr. Gabelli, maybe Mark Gabelli, Mr. Messier, maybe

24  Mr. Hannezo?

25  A.  Yes.  And I think investor relations staff was there, too.

1    Q.   Somebody from Vivendi investor relations staff?

2    A.   Yeah.

3    Q.   But no other members of the public?

4    A.   Not -- no.

5    Q.   On how many occasions did you do that during the relevant

6    period?

7    A.   I believe two.

8    Q.   And how long did each meeting take?

9    A.   Probably an hour.

10   Q.   Did you take any notes during that meeting?

11   A.   Yes.

12   Q.   What happened to your notes?

13   A.   I left them at Gabelli when I left the firm.

14   Q.   All right.

15   A.   In a file cabinet.

16   Q.   What was discussed at those meetings?

17   A.   I don't recall.

18   Q.   Anything at all?

19   A.   I mean, I think I -- I think I had mentioned at my

20   deposition that we -- I remember discussing general strategy of

21   the company and what the CEO's vision for the company was, you

22   know, for the coming -- the coming years.  But that's all the

23   detail I remember.

24   Q.   Did you discuss anything that was not public knowledge

25   already?

1   A.  I don't know.  I don't recall.

2   Q.  You don't recall?

3   A.  I don't recall.

4   Q.  All right.  So going back to the chart, after the visit to

5   the company, then there are two decision trees, decisions.  The

6   one on the left says catalyst not present, and the one on the

7   right says catalyst present.  What do those refer to?

8   A.  Well, you have to think there's a catalyst to surface value

9   to be interested in purchasing the security.  If there's not a

10  catalyst, then you do nothing.

11  Q.  And did you determine that there was a catalyst with

12  respect to Vivendi ADRs?

13  A.  I don't recall what the catalyst was.

14  Q.  No, I'm not asking you what it was.  I'm just asking you

15  whether or not you determined that there was, in fact, a

16  catalyst.

17  A.  I don't recall.

18  Q.  Would you have made a buy recommendation if there was not a

19  catalyst?

20  A.  Potentially, but I don't recall -- I don't recall what the

21  catalyst was.

22           THE COURT:  Without knowing what it was, is it part of

23  the recommendation process to identify whether or not there is

24  one?

25           THE WITNESS:  There is, yes.

1          THE COURT:  Okay.  So generally speaking, if there is

2     one, then you recommend a buy, is that right?

3          THE WITNESS:  Yes.

4          THE COURT:  And if there's not one, you stop?

5          THE WITNESS:  Yes.

6          THE COURT:  All right.

7          MR. SAUNDERS:  All right.  Thank you.

8     BY MR. SAUNDERS:

9     Q.  And then if the catalyst is present according to this chart

10    on page 57, the stock goes on the buy list.  What does that

11    mean?

12    A.  I don't know actually.  I was wondering myself.

13    Q.  All right.

14    A.  I don't believe there was a buy list that I knew of.

15    Q.  All right.  But Gabelli did, in fact, buy Vivendi ADRs

16    during this period, right?

17    A.  I'm not sure.  I --

18    Q.  All right.  Fair enough.

19    A.  I mean, I know now they did, but I did not know whether he

20    was trading in the securities at the time.

21    Q.  All right.  You certainly recommended that Gabelli buy

22    Vivendi during this period, right?

23    A.  Yes.  If he asked, I would -- yes.

24    Q.  All right.  Let me ask you --

25          MR. SAUNDERS:  I'm going to a slightly different

Daiqiv@9                                  Rittenberry - direct

 1   subject, your Honor, and that's exactly how the PMV was

 2   calculated.  I'm at your Honor's pleasure with respect to

 3   whether you want me to continue or take a break.

 4          THE COURT:  I take a break at exactly 11:30 all the

 5   time, which is five whole minutes from now.

 6          MR. SAUNDERS:  We have four minutes, your Honor, and

 7   I'll use them.

 8          THE COURT:  Exactly.

 9   BY MR. SAUNDERS:

10   Q.  Now, Mr. Rittenberry, I want to ask you in more detail

11   about how you went about calculating the private market value

12   in general, and then in particular with respect to Vivendi.

13   How did you do that?

14   A.  Is that a question?

15   Q.  Yeah.  How did you calculate the market value?

16   A.  I thought that was a preface to a question.

17          Essentially I laid out all the information, the

18   financials, based on the publicly available securities filings.

19   I projected the business performance of those difference pieces

20   of the business over a five-year period, based on my judgment

21   as I thought about the industry dynamics and what was going on

22   in those different industries that the company operated in.

23   And then I applied a multiple for each one of those businesses,

24   a cashflow multiple based on our estimate, my estimate of what

25   an informed buyer would pay for each one of those businesses.

 1   And typically that was based on transactions that had taken

 2   place in those businesses, in those various businesses.

 3   Q.  All right.  Sir, so would it be correct to say that one of

 4   the first steps in your analysis would be to compute what you

 5   thought the various assets of the company in question were

 6   worth?

 7   A.  Yes.

 8   Q.  And once did you that, would it be fair to say that you

 9   then would apply a multiple to those assets to determine --

10   A.  To the cash flow generated by those assets.

11   Q.  I'm sorry.  A multiple to the cash flow generated by those

12   assets --

13   A.  Yes.

14   Q.  -- for the purpose of determining what somebody would --

15   what an industrialist would pay for those assets?

16   A.  Yes.

17   Q.  And would it also be fair to say that your determination of

18   what the multiple was or should be was based upon your judgment

19   as an analyst?

20   A.  It was judgment, but, you know, typically -- typically we

21   looked at prior transactions in the same industry, and that

22   informed our judgment as to what the multiples should be at

23   that point in time.

24   Q.  All right.  So if, for example, a company with similar

25   assets sold those assets for two or three times their cash

1   flow, hypothetically --

2   A.  Yes.

3   Q.  -- you would say, well, the multiple that I should apply

4   to a similarly situated company would be two or three times

5   cash flow?

6   A.  Yes, assuming there's similar assets and circumstances.

7   Q.  Yes.

8   A.  Yes.

9   Q.  And did you, in fact, do that analysis for Vivendi --

10  A.  Yes.

11  Q.  -- during the relevant period?

12  A.  Yes.

13  Q.  All right.  If you would look, please, at Defendant's

14  Exhibit AU.

15          MR. SAUNDERS:  Defendant's Exhibit AU, your Honor, is

16  already in evidence.

17          THE COURT:  Is it in this book?

18          MR. SAUNDERS:  It's in the book of exhibits that I

19  gave you a moment ago.  It's toward the end.

20          THE COURT:  Oh.  Oh, okay.  Yes.

21          MR. SAUNDERS:  We've lettered the defendants' and

22  numbered the plaintiff's exhibits.

23          THE COURT:  I've got it, AU.

24  BY MR. SAUNDERS:

25  Q.  Do you have that, Mr. Rittenberry?

 1   A.  Yes.

 2   Q.  Could you tell the Court what Defendant's Exhibit AU is.

 3   A.  It's a spreadsheet that calculated private market value.

 4   Q.  For Vivendi?

 5   A.  For Vivendi.  It looks like it was from January 2001.

 6           THE COURT:  How do you know that?

 7           THE WITNESS:  It says market price up in the top left

 8   corner.  It says -- you have balance sheet as of --

 9           THE COURT:  Oh, yeah.

10           THE WITNESS:  -- December '00 and market price as of

11   January 11, 2001.

12           THE COURT:  Yes, I see that.

13   BY MR. SAUNDERS:

14   Q.  Now, just so that we understand exactly what this chart is,

15   is it correct that when you -- I'm sorry.  Withdrawn.

16           Did you prepare this chart?

17   A.  I believe so.

18   Q.  Is it correct that when you prepared this originally at

19   Gabelli, you did it as -- on an Excel spreadsheet?

20   A.  Yes.

21   Q.  So what we have here is a printout from the Excel

22   spreadsheet?

23   A.  Yes.

24           MR. SAUNDERS:  And, your Honor, when this was produced

25   to us, there were three different sections to it.  I've tabbed

1   those sections A, B and C, because that's the way the document

2   was produced to us.  But I only intend to ask Mr. Rittenberry

3   about the first page --

4           THE COURT:  Okay.

5           MR. SAUNDERS:  -- of this exhibit.

6           THE COURT:  Okay.  And that does seem to bring us to

7   11:30, when I always take the recess.  So given we have no

8   jury, I'm sure we can get back in ten minutes.  So let's

9   reconvene at 20 of 12:00.

10          (Recess)

11          MR. SAUNDERS:  May I proceed, your Honor.

12          THE COURT:  Please.

13  BY MR. SAUNDERS:

14  Q.  Mr. Rittenberry, do you have Defendant's Exhibit AU?

15  A.  Yes.

16  Q.  All right.  Now, on the left-hand side of Defendant's

17  Exhibit AU, what is being described there in general terms?

18  A.  Just the current enterprise value of the company based on

19  the market price and the debt on the balance sheet, less cash

20  and less the -- the investments the company has.

21  Q.  All right.  And then at the top portion of the right-hand

22  side of the first page of Defendant's Exhibit AU, what is being

23  displayed there?

24  A.  That's just the arraying the data, laying out the data for

25  the private market value by business segment.

1    Q.  I'm sorry.  I think there's a miscommunication.  I'm

2    referring to the top part --

3    A.  Sorry.

4    Q.  -- of the right-hand side.

5    A.  I was talking about the right-hand side of the chart.  The

6    top of the chart is just the consolidated revenue, an EBITDA of

7    the company.  And the little box underneath it is the current

8    multiple that the stock is trading at, the enterprise value

9    EBITDA basis.

10   Q.  And there are columns that begin in 1999 and go out to

11   2004.  Would it be correct to say that some portion of that

12   would be projections?

13   A.  Yes.

14   Q.  Is that what the P means?

15   A.  Yes.

16   Q.  All right.  And then underneath that there's a box that is

17   entitled private market value or analysis consolidated basis.

18   What does that box represent?

19   A.  That's what I was describing before.  That's essentially

20   the -- these are all the segments of the company that separate

21   financial reporting on.  So it's each one of those segments

22   projected out to 2004.  And the multiple of cash flow is used

23   to ascertain the value of each business.  And we -- you add

24   that up and then subtract the liabilities at the bottom and add

25   the investments that they have to come up with the private

 1   market value year by year.

 2   Q.  All right.  So on this particular page at the bottom of the

 3   first column, 1999, it says private market value per share in

 4   Euros, 60.22?

 5   A.  Yes.

 6   Q.  And what does that represent?

 7   A.  That's my analysis of what the private market value was

 8   during the year 1999.

 9   Q.  For Vivendi?

10   A.  For Vivendi.

11   Q.  And the next column, 2000, that would be your projection

12   for what the private market value would be for that year?

13   A.  Yes.  This was in -- this was in January 2001, but the

14   yearend financial statements had not been published yet.  So

15   it's still just a projection.

16   Q.  And the same would be true for the other columns to the

17   right of that column?

18   A.  Yes.

19   Q.  Correct?

20   A.  Yes.

21   Q.  All right.  Now, underneath where it says PMV per share,

22   there's another entry that says current market slash -- hyphen

23   discount to PMV.  What is that?

24   A.  That's the difference between the market price in the top

25   left corner and the estimate of private market value.

1  Q.  Was the market price of the Vivendi securities a factor in

2  calculating the private market value?

3  A.  No.

4  Q.  Would it be fair to say that it's never a factor in any

5  private market value of anything?

6  A.  You know, not in the way that I was displaying it here.  I

7  mean, in my -- in my usage of it, it would not be a factor.

8  Q.  It would not be a factor.  So it would be fair to say that

9  market price was not a factor that you used in calculating the

10  private market value for Vivendi securities?

11  A.  Yes.

12  Q.  Did you ever use it as a factor in calculating the private

13  market value for any security while you were at Gabelli?

14  A.  No.  The only thing I would note here is that -- like this

15  company had investments in public companies.  Vivendi

16  Environmental was one.  We -- when we added -- when we created

17  our private market value, we used the market value of that

18  security in our analysis here --

19  Q.  All right.  But I --

20  A.  -- as a rough approximation of what it was worth.

21  Q.  Right.  But --

22  A.  But in terms of in general, thing -- no, the answer is no.

23  Q.  My question was:  Was the public market price of Vivendi

24  securities a factor in computing the private market value of

25  Vivendi?

 1  A.  No.

 2  Q.  Was the private market value an important part of your

 3  recommendation to buy, sell or hold Vivendi stock?

 4  A.  Yes.

 5  Q.  Was it the main factor in making your recommendation?

 6  A.  I would say yes -- you know, the two main factors are what

 7  the private market value is and how significant is the discount

 8  between the public securities price and the private market

 9  value.

10          MR. CAPPUCCI:  Could you please read that answer back.

11          (Record read)

12  BY MR. SAUNDERS:

13  Q.  And again, when you say "the discount," you mean the

14  difference between the public market price and the private

15  market value?

16  A.  Yes.

17  Q.  Did you, from time to time, update your private market

18  value analysis of Vivendi?

19  A.  Yes.

20  Q.  And would you do that every time additional information

21  became available?

22  A.  Yes.

23  Q.  And would you do that in your Excel spreadsheet?

24  A.  Yes.

25  Q.  And to whom did you make this Excel spreadsheet available?

1   A.  Anyone who asked for it that worked at Gabelli.

2   Q.  Do you remember anybody in particular who might have asked

3   for it during the time that you were there?

4   A.  Mr. Gabelli.

5   Q.  Mr. Gabelli?

6   A.  Mario Gabelli.

7   Q.  He would ask to see it?

8   A.  He would ask to see it.

9   Q.  Did he ever write notes on it?

10  A.  He did.

11  Q.  He did?

12  A.  Yeah.

13  Q.  Did he ever tell you why he wanted to see it?

14  A.  Occasionally -- I mean, he would -- he would ask for it,

15  and not without -- not always tell me -- a couple times I

16  remember he asked me for it because he was having a phone call

17  with the -- he had a phone call with someone from the company.

18  And he wanted the -- he wanted to see the model, wanted it

19  while he had the discussion.  And he would ask -- when we went

20  to visit the company, he would ask for it prior to that so he

21  could look at it.

22  Q.  By "the company" you mean Vivendi?

23  A.  Yes, the company.

24  Q.  Now, Mr. Rittenberry, what is or was a morning meeting?

25  A.  Essentially all the analysts would meet in the morning

1  before the market opened with Mr. -- Mr. Gabelli was usually

2  there or on the telephone.  And we would discuss, you know, any

3  events happening in our industry, or specific items happening

4  with our companies that we thought would be appropriate to

5  discuss with Mr. Gabelli.

6  Q.  And who attended the morning meetings?

7  A.  Anyone in the firm was welcome to.  All the analysts

8  that -- Gabelli & Company analysts were there.  And as I said,

9  using Mr. Gabelli, they also broadcast the meeting over the --

10 over speakers throughout the firm so people could listen from

11 outside the meeting room.

12 Q.  And how long would the morning meetings last?

13 A.  An hour -- usually an hour.

14 Q.  And did they take place every day?

15 A.  Yes.

16 Q.  And did you ever make presentations at morning meetings

17 with respect to Vivendi during the relevant period?

18 A.  I don't know that I actually made a presentation, but I

19 discussed it with -- at the morning meeting.

20 Q.  And what would you discuss about Vivendi?

21 A.  Well, a lot of times Mr. Gabelli led the questioning.  So

22 he would ask -- he might come in with a question about Vivendi.

23 If they reported earnings, I thought there was something worth

24 mentioning, I would discuss that in the morning meeting or some

25 other event in the newspapers, etc.

1   Q.  And did you ever discuss your buy, sell or hold

2   recommendations during the morning meetings?

3   A.  I do not recall actually.  I believe so but ...

4   Q.  All right.  Who was Mark Gabelli?  Who is Mark Gabelli?

5   A.  Mark Gabelli is Mr. Gabelli's son.

6   Q.  Did he work at --

7   A.  He worked at Gabelli, yes.  He might still work -- I'm not

8   sure if he still works there or not.

9   Q.  Who is Vincent Roche?

10  A.  Vincent Roche worked for Mark Gabelli.  He was a trader for

11  Mark.  He traded securities for Mark Gabelli.  Mark Gabelli was

12  a portfolio manager, or is a portfolio manager.

13  Q.  Let me see if I can do this very quickly.  Would you look

14  very quickly at Defendant's Exhibit K in your book.  Can you

15  identify that for us?

16  A.  E-mail from me to Mark Gabelli and Vincent Roche, sending

17  them my model on Vivendi, my private market value model.

18  Q.  So the model would have been similar to what we saw on

19  Exhibit AU?

20  A.  Yes.

21  Q.  And in this e-mail you refer to your number as being more

22  conservative than some of the sell side guys.  What does that

23  mean?

24  A.  Wall Street analysts in general that published on the

25  company, published research on the company.

1    Q.  When you say more conservative, sir, what does that mean?

2    A.  What I'm referring to here, I believe, is I assigned less

3    value in my private market value analysis to the Internet

4    assets that the company owned.  And why I did that was because

5    there were not reliable private market transactions to look at

6    for these Internet assets, because they didn't produce cash

7    flow.  And, you know, it was -- the businesses were not well

8    established and were not -- there were not a lot of -- there

9    were not a lot of mergers to use to create the value of these

10   assets in my private market model here.

11   Q.  All right.  If you would look briefly at Defendant's

12   Exhibit L.  Can you tell us what that is.

13   A.  It's like an e-mail correspondence between me and one of

14   the portfolio managers, saying that my PM -- I still have a PMV

15   calculation of 94 Euros.

16   Q.  Was that higher than the market -- public market price for

17   Vivendi at the time?

18   A.  I don't recall, but I believe -- I believe it was.

19   Q.  All right.  And you see at the bottom of this page there's

20   an e-mail to you from Mr. Woodson?

21   A.  Yes.

22   Q.  And he says, quote, I still have a target of E100?

23   A.  Yes.

24   Q.  What does that mean?

25   A.  I assume he had his own target that he did himself.

1   Q.  That would be a target for the private market value?

2   A.  I assume so.

3   Q.  For Vivendi?

4   A.  I assume so.  I don't know -- I don't know that he was

5   looking at it in terms of private market value, but he was a

6   portfolio manager based in London.

7   Q.  All right.  If you look at Exhibit N.

8           MR. SAUNDERS:  Again, this is a document I showed your

9   Honor during my opening, in particular beginning at page 0042.

10          THE COURT:  Just to forestall the objection, this

11  would be page one of it, it's the 16th annual meeting at the

12  Pierre Hotel, May 12, 2001, of the company.

13          Do you see the cover page?

14          THE WITNESS:  Yes.

15  Q.  Did you attend that meeting?

16  A.  I did, yes.

17          MR. SAUNDERS:  I'm sorry.  I didn't hear your Honor.

18          THE COURT:  Same question as you asked.

19          So you were there?

20          THE WITNESS:  I was there, yes.

21          THE COURT:  You were there.  Now we can go -- what

22  page did you want to go to?

23          MR. SAUNDERS:  Beginning at page 0042.  I'm just going

24  to go through very quickly the pages, then I'll show your

25  Honor.

1          THE COURT:  Yes.

2    BY MR. SAUNDERS:

3    Q.  Are you with me, Mr. Rittenberry?

4    A.  Yes.

5    Q.  Then this purports to be describing the investment process,

6    I take it, at GAMCO?

7    A.  Yes.

8    Q.  And the next page says, analyst follow stocks on an

9    industry basis.  Would that be referring to people like you who

10   followed the media --

11   A.  Yes.

12   Q.  -- industry --

13   A.  Yes.

14   Q.  -- for example?

15   A.  Yes.

16   Q.  And then in the next page, it says, investment process

17   identifying intrinsic value of each business.  Do you see that?

18   A.  Yes.

19   Q.  What does that mean to you?

20   A.  Identify the private market value of each business.

21   Q.  I'm sorry.  I didn't hear the end.

22   A.  Identify the private market value of each business.

23   Q.  Of each business, okay.  And then the next page says

24   EBITDA.  Do you see that?

25   A.  Yes.

1    Q.   What role would that -- first of all, what is EBITDA, and

2    second, what role would that play in the analysis?

3    A.   EBITDA is earnings before interest taxes, depreciation,

4    amortization.  It's a proxy for free cash flow before cap X

5    from an enterprise.  And it's used a lot in merger and

6    acquisition analysis.  When buying and selling companies,

7    that's a typical metric that is used in the process.

8    Q.   All right.  That's not based on the public market price, is

9    it?

10   A.   No.

11   Q.   And then the next page, 0047, says, also under the heading

12   investment process, select stocks with a two-year 50 percent

13   return potential.  What do you understand that to be referring

14   to?

15   A.   Looks pretty self-explanatory.  By -- you know, the goal in

16   buying a stock is to have it appreciate 50 percent over a

17   two-year period.  Straightforward, I --

18   Q.   All right.  Did -- I think I referred in my opening to the

19   fact that from time to time Gabelli might refer to a slightly

20   longer window.

21   A.   I heard him say that, yes.

22   Q.   And does -- what can you tell us about whether or not that

23   is true?

24   A.   I don't recall.

25   Q.   You don't recall one way or the other, right?

1          All right.  The next page says identify catalysts.

2   And could you tell her Honor what that refers to?

3   A.  These are just examples of potential catalysts that might

4   help surface value for a company.

5   Q.  That is, if some of these things occurred, the public

6   market price would go up; is that what you're referring to?

7   A.  Yeah.  I mean, these could be negative catalysts as well.

8   It could be positive or negative, but --

9   Q.  Positive or negative?

10  A.  Yes.

11  Q.  But things that might affect the public -- market price

12  things that --

13  A.  Yes, correct.

14  Q.  All right.  Then the next page, the one that I referred the

15  Court to at the beginning, says PMV versus Mr. Market.  This is

16  page 0049.  Do you see that, sir?

17  A.  Yes.

18              (Continued on next page)

19

20

21

22

23

24

25

1    Q.   In the course of my opening, I think I said to the Court

2    that my reading of this was that the solid line with the two

3    arrows on each end refers to the private market value.  Would

4    you agree with me?

5    A.   I assume so.

6    Q.   And that the dotted line underneath that on the left and

7    above that on the right would be a reference to the public

8    market price?

9    A.   It appears to be.

10   Q.   It says "PMV v. Mr. Market."  Is this the same Mr. Market

11   that you referred to earlier?

12   A.   I believe so.

13            MR. CAPPUCCI:  Objection to form.

14            THE COURT:  I will allow it.

15   A.   I believe so.

16   Q.   Then it says "The Graham and Dodd approach," and that is a

17   reference to the value investing approach articulated by

18   Professors Graham and Dodd at Columbia?

19   A.   Correct.

20   Q.   How would you read this chart?

21   A.   It looks like a simple schematic.  You buy at a discount to

22   private market value and you sell at or about private market

23   value, when the public price is at or above private market

24   value.

25   Q.   So Gabelli would buy stock if the private market value was

1  above the public market price, correct?

2  A.  In theory, yes.

3  Q.  And sell stock when the public market price was equal to or

4  higher than private market value, correct?

5  A.  Yes.

6  Q.  Would you look briefly at Exhibit V, Defendants' Exhibit V.

7  A.  Yes.

8  Q.  This exhibit purports to be morning meeting notes.

9         MR. SAUNDERS:  Your Honor, I should note that I

10  believe, and Mr. Rittenberry can help us, I believe that the

11  date is wrong.  I believe that the date is probably August

12  2002.

13         MR. CAPPUCCI:  Your Honor, we will stipulate to that.

14  That's correct.

15         THE COURT:  OK.

16  Q.  First of all, what is this document?

17  A.  This is just a document that Gabelli & Company sent to the

18  portfolio managers after the morning meeting that basically has

19  kind of the four or five important bullet points that were

20  discussed during the morning meeting on each company that was

21  discussed.  It might have been sent to outside people as well.

22  I'm not sure.

23  Q.  If you look at page 003 of Exhibit V, do you have that,

24  sir?

25  A.  Yes.

 1   Q.  At the bottom of the page there is an entry under

 2   "Vivendi."

 3   A.  Yes.

 4   Q.  First it says V.  I take it that is the stock market

 5   symbol?

 6   A.  Yes.

 7   Q.  Then it says, dollar sign $12?

 8   A.  Yes.

 9   Q.  What would that be a reference to?

10   A.  That's the market price of Vivendi on that date.

11   Q.  The market price.

12            MR. SAUNDERS:  Your Honor, I actually checked the

13   market price.  On August 14th the market price was $11.66.  So

14   I think we are talking something roughly in that time period.

15   Q.  Then it says "Andrew Rittenberry."  Did that suggest that

16   you made this presentation?

17   A.  These were just the things I said at the meeting.  We

18   usually type these up.  The analysts would type these up before

19   the meeting and then discuss them at the meeting.

20   Q.  Did you in fact discuss these topics at the morning

21   meeting?

22   A.  Yes, I believe so.

23   Q.  The first one is new CEO Fortou, sent letter to

24   shareholders Sunday night.  Do you see that, sir?

25   A.  Yes.

1          MR. SAUNDERS:  Again, your Honor, I think Mr. Cappucci

2    can probably confirm this, there was a letter sent by Mr.

3    Fortou on Sunday, August 18th, 2002, which appears to be the

4    letter that is being described.  I don't think anything flows

5    from that particular information.  As your Honor told me once

6    before, that may be TMI.

7    Q.  Then it says, Mr. Rittenberry, "PMV above 50."  Do you see

8    that?

9    A.  Yes.

10   Q.  "Stock trading on liquidity concerns which is warranted,"

11   do you see that?

12   A.  Yes.

13   Q.  What does that entry mean?

14   A.  Essentially, I thought the PMV was 50 but there was a panic

15   in the security markets because there were liquidity concerns

16   around the company about them being able to refinance their

17   balance sheet.

18   Q.  Notwithstanding that, your private market value was still

19   significantly higher than the public market price, right?

20   A.  Correct.

21   Q.  I take it, then, you continued to recommend that Gabelli

22   purchase Vivendi stock?

23   A.  I don't recall.

24          MR. CAPPUCCI:  Objection to form.  No foundation for

25   that.

1              THE COURT:  Did you make a recommendation?

2              THE WITNESS:  I don't recall.

3              THE COURT:  Would that have been your practice?

4     There's all these names of employees.

5              THE WITNESS:  This was --

6              THE COURT:  Let me finish.  Each company has the name

7     of an employee next to it.  Your name is next to Vivendi.

8     After analyzing it, do you usually either recommend sell, buy,

9     or hold?

10             THE WITNESS:  Only if asked by Mr. Gabelli.

11             THE COURT:  And you don't know whether you were asked?

12             THE WITNESS:  I don't remember.  I don't recall.

13    Q.  If you had been asked, what would your opinion

14    recommendation have been?

15             MR. CAPPUCCI:  Objection.

16             THE COURT:  Sustained.

17    Q.  You can put that exhibit aside.  Let me direct your

18    attention very briefly -- before I do that, did you ever hear

19    during the relevant period that Vivendi shareholders were

20    becoming unhappy with Mr. Messier's performance?

21    A.  I believe so.

22    Q.  Did that affect your private market value calculation?

23    A.  No.

24    Q.  Did it affect whether or not you thought there might be a

25    catalyst?

 1   A.  Potentially, but I don't recall.  I don't recall.

 2   Q.  Did Mr. Roche ever attend any Vivendi meetings?

 3   A.  In person?  Attend in person?

 4   Q.  Yes.

 5   A.  I don't know.

 6   Q.  Did he speak French?

 7   A.  He did.

 8   Q.  Let me ask you to looked Defendants' Exhibit AA.  First I

 9   would ask you whether you recall ever having seen this before.

10   A.  I don't recall.

11   Q.  This appears to be a summary taken by Mr. Roche at the

12   Vivendi annual meeting.  Do you see that, sir?

13   A.  Yes.  I believe he listened to a phonecall.  I'm not sure

14   he was actually in-person at the meeting.  Not that that's

15   relevant.

16   Q.  The first entry says, "5,000 shareholders attending, crowd

17   shouting Messier quit."  Do you see that?

18   A.  Yes.

19   Q.  Is that consistent with your recollection that you heard

20   that Vivendi shareholders were unhappy with Mr. Messier's

21   performance?

22   A.  Yes.

23   Q.  If you look at Defendants' Exhibit AB, do you see that,

24   sir?

25   A.  Yes.

1    Q.  This is an email that you apparently sent to Ken Eguza?

2    A.  Yes.

3    Q.  In February 2002, do you see that?

4    A.  Yes.

5    Q.  Who was he?

6    A.  He was an analyst following Japanese companies at Gabelli.

7    Q.  I take it you're sending him a copy of your PMV analysis on

8    Vivendi, correct?

9    A.  Yes.

10   Q.  Would that be your Excel spreadsheet?

11   A.  I believe so.

12   Q.  Is that what is referred to at the bottom where it says

13   Vivendi.xls?

14   A.  Yes.

15   Q.  In this email you say, quote, "I had to do it this way

16   because these jokers only have minority positions in some

17   units, yet they consolidate all of it and act like they have

18   access to the cash flow, which of course they don't.  They only

19   have voting control.  Anyway, I guess that is the European

20   way."  Do you see that, sir?

21   A.  Yes.

22   Q.  To what were you referring?

23   A.  Some of the businesses they owned, they did not own the

24   entire business, so they could not pull cash out of it whenever

25   they wanted to, essentially.

1    Q.  Was that publicly available information?

2    A.  Yes, at some point it was.

3            THE COURT:  What does the "that" refer to?  Was what

4    publicly available?

5            MR. SAUNDERS:  The fact that Vivendi had minority

6    interest in certain positions.

7    A.  It was publicly available.

8    Q.  It was publicly available?

9    A.  The minority interests were publicly available, yes.

10   Q.  If it was publicly available information, why did you find

11   it necessary to remind Mr. Eguza that that is in fact the way

12   it worked?

13   A.  He was asking me for an example of how to lay out a

14   Japanese company.  He worked for Mario Gabelli.  Mario Gabelli

15   asked him to look at this analysis as an example of a way to

16   lay out a Japanese company.  A lot of Japanese companies have

17   minority interests as well.

18   Q.  You're not reflecting anything that you think you knew that

19   the market didn't know in this email?

20   A.  Not to my recollection.  I don't know what the market did

21   or didn't know.  I don't know.

22   Q.  You don't know?

23   A.  I don't know.

24   Q.  There came a time, did there not, when you were interviewed

25   by The Wall Street Journal?

1       THE COURT:  That is a question.  Do you recall being

2   interviewed?

3   A.  I do not recall being interviewed, no.

4   Q.  Would you look at Defendants' Exhibit AC.

5   A.  Yes.

6   Q.  In particular, the third page of that exhibit.

7   A.  Yes.

8   Q.  An article written by John Carreyrou, C-A-R-R-E-Y-R-O-U?

9       MR. CAPPUCCI:  Could counsel remind the witness of the

10  date of the article, please.

11  Q.  The date of the article, I believe it is in 2002.  February

12  12, 2002.  Do you see that?

13  A.  Yes.

14  Q.  The lower right-hand corner of the third page, does that

15  refresh your recollection as to whether or not you were

16  interviewed by The Wall Street Journal?

17  A.  Yes.  I knew that I was.  I just don't recall the actual

18  interview itself.

19  Q.  Does this refresh your recollection about the actual

20  interview?

21  A.  No, not necessarily.  I remember this subject, but I don't

22  remember the exact interview contents.

23  Q.  What do you remember about the subject?

24  A.  I think there's another email where I referenced it.  I

25  believe I was talking about the difference in U.S. GAAP versus

1   French GAAP in terms of the cash and debt numbers were

2   different, U.S. GAAP versus French GAAP.

3   Q.  Is the email to which you referred in your answer

4   Defendants' Exhibit AD?

5   A.  Yes.

6   Q.  That's an email that you wrote to Eileen McLaughlin?

7   A.  Yes.

8   Q.  On February 12, 2002, the same day as the article?

9   A.  Yes.

10  Q.  Who is Eileen McLaughlin?

11  A.  The head of investor relations in the U.S.

12  Q.  At Vivendi?

13  A.  She is now.  I can't remember what her title was then.  She

14  was in investor relations.

15  Q.  At Vivendi?

16  A.  A person, professional, yes, at Vivendi.

17  Q.  I take it that you are writing to explain to her your

18  comments in The Wall Street Journal?

19  A.  Yes.

20  Q.  Would that be fair?

21  A.  Yes.

22  Q.  You say in your email to Ms. McLaughlin, "What I said right

23  after that sentence was, every analyst should have done the

24  same thing, is done their homework.  So while it is complex to

25  value the media business at Vivendi, I do not think anyone was

1    misled in any way.  Anyone who knows that there is a difference

2    in U.S. and French GAAP should have dug into the filings,

3    talked to you guys for five minutes, and figured out the

4    answer."  Do you see that, sir?

5    A.  Yes.

6    Q.  Were you suggesting that it was not possible to figure out

7    the answers from the publicly available information without

8    talking to Vivendi for five minutes?

9            MR. CAPPUCCI:  Objection to form.

10   A.  No.

11           THE COURT:  I'll allow it.  That's not what you meant

12   by that?

13           THE WITNESS:  I don't think that is the critical point

14   of that sentence.  There are other ways to figure out the

15   difference in U.S. and French GAAP.

16           THE COURT:  There is a comma there.  It says, "Anyone

17   who knows that there is a difference in U.S. and French GAAP

18   should have dug into the files," comma, "talked to you guys for

19   five minutes" --

20           THE WITNESS:  Yes.  I believe I'm referencing the fact

21   that I asked them about the difference between U.S. and French

22   GAAP, because there are different rules for media companies

23   under the two accounting systems.

24           THE COURT:  If you took those two steps, if you

25   figured out the difference and talked to the management people,

1  you would figure out the answers?

2          THE WITNESS:  Yes.

3  Q.  Why did you have to talk to the Vivendi people in order to

4  figure out the answer?

5  A.  I don't know that you did have to.  That's what I was

6  trying to say.

7  Q.  But you did.

8  A.  It was a resource for investors.  Investor relations is a

9  resource for investors, potential resource.  You wouldn't have

10  to talk to them to understand what the differences were

11  necessarily.

12  Q.  Did you come to hear in the April 2002 time frame that

13  there was a rumor that Mr. Messier might be fired?

14  A.  Not that I recall.  But I believe I referenced that in my

15  deposition.  I don't remember the exact --

16  Q.  Would you look at Defendants' Exhibit AE.

17  A.  Yes.

18  Q.  What is that, sir?

19  A.  This was a meeting that a French investment bank hosted.

20  They invited Mario Gabelli, and he couldn't go.  He basically

21  told me to go in his place.  I'm emailing him after the dinner

22  I guess the next day.  Basically, this is what the French

23  bankers were saying the night before at the dinner.

24  Q.  The French bankers were saying that Mr. Messier was going

25  to be sacked at the April 24, I presume 2002, meeting?

 1   A.  That was this person's opinion, yes.

 2   Q.  You heard that?

 3   A.  Yes.

 4   Q.  You were at that meeting and you heard that?

 5   A.  Yes.

 6   Q.  Now would you look at Defendants' Exhibit AG, please.

 7   A.  Yes.

 8   Q.  What is that?

 9   A.  It looks like an email I sent to the CFO after I attended a

10   meeting with him, I think with Mr. Messier with Mr. Gabelli in

11   April 2002.

12   Q.  That was a private meeting not open to the public, was it

13   not?

14   A.  It was private, yes.

15   Q.  How long did that meeting last?

16   A.  Probably an hour.  I don't recall.

17   Q.  You said in your email, "I think focusing on free cash flow

18   is key, and I think some of the European analysts that I've

19   spoken to are really missing the big picture."  Do you see

20   that, sir?

21   A.  Yes.

22   Q.  Did you discuss in this private meeting with Mr. Hannezo

23   Vivendi's focus on free cash flow?

24   A.  I don't recall.

25   Q.  You don't recall.  All right.  Why did you write that

1   letter to Mr. Hannezo after the meeting?

2   A.   Every time we met a company, we were instructed by Mr.

3   Gabelli to write a letter to thank them for having us.   I

4   assume we discussed some of these things.   I don't know that we

5   discussed that or not.   That might have just been my opinion.

6   I don't recall.

7   Q.   Did you ever ask Mr. Hannezo to help you understand the

8   Vivendi public documents?

9   A.   I believe there is another email I sent to him.   I don't

10   remember when it was.

11   Q.   Defendants' Exhibit AK?

12   A.   Yes.

13   Q.   Why were you asking Mr. Hannezo to help you understand the

14   Vivendi public documents?

15   A.   I was just trying to find the public documents where the

16   leverage covenants that explained the debt securities that the

17   company issued were public documents, I was asking him where I

18   could find those public documents, which public documents I

19   should look at, basically.

20           MR. SAUNDERS:   Coming near the end, your Honor, I

21   think.

22   Q.   Your analysis disclosed that there was a liquidity issue at

23   Vivendi sometime in the middle of 2002, correct?

24           MR. CAPPUCCI:   Objection to form.

25   A.   I believe so.

 1          THE COURT:  Wait a minute.  What does it mean,

 2    objection to form?

 3          MR. CAPPUCCI:  Your Honor, I don't know what the

 4    foundation is.

 5          THE COURT:  He is asking him.  If he doesn't know, he

 6    will say "I don't know," and then we will realize there is no

 7    foundation.  If he knows, he will answer.  What did you answer?

 8    A.  Can you repeat the question?  I said I don't recall.

 9    Q.  Did you ever conclude that Vivendi had a liquidity issue?

10    A.  I believe so, yes.

11    Q.  Do you recall when that occurred?

12    A.  No, I don't.

13    Q.  Was it in 2002?

14    A.  Yes.

15    Q.  Early part of 2002?

16    A.  I don't know.  I don't recall.

17    Q.  After that liquidity issue occurred, whenever it occurred,

18    did that change your recommendation with respect to Vivendi

19    stock?

20    A.  I don't recall.

21    Q.  Did it change your recommendation from buy or hold to sell?

22    A.  Not that I recall.

23    Q.  Did you ever recommend that Vivendi stock be sold?

24    A.  Not that I recall.

25    Q.  Did Mr. Gabelli, Mario Gabelli, ever disagree with the

1    private market value number that you came up with for Vivendi

2    during the relevant period?

3    A.  I don't recall.

4    Q.  You don't recall?

5    A.  I don't recall.

6    Q.  Do you recall that your deposition was taken in this case?

7    A.  I recall the deposition.

8    Q.  Were you under oath at the time?

9    A.  I was.

10   Q.  Do you recall being asked this question and being given

11   this answer?

12   "Q.  Do you remember Mario Gabelli disagreeing with the private

13   market value number that you came up with for Vivendi during

14   the relevant period?

15   "A.  No."

16           Was that correct?

17   A.  I believe so.

18   Q.  Is it correct, sir, that at Gabelli -- by "Gabelli" I mean

19   the various entities at Gabelli -- is it correct that the

20   larger the difference between the public market price on the

21   one hand and the private market value on the other hand, the

22   more likely it is that Gabelli would buy if the private market

23   value was higher?  Correct?

24   A.  Yes.  All other things equal, yes.

25   Q.  I asked you a moment ago about a liquidity issue or

1   liquidity crisis that Vivendi experienced in 2002.

2   A.  Yes.

3   Q.  Do you recall that?

4   A.  Yes.

5   Q.  How did that supposed liquidity crisis impact your PMV

6   calculation for Vivendi?

7   A.  I don't believe it did.

8   Q.  You don't think it did?

9   A.  No.

10  Q.  I take it that if it did not affect your PMV calculation, a

11  liquidity crisis would similarly not affect your buy, sell, or

12  hold recommendation, correct?

13  A.  No, not necessarily.  The big driver, I see PMV.  But the

14  discount to the PMV between the market price and the PMV is a

15  key factor.  If there is a liquidity crisis or some type of

16  event like that, you would expect the discount to widen.  I

17  mean you would expect the stock to go down.

18  Q.  You would expect the public market price to go down?

19  A.  Yes.  You wouldn't want to buy it in front of that -- if

20  you thought it was going to go down, you would wait to buy it

21  or buy more or recommend to buy more at that point.

22  Q.  But every time the public market price goes down, that

23  increases the difference between the public market price and

24  the private market value, correct?

25  A.  The discount.  It increases the discount.

1    Q.   The discount?

2    A.   Yes.

3    Q.   Between the two.  It does not affect the private market

4    value analysis at all, according to you, correct?

5    A.   No.

6    Q.   According to your recollection, sir, is it correct that

7    throughout the entire relevant period, the private market value

8    that you calculated for Vivendi was always above the public

9    market stock price?

10   A.   I believe so.

11   Q.   With respect to Mario Gabelli, is he a short-term or long-

12   term investor?

13   A.   It is my understanding he was a long-term investor.

14   Q.   What does that mean?

15   A.   He's not focused on near-term trading.  He's more focused

16   on buy and hold and realizing value over time.  You would have

17   to ask him.  I'm not sure what his -- he didn't communicate his

18   exact time horizon to me as an analyst.

19   Q.   At the time that you were analyzing Vivendi, did you have

20   an opinion as to whether or not the liquidity issue that

21   Vivendi was experiencing in 2002 was a short-term or a long-

22   term issue?

23   A.   It depends on what your definition of short and long-term

24   is.  I believe I thought it was a short-term issue, undefined

25   short term.  Something that could be solved within a year or

1    so, I call that short term.

2    Q.  Short term.  All right, sir.  Were you negative on Vivendi

3    in June of 2002?

4              MR. CAPPUCCI:  Objection to form.  Where does that

5    mean, negative?

6              THE COURT:  You didn't recommend selling, did you?

7              THE WITNESS:  Not to my knowledge.  I don't recall.

8              THE COURT:  You don't remember if you recommended

9    buying, either?

10             THE WITNESS:  No.

11             MR. SAUNDERS:  May I have a moment, your Honor, to

12   check with my colleagues?  I think I've come to the end.

13             THE COURT:  Sure.

14             MR. SAUNDERS:  I have no further questions, your

15   Honor.

16             THE COURT:  Thank you.

17             MR. CAPPUCCI:  I'll use the 15 minutes, if that's OK.

18             THE COURT:  Yes, let's use it.

19             MR. CAPPUCCI:  I'm ready to be as productive as

20   possible.  I thank you.

21             THE COURT:  Good.

22   CROSS-EXAMINATION

23   BY MR. CAPPUCCI:

24   Q.  May we please pull up Defendants' Exhibit AU.

25   A.  Same book?

1        THE COURT:  Yes.

2   Q.  Yes, if it's in your book, Mr. Rittenberry, thank you.  Mr.

3   Saunders put this exhibit in front of you.  I'd like you to

4   turn your attention to again what is called the box, and the

5   bottom line of the box, which says, "Current market discount to

6   PMV."  Do you see that?

7   A.  Yes.

8   Q.  Obviously, that information, is it not, is projected over a

9   multiyear period, correct?

10  A.  Yes.

11  Q.  Generally, once again for the record, what is that meant to

12  portray?

13  A.  It's the discount between the current publicly traded

14  security price and the private market value estimate by year.

15  Q.  I believe you were referring to that in your testimony as

16  the discount or the differential, is that not correct?

17  A.  That's the discount, yes.

18  Q.  Is that important information for purposes of the

19  presentation of the material on this chart?

20  A.  Yes.  I think I said obviously the size of the discount is

21  important and whether you think that discount is going to

22  shrink or grow over time.

23  Q.  Is it not true that this analysis for that point only at

24  this juncture relies on where the market price is at that time,

25  correct?

1    A.  The discount, yes.

2    Q.  Right.  In order to present the difference between market

3    price and PMV, you have to present what the market price is?

4    A.  Correct, yes.

5    Q.  Did you assume at all times during the relevant period that

6    the market price was free of inflation?

7    A.  Inflation?

8            THE COURT:  It was an honest figure, so to speak?

9    A.  An honest figure.  I did, yes.

10   Q.  Did you have any reason to believe at any time during the

11   relevant period that the market price was impacted by false

12   statements by Vivendi's management?

13   A.  No.

14   Q.  Did you believe the market price had integrity?

15   A.  Yes.

16   Q.  If the market price was subject to manipulation and/or was

17   inflated as a result of a fraud, would that impact the

18   reliability of the information which is being portrayed here?

19   A.  It would affect the reliability of the discount in terms of

20   the market price itself and the numbers themselves are based on

21   publicly available releases from the company that are assumed

22   to be factual.

23   Q.  What would you do if you found out during the process of

24   preparing a PMV analysis that the market price was unreliable?

25   A.  It would call into question the size of the discount and

1   how big or small I thought that discount would be in the

2   future, I guess is the right way to put it.

3   Q.  You testified earlier, Mr. Rittenberry, that your

4   understanding was that the way the PMV worksheet was used, to

5   the extent it was used, would be to look at the differential

6   between where the PMV number was and the market price, correct?

7   A.  Yes.

8   Q.  If a person was doing that comparison and the market price

9   was inflated, they would be going down the wrong course,

10  correct?

11  A.  As it pertains to the discount, yes.

12          THE COURT:  I'm not sure I understand that.  The

13  market price was inflated.  If you took the inflation out, it

14  would be lower and the discount would be even greater, right?

15          THE WITNESS:  Yes.  I think that's what you are

16  asking.

17          THE COURT:  If the price was inflated and you stripped

18  that inflation out, the market value would be even lower and

19  the discount would be bigger, between the private market and

20  the market price, right?

21          THE WITNESS:  Yes.

22  Q.  In the hypothetical that the Court just gave you where the

23  market price was inflated, the discount would be a greater

24  number, correct?

25          THE COURT:  If you took the inflation out.

1      MR. CAPPUCCI:  Yes.

2   A.  If you took the inflation out, yes.

3   Q.  Therefore, under that scenario, someone looking at the

4   chart may believe that the investment is more attractive than

5   it should have been, correct?

6          THE COURT:  No, it's the exact opposite.  If the

7   inflation was out, market value would be even lower and the

8   discount would be even greater?

9          THE WITNESS:  On that basis, yes.  If you knew there

10  was inflation, that the numbers were inflated, then that would

11  bring you to a different decision.

12         THE COURT:  The market value would be even lower?

13         THE WITNESS:  Yes.

14         THE COURT:  The private market value would stay the

15  same?

16         THE WITNESS:  Yes.

17         THE COURT:  Right.

18         THE WITNESS:  If you ignore all other dynamics.

19         THE COURT:  That's right.  The differential would be

20  even greater?

21         THE WITNESS:  Yes.

22         MR. CAPPUCCI:  I think we get the point, your Honor.

23  Q.  What I'm saying, Mr. Rittenberry, is that the analysis

24  which is reflected on this worksheet of PMV, which is the model

25  that you testified that Gabelli uses to prepare PMV, relies on

1  market price in that respect, correct?

2  A.  In that respect, yes.

3  Q.  It assumes that the market price is free of artificial

4  inflation, correct?

5  A.  Yes.

6  Q.  Similarly, on the top left section of the document, it

7  reports the 52-week trading range of the stock.  Do you see

8  that?

9  A.  Yes.

10           THE COURT:  Where is that?

11           MR. CAPPUCCI:  Top left-hand, about an inch or two

12  down.  It reads "52-week trading."

13           THE COURT:  Thank you.

14  Q.  Why is that information being reflected on a PMV chart?

15  A.  Just so you can reference where the stock has traded

16  relevant to what you think the private market value is.

17           THE COURT:  So you can calculate the discount, right?

18           THE WITNESS:  You can think kind of the highest and

19  lowest point, how big the discount was over the course of the

20  year.

21           THE COURT:  Exactly.  How big or small the discount

22  was or the differential between PMV and market value?

23           THE WITNESS:  Yes.

24  Q.  Similarly, if that information was being manipulated, it

25  would impact the reliability of the comparison, correct?

1    A.  Of the discount, yes.

2    Q.  Now, let's again use Mr. Saunders' chart, Exhibit AU, which

3    has been identified as the January '01 PMV.

4            THE COURT:  Wait.  I want to make sure I'm at the same

5    document.

6            MR. CAPPUCCI:  Same document.  I was going to use

7    another one, your Honor, but I might as well use this one

8    because it's easier for all of us.

9            THE COURT:  I see.  It's just it was confusing when

10   you called it Mr. Saunders' document.

11           MR. CAPPUCCI:  Defendants' Exhibit AU.

12           THE COURT:  Could you slow down a minute?  When I'm

13   talking, could you pause?

14           MR. CAPPUCCI:  I'm sorry.

15           THE COURT:  This is a Vivendi document, right?

16           THE WITNESS:  Yes, that I created.

17           THE COURT:  It's a GAMCO document?

18           THE WITNESS:  Yes.

19           THE COURT:  That you created?

20           THE WITNESS:  Yes.

21           THE COURT:  Thank you.  Go ahead.

22   BY MR. CAPPUCCI:

23   Q.  Do you see where it says 2001 P?  Those were your

24   projections for 2001, correct, that column?

25   A.  Yes.

1           MR. CAPPUCCI:  Your Honor, are you with me?

2           THE COURT:  I am.

3   Q.  If I'm correct, the box reflects varying segments of

4   Vivendi's businesses and projections which are applied to

5   revenues and earnings for each segment, correct?

6   A.  Yes.

7   Q.  Those multiples that you are using to compute enterprise

8   value for those segments, do they assume that there is a

9   willing industrialist who was ready to buy at the time this PMV

10  worksheet is calculated?

11  A.  Yes.

12  Q.  Was there a willing industrialist ready to buy these

13  segments at any time during the relevant period, to your

14  knowledge?

15  A.  No.

16  Q.  In that respect, the multiples that you used, although they

17  were based on judgment, were speculative, correct?

18  A.  Correct.

19  Q.  They were hypothetical, correct?

20  A.  Yes.

21  Q.  What was the likelihood in any given year during the

22  relevant period that Vivendi, in your opinion, would hit the

23  private market value?

24  A.  A low likelihood.

25  Q.  Explain that to the Court.

 1    A.  Essentially, the private market value is where the company

 2    would trade if it was sold kind of in a perfect world and you

 3    had an industrial buyer for each one of the assets, including a

 4    control premium, etc.  Typically, stocks do not trade with a

 5    control premium embedded.  It's fairly rare for a company to

 6    trade at its private market value unless there is speculation

 7    that the company is going to be sold or there is some other

 8    dynamic driving the stock price.

 9    Q.  Once again, was there any speculation in the marketplace

10    during the relevant period that Vivendi was going to be, for

11    example, a takeover candidate?

12    A.  Not that I recall.

13            MR. CAPPUCCI:  Your Honor, I would like to move to

14    Defendants' Exhibit AS, which is a June 25, 2003 analyst

15    report.

16            THE COURT:  Is that in the book?  Is AS in the book?

17            MR. CAPPUCCI:  No, your Honor, it is not in the book.

18            THE COURT:  It is, AS.

19    A.  It is, yes.

20            THE COURT:  We all have AS.

21    Q.  Mr. Rittenberry, do you have the document in front of you?

22    A.  Yes.

23    Q.  Can you please quickly look at it for us.

24    A.  Yes.

25    Q.  I'm going to ask you to identify it.

1   A.  This is a published recommendation that I wrote up to

2   purchase Vivendi securities that we sent to our internal and

3   external clients in 2003.  This was my buy thesis on the stock

4   at that point.

5   Q.  This is in 2003, well after the relevant period?

6   A.  Yes.

7   Q.  Turn to the last page, please.  Do you see where it says

8   One Corporate Center, the address of the firm, on the last

9   page?

10  A.  Yes, sir.

11  Q.  Is that section referred to as a legend?

12  A.  I don't know.

13  Q.  Is this print something that would have been found on all

14  Gabelli analyst reports?

15  A.  Yes.

16  Q.  During the relevant period?

17  A.  Yes.

18  Q.  There is a section that discusses PMV.  I want to read that

19  to you.

20  A.  OK.

21          THE COURT:  Is that the sentence that starts with "We

22  do refer"?

23          MR. CAPPUCCI:  Yes.  Your Honor, you're head of me.

24          THE COURT:  I was afraid you read too fast, so I was

25  going to read it.

1          MR. CAPPUCCI:  I'm sorry, your Honor.

2    Q.  "We do refer to private market value, or PMV, which is the

3    price that we believe an informed buyer would pay, would pay,

4    to acquire 100 percent of a company.  There is no assurance

5    that there are any willing buyers of a company at this price,

6    and we do not intend to suggest that any acquisition is

7    likely."

8          Can you please explain that last sentence with respect

9    to the fact that you are giving --

10         THE COURT:  I actually won't allow him to.  I

11   understand it.  It's in plain English.  I don't need him to

12   tell me what it means.

13         MR. CAPPUCCI:  Thank you, your Honor.

14   Q.  Did you believe that to be correct during the relevant

15   period?

16   A.  Yes.

17   Q.  Did you believe that there were no willing buyers of

18   Vivendi at the PMV values?

19   A.  Yes.

20   Q.  Further on this page, Mr. Rittenberry, there is a section

21   that is entitled "Management."  If you would look at the

22   triangle, the famous diamond.

23   A.  Yes.

24   Q.  What is reflected in this chart?  What is depicted?

25   A.  This is just a schematic of the Gabelli investment process.

1   It researches the foundation.  Private market value determined

2   by cash flow and management is at the top of whatever this

3   thing is, diamond or pyramid or something.

4   Q.  What is your understanding of the reference to the term

5   "management" there?

6   A.  Essentially, that management is going to help unlock value

7   managing the company for investors.

8              THE COURT:  We have to stop now and reconvene at 2

9   o'clock for the luncheon recess.  2 o'clock sharp.

10             MR. CAPPUCCI:  Yes, your Honor.

11             THE COURT:  Thank you.

12             (Luncheon recess)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          AFTERNOON SESSION

2                              2:00 p.m.

3    ANDREW RITTENBERRY, resumed.

4              THE COURT:  Mr. Cappucci.

5              MR. CAPPUCCI:  Thank you, your Honor.

6    CROSS-EXAMINATION (continued)

7    BY MR. CAPPUCCI:

8    Q.  Perhaps to reflect quickly on what we covered before the

9    break, Mr. Rittenberry, will you once again pull out what has

10   been marked Defendants' Exhibit AS.  This is the June 25,

11   2003 --

12             THE COURT:  You don't want to repeat what you already

13   did, did you?

14             MR. CAPPUCCI:  No. I want to get him back on the

15   subject, your Honor.

16             THE COURT:  But don't repeat.

17             MR. CAPPUCCI:  I'm not going to repeat.

18             THE COURT:  It is nonjury.  I remember where we were.

19   Q.  Mr. Rittenberry, you recall I asked you a question about

20   the private market value and the legend in the analyst report?

21   A.  Yes.

22   Q.  It's reference to the fact that this was a price that the

23   firm believed an informed buyer would pay, would pay, to

24   acquire 100 percent of the business.  OK?

25   A.  Yes.

Case 1:09-cv-07962-SAS   Document 45   Filed 03/19/13   Page 100 of 156

1   Q.  That's correct, right?

2   A.  Yes.

3   Q.  When would that value be recognized by Vivendi?  Your

4   private market valuation applies, does it not, multiples to a

5   business segment?

6   A.  Yes.

7   Q.  That's a number, and it kicks out a number for a segment

8   that you think an industrialist would pay, correct?

9   A.  Correct.

10  Q.  When does that value appear on Vivendi's balance sheet?

11  When does it occur?

12  A.  In the stock price you're saying?

13  Q.  No.  When does the event that you are projecting occur?

14  A.  In the hypothetical?

15  Q.  Yes.

16  A.  Sale of the company.

17  Q.  A sale of a company or perhaps the sale of a division?

18  A.  Yes.

19  Q.  In that sense is the value yet to be unlocked?

20  A.  Correct, yes.

21  Q.  Does this analysis, in effect, point to value which you

22  believe exists but will occur and manifest itself at some later

23  point in time?

24  A.  Correct, yes.

25  Q.  Isn't that why you said that the PMV for a given year, it

1   was unlikely, if not impossible, that the PMV in any one year

2   would be realized, correct?

3   A.  Yes.

4   Q.  For that to happen, all of those segments would have to be

5   monetized?

6   A.  Correct.

7   Q.  It would have to be --

8          THE COURT:  Are you testifying?

9          MR. CAPPUCCI:  No, I'm asking.

10          THE COURT:  No, you're testifying.  Please.  I got the

11   point before lunch.

12          MR. CAPPUCCI:  OK.

13   Q.  That's correct, do you understand what I'm saying, Mr.

14   Rittenberry?

15   A.  Yes.

16   Q.  Once again, to quickly touch on that as you understand it,

17   Mr. Rittenberry, if you believed that Vivendi during the

18   relevant period was making false statements into the

19   marketplace, it was lying about its businesses publicly, would

20   you continue to have a buy recommendation on the stock?

21   A.  No, probably not.

22   Q.  Would you recommend to Mr. Gabelli or anyone else at GAMCO

23   to buy Vivendi's stock if you believed the stock price was

24   artificially inflated?

25   A.  Probably not, no.

Case 1:09-cv-07962-SAS   Document 45   Filed 03/19/13   Page 102 of 156
Rittenberry - cross

1   Q.  I don't think he would be too happy if you did, correct?

2   A.  Correct.

3            THE COURT:  If you move to strike the last question

4   and answer, I'll grant that, Mr. Saunders.

5            MR. SAUNDERS:  So moved, your Honor.

6            THE COURT:  Granted.

7   Q.  Mr. Saunders asked you questions about the multiples about

8   the PMV analysis and also talked to you a bit about the

9   liquidity crisis at Vivendi.  My question to you is, would it

10  be not true that if there was a liquidity crisis -- withdrawn.

11  If Vivendi was required to sell assets, to sell its assets, in

12  a compressed period of time, would that impact the multiples

13  that could be expected on the sale of a particular business or

14  division of the company?

15  A.  Yes.

16  Q.  If Vivendi was headed towards a liquidity crisis and had to

17  sell assets, would that affect the utility of the PMV model?

18  A.  Yes.

19  Q.  Why?  Please explain that to the Court.

20  A.  The PMV assumes a hypothetical scenario where an acquirer

21  pays a full multiple for the business.  If you are in a

22  compressed time period where you have to have a fire sale, you

23  might not be able to realize that ultimate value that you think

24  you would in a normal environment, because it has to be

25  compressed.  It's a fire sale by definition.

Case 1:09-cv-07962-SAS   Document 45   Filed 03/19/13   Page 103 of 156

1  Q.  Do you recall statements by Vivendi at the close of this

2  period where it discussed its necessity of selling assets in a

3  very short period of time?

4  A.  No.

5  Q.  August of 2002, does that refresh your recollection?

6  A.  Not specific statements.  I remember the general issue in

7  the time period.

8  Q.  If Vivendi had to sell $10 billion in assets in less than a

9  year, would that be a compressed timetable?

10  A.  Yes.

11  Q.  Would that impair the company from reaching the PMV

12  multiples that perhaps were in your model had you not known of

13  any such forced sales?

14  A.  Yes.

15  Q.  Your multiples would have been larger, correct?

16  A.  Smaller.

17  Q.  Your multiples would have been smaller?

18  A.  Smaller, yes.

19  Q.  With your multiples having been smaller, the PMV price, the

20  correct price value that you would have come up with would have

21  been a lower price, correct?

22  A.  Yes.

23  Q.  Mr. Rittenberry, you were asked questions about various I

24  think it was two in-person meetings with management during the

25  relevant period.  My question to you is, were those meetings

1   typical, in your opinion?

2   A.  I believe, so yes.

3          THE COURT:  I'm sorry.  Typical of what?

4          THE WITNESS:  Typical of an institutional investor

5   meeting with a management team.

6   Q.  Did you believe that during the relevant period you had any

7   special access to Vivendi management?

8   A.  No.

9   Q.  One of the documents that Mr. Saunders showed you was an

10  email that you had with the chief financial officer.  Do you

11  recall that?

12  A.  Yes.

13  Q.  Was it typical for an analyst to be communicating by email

14  with a chief financial officer?

15  A.  Yes.

16  Q.  Isn't that what companies do all the time?

17  A.  Yes.

18  Q.  To try to provide that access?

19  A.  Yes.

20  Q.  Mr. Rittenberry, once again for the record, did you

21  participate in any decision to purchase or sell Vivendi

22  securities during the relevant period?

23  A.  I did not.

24  Q.  Do you know, do you have actual knowledge as to whether

25  anyone at the Gabelli firm who purchased or sold Vivendi

1    securities specifically relied on any PMV analysis?

2    A.  No, no direct knowledge.

3            MR. CAPPUCCI:  No further questions, your Honor.

4            THE COURT:  Anything further, Mr. Saunders?

5    REDIRECT EXAMINATION

6    BY MR. SAUNDERS:

7    Q.  Mr. Rittenberry, Mr. Cappucci asked you about the private

8    market value and what the likelihood was in any given year

9    during the relevant period that Vivendi would hit the private

10   market value.  Do you recall that question?

11   A.  Yes.

12   Q.  Your answer was, as I recorded it, a low likelihood?

13   A.  Yes.

14   Q.  Then you went on to explain that?

15   A.  Yes.

16   Q.  First of all, he limited his question to the period during

17   the relevant period, right?

18   A.  OK, yes.

19   Q.  He didn't ask you about what would happen after the end of

20   the relevant period, that is, after August of 2002, right?

21   A.  Yes.

22   Q.  In making your buy, sell, or hold recommendations, you took

23   into account, did you not, not only the private market value

24   and the discount between the private market value and the

25   public market price, you also took into account whether a

1   catalyst might be found that would surface, or unrock, the

2   value that you believe was the difference between the public

3   market price and the private market value, right?

4   A.  Correct.

5   Q.  That catalyst was not limited to whether somebody would

6   come along and buy the entire company, was it?

7   A.  Right, no.

8   Q.  It could have been anything else that in your professional

9   judgment might have unlocked the value and caused the public

10  market price to go up?

11  A.  Correct.

12  Q.  Your period that you were looking at was a 2-year period,

13  right?

14  A.  The model is over a 5-year period, the multiyear period.

15  It wasn't specifically a 2-year period.

16  Q.  It certainly wasn't limited to the relevant period that we

17  have defined in this case?

18  A.  No, correct.

19  Q.  If you look at Defendants' Exhibit N.  In particular, you

20  looked at this before, page 0047.

21  A.  Correct.

22              (Continued on next page)

23

24

25

1    BY MR. SAUNDERS:

2    Q.  In describing the investment process, this document, which

3    was shown to the Gabelli shareholders, says that --

4    A.  Investors.  It was shown to our investors.

5    Q.  I'm sorry.  To investors, yes.

6          The purpose was to select stocks with two-year 50

7    percent return potential, correct?

8    A.  Correct.

9    Q.  It doesn't say select stocks that have a low likelihood of

10   reaching the private market value, does it?

11   A.  No.

12   Q.  If you had gone to Mr. Gabelli and said, Mr. Gabelli, I

13   think we ought to buy this stock because I think there's a low

14   likelihood that this stock will ever reach the private market

15   value, what would he have said to you?

16   A.  I don't know.

17   Q.  He would have said, I'm not buying it?

18          MR. CAPPUCCI:  Objection.

19   Q.  Right?

20          THE COURT:  Sustained.

21   Q.  Don't you know that, sir?

22          MR. CAPPUCCI:  Objection.

23          THE COURT:  I sustained the objection.

24   A.  You can ask him tomorrow.

25   Q.  All right.  You certainly didn't recommend, I take it, any

1   stocks that Gabelli ought to buy that had a low likelihood of

2   reaching the private market value, did you?

3   A.   I -- I'd like to say one thing.  Stocks very rarely trade

4   at the private market value.  I think I said that earlier.

5   It's a question of the discount.  And the -- the shares, you

6   know, if they traded at 10 percent discount to private market

7   value and, you know, you -- you wouldn't buy them for that

8   10 percent gain until this point about the 50 percent return

9   over two years.

10          But the discount is the key, the key variable in

11  there.  And as I said before, stocks rarely trade at above

12  private market value.  And, you know, when they're within the

13  vicinity of private market value, I would consider that, you

14  know, good enough, whether I would make a recommendation or

15  not.

16  Q.   I'm sorry.  Let me sort of deconstruct that.  You say

17  stocks rarely trade at the private market value?

18  A.   Yes.

19  Q.   Your buy recommendation was based upon the fact, was it

20  not, that the stocks you were recommending were not trading at

21  their private market value?

22  A.   That's correct.

23  Q.   Right, that they were trading below --

24  A.   There was never the assumption that it would ever trade at

25  the private market value, just that it's a large discount to

1  private market value, and at some point that discount is going

2  to narrow it towards private market value.  It very rarely

3  actually gets to private market value or exceeds private market

4  value.

5  Q.  Right.  And --

6  A.  That was my point.  Sorry it was convoluted.

7  Q.  So is that what the 50 percent return means on this page?

8  A.  Yes.  Yes.

9  Q.  All right.  So, you may not hit the private market value

10  exactly, but you would recommend stocks that you thought --

11  A.  Yeah.

12  Q.  -- had a high likelihood of a 50 percent return within two

13  years?

14  A.  Yes.

15  Q.  Correct?

16  A.  Yes.

17  Q.  By 50 percent return, I mean --

18  A.  Yes.

19  Q.  -- 50 percent higher than the existing public --

20  A.  That doesn't necessarily mean it's going to trade at the

21  private market value, but you expect the 50 percent

22  appreciation over the time period.

23  Q.  Appreciation in the public market price?

24  A.  Yes, correct.  Yes.

25  Q.  All right.  Just one last question.  You said that, in

1    response to one of Mr. Cappucci's questions, that if you

2    believe that Vivendi issued misleading statements, you would

3    not have recommended that Gabelli buy the stock.  Do you recall

4    that?

5    A.   Yes.

6    Q.   Did I get that right?

7    A.   I think so.  I'm not sure.

8    Q.   Now, you told us in your deposition that you had formed the

9    conclusion during 2002 that Vivendi had, in fact, issued

10   misleading statements.  Do you recall that?

11   A.   Yes.  I mean, I think they did -- I think that was admitted

12   by the company, correct.  I mean --

13   Q.   All right.  Let me just be sure.  You formed the conclusion

14   in 2002 that Vivendi had, in fact, issued misleading

15   statements, correct?

16   A.   Yes.

17   Q.   And you told us in the deposition -- I'm asking you now

18   whether it's still your testimony -- that notwithstanding that

19   conclusion, you nevertheless continued to recommend that

20   Gabelli buy the Vivendi stock, correct?

21   A.   I think I said buy or hold.  I can't remember what my exact

22   testimony was.

23   Q.   I think -- well, did that fact affect your recommendation

24   in any way?

25   A.   Well, it just affects it in the mindset of the discount.

1    And if you think there's a misleading statement, you -- I think

2    it's natural to think, as an analyst, that that discount might

3    get wider as that information comes to light in the

4    marketplace.

5    Q.  It didn't cause you to change your recommendation, did it?

6    A.  Not -- I don't recall.  I don't recall.  Not to my

7    knowledge, but I don't recall what I -- what my exact sentences

8    were at the deposition.

9    Q.  But to your knowledge, to your best recollection, it did

10   not cause you to change your recommendation?

11   A.  I don't think so but I don't know.  There was -- there were

12   verbal recommendations, so there was no -- we didn't keep

13   records of them, unfortunately.  Go back and look when I said

14   what.  It's all from memory.  So I don't recall that I did.

15   Q.  In your deposition beginning at page 177, you talk about

16   the misleading statements that you thought Vivendi issued with

17   respect to SFR.  I'm happy to put that in front of you.

18           MR. CAPPUCCI:  If he's going to ask him questions

19   about his transcript --

20           MR. SAUNDERS:  I'm happy to put that in front of

21   the --

22           THE COURT:  That's fair.  If he can't represent he --

23           MR. CAPPUCCI:  He's citing pages.

24           THE COURT:  Once he said he can't remember, you want

25   to refresh his recollection.  Do you want to show him the page?

 1          MR. SAUNDERS:  Yes.

 2          MR. CAPPUCCI:  What page, Paul?

 3          MR. SAUNDERS:  The colloquy starts on page 177.  What

 4   I want to ask is on 178.

 5          THE WITNESS:  Is it in here?

 6          MR. SAUNDERS:  It's not in that book.

 7          THE COURT:  He's going to bring it.

 8          MR. SAUNDERS:  May I approach, your Honor, please.

 9          THE COURT:  Of course.

10          THE WITNESS:  Page 47?

11          MR. SAUNDERS:  177.

12          THE COURT:  You said 177?

13          MR. SAUNDERS:  177.  The colloquy starts on 177.

14   BY MR. SAUNDERS:

15   Q.  And you can read that to refresh your recollection.  The

16   question I want to ask you about is on 178.

17   A.  Okay.  Okay.

18   Q.  Do you see on 177 there's a discussion about what you

19   believe was a misleading statement issued by Vivendi?

20   A.  Okay.

21   Q.  Do you see that, sir?

22   A.  Yes.

23   Q.  All right.  And then on 178 you were asked at line 13:

24   "Q  Did you change your investment recommendation based on this

25   understanding that you gained?

1    "A   No."

2    A.   Okay.

3    Q.   Was that testimony correct --

4    A.   I think so.

5    Q.   -- at the time you gave it?

6    A.   Yes.

7              MR. SAUNDERS:  Thank you very much.  No further

8    questions, your Honor.

9              MR. CAPPUCCI:  Your Honor, just one question.

10             THE COURT:  All right.

11   RECROSS EXAMINATION

12   BY MR. CAPPUCCI:

13   Q.   Mr. Rittenberry, just going from the last time back to

14   Defendant's Exhibit AU, which is the January 11, 2001, PMV

15   worksheet?

16   A.   AU you said?  AU.

17   Q.   What was the price of Vivendi ADRs on the date of this

18   worksheet?

19   A.   70.39.

20   Q.   Would you have paid any more for those shares beyond the

21   public market price on that date?

22   A.   Excuse me?

23   Q.   Would you have recommended to anyone at Gabelli that they

24   pay more than $70.39 for the Vivendi ADRs on January 11, 2001?

25             MR. SAUNDERS:  Your Honor, I'm going to object to that

Case 1:09-cv-07962-SAS   Document 45   Filed 03/19/13   Page 114 of 156

1    question.

2              THE COURT:  Sustained.

3              MR. SAUNDERS:  No questions.

4              THE COURT:  Okay.  I think we're done,

5    Mr. Rittenberry, right?

6              MR. CAMERON:  Yes, your Honor.

7              THE COURT:  All done.  Thank you.

8              (Witness excused)

9              THE COURT:  Next witness?

10             MR. CAMERON:  Good afternoon, your Honor.  Defendant

11   calls Mr. Douglas Jamieson as our next witness, your Honor.

12             THE COURT:  Are you going to have an exhibit book on

13   this witness?

14             MR. CAMERON:  Your Honor, I think I'm going to have a

15   couple exhibits which I can hand out as we go.

16             THE COURT:  No problem.

17    DOUGLAS JAMIESON,

18        called as a witness by the Defendant,

19        having been duly sworn, testified as follows:

20   DIRECT EXAMINATION

21   BY MR. CAMERON:

22   Q.  Good afternoon, Mr. Jamieson.

23             Sir, can you please provide for the Court just a brief

24   summary of your education and your employment history through

25   this point.

1   A.   Undergraduate Bucknell University, 1977, degree in

2   economics and international relations.  Graduate degree,

3   Columbia University School of Business, 1981, finance and

4   international relations -- I mean, finance and accounting.

5   I've worked with Gabelli since 1981.

6   Q.   And as I understand it, you are currently the president and

7   chief operating officer on a company called GAMCO Investors,

8   Inc., is that correct?

9   A.   Correct.

10  Q.   And I think you've held that position since August of 2004,

11  is that right?

12  A.   Yes, it is.

13  Q.   And GAMCO Investors, Inc. is a publicly traded company on

14  the New York Stock Exchange under the symbol GBL, is that

15  right?

16  A.   Yes, it is.

17  Q.   And if it's okay with you, Mr. Jamieson, I'll refer to that

18  company as GBL just as we go through this part of the

19  questioning.

20  A.   Okay.

21  Q.   And GBL is the parent company that oversees the various

22  activities undertaken by the GAMCO group of companies, is that

23  fair?

24  A.   Yes.

25  Q.   All right.  So let me then ask you about some of those

 1   subsidiaries.

 2           You're aware that one of the plaintiffs in this action

 3   is a company called GAMCO Investors, Inc., at least that's the

 4   name on the caption, is that correct?

 5   A.  Yes.

 6   Q.  And I know it's a little confusing, but that company is not

 7   the same company as GBL, which is the company that we just

 8   spoke about, right?

 9   A.  Correct.

10   Q.  And that's because the company that was formerly known as

11   GAMCO Investors, Inc. was renamed GAMCO Asset Management in

12   September 2005, correct?

13   A.  Correct.

14   Q.  But throughout the relevant period -- and you understand

15   the relevant period here to be October 30th of 2000 through

16   August 14 of 2002 -- it was called GAMCO Investors, Inc.,

17   right?

18   A.  Yes.

19   Q.  And again, just so it's clear in the questions that follow,

20   I'll refer to that as GAMCO, if that's all right.

21   A.  Yes.

22   Q.  And you've been chief operating officer of that company

23   since 1999, is that correct?

24   A.  Yes, it is.

25   Q.  And you continue in that position today, sir?

1    A.   Yes.

2    Q.   And again, throughout the relevant period GAMCO was a

3    wholly-owned subsidiary of GBL, correct?

4    A.   Correct.

5    Q.   Now, is it fair to describe GAMCO, one of the plaintiffs in

6    this case, as a registered investment adviser providing

7    investment advice to a broad array of clients?

8    A.   Yes.

9    Q.   And that, again, was the case throughout the relevant

10   period?

11   A.   Yes.

12   Q.   And those clients include pension funds, endowments,

13   foundations, high net worth individuals and subadvised clients,

14   is that right?

15   A.   Yes.

16   Q.   Can you explain what a subadvised client is, sir?

17   A.   That's an institution that retains GAMCO to manage assets

18   that they are gathering.

19   Q.   And so in terms of the services that GAMCO provides to its

20   clients, is it fair to say that GAMCO manages its clients'

21   accounts and has discretion to invest its funds, its clients'

22   funds in, for example, equity securities, right?

23   A.   Yes.

24   Q.   And GAMCO also talks to its clients about the markets from

25   time to time, is that fair?

 1    A.   Yes.

 2    Q.   And I think throughout the relevant period GAMCO had

 3    approximately 150 to 200 employees, right?

 4    A.   Yes.

 5    Q.   And it's your understanding that GAMCO is a plaintiff here

 6    today suing Vivendi to recover losses incurred by its clients

 7    as a result of its trading in Vivendi ADRs during the relevant

 8    period, correct?

 9    A.   Yes.

10    Q.   All right.  Let me ask you about a separate company called

11    Gabelli Funds, LLC.  That's also a wholly-owned subsidiary of

12    GBL, correct?

13    A.   Yes.

14    Q.   And is it fair to say that during the relevant period

15    Gabelli Funds managed the proprietary mutual fund products of

16    GBL?

17    A.   That is correct.

18    Q.   And you're aware that some of those mutual funds managed by

19    Gabelli Funds, LLC are also plaintiffs in this litigation,

20    correct?

21    A.   Correct.

22    Q.   And just so the record is clear, that includes GAMCO Global

23    Series Funds, Inc., is that correct?

24    A.   Yes.

25    Q.   Gabelli Capital Asset Fund?

1    A.   Yes.

2    Q.   The Gabelli Value Fund, Inc.?

3    A.   Yes.

4    Q.   The Gabelli Asset Fund?

5    A.   Yes.

6    Q.   The Gabelli Global Multimedia Trust, Inc.?

7    A.   Yes.

8    Q.   And the Gabelli Equity Trust, Inc.?

9    A.   Yes.

10   Q.   And again, just for the ease of reference, as my questions

11   proceed, I'm going to refer to those entities as the mutual

12   fund plaintiffs, if that's okay.

13   A.   Okay.

14   Q.   Now, and by the way, it's fair to say that all of the GAMCO

15   plaintiffs, GAMCO and those mutual fund plaintiffs, were value

16   styled investors throughout the relevant period, correct?

17   A.   Correct.

18   Q.   Can you explain what that means.

19   A.   That the investment advisers are buying companies in the

20   public market that they believe are trading at a significant

21   discount to their intrinsic value.

22   Q.   And the intrinsic value from the perspective of GAMCO and

23   the mutual fund plaintiffs is represented by their calculation

24   of private market value, correct?

25   A.   Correct.

1    Q.  And you're aware that those mutual fund plaintiffs are also

2    suing Vivendi here today to recover losses that they incurred

3    by trading Vivendi ADRs during the relevant period, correct?

4    A.  Yes.

5    Q.  And Mr. Albert, who's going to be called next by the

6    defendants and who is sitting at the plaintiff's table, is

7    currently the chief operating officer and executive vice

8    president of Gabelli Funds, LLC at the moment, correct?

9    A.  Correct.

10   Q.  All right.  The last company I have to ask you about is one

11   called Gabelli & Company, Inc.  That's also a subsidiary of

12   GBL, correct?

13   A.  Yes.  Indirectly, but, yes.

14   Q.  To be more precise, an indirect subsidiary, I believe, is a

15   company called Gabelli Securities, Inc. interposed in the

16   middle?

17   A.  Yes.

18   Q.  And is it fair to describe Gabelli & Company as the

19   research arm of GBL?

20   A.  Institution research services, yes.

21   Q.  So throughout the relevant period Gabelli & Company, or the

22   analysts employed by Gabelli & Company, conducted research for

23   GAMCO, is that correct?

24   A.  They conducted research for Gabelli & Company.  GAMCO may

25   or may not use their research.

D2IRVIV6                     Tamias - direct

1   Q.   Well, does Gabelli & Company perform research for GAMCO?

2   A.   It provides institutional research services for

3   institutions, one of which is GAMCO, yes.

4   Q.   And so what that means is they did the research for the

5   portfolio managers who make the decisions about which equity

6   securities to buy on behalf of GAMCO's clients, is that

7   correct?

8           MR. CAPPUCCI:   Objection to form.

9           THE COURT:   And what's --

10          MR. CAPPUCCI:   Lacks foundation.

11          THE COURT:   It's a strange question.  Either he has

12   that knowledge or he doesn't.  If he does, then there's

13   foundation by definition.

14          Do you know the answer to that question?

15          THE WITNESS:   Would -- they do provide research

16   services to GAMCO, yes.

17          THE COURT:   How do you know that?

18          THE WITNESS:   I'm part -- I know that they do.

19          THE COURT:   How?  From your position there?

20          THE WITNESS:   From position there, yes.

21   BY MR. CAMERON:

22   Q.   Just to elaborate on that point, Gabelli & Company analysts

23   like Mr. Rittenberry -- and you're aware Mr. Rittenberry was an

24   analyst employed by Gabelli & Company during the relevant

25   period, is that correct?

 1   A.   Yes.

 2   Q.   And, in fact, that he was the analyst responsible for

 3   researching companies, including specifically Vivendi, during

 4   that period, correct?

 5   A.   Correct.

 6   Q.   And analysts like Mr. Rittenberry reported their research

 7   at daily morning meetings during the relevant period, correct?

 8   A.   Yes.

 9   Q.   And you attended those morning meetings yourself, correct?

10   A.   Telephonically, yes.

11   Q.   And GAMCO portfolio managers also attended those meetings,

12   correct?

13   A.   Yes.

14   Q.   And those are the portfolio managers who were making

15   decisions on behalf of GAMCO about which equity securities to

16   purchase on behalf of GAMCO's clients, is that fair?

17   A.   Yes.

18   Q.   Now, that also -- it's also the case that Gabelli & Company

19   were performing research for the various mutual fund plaintiffs

20   here, correct?

21   A.   Yes.

22   Q.   And that also includes Gabelli Funds, LLC and the other

23   mutual fund plaintiffs that I had listed before, correct?

24   A.   Yes.

25   Q.   Now -- and I think you answered this question a short while

 1   ago -- would it be fair to say, Mr. Jamieson, that throughout

 2   the relevant period the investment strategy pursued both by

 3   GAMCO and the mutual fund plaintiffs involved purchasing

 4   securities that they determined to be undervalued?

 5   A.   Yes.

 6   Q.   And undervalued in this context means that the public stock

 7   price of a company was trading below its intrinsic value,

 8   correct?

 9   A.   Yes.

10   Q.   And that intrinsic value was represented by GAMCO's

11   calculation of that company's private market value, right?

12   A.   Yes.

13            MR. CAMERON:   Your Honor, permission to approach the

14   witness?

15   Q.   Mr. Jamieson, I'm showing you a document that's been marked

16   as Defendant's Exhibit BE.   And do you recognize what this is,

17   sir?

18   A.   Yes.

19   Q.   Can you explain.

20   A.   It looks like a caption of the GAMCO website.

21   Q.   And if you look at the bottom right-hand corner, you'll see

22   a date on the date of the printout, and that's December 27,

23   2012.  Do you see that?

24   A.   Yes, I do.

25   Q.   And I want to direct your attention to -- well, first, the

 1    name of the company on the top left-hand corner, GAMCO

 2    Investors, Inc.  Do you see that?

 3    A.  Yes, I do.

 4    Q.  And that, I believe, is the company that you are the

 5    president and COO of, is that right?

 6    A.  Yes, it is.

 7    Q.  You're familiar with this website?

 8    A.  Yes, I am.

 9    Q.  And I want to ask you about the heading halfway down in the

10    text that says our philosophy.  Do you see that?

11    A.  Yes, I do.

12    Q.  And it reads, GAMCO Investors, Inc. is best known for its

13    research driven, value oriented equity investing expertise,

14    which is based on the principles of Graham and Dodd.  That is

15    investing in undervalued companies that have a high probability

16    of achieving their intrinsic or private value over time.

17            Did I read that correctly?

18    A.  Yes.

19    Q.  Is that a fair or correct statement of GAMCO's philosophy,

20    sir?

21    A.  That's a fair statement.

22    Q.  Has that philosophy changed at any point since the relevant

23    period in this case?

24    A.  No.

25            MR. CAMERON:  Your Honor, we would move the admission

1    of Exhibit DBE.

2              MR. CAPPUCCI:  No objection.

3              THE COURT:  Exhibit BE is received.

4              (Defendant's Exhibit BE received in evidence)

5    BY MR. CAMERON:

6    Q.  And, Mr. Jamieson, during the relevant period, and even

7    today, you're aware that the analysts who are conducting

8    research both for GAMCO and the mutual fund plaintiffs

9    calculated what they viewed as the intrinsic value of the

10   security by using a PMV analysis of the kind Mr. Rittenberry

11   spoke about, right?

12   A.  Yes.

13             MR. CAMERON:  Your Honor, permission to approach?

14             THE COURT:  You don't need to ask any longer.

15             MR. CAMERON:  I'm sorry, your Honor?

16             THE COURT:  You don't need to ask that, any of the

17   lawyers.  Thanks.

18   BY MR. CAMERON:

19   Q.  Mr. Jamieson, I'm showing you a document that's been marked

20   as Defendant's Exhibit J, and I believe that this is already in

21   evidence.  Have you seen this before, sir?

22   A.  Yes.

23   Q.  And, in fact, I believe this is what is described as

24   GAMCO's all product book.  Is that fair?

25   A.  Yes.

1  Q.  And if you look at the page that has a Bates stamp on it of

2  006.  Do you have that, sir?  It's the little typed numbers on

3  the side of the document.

4  A.  Yes.

5  Q.  You'll see a page that identifies senior executives, but in

6  the bottom hand corner underneath Gabelli Asset Management

7  Company, there's a date, isn't there?

8  A.  Yes, there is.

9  Q.  And that suggests the document is dated March 31, 2001,

10  correct?

11  A.  Correct.

12  Q.  Can you explain the purpose of this all product book, sir?

13  A.  It's a pitch book that's used for -- by the marketing team

14  when they go and speak to institutional institutions or

15  consultants.

16  Q.  So is it fair to say that the purpose of this document is

17  to explain to a potential investor a little bit about GAMCO?

18  A.  Yes.

19  Q.  And also about its personnel?

20  A.  Yes.

21  Q.  And also about its investment philosophy?

22  A.  Yes.

23  Q.  And also its investment methodology?

24  A.  Yes.

25  Q.  And has anything about any of those aspects of GAMCO's

1   business changed since the relevant period, sir?

2   A.  No.

3   Q.  And indeed, if we continue looking at page 6 with a list of

4   senior executives, you are listed second down on the right-hand

5   side of that page, correct?

6   A.  Yes.

7   Q.  Now, can you turn to page 11, please.  Do you have that

8   document, sir?

9   A.  Yes, I do.

10  Q.  And the heading is value.  And underneath, philosophy.  And

11  it says, in the tradition of Graham and Dodd, Gabelli Asset

12  Management employs fundamental research to identify companies

13  of dominant industry positions that are selling at substantial

14  discounts to their intrinsic private market values.

15          Did I read that correctly, sir?

16  A.  Yes, you did.

17  Q.  And is it fair to say that what that is referring to is

18  companies where the public stock price is at a substantial

19  discount to their intrinsic private market values as calculated

20  by Gabelli?

21  A.  Yes.

22  Q.  And, in fact, it's the case that from Gabelli's

23  perspective, the true value of these companies is what is

24  represented by the private market value, correct?

25          MR. CAPPUCCI:  Objection to form.

1            THE COURT:  Overruled.

2            Is that your understanding?

3            THE WITNESS:  Yes.

4   Q.  And not the public stock price in the market, correct?

5   A.  The ultimate value is a private market value.  The price is

6   where you can buy and sell a security on any given day.

7   Q.  Right.  So the price in the stock market is simply if you

8   like the price to obtain the security but its value is what is

9   represented by the private market value calculation, correct?

10  A.  Yes.

11  Q.  It's also the case that throughout the relevant period the

12  only evaluation metric used by GAMCO and the mutual fund

13  plaintiffs was this private market value analysis, correct?

14  A.  Well, we did use the earnings per share and the cash flow

15  in addition to the private market value.  It was a three-prong

16  metric.

17  Q.  And so is it fair to say that the decisions that were made

18  by GAMCO and the mutual fund plaintiffs to purchase Vivendi

19  ADRs during the period was based upon this private market value

20  analysis, supplemented by earnings per share, I think you said,

21  and not because you felt that the stock market price was an

22  accurate measure of the intrinsic value of those securities?

23  A.  Yes.

24  Q.  Now, the private value metric that was employed by GAMCO in

25  the Gabelli funds during the period is a proprietary metric, is

 1    that correct?

 2    A.  Yes, it is.

 3    Q.  It's proprietary to GAMCO?

 4    A.  Yes, it is.

 5    Q.  And it's proprietary in part because it was GAMCO and Mario

 6    Gabelli who developed its use in the analysis of public

 7    securities, correct?

 8    A.  Yes.

 9    Q.  And another reason why it's proprietary is because GAMCO's

10    own process includes a special and secret ingredient that goes

11    into calculating the final private market value, correct?

12    A.  Yes.

13    Q.  And that secret or proprietary agreement is part of all

14    evaluations done by GAMCO or mutual fund plaintiffs where they

15    are looking to assess the value of a potential investment,

16    right?

17    A.  Yes.

18    Q.  And it's GAMCO's use of this proprietary ingredient,

19    including with respect to its valuation of Vivendi, that

20    permitted it to do something that the rest of the market was

21    not doing, namely to buy when everyone is selling and to sell

22    when everyone is buying, correct?

23    A.  Yes.

24             MR. CAMERON:  No further questions, your Honor.

25             THE COURT:  Thank you.

1   CROSS EXAMINATION

2   BY MR. CAPPUCCI:

3   Q.  Mr. Jamieson, just would you -- if you could please turn

4   back to Defendant's Exhibit J, that same page that my colleague

5   referred you to on page 11 entitled value.  I would like to

6   refer you in the philosophy section of the document, it refers

7   to the term intrinsic private market values.

8           What is meant by intrinsic private market values?

9   A.  In its simplest terms, it's the price that someone who knew

10  the various industries would be willing to pay for that

11  business.

12  Q.  So when -- is it your understanding that at Gabelli, when

13  the term intrinsic value was used, it's meant to reference the

14  intrinsic private market value as opposed to the in -- an

15  intrinsic value on the New York Stock Exchange?

16  A.  Yes.

17  Q.  Okay.  If I call you up today, Mr. Jamieson, and I have an

18  account at GAMCO, and I ask you what my account is worth, how

19  do you value my account?

20  A.  Based on the public prices that are on your statement.

21  Q.  What about PMV?  Let's say I have shares of Apple, and you

22  have a PMV analysis on Apple, and I ask you, Mr. Jamieson, what

23  are my Apple shares today?  Do you give me the market price or

24  do you give me the PMV price?

25  A.  Market price.

 1   Q.  Why don't you give me the PMV price?

 2   A.  Because it's not a price -- it's not a price today.  It's a

 3   value that could potentially be obtained in the future.

 4   Q.  What are those shares worth on that day?

 5   A.  Price.

 6   Q.  What are those shares valued at on that day?

 7   A.  The price.

 8          MR. CAPPUCCI:  No further questions, your Honor.

 9          THE COURT:  Anything further, Mr. Cameron?

10          MR. CAMERON:  No, your Honor.  Thank you.

11          THE COURT:  Thank you, Mr. Jamieson.  All set.

12          (Witness excused)

13          MR. CAMERON:  Your Honor, defendant calls as its next

14   witness Mr. Bruce Alpert.

15    BRUCE ALPERT,

16       called as a witness by the Defendant,

17       having been duly sworn, testified as follows:

18          MR. CAMERON:  Thank you, your Honor.  At this time I

19   do have a witness book, if I may pass that up.

20   DIRECT EXAMINATION

21   BY MR. CAMERON:

22   Q.  Good afternoon, sir.  Could you state briefly for the Court

23   a summary of your educational background, with experience to

24   the current time.

25   A.  I graduated from Rensselaer Polytechnic Institute in 1974

1   with a Bachelor's in Management Science, and at the end of that

2   year, 1974, with a Master's in Business Administration.

3         I joined PriceWaterhouse and spent eight years with

4   them as an auditor, general audit.  I moved from there to Smith

5   Barney and was vice president and treasurer of their mutual

6   funds.  I left in 1988 -- 1986 to Dean Witter and served two

7   years there.  And in 1988 I joined Gabelli funds as the vice

8   president and treasurer of their mutual funds.

9   Q.  Now, Mr. Alpert, as I understand it you are currently the

10  chief operating officer and the executive vice president of

11  Gabelli Funds, LLC, correct?

12  A.  Yes.

13  Q.  And you were here for Mr. Jamieson's examination, and you

14  would agree that Gabelli Funds is the entity that manages the

15  proprietary fund products of the Gabelli group, is that right?

16  A.  Yes.

17  Q.  And I understand you've been the chief operating officer of

18  Gabelli Funds, LLC since 1998, right?

19  A.  Yes, and since 1988 when I joined the firm.

20  Q.  Oh, excuse me.  And throughout the relevant period, which

21  you understand to be October 30 of 2000 through August 14 of

22  2002, Gabelli Funds, LLC managed the various mutual funds that

23  sued Vivendi as plaintiffs in this litigation?

24  A.  Yes.

25  Q.  And again, so the record is clear, I apologize for listing

1   them, but those mutual fund plaintiffs are GAMCO Global Series

2   Funds, Inc., correct?

3   A.  Yes.

4   Q.  Gabelli Capital Asset Fund?

5   A.  Yes.

6   Q.  The Gabelli Value Fund, Inc.?

7   A.  Yes.

8   Q.  The Gabelli Asset Fund?

9   A.  Yes.

10  Q.  The Gabelli Global Multimedia Trust, Inc.?

11  A.  Yes.

12  Q.  And the Gabelli Equity Trust, Inc.?

13  A.  Yes.

14  Q.  Now, I also understand that one of those that I mentioned,

15  the first one, GAMCO Global Series Funds, Inc., incorporates

16  four separate fund portfolios, is that right?

17  A.  Yes.

18  Q.  And three of those four funds are seeking damages against

19  Vivendi in this case today, correct?

20  A.  I believe so, yes.

21  Q.  And I think those funds are GAMCO Global Telecommunications

22  Fund, GAMCO Global Growth Fund and the GAMCO Global Opportunity

23  Fund, is that correct?

24  A.  Yes.

25  Q.  And you're also the president and treasurer of each of

 1   those plaintiff mutual funds, is that right?

 2   A.  I'm treasurer -- excuse me.  I'm president of all those

 3   funds.  We have a new treasurer today, and I was probably

 4   treasurer then.

 5   Q.  I think you were a treasurer during the relevant period, is

 6   that correct?

 7   A.  Yes, I think so.

 8   Q.  And probably more accurately, when your deposition was

 9   taken, I think, right?

10   A.  Yes.

11   Q.  And for ease of reference, as I did with Mr. Jamieson, I'm

12   going to refer to those funds, those seeking damages from

13   Vivendi in this case, as the mutual fund plaintiffs.  Is that

14   okay?

15   A.  Fine.

16   Q.  Now, it's true, is it not, that all of those funds that

17   I've mentioned, the mutual fund plaintiffs in this case, are

18   value styled funds?

19   A.  Yes.

20   Q.  Can you explain what that is.

21   A.  It's an approach to selecting securities that are trading

22   at a significant discount to their private market value.

23   Q.  And so is it fair to say that as value styled funds, all of

24   those mutual fund plaintiffs relied upon GAMCO's PMV

25   methodology, the private market value methodology when making

1   their investment decisions?

2   A.  Not entirely, but substantially all of the portfolio would

3   be managed that way.

4   Q.  Well, I'm talking about these specific --

5   A.  We have investments in cash.  We also have investments in

6   merger arbitrage situations --

7   Q.  I take your point.  Let me then narrow the question to

8   refer to the identification and purchase of equity securities

9   held by those mutual fund plaintiffs.

10  A.  Substantially, yes.

11  Q.  And I won't go through it all again, but just so we're

12  clear, that means that the mutual fund plaintiffs would invest

13  in an equity security when the stock price and the market for

14  that security is less than the intrinsic value of the security

15  calculated using the private market valuation methodology?

16  A.  That's the stated objective, yes.

17  Q.  And the way that you think about it is that if the stock

18  price is indeed below the private market valuation, then the

19  stock is undervalued, correct.

20  A.  Relative to the private market value, yes.

21  Q.  And that's actually how this kind of value investing works,

22  right?  Because if the stock price is below the private market

23  valuation, then you are actually obtaining a security that has

24  more value than that represented by the stock price that you're

25  paying for it, correct?

D2IFVIV6                        Albert - direct

1   A.  Relative to the future value.

2   Q.  Can you answer my question, sir?

3   A.  You want to repeat the question, please?

4   Q.  I just want to make sure that I understand this is how this

5   type of value investing works.  You are looking to purchase

6   securities that you think have a greater value than that

7   represented by the actual stock market price of that security,

8   correct?

9   A.  A greater potential value.

10  Q.  But greater value, correct?

11  A.  Potential value.

12  Q.  Well, let's look at some examples.  You have a binder in

13  front of you, sir?

14          THE COURT:  You have the binder, right?

15          THE WITNESS:  Yes.  I didn't hear that.

16          THE COURT:  Yes.

17  Q.  Can I take you first to Exhibit Z, which should be in your

18  binder.

19          MR. CAMERON:  And I believe this is already in

20  evidence, your Honor.

21  A.  Yes, I have it.

22  Q.  Have you seen this before, sir?

23  A.  Yes.

24  Q.  And the -- this is the annual report from the Gabelli Asset

25  Fund dated September 31, 2001, correct?

 1   A.  Yes.

 2   Q.  What I'd like to take you to, please, is page five.  Do you

 3   have that, sir?

 4   A.  Yes.

 5   Q.  Do you see the heading investor psychology?

 6   A.  Yes.

 7   Q.  Let me read this paragraph for you:  Of course, intrinsic

 8   value and equities prices are horses of two very different

 9   colors.  Remember the emotional Mr. Market often values stocks

10   materially above and substantially below intrinsic value.

11        Did I read that correctly, sir?

12   A.  Yes.

13   Q.  Do you agree with that?

14   A.  It's not -- yes.  Yes.

15   Q.  And that, in fact, is what the Gabelli Asset Fund was

16   telling its own investors in its annual report for December 31,

17   2001, correct?

18        MR. CAPPUCCI:  Objection, your Honor.

19        THE COURT:  Sustained.  I don't know what you're

20   referring to.  You mean in this --

21        MR. CAMERON:  The entire document.  This is the annual

22   report.

23        THE COURT:  In the entire Exhibit Z, but that's a

24   rather long report to say, boil it down to telling the

25   investors that.  I think you have to be more specific.

1              MR. CAMERON:  I'll move on, your Honor.

2              THE COURT:  All right.

3     BY MR. CAMERON:

4     Q.  Can you look at Exhibit E, please.

5     A.  Yes, I have it.

6     Q.  And before I proceed, I just want to be clear, I think you

7     mentioned before that the private market value captures

8     potential value, is that right?

9     A.  Yes.

10    Q.  Does the stock market price on a particular day capture

11    that potential value?

12             MR. CAPPUCCI:  Objection.

13             THE COURT:  He can answer it.

14    A.  I don't analyze individual stock prices.  You would think

15    that there is a discount of all of the factors that affect the

16    market price in determining what that price should be.  So I

17    can't answer that.

18    Q.  So do you know one way or the other?

19    A.  No.

20    Q.  Can you look at Exhibit E, please.  Have you seen this

21    document before, sir?

22    A.  Yes.

23    Q.  And is this the annual report dated December 31, 2000, or

24    for the period ended December 31, 2000 of the Gabelli Equity

25    Trust, Inc.?

1  A.  Yes.

2          MR. CAMERON:  And this is already also in evidence,

3  your Honor.

4  Q.  Would you turn to page 181.

5  A.  I have it.

6  Q.  And in the middle of that first paragraph of text it says,

7  our portfolio is full of small companies trading at discounts

8  to private market value, defined as the price an informed

9  industrialist would be willing to pay for the company's assets.

10          Do you see that?

11 A.  Yes.

12 Q.  And is that consistent with the fact that the mutual fund

13 plaintiffs identified companies or securities for purchase

14 based upon the existence of a discount of the stock price below

15 the private market value for that company?

16 A.  Yes.

17 Q.  And again, that's consistent with the type of value

18 investing that we were talking about?

19 A.  Yes.

20 Q.  Last one.  Can you turn to a document, AR, please,

21 Exhibit AR.

22 A.  Yes.

23 Q.  And, sir, this is also in evidence.  This is the Gabelli

24 Asset Fund's annual report for December 31, 2002.  Do you see

25 that?

1   A.  Yes.

2   Q.  And if I can take you, please, to page 66.

3   A.  Yes.

4   Q.  And the last paragraph on that page,it's page four of the

5   report, reads, in the mid-'70s we originated and focused a

6   valuation methodology based on private market value.

7        Do you see that?

8   A.  Yes.

9   Q.  So, again, is it fair to say, sir, that the investment

10  decisions that were being made by the mutual fund plaintiffs

11  during the relevant period were based upon this private market

12  value methodology?

13       MR. CAPPUCCI:  Objection, your Honor.

14       THE COURT:  Right, as is stated, but not for the

15  reason you think.

16       You just read that sentence from the report, so leave

17  it at that.

18       THE WITNESS:  I don't --

19       THE COURT:  I don't think you have anything to answer.

20  That's what it says.

21       MR. CAMERON:  All right, your Honor.  I have no

22  further questions.

23       THE COURT:  Okay.  Thank you.  Mr. Cappucci?

24       MR. CAPPUCCI:  I'll be brief, your Honor.

25                           - - - - -

1   CROSS EXAMINATION

2   BY MR. CAPPUCCI:

3   Q.  Mr. Alpert, you had no involvement in any of the

4   transactional decisions regarding Vivendi securities which are

5   the subject of this case, correct?

6   A.  Correct.

7   Q.  Okay.  You are, though, a senior, if not the senior officer

8   at many of the plaintiffs in this case, correct?

9   A.  Yes.

10  Q.  You have a financial background which you just identified

11  for the Court.  So I'd like you to go to Defendant's Exhibit E,

12  which, again, is the annual report for the Gabelli Equity Trust

13  for the period ended December 31, 2000.  And turn to page 202,

14  which is 26 of the document.

15          And it is a letter to the board of directors of the

16  Gabelli Equity Trust by the firm of PriceWaterhouseCoopers.  Do

17  you see that?

18  A.  Yes.

19          MR. CAMERON:  Which page?

20          MR. CAPPUCCI:  This is page 202, page 26 of the

21  document.

22  Q.  Now, sir, you have an accounting background.  Please

23  explain to the Court basically what the opinion is here, what

24  the auditors are saying.

25  A.  This is a report to the directors and shareholders of the

D2IRVIV6                          Albert - direct

1  Gabelli Equity Trust from the independent registered accounting

2  firm PriceWaterhouseCoopers which gives an opinion on the

3  fairness of the financial statements, of the equity trusts.

4  Q.  Fairness in what respect?

5  A.  That it's in accordance, prepared in accordance with the

6  generally accepted accounting principles and has been conducted

7  under the general auditing standards at the time.

8  Q.  What about accounting policies that are applied by the

9  firm?  Are they blessing that, and to the extent they've

10  reviewed those processes?

11  A.  They're saying that the policies and procedures in terms of

12  valuation have been applied consistently throughout the period.

13  Q.  Okay.  Fine.  Turn to page 197 of the document, which is

14  page 21.  Gabelli Equity Trust, Inc. notes the financial

15  statements, significant accounting policies, generally for the

16  Court -- and for the benefit of the Court and those in here,

17  what's being presented here in terms of accounting, significant

18  accounting policies?

19  A.  How we value the individual securities that are held in the

20  portfolio.

21  Q.  I'll get to that, but just generally, is it not the case

22  that these are the significant accounting policies which are

23  applied by the firm for the purposes of its preparation of the

24  account -- of the financial statements?

25  A.  Yes.

1    Q.   So in other words, these are your financial statements.

2    You apply methodology -- accounting policies, and then that's

3    all -- that's all reviewed by the outside auditors, correct?

4    A.   Yes.

5    Q.   PriceWaterhouse, again, as this document shows, passed upon

6    the methodology.

7            Now, with respect to security valuation, what does it

8    say here in terms of security valuation?

9    A.   It identifies the process we use to assign a value to each

10   individual holding within the portfolio.

11   Q.   Okay.  I want to read a sentence to you:  Security

12   valuation, portfolio securities listed or traded on a

13   nationally recognized securities exchange, quoted by the

14   National Association of Securities Dealers Automated Quotations

15   Inc., NASDAQ, or traded on a foreign exchange, are valued at

16   the last sale price on that exchange as of the close of

17   business on that date.

18           Do you see that?

19   A.   Yes.

20   Q.   What does that mean?

21   A.   We take a closing market price on the individual exchange

22   upon which a security trades.

23   Q.   Now, I want you to go in that same report -- just give me a

24   moment -- to the section where it provides a breakdown of the

25   holdings in the trust.  Do you see that?  This would begin on

1   page 14.

2   A.  This is the schedule of investments.

3   Q.  Yes.

4   A.  Or portfolio of investments.

5   Q.  Yes.

6   A.  I have it.

7   Q.  Can you see -- can you find for us whether Vivendi is

8   reflected -- a position in Vivendi is reflected in that

9   schedule?  And I'll direct your attention to page 17, to make

10  it faster.

11          Do you see that, sir, left-hand column at the bottom

12  of the section entitled business services?

13  A.  Yes, I see that.

14  Q.  Okay.  I see 220,000 shares, Vivendi Universal, S.A. ADR.

15  I see a number for cost and a number for market value.  Sir, is

16  this saying that you're valuing that holding in Vivendi ADRs at

17  market?

18  A.  At the market price that closed on December 31st.

19  Q.  If I call you up, sir, and I have an account with you in

20  the equity trust, and I want to know the net asset value, what

21  is that going to be based on?

22  A.  Closing market prices of the individual securities, plus or

23  minus other assets and liabilities.

24  Q.  Would you use PMV?

25  A.  No.

1   Q.  Okay.

2              MR. CAPPUCCI:  No further questions.

3              THE COURT:  Anything further for this witness?

4              MR. CAMERON:  Nothing further, your Honor.

5              THE COURT:  Thank you.

6              (Witness excused)

7              MR. SAUNDERS:  Your Honor, our next witness is Hart

8   Woodson, who we would present to the Court by deposition.

9              The deposition is two hours long, I'm sorry to say.

10  We've tried to cut it down by taking out all of the pauses, but

11  it's still two hours.  So with your Honor's permission -- do

12  you want to see it, or do you want to read it?

13             THE COURT:  It's up to you.  I don't want to read it

14  by myself.  If you want to read it in court --

15             MR. SAUNDERS:  We have it on video.

16             THE COURT:  -- it's the same to me.

17             MR. SAUNDERS:  It's entirely up to you, your Honor.

18             THE COURT:  The video and the reading are the same to

19  me, I think, unless one is faster than the other.

20             MR. SAUNDERS:  They ought to be exactly the same, if I

21  read it correctly.

22             THE COURT:  No, because a witness can pause and think

23  whatever.  The reading should theoretically be faster than

24  videotape.

25             MR. SAUNDERS:  I think you're right.  I think

 1    theoretically reading it would be faster than the video, but

 2    you won't get a chance to evaluate the witness.

 3          THE COURT:  All right.  Well, let's start with the

 4    video, then.

 5          MR. SAUNDERS:  You know, if it's getting tedious,

 6    we'll switch.  I think you have -- you ought to have a chance

 7    to see the witness.

 8          THE COURT:  I know that the lawyers, whatever,

 9    collectively asked my chambers first if I would just read it in

10    the privacy of my study, so to speak.  And I said no.  And I

11    know the truth is because it's hard to concentrate.  You find

12    yourself wanting to do everything but read it.  You start out

13    reading it, then you read something else, and then you look at

14    the news, then you do something else, and you don't want to

15    read it.

16          So let's do the videotape.

17          MR. SAUNDERS:  So maybe we start.  And, your Honor, if

18    you think it's getting tedious, just let us know and we'll

19    switch.

20          THE COURT:  Okay.  For those who don't want to sit

21    through two hours of this, feel free to walk out.

22          MR. CAPPUCCI:  Thank you, your Honor.

23          THE COURT:  I'm serious.

24          MR. CAPPUCCI:  I'm only kidding.

25          THE COURT:  I'm serious.  Not everybody needs to sit

D2IRVIV6                      Albert - direct

 1    here and listen to two hours they've heard many times, because

 2    it's the rest of the afternoon.

 3              MR. CAPPUCCI:  Could I maybe have some of my

 4    associates go back to the office, your Honor?

 5              THE COURT:  Of course.  I just said that.  Seriously.

 6              MR. CAPPUCCI:  Thank you so much.

 7              THE COURT:  Seriously.  They're all invited to do

 8    that.

 9              MR. CAPPUCCI:  Can we take two seconds while they're

10    setting up?

11              MR. SAUNDERS:  One more thing I just need to mention,

12    then we can take a break.  Some of the exhibits that

13    Mr. Woodson is going to testify about are exhibits to which the

14    plaintiffs have objected.  They haven't objected to the

15    deposition.

16              THE COURT:  I understand.

17              MR. SAUNDERS:  But they've objected to some of the

18    exhibits.  I have those, if you'd like to see those, your

19    Honor, and rule on them.  I can pass them up to you in a book.

20              THE COURT:  Okay.

21              MR. SAUNDERS:  I think there are four exhibits I'm

22    told, your Honor.

23              THE COURT:  All right.  Mr. Saunders, the one to which

24    there is not objection your tech person will be putting up or

25    no?

 1            MR. SAUNDERS:  They are -- all exhibits to which

 2   Mr. Woodson refers in the deposition have been objected to.

 3            THE COURT:  Oh, all.  Okay.  Oh.  So they're all in

 4   the book?

 5            MR. SAUNDERS:  They're all in the book.  I think there

 6   are four of them.

 7            THE COURT:  They've all been objected to?

 8            MR. SAUNDERS:  Right.  I don't know whether those

 9   objections are still being maintained or not.

10            THE COURT:  Maybe that's the way to pass the time.

11   I'll just do the objections first, without context.

12            MR. SAUNDERS:  That might make sense, your Honor.

13            THE COURT:  Let's see.  Who's handling the objections?

14   Mr. Cappucci?

15            MR. SAUNDERS:  Mr. Raciti, are you going to do it?

16            MR. RACITI:  Let's wait for Mr. Cappucci.

17            MR. SAUNDERS:  While we're waiting, your Honor, I do

18   have one thing that I would like to note for the record.  You

19   will see that in our joint pretrial order, we have a section of

20   undisputed facts.

21            THE COURT:  Yes.

22            MR. SAUNDERS:  And undisputed fact number ten is that

23   during the relevant period, I think the Vivendi stock traded in

24   an efficient market.

25            THE COURT:  Yes.

D2IRVIV4                         Albert - direct

 1              MR. SAUNDERS:  I simply wanted to explain that what we

 2   meant by saying that, what we on our side meant by saying that

 3   is that the stock met the Cammer factors.  I just wanted to

 4   note that for the record, in case there's ever any later

 5   explanation about what an efficient market means, we had in

 6   mind that we met the Cammer factors.

 7              MR. CAPPUCCI:  That's fine.  We like Cammer.

 8              THE COURT:  Now, what Mr. Saunders said when you were

 9   referring or saying good-bye to colleagues is there are four

10   exhibits that he's handed you in the book.

11              MR. CAPPUCCI:  Your Honor, we're on the same page.

12              THE COURT:  Okay.  So there are four exhibits to which

13   you objected that are part of the Woodson deposition.  I said

14   maybe I can handle the objections first, so maybe it would be

15   even smoother.

16              MR. CAPPUCCI:  Your Honor, I've looked at these.

17   Other than relevance and hearsay, I'm not -- which we're not

18   going to debate here, okay?

19              THE COURT:  We're not going to debate?

20              MR. CAPPUCCI:  I would rely on you to weigh the

21   evidence.  But there is one exhibit which has an authenticity

22   issue.  It's Exhibit C.

23              THE COURT:  Let me see if I can figure out which is C.

24   I only have them written as 3, 4, 5 and 6.

25              MR. CAPPUCCI:  It's a PMV worksheet.

1           THE COURT:  I only have 3, 4, 5 and 6.

2           MR. CAPPUCCI:  Handwritten.

3           THE COURT:  Mr. Saunders?

4           MR. SAUNDERS:  It's the last tab in your book,

5   Exhibit 6.

6           THE COURT:  Go ahead.

7           MR. SAUNDERS:  In the Woodson deposition.

8           MR. CAPPUCCI:  And it has handwriting on it, and we

9   don't know whose handwriting it is.

10          THE COURT:  Okay.

11          MR. SAUNDERS:  I think, your Honor, the record will

12  reflect tomorrow that that's Mr. Gabelli's handwriting.

13          THE COURT:  I'll take it what they call subject to

14  connection, if Mr. Gabelli says it's his.  If he says he

15  doesn't recognize it, then I won't.

16          MR. CAPPUCCI:  That was the only --

17          THE COURT:  All right.  So with that, the objections

18  are withdrawn and all the Woodson exhibits are coming in except

19  6, which is taken subject to connection, depending on what

20  Mr. Gabelli says tomorrow.

21          MR. CAPPUCCI:  Your Honor, if I can make one point

22  with respect -- just with respect to the relevance, if there

23  were documents which are referring to other portfolios that are

24  not part of this case, we felt some of it may not have

25  relevancy, but that will be borne out, I believe, in the

D2IRVIV6                          Albert - direct

1    testimony.

2                THE COURT:  Okay.

3                MR. CAPPUCCI:  Thank you.

4                MR. SAUNDERS:  With that, your Honor, we call as our

5    next witness Mr. Hart Woodson by deposition.

6                (Video played)

7                THE COURT:  Well, we finished the deposition reading.

8    I must say, as I think some kind of retribution for forcing me

9    to sit through that for two-and-a-half hours, that each side

10   should highlight in yellow pen, yellow highlighter, what they

11   think was relevant to the issue we're trying, because I'm

12   convinced I heard much that was relevant to the issue we're

13   trying.  At the time he was deposed maybe you didn't know that

14   we would narrow the case so much.  So if you would, each side,

15   take a yellow highlighter -- not both yellow; yellow for the

16   defense, pink for the plaintiff -- and point out what you think

17   was really important there.

18               MR. SAUNDERS:  We'll be happy to do that, your Honor.

19               THE COURT:  I'm serious.  That's an assignment:

20   Yellow, pink, highlighter.

21               MR. SAUNDERS:  If I could make just a couple of

22   statements for the record.

23               First, there were references to five exhibits during

24   the course of that testimony.  And I could just give the

25   corresponding defendant's exhibit numbers.

1          MR. CAPPUCCI:  Why don't we clean it up for the Court,

2     Paul, and do a separate submission on the transcript.  Sounds

3     like we've got some work to do with this.

4          THE COURT:  That would be a good idea.

5          MR. CAPPUCCI:  You may not want to put that stuff in.

6          THE COURT:  The purpose of the reading -- I followed

7     it in the book.  I see you want to translate those into the

8     defense exhibit letters.

9          MR. SAUNDERS:  I think they're already in evidence.

10         THE COURT:  I know, but if you would just send that

11    over as a letter or something.

12         MR. SAUNDERS:  I'd be happy to do that.

13         THE COURT:  That would be easier.

14         MR. SAUNDERS:  Also, your Honor, just there are two

15    other places where Mr. Cappucci and I can agree that the

16    witness confused private versus public market value in his

17    answer.  And the two that we've identified, the first one is in

18    the portion of the answer that begins on transcript page 145,

19    line 22, and ends on transcript page 146, line 7.  The witness

20    inadvertently, I suppose, transposed the words private versus

21    public.  So we can stipulate that he meant to transpose those

22    words at that place in the transcript.

23         Similarly, we agree that on transcript page 200, line

24    12 to line 15, the witness inadvertently, I think, reversed the

25    words private and public when he was referring to values.

1           THE COURT:  I don't think I have a whole transcript

2    now, but when you submit the marked transcript, the one that

3    will have yellow for the defense and pink for the plaintiff,

4    you can go ahead and circle that and make the change in the

5    margin --

6           MR. SAUNDERS:  Thank you, your Honor.

7           THE COURT:  -- so that I see it that way.

8           When are you going to submit those marked transcripts?

9           MR. SAUNDERS:  We can do it tomorrow morning, if you

10   like.

11          MR. CAPPUCCI:  Wednesday.

12          THE COURT:  Wednesday sounds better.  Why should you

13   have to read that thing again tonight?  Wednesday sounds fine.

14          MR. SAUNDERS:  That's fine.

15          THE COURT:  All right.  What do we pick up with

16   tomorrow?

17          MR. SAUNDERS:  The next witness we have is

18   Mr. Gabelli, and I understand that he's not available until

19   tomorrow afternoon.

20          THE COURT:  Yes.  And how are we using the morning?

21          MR. CAPPUCCI:  I believe we contacted the Court about

22   this last week.  We spoke to Jim.

23          THE COURT:  I don't recall.  What, and miss the

24   morning?

25          MR. CAPPUCCI:  No.  What we intended, both of us, was

1    that the deposition transcript would be read tomorrow morning.

2    I believe the Court wanted to start at 10:00 and then was

3    taking an early break.  So we had Mr. Gabelli, who was flying

4    in, to be available for the entire afternoon.  That would be

5    our last witness.  So at this juncture --

6            THE COURT:  In other words, you have no witnesses?

7            MR. CAPPUCCI:  The last witness is Mario Gabelli.  He

8    is going to be here at 2:00.  We thought the Court would be

9    appreciative of that and perhaps free up the calendar for other

10   things.

11           THE COURT:  No, I didn't think I understood it, so

12   that's too bad.  Breakdown in communications with staff.  But

13   there's nothing I can do about it now, because I can't have the

14   summation before that.

15           So how long do we think he'll last on the stand?

16           MR. SAUNDERS:  Probably an hour on direct.

17           MR. CAPPUCCI:  Half an hour on cross.

18           THE COURT:  So there will still be time for you to try

19   to pull it together?

20           MR. CAPPUCCI:  There will be time.  And how long would

21   you like for the closings, your Honor?

22           THE COURT:  Whatever it takes.  Whatever it takes.

23           Okay.  That's it, then.

24           MR. CAPPUCCI:  So I can't see more than a half an hour

25   each side on closings.  I'm just trying to get a --

1           THE COURT:  I'm not going to tell you.  Whatever it

2   takes you.  Say what you have to say without repeating yourself

3   endlessly.

4           So apparently I don't see you until 2:00?

5           MR. CAPPUCCI:  That's correct.

6           THE COURT:  Okay.  Very good.  Thank you.  See you

7   then.

8           MR. CAPPUCCI:  Thank you, your Honor.  Sorry for any

9   miscommunication with the Court.

10          THE COURT:  I'm sure it was in my chambers.

11          (Adjourned to February 19, 2013, at 2:00 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

ANDREW RITTENBERRY

Direct By Mr. Saunders . . . . . . . . . . . .30

Cross By Mr. Cappucci  . . . . . . . . . . . .87

Redirect By Mr. Saunders . . . . . . . . . . 105

Recross By Mr. Cappucci  . . . . . . . . . . 113

DOUGLAS JAMIESON

Direct By Mr. Cameron  . . . . . . . . . . . 114

Cross By Mr. Cappucci  . . . . . . . . . . . 130

BRUCE ALPERT

Direct By Mr. Cameron  . . . . . . . . . . . 131

Cross By Mr. Cappucci  . . . . . . . . . . . 141

DEFENDANT EXHIBITS

Exhibit No.                               Received

 BE   . . . . . . . . . . . . . . . . . . . 125