```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   GAMCO INVESTORS, INC., et al.,

 4                  Plaintiffs,

 5           v.                          03 Civ. 5911 (SAS)
                                         09 Civ. 7962 (SAS)
 6   VIVENDI, S.A. and
     VIVENDI UNIVERSAL, S.A.,
 7                                       Conference
                 Defendants.
 8
     ------------------------------x
 9
                                         New York, N.Y.
10                                       February 19, 2013
                                         2:07 p.m.
11
     Before:
12
            HON. SHIRA A. SCHEINDLIN
13
                                         District Judge
14

15
            APPEARANCES
16

17
     ENTWISTLE & CAPPUCCI
18       Attorneys for Plaintiffs
     BY:  VINCENT R. CAPPUCCI
19       EVAN T. RACITI
         ARTHUR NEALON
20       ASHLEY GRAHAM

21
     CRAVATH, SWAINE & MOORE LLP
22       Attorneys for Defendants
     BY:  PAUL C. SAUNDERS
23       TIMOTHY CAMERON
         MARGOT A. MILLER
24       XIAO LIU

25
```

```
 1                    (In open court)

 2                    (Case called)

 3              THE COURT:  Your next witness?  Next witness?

 4              MR. SAUNDERS:  Good afternoon, your Honor.  May I

 5    proceed?

 6              THE COURT:  Please.

 7              MR. SAUNDERS:  We call as our next and last witness,

 8    Mario J. Gabelli.

 9     MARIO J GABELLI,

10        called as a witness by the Defendant,

11        having been duly sworn, testified as follows:

12    DIRECT EXAMINATION

13    BY MR. SAUNDERS:

14    Q.  Mr. Gabelli, good afternoon.

15              Would you please give the Court a very brief summary

16    of your educational and employment history.

17    A.  Sure.  I grew up in the Bronx.  Went to PS4.  Went to

18    St. Joseph's in the South Bronx.  Went to Immaculate Conception

19    in the South Bronx.  Went to Evander Childs High School.  Went

20    to Fordham Prep.  Went to Fordham University.  Went to Columbia

21    University graduate school of business, and briefly enrolled in

22    a PhD program at NYU.

23              THE COURT:  You said briefly enrolled.  Did you

24    complete that?

25              THE WITNESS:  No.  It's too much work.
```

D2jegam1                    Gabelli - direct

1   Q.  And your employment history, briefly?

2   A.  I started as an analyst on the day I graduated -- on the

3   Monday after; I graduated on a Saturday -- at a firm called

4   Loeb Rhoades & Company.  Went to a firm called William D.

5   Witter -- we merged into Drexel Burnham, and then I started an

6   institutional research firm called Gabelli & Company on

7   January 1, 1977.

8   Q.  And have you been employed in one capacity or another with

9   Gabelli or various Gabelli enterprises ever since that time?

10  A.  That's 45 years, thank you.  Yes.

11  Q.  And what is your current position with -- I guess I could

12  use Gabelli as a generic term, and you'll explain to us in more

13  detail by whom you are actually employed.  But what is your

14  current position?

15  A.  We went public in 1999, February of 1999 through Merrill

16  Smith Barney.  So I am the CEO of a publicly trading company.

17  I'm also serving as the chairman, and I function more

18  effectively daily as the chief investment officer on the value

19  side of the -- of the house.

20  Q.  All right, sir.  And so would it be fair to say that GAMCO

21  Investors is a part of this enterprise, GAMCO Investors, Inc.?

22  A.  Well, a road map could help.  The public company is called

23  Gabelli -- Gabelli Asset Management, shortened to GAMCO

24  Investors.  Below that is an institutional asset management

25  firm.  That is private wealth and institutional.  Then there's

D2jegam1                      Gabelli - direct

1    Gabelli funds which is a mutual fund.  That is the hedge funds.

2    And then there's a broker dealer and institutional research

3    firm.

4    Q.  All right.  What was your major at Fordham?

5    A.  Undergraduate I assume, not the high school?

6    Q.  Yes.

7    A.  I was an accounting major and a philosophy minor.

8    Q.  All right, sir.  Now, I want to ask you some questions

9    about something that we heard yesterday, and I'm going to ask

10   you to elaborate for a moment, if you would, about two men

11   called Graham and Dodd.  If you would explain to us briefly who

12   they are, how they influenced you and what role that influence

13   plays in the investment philosophy of Gabelli.  By that --

14           THE COURT:  That was three questions.

15           MR. SAUNDERS:  Three questions.

16           THE COURT:  Do you remember all three or do you want

17   to do one at a time?

18           THE WITNESS:  Thank you, your Honor.

19           THE COURT:  I think the first of three is who are

20   they?

21           THE WITNESS:  Basically I'm going to take a little

22   liberty with your question, because they didn't influence me.

23   But notwithstanding that --

24           THE COURT:  Let's go with the first one.  Who are

25   they?

D2jegam1                          Gabelli - direct

1          THE WITNESS:  Graham and Dodd were two professors at

2    the Columbia graduate school of business.  And they wrote a

3    book called Graham and Dodd Value Investing in 1934.

4          THE COURT:  Okay.  And did their book or theories

5    influence you?

6          THE WITNESS:  What happened was that I was always

7    interested in the stock market from the days I used to caddy up

8    in Scarsdale, New York, hitchhiking up from the Bronx.  And I

9    didn't know what part of Wall Street I wanted to go into until

10   I took a course from Roger Murray, a course with Roger Murray,

11   who was the most influential person in understanding what I

12   would do in terms of my career.  He had written a subsequent

13   book --

14         THE COURT:  Where was he?

15         THE WITNESS:  He was teaching finance at Columbia

16   Business School.

17         THE COURT:  And you went there?

18         THE WITNESS:  Yeah.  This was the security analysis

19   program.

20         Third question?

21   BY MR. SAUNDERS:

22   Q.  Third question was what role, if any, did that influence

23   play on the investment philosophy of the Gabelli companies?

24   A.  Well, you know, everyone is -- has a variety of elements

25   that go into their philosophy.  But to fast-forward from the

1    time I started as an analyst in the mid-'60s to when I started

2    the firm, in the mid-'70s, no one wanted to do anything on Wall

3    Street.  They didn't -- it was not a good business to go in.

4    You could buy a taxicab driver medallion for $30,000.  You

5    could buy an apartment on Park Avenue, believe it or not, for

6    $30,000, or a seat on New York.

7              So when we started the firm, nobody wanted stocks.  So

8    we came up with the notion of, what is a stock worth?  And

9    those are the elements that the background, both accounting

10   philosophy, Graham and Dodd, security analysis all converges to

11   say, hey, this is not a complicated world.  What would someone

12   who has money, what would they pay to buy a company that's

13   listed on the New York Stock Exchange or on the American Stock

14   Exchange, which existed at the time, or the over-the-counter,

15   which existed at the time.

16   Q.  Is that what one would call value investing?

17   A.  No.  That was the -- what I just described -- but you're

18   close.  That was what I described as the private market value

19   approach to investing.  And that is, that you -- an analyst by

20   his -- the essence of what one does in research gathers data

21   from publicly available sources, a ten -- they probably didn't

22   have 10Ks then, but whatever the documents were that were

23   publicly available and a report of trade conferences, visiting

24   competitors, visit the companies, you gather that data.  And

25   I'm sure you heard this before.  You kind of model it out.  At

D2jegam1                    Gabelli - direct

1       that time we used 13-column spreadsheets and you manually wrote

2       them in.  Today you use -- what are those devices in front of

3       you, PCs?  And basically you then project the data.  The

4       interpretation of the data is what we brought to the table, and

5       that was basically a need to pay bills.  And that is, who would

6       want to buy this stock and why?  And that was only 40-odd years

7       ago, and those were some fundamental questions in the world

8       that we live in.

9       Q.  Going back to Graham and Dodd for a moment.  Would it be

10      fair to say that in your literature at Gabelli companies you

11      have used Graham and Dodd as an example of the kind of

12      investment philosophy that you use or endorse?

13      A.  Well, we don't endorse it.  They don't need our

14      endorsement.  But within the framework of a benchmark, Graham

15      and Dodd is a shorthand because the next element would be

16      Warren Buffett.  So it would be Graham, Dodd, plus Buffett,

17      plus Gabelli equals what we do.  And we kind of put that on

18      T-shirts and make it available.  We should send some -- we

19      don't have any available.  Don't look around.  I didn't bring

20      any.

21              MR. SAUNDERS:  Your Honor, I have a book of exhibits

22      that I'm going to ask Mr. Gabelli about.  I put a book for him

23      on the witness table, and with your permission, I'll hand a

24      copy up for you and for your clerk.

25              THE COURT:  Thank you.

D2jegam1                          Gabelli - direct

```
 1  Q.  Now, Mr. Gabelli, if you would look, please, at Exhibit BD
 2  in that book.
 3  A.  I'm sorry.  I have a D to start with.
 4  Q.  Yeah.  Exhibit BD.
 5          THE COURT:  Toward the back.
 6  Q.  They're in alphabetical order.
 7          THE COURT:  BD in the back.
 8          THE WITNESS:  Thank you.  BD, broker dealer.
 9          THE COURT:  Right.
10          MR. SAUNDERS:  Your Honor, this is already in
11  evidence.
12  BY MR. SAUNDERS:
13  Q.  If we look at the third page of that exhibit, page 2487.
14  Do you have that?
15  A.  Yes.  Thank you.
16  Q.  There's a schematic chart that starts with Graham and Dodd
17  at the bottom, goes up to Buffett and ends with Gabelli at the
18  top.  Could you explain to us very briefly what that is meant
19  to represent.
20  A.  Yeah.  This is basically a marketing piece to try to
21  conceptualize, in a very one-page document, what essentially
22  the evolution of value investing was.  And that is that you go
23  from the Graham and Dodd of 1934 to the Warren Buffett of 1950,
24  when he attended the Columbia graduate school of business and
25  attended class with Ben Graham to the next version of that.
```

1   And each one was bringing in their elements of the mosaic.

2              And we added to that mosaic according to the academics

3   the notion of, what is a business worth when it would be taken

4   over by someone that no longer trades on the New York or listed

5   exchange called the private market value?

6              And then below that is the word catalyst, which is

7   another element that we added to the equation.

8   Q.  And what exactly is a catalyst in your Lexicon?

9   A.  Well, some organizations, like colleges and universities,

10  that professor has tenure.  That means that he has a job for a

11  period of time.  And within our business we don't have any

12  tenure with regards to the visibility of our cash flow; so that

13  when we buy a stock, we were looking for some kind of an event

14  that would allow our clients to earn a return.  And we labeled

15  that a catalyst.  And that is a visible event.  That's public

16  information that is part of the opportunity to surface that

17  value.

18  Q.  Now, you said earlier that your private market value was

19  based upon what somebody would pay for the assets of this

20  company.  I think that's basically what you said?

21  A.  Yeah, if I did, I should have flushed it out a little

22  further.  And that is what would a private equity, known as an

23  LBO, leveraged buyout firm, pay, because a corporation called a

24  strategic buyer would pay more.

25  Q.  All right.  So is the catalyst limited to those types of

D2jegam1                        Gabelli - direct

1   buyers as an event?

2   A.  Well, you know, over 45 years things have changed.  So at

3   the time leveraged buyouts weren't easy to understand and easy

4   to explain.  They were kind of a new name for what was called

5   bootstrap financing, which is the dynamics that the Charlie

6   Allens of the world and others grew up with in the '50s and

7   '60s.  So that in itself -- that is, a company going private --

8   would be an example of that.  But there are many others.

9   Q.  For example, would change of -- could change of management

10  be a catalyst?

11  A.  You bet, a lot.  You did.  Yes.

12  Q.  Yeah, okay.

13  A.  Whether it's a government, like if Fidel Castro was to

14  leave, that would be a catalyst.

15  Q.  And could a new regulation, new government regulation be a

16  catalyst?

17  A.  Maybe.  Could be a negative catalyst.

18  Q.  All right.  If you look at page 02489 in this document,

19  there's another schematic drawing that we have talked about

20  yesterday.  And I'd ask you if you could explain that schematic

21  drawing to the Court.  What is it meant to represent?

22  A.  I must admit that I've seen this in the past, and someone

23  else who put these marketing books together, I -- I hope they

24  can explain it, they did, hopefully better than I could here

25  today.  But essentially it just means it's part of a simple

1    concept.  If we have an individual who does research, and his

2    capacity is 50 stocks, and he covers the universe of 50 stocks,

3    he analyzes the company, watches it, monitors it -- and I can't

4    read the -- mine is all whited out.  And there's a catalyst of

5    some sort.  And then how does it go into a portfolio, as

6    opposed to just picking stocks?  If someone entrusts you an

7    asset, you just don't buy one stock; you buy a portfolio.

8    That's the way I would interpret this.

9    Q.  So let me try it this way:  In your investment methodology,

10   if the private market value as computed by your analysts would

11   be lower than the public market price of a particular security,

12   in general, would you buy that security?

13   A.  It's possible.

14   Q.  Under what circumstances would you buy it if the private

15   market value were lower than the public market price?

16   A.  Well, first of all, the analyst may have done it wrong.

17   Q.  I'm assuming the analyst did it correctly.

18   A.  Well, I don't.  I mean, I gave you an example.  You asked

19   me when I would buy it if the analyst -- you know --

20            THE COURT:  You have to answer his question.

21            THE WITNESS:  Thank you.

22            THE COURT:  Excuse me.  I'm in charge here.  So you

23   have to answer his question.

24            His question was:  Assuming the analyst got it

25   right -- he says the private market value is less than the

D2jegam1                    Gabelli - direct

1   public market price -- would that be a buy in your view of

2   things?

3            THE WITNESS:  It could be.  For example, let's assume

4   Heinz was selling today because Warren Buffett and an entity

5   called 3G bought the company above or at private market value.

6   We would buy that stock because we thought that maybe somebody

7   else would come in and top that.

8   BY MR. SAUNDERS:

9   Q.  I see.

10  A.  There are other examples, but I don't think that too often,

11  but I always think about each stock specifically.

12  Q.  Would it be fair to say that, in general, your investment

13  methodology is that you buy stocks when their private market

14  exceeds their public market price in general?

15  A.  Yeah, I would say that's a fair statement.

16  Q.  All right.  Now, have you ever described in any of your

17  marketing or other literature the private market value as the

18  intrinsic value of a security?

19  A.  I don't think I would do that.  Now, others may have taken

20  liberty with that because intrinsic value is not private market

21  value.

22  Q.  It's not?

23  A.  No.

24  Q.  Are you sure about that?

25  A.  Since I came up with the word private market value and the

D2jegam1                          Gabelli - direct

 1   academics attribute that to me, eh, yeah.  Yes.

 2   Q.  All right.  Would you look at AZ in your book.

 3          MR. SAUNDERS:  Your Honor, this is already in

 4   evidence.

 5   Q.  Do you have that?

 6   A.  Yes.

 7   Q.  Do you see on the second page of that exhibit there's a

 8   letter -- I guess it's the fourth page of the exhibit --

 9   there's a letter with your name and Marc Gabelli, who I assume

10   is your son's name also?

11   A.  I see the letter.

12   Q.  Did you write that letter?

13   A.  No.

14   Q.  Did somebody write it and put your name on it?

15   A.  I didn't write it.

16   Q.  Did somebody else write it and put your name on it?

17          THE COURT:  Wait a minute, folks.  Clearly somebody

18   else wrote it because there's a letter, right?

19          THE WITNESS:  Yes.

20          THE COURT:  And you didn't write it?

21          THE WITNESS:  Yes.

22          THE COURT:  That means somebody else wrote it by

23   definition.

24   BY MR. SAUNDERS:

25   Q.  My next question is:  Did the person who wrote it put your

D2jegam1                        Gabelli - direct

1   name on it with your permission?

2   A.  I don't think so.

3           THE COURT:  They did not have your permission to put

4   your name on this letter?

5           THE WITNESS:  I --

6           THE COURT:  Dear Investors, sincerely, Mario Gabelli,

7   Marc Gabelli?

8           THE WITNESS:  I think, your Honor, to explain it,

9   there are many times in which I travel a great deal and

10  documents are written.  I don't sign it.  They could type it on

11  and it happens.  I don't read all of the documents.  We have

12  200 individuals and many documents.

13  BY MR. SAUNDERS:

14  Q.  All right.  If you look at page 005 of this document.

15  Under the heading Gabelli Asset Management overview, I would

16  direct your attention to the last sentence of the first

17  paragraph, beginning with the words "we are."

18          THE COURT:  I have not found it.

19          I see it now, we are research driven.

20  Q.  We are research driven fundamental investors focusing on,

21  quote, value with a catalyst, closed quote, investing based on

22  the principles of Graham and Dodd and further adapted by our

23  chief investment officer, Mario Gabelli, with his development

24  of private market value analysis.

25          Do you see that, sir?

D2jegam1                        Gabelli - direct

1    A.  Yes.

2    Q.  Is that a correct description of your investment

3    methodology?

4    A.  Well, it's certainly something that someone would attribute

5    to me.

6            THE COURT:  That wasn't his question.  Is it correct?

7    Is it a correct statement of your investment philosophy?

8            THE WITNESS:  It's not completely encompassing.

9            THE COURT:  It's not completely encompassing?  Does

10   that make it incorrect?

11           THE WITNESS:  No, it is not, your Honor.

12           THE COURT:  So it's correct?

13           THE WITNESS:  If those are the two choices, the answer

14   is correct.

15   BY MR. SAUNDERS:

16   Q.  In what respect is it not complete?

17   A.  Our philosophy from day one, when we started the firm, was

18   also to be tax efficient, so that you would also -- the

19   objective of investing is to generate a positive absolute

20   greater return, risk adjusted, client specific and tax

21   sensitive.  So I would have embellished on that, if I were

22   describing it myself.

23   Q.  All right.  If you look at page 007 -- yeah, page 007 of

24   this exhibit.

25   A.  Okay.

D2jegam1                          Gabelli – direct

1   Q.  In the third full paragraph, under the heading Gabelli

2   Asset Management portfolio overview, in the third paragraph I

3   would direct your attention to the second -- a third -- I'm

4   sorry, the second -- the third full sentence, beginning with

5   the words "the objective is."

6             MR. CAPPUCCI:  Your Honor, I have an objection.  I

7   mean, I just think it would be fair to the witness to allow the

8   witness to flip through the document as a whole to refresh

9   recollection.  Mr. Saunders --

10            THE COURT:  He hasn't said that he needs his

11   recollection refreshed.  Excuse me.  Now, look, Mr. Cappucci,

12   let me rule on your objection.

13            He hasn't said he needs his recollection refreshed.

14   Mr. Saunders wants to ask him about a particular sentence.  If

15   he says, I need a moment, I'd like to read this whole page, of

16   course I'll say sure.  Maybe he has no problem with the

17   sentence that Mr. Saunders wants him to focus on, which reads:

18   The objective is to identify large differences between our

19   estimate of PMV and the stock market price.

20            What was your question about that sentence,

21   Mr. Saunders?

22            MR. SAUNDERS:  First of all, I want to make sure the

23   witness has found it.

24   BY MR. SAUNDERS:

25   Q.  Have you found that sentence?

D2jegam1                    Gabelli - direct

1   A.  Thank you for highlighting it in yellow.  Yes.

2   Q.  Is that a correct description of your investment objective?

3   A.  Standing alone, there is no God.  This sentence on its own

4   cannot -- you know, has to be taken in the context of a larger

5   dynamic.  That sentence is cherrypicking a statement.

6           THE COURT:  Be that as it may, I'd like to know if

7   that's a goal, to find one stock, I guess, where there's a

8   large difference between your estimate of PMV and stock market

9   price.  Is that your goal?

10          THE WITNESS:  Yes, that is an element of the goal.

11  And then because we are not -- have tenure, we try to have that

12  catalyst which is joined at the hip with that.  So this is an

13  important building block of that goal.

14          THE COURT:  I understand that.  That's good.

15  BY MR. SAUNDERS:

16  Q.  It's one element of your investment methodology, would that

17  be correct?

18  A.  It's part of the mosaic.

19  Q.  All right.  And you told us a moment ago that you did not

20  regard the private market value as representing the intrinsic

21  value of the security.  Do you recall that?

22  A.  I thought I said -- maybe I didn't, and it's -- the way I

23  look at private market value is, what does the

24  fundamentalist -- what will an individual who's in the

25  leveraged buyout business pay to buy an entire piece of a

1    public company -- an entire public company?  And I call that

2    private market value.

3    Q.  And I think I asked you before if you would call it the

4    intrinsic value, and you said no.  Did I misunderstand that?

5    A.  I personally call it private market value.  If others

6    attribute the word intrinsic, it is the private market -- you

7    didn't ask what is the private market value, but I would say

8    that that's what I view as private market value.

9    Q.  All right.  If you look at page 009 of Exhibit AZ.  Do you

10   have that?

11   A.  You're going -- okay.

12   Q.  And if you wish to look at any other part of this document,

13   please feel free to do so.

14   A.  I can't read them.  The print is too small.

15   Q.  It should be on your screen.

16   A.  Not the other document -- not the other pages of the

17   document, but what's on the screen is --

18   Q.  Page 009, first full paragraph.  Do you see the first part

19   of that paragraph talks about Graham and Dodd?  Are you with

20   me?

21   A.  You highlighted the words Benjamin Graham and Graham and

22   Dodd.

23   Q.  Now I want to highlight the sentence that begins with the

24   words "our goal is to identify."

25   A.  Yeah.

D2jegam1                         Gabelli - direct

1    Q.  No what?

2           THE COURT:  Why don't we read the whole sentence?

3    Excuse me, I'm reading it:  Our goal is to identify companies

4    in the public market that are selling at differences to their

5    intrinsic or private market values, with a catalyst in place to

6    generate returns.

7           Do you see the sentence?

8           THE WITNESS:  Yes.  Thank you, your Honor.

9           THE COURT:  All right.  And the question is?

10   BY MR. SAUNDERS:

11   Q.  Now, is that sentence an accurate description of your goal?

12   A.  No.  I would not describe it that way if I were describing

13   this.  I would describe it as the private market value.  I do

14   not use intrinsic value at the same time as private.  They're

15   different concepts.

16          THE COURT:  Clearly somebody in your company did,

17   right?

18          THE WITNESS:  Clearly I should have read this earlier.

19          THE COURT:  Yeah.

20   Q.  I take it you didn't read this before it went out?

21   A.  I thought I stipulated that earlier.  I said it before,

22   that I don't read everything that everyone writes.  I clearly

23   need to educate.

24   Q.  All right.  Under the heading research methodology in that

25   same page, the last full paragraph?

D2jegam1                          Gabelli – direct

1              THE COURT:  The one that reads the objective of this

2        process?

3              MR. SAUNDERS:  Yes, your Honor.

4              THE COURT:  Is to identify companies that trade at

5        significant differences to their intrinsic or private market

6        values.

7              You see the sentence, right?

8              THE WITNESS:  Yes, I do, your Honor.

9        BY MR. SAUNDERS:

10       Q.  And your testimony is that that's not correct either?

11       A.  You're using the word correct or incorrect as though you're

12       giving a quiz.  The answer is that I, as a practitioner, have

13       used the concept of private market value and introduced it into

14       the Graham and Dodd/Murray Lexicon of security analysis in the

15       late '60 –– '70s.  Private market value is not the same as

16       intrinsic value in my mind.  It's never been the same.  But

17       there is an element that can be traced back to intrinsic value

18       in the Graham and Dodd literature.

19       Q.  All right.  If you look at page 010 in this exhibit.

20             THE COURT:  I'm sorry, 010?  What does that mean?  Ah.

21             MR. SAUNDERS:  At the very bottom.

22             THE COURT:  Got it.  Next page, 010.

23       Q.  Under the heading catalyst –– and I will call your

24       attention to the second sentence in that paragraph.

25             THE COURT:  The next step is to determine events that

D2jegam1                          Gabelli - direct

1  will narrow the spread between a stock's public market price

2  and our determination of its intrinsic value.

3           Do you see the sentence, right?

4           THE WITNESS:  Yes, I do, your Honor.

5  Q.  Is that a reference to the private market value?

6  A.  It's not a reference.  It's a totally different

7  description.  Can I help out?

8           THE COURT:  I don't think so.  I think you have to

9  answer the questions the lawyer asks.

10 Q.  Let me put my question precisely.  Is the word intrinsic

11 value, as used in that sentence, a reference to the private

12 market value?

13 A.  It is not the way I would describe private market value,

14 nor is it how I look at what a company is when I look at

15 private market value.

16 Q.  My question was a little bit different, Mr. Gabelli.  I'm

17 simply asking you whether the reference in that paragraph --

18 and I accept that you don't accept those words, but I'm asking

19 you whether the reference to intrinsic value in that sentence

20 is a reference to private market value.

21 A.  No.

22 Q.  Well, then what is it?

23 A.  I have no idea.  It's what -- let me -- can I help you?

24           THE COURT:  No.  What spread is being referred to

25 there, a spread between a stock's public market price and what?

D2jegam1                          Gabelli - direct

1   And our determination of what?

2              THE WITNESS:  There are --

3              THE COURT:  Can you try to answer my question?

4              THE WITNESS:  Yes, your Honor.  Can I --

5              THE COURT:  No, you can't.

6          This sentence refers to a spread.  The next step is to

7   determine events that will narrow the spread between a stock's

8   public market price and our determination of what?

9              THE WITNESS:  Private market value.

10             THE COURT:  Thank you.  Thank you.  That was his

11  question.

12             THE WITNESS:  Thank you, your Honor.

13             MR. SAUNDERS:  Thank you.

14             THE COURT:  You're welcome, Mr. Saunders.

15             THE WITNESS:  I'll do a Rubio moment.

16             THE COURT:  Was bad enough the first time,

17  Mr. Saunders.

18  BY MR. SAUNDERS:

19  Q.  Page 014 in this exhibit.  In particular under the heading

20  strategy description, the third full sentence?

21             THE COURT:  In this context?

22             MR. SAUNDERS:  I'm sorry.  In this context, yes, your

23  Honor.

24             THE COURT:  In this context we carefully select stocks

25  whose intrinsic value, based on our estimate of current asset

1   value and future growth and earnings power, is significantly

2   different from the value as implied by the public market.

3           First of all, do you see the sentence?

4   A.  Yes.

5           THE COURT:  All right.  Your question, Mr. Saunders?

6   Q.  Is the word intrinsic value there meant to be a reference

7   to private market value?

8           THE COURT:  As used in that sentence?

9           MR. SAUNDERS:  As used in that sentence.

10  A.  I can see the person that wrote that writing it in that

11  fashion.

12          THE COURT:  Did mean it to refer to private market

13  value?

14          THE WITNESS:  Yeah, but I would not write it that way.

15          THE COURT:  I understand that.

16  A.  I can see how a person that is not trained in financial

17  analysis can interpret it that way.

18  Q.  Do you have any idea why this was written this way and

19  presumably disseminated in this fashion?

20  A.  Well, this article that you took this from was for the

21  hedge funds, and they are written for a different audience than

22  I would write it for.

23          But I think it goes back to in about 1993, 1994, when

24  I asked Roger Murray, the professor that I had at Columbia, to

25  lecture at the Museum of Television and Radio.  And he pointed

1   out what intrinsic value was and how it differed from private

2   market value that I came up with.

3           THE COURT:  We obviously can't have Professor Murray's

4   out-of-court statement, so we go on, Mr. Saunders.

5           MR. SAUNDERS:  I'm not going to object to that, your

6   Honor.  I'm -- it is what it is.

7           THE COURT:  He didn't give us the statement, and I

8   don't want it.

9           MR. SAUNDERS:  I understand.

10          THE COURT:  It's an out-of-court statement.

11  BY MR. SAUNDERS:

12  Q.  Now, attached to this document as an appendix are some

13  newspaper articles.  Do you see that, sir?

14  A.  Which one of the newspaper articles?

15          THE COURT:  He's just saying there's a group of them.

16  The first one is from the Financial Times, the second from the

17  Wall Street Journal Europe.  You see those.

18          THE WITNESS:  The third one or last one is not a

19  financial article.  It's from the Columbia University graduate

20  school of business.  Somebody wrote it up, so it's not a

21  newspaper article.

22          THE COURT:  Okay.  So but for the last one, the others

23  are newspaper articles, right?

24          MR. SAUNDERS:  Right.

25  Q.  Have you ever seen these before?

1    A.  The last one I -- the Graham and Dodd breakfast I have seen

2    before, yes.  The others I may have.  I don't remember them,

3    other than some material that was passed by me.  I just looked

4    at them as a headline.

5    Q.  Do you know why they were attached as appendices to this

6    particular hand-out?

7    A.  I don't want to speculate.

8    Q.  All right.  I just want to ask you a question about two

9    comments, two pieces of these articles.  The first is the

10   article in the Financial Times.  And this is an article that

11   quotes your son, Marc Gabelli, an interview with your son.

12          Do you see that?

13   A.  I see the article, an alternative path to growth.

14   Q.  The passage that I want to ask you about is in the

15   right-hand column, the second full paragraph, beginning with

16   the words, no quotes, we try to find companies.

17          THE COURT:  The whole sentence is, we try to find

18   companies trading at large differences to their private market

19   value in the public market.

20          You see the sentence, right?

21          THE WITNESS:  Yes, I do, your Honor.

22   Q.  Would that be accurate in your view?

23   A.  Which part?

24          THE COURT:  That sentence.

25   A.  In other words, I don't know -- it says private market

D2jegam1                          Gabelli - direct

1   value, 2003, of about $95 to $100 a share.  I can't remember

2   that.

3            THE COURT:  Where are you?  He's just talking about

4   the very first sentence:  We try to find companies trading at

5   large differences to their private market value in the public

6   market.  That's all.

7            THE WITNESS:  Because mine -- it wasn't highlighted in

8   yellow until now.

9            THE COURT:  No, no, just that.

10  A.   That first sentence is fine.  I have no problem with that.

11  Q.   All right.  So now the next sentence reads, in Vivendi's

12  case, for example, the analysts showed --

13           THE COURT:  The analysis.

14  Q.   I'm sorry.  The analysis showed the company was trading at

15  a 50 percent discount to a private market value in 2003 of

16  about $95 to $100 a share.  It's cheap on a cash flow multiple

17  basis and private value basis.

18           Do you see that, sir?

19  A.   Yeah.  In this particular case --

20           THE COURT:  I don't think there is a question yet.

21  All he asked so far is, do you see it?

22  A.   Yes.

23  Q.   Is that accurate in your view?

24  A.   To the degree that it talks about private value as opposed

25  to intrinsic value, I agree.

D2jegam1                      Gabelli - direct

1              Secondly, to the degree that I don't know the numbers

2    of 95 to $100, I have no idea whether that's accurate or not.

3    It was too long ago.

4    Q.  Do you recall that in the 2001/2002 time period Vivendi's

5    private market value was higher than the public market price?

6    A.  I remember buying some shares and preparing for today.  And

7    so I before indicated that generally I would have assumed that

8    the private market value was higher than the public price.

9    Q.  Do you assume that the public market price of a security is

10   an accurate measure of its intrinsic value?

11   A.  We've been discussing this for a while with regards to

12   private market value, including this page you just showed me --

13             THE COURT:  Now he's asking you a different question

14   about the public market value.  Did you hear the question?

15             THE WITNESS:  I would like to -- thank you, your

16   Honor, I did not.  I was thinking of this question.

17             THE COURT:  No.  So his question was:  Do you assume

18   that the public market price of a security is an accurate

19   measure of its intrinsic value?

20             THE WITNESS:  I -- they're apples and oranges.  In a

21   given day I'm assuming a stock reflects all the information

22   that's out there, but I -- I don't look at intrinsic value by

23   the thought I've been saying for a while.  I look at private

24   market value, and there is a difference.

25             THE COURT:  I know.  He's asking whether the public

D2jegam1                        Gabelli - direct

1    market price reflects the intrinsic value of the security.

2              THE WITNESS:  On a given day?

3              THE COURT:  Yeah.

4              THE WITNESS:  At a given moment?

5              THE COURT:  I guess.

6              THE WITNESS:  I think it -- at a given moment, like

7    right now, it's quarter to 3:00.  The market's been open since

8    9:30.  If you're trading General Electric, it reflects the full

9    knowledge of all the dynamics that are taking place at that

10   moment in time.

11             THE COURT:  And so that's not his question.  Does it

12   reflect the intrinsic value of that company or that security?

13             THE WITNESS:  I don't look at intrinsic value that

14   way, so I can't answer that question, your Honor.

15             THE COURT:  You can't say yes or no?

16             THE WITNESS:  No, I cannot.

17             THE COURT:  Whether the public market price reflects

18   the intrinsic value?

19             THE WITNESS:  I believe only at that -- I believe it

20   reflects the full body of --

21             THE COURT:  You said that, available knowledge at that

22   time, but you won't tell me whether it reflects the intrinsic

23   value of that.

24             THE WITNESS:  I can't answer the question, your Honor.

25             THE COURT:  Okay.  You can't answer it.

D2jegam1                          Gabelli - direct

1              MR. SAUNDERS:  All right, your Honor.

2    BY MR. SAUNDERS:

3    Q.  Let me ask you if you look at Exhibit J, Defendant's

4    Exhibit J.

5              MR. SAUNDERS:  I believe this is also already in

6    evidence, your Honor.

7    Q.  Do you have this?

8    A.  Yes, sir.

9    Q.  In your book?

10   A.  Yes, sir.

11   Q.  Have you seen this before?

12   A.  A triangle?  Yes.

13   Q.  The document.

14   A.  Oh, this document?

15   Q.  Yes.

16   A.  Not from the first page.  I mean, I have to --

17             THE COURT:  Go ahead.

18             THE WITNESS:  Can I?

19             THE COURT:  Sure.  Flip through it.

20   A.  I have seen a document like this, and I think I understand

21   what it is, but I've not seen this document specifically.

22   There's so many variations over time.

23   Q.  Did you have any role in the creation of this document?

24   A.  As far as I can tell, it's a marketing piece prepared by

25   our institutional department.

D2jegam1                        Gabelli - direct

1   Q.  And it would be distributed to whom?

2   A.  A limited number of prospects that would want our research

3   services or someone that was looking for an update on our money

4   management activities.

5   Q.  So you're using this to sell your research services to

6   other investors?

7   A.  The institutional relations people would be using it to try

8   to lay out an -- a primer of what we are offering in terms of

9   services, yes, sir.

10  Q.  All right.  If you look at -- very briefly, I'm going to go

11  through this, page 003, under the heading company background.

12  A.  Yes, sir.

13  Q.  Is that correct?

14  A.  The company background?

15  Q.  Yeah.

16  A.  Everything on it?

17  Q.  Yes.

18  A.  Oh, I have to read it.

19  Q.  Please.

20  A.  I have -- can I ask a question?

21          THE COURT:  Sure.

22  A.  Since it's 23 years, I assume this is a document you found

23  somewhere around the year 2000?

24  Q.  I believe it was 2001.  There's a date on page 005 which

25  says March 31, 2001.

D2jegam1                          Gabelli - direct

1   A.  I see.  I'm sorry.  I didn't get there yet.

2           Okay.  That's fine.  I -- everything on here would be

3   reasonably accurate, without me verifying that it's 24 billion

4   AUMs, assets under management.

5   Q.  All right, sir.  I'm not going to bother taking you through

6   the early pages.  I do want to direct your attention to page

7   011.  Do you have that?

8   A.  Yes, sir.

9   Q.  Under the heading philosophy, the sentence reads, quote, in

10  the tradition of Graham and Dodd, Gabelli Asset Management

11  employs fundamental research to identify companies with

12  dominant industry positions that are selling at substantial

13  discounts to their intrinsic private market value.

14          Do you see that, sir?

15  A.  Yes, I do.

16  Q.  Is that a correct description of your philosophy?

17  A.  No.

18  Q.  Why did you put it out?

19  A.  I didn't.

20  Q.  Somebody did?

21  A.  Yes, I agree.

22  Q.  Do you know why?

23  A.  Why did they put it out?  Because they in their mind looked

24  at this as an example of how they interpreted the philosophy of

25  the firm.

1   Q.  Did you ever tell anyone in your firm that it was

2   inaccurate to describe private market value as an intrinsic

3   value?

4   A.  I do not have to, because it's baseball and basketball.

5   It's different sports.

6           THE COURT:  All right.  So let me just understand.  I

7   got to understand.  So the only thing that's inaccurate about

8   this sentence is the use of the word intrinsic?  If that were

9   X-ed out, would the sentence be correct?  Could you help me

10  out?

11          THE WITNESS:  Yes, your Honor.  I --

12          THE COURT:  Please.  If that one word wasn't there,

13  would the sentence be accurate?  Would you look at it?

14          THE WITNESS:  Yes, I did, your Honor.  There's one

15  other word I would X out.

16          THE COURT:  What's that?

17          THE WITNESS:  Dominant.

18          THE COURT:  Okay.  With those two words X-ed out --

19          THE WITNESS:  Yes.

20          THE COURT:  -- the sentence would be accurate?

21          THE WITNESS:  Yes.

22          THE COURT:  Thank you.

23  BY MR. SAUNDERS:

24  Q.  All right.  Did you ever write an article for a magazine

25  called Cigar Aficionado?

D2jegam1                        Gabelli - direct

1   A.  Yes.  I wrote many articles for Cigar Aficionado.

2   Q.  All right.  Would you look, please, at Defendant's

3   Exhibit Z.

4               MR. SAUNDERS:  I believe this is already in evidence,

5   your Honor.  This is an annual report dated December 31, 2001,

6   for the Gabelli Asset Fund.

7   Q.  Do you have it?

8   A.  Yes, I do.

9   Q.  On page 033 under the heading -- let me ask you about page

10  032 first.  Page 032 says, back to basics.  And then there is

11  some photographs and pictures.  And the heading, it says,

12  earnings plus interest rates plus Mr. Market equals question

13  mark.

14              Do you see that?

15  A.  Yes, sir.

16              THE COURT:  You do?

17  Q.  Who or what is Mr. Market?

18  A.  Without being precise, it is the name applied to the daily

19  fluctuations in the stock market due to psychological behavior

20  and other elements by Professors Graham and Dodd in their book

21  on 1934.  And that's my best recollection and best way to

22  articulate it today.

23  Q.  So would it be fair to say that Mr. Market is their -- the

24  word that they use for the public stock market?

25  A.  I don't want to speculate on that.  I don't know.  It is

D2jegam1                      Gabelli - direct

1    basically an individual or an entity -- I can describe it but I

2    can't tell you whether that's their best description.

3    Q.  Have you ever used that phrase to describe the public stock

4    market?

5    A.  Mr. Market?

6    Q.  Yes.

7    A.  I -- I'd answer your question.  Can I answer it my way?

8    Q.  If you can answer it my way first, I'd be happy to have you

9    explain in any way you like.

10           THE COURT:  I think he just asked if you ever used

11   that phrase in an article you wrote.

12           THE WITNESS:  I have talked about --

13           THE COURT:  No.  No.  Have you ever used that phrase

14   in an article you wrote?

15           THE WITNESS:  After 45 years --

16           THE COURT:  You don't know?

17           THE WITNESS:  I may have.

18           THE COURT:  All right.

19   BY MR. SAUNDERS:

20   Q.  Look at page 033.

21   A.  Yes, sir.

22   Q.  The heading on this page says, earnings, interest rates,

23   investor psychology and the stock market.  Then underneath that

24   it says, prepare for Cigar Aficionado by Mario J. Gabelli.

25           Do you see that, sir?

D2jegam1                          Gabelli - direct

1    A.  I see it.

2    Q.  Is this the text of an article that you prepared for Cigar

3    Aficionado?

4    A.  I have written or prepared --

5           THE COURT:  No, no, that's not the question.

6    A.  I --

7           THE COURT:  Do you know if this is the text of an

8    article you wrote for Cigar Aficionado?

9           THE WITNESS:  You know, I can't remember, but my name

10   is on it, and I have had help preparing and editing articles in

11   the past.  And this may be one of those.

12   Q.  By allowing your name to be put on it, did you adopt it as

13   yours?

14   A.  I don't understand the question.

15          THE COURT:  Well, by letting it be published as an

16   article by Mario J. Gabelli, did you acknowledge it as yours?

17          THE WITNESS:  I never wrote to anyone telling them

18   it's not something I can live with.  I probably didn't read it

19   after it was published anyway.

20          THE COURT:  That's not the question.

21          THE WITNESS:  I know.

22          THE COURT:  If it says by Mario J. Gabelli, do you

23   understand and accept that it's yours?

24          THE WITNESS:  I have never refuted that it was mine.

25          THE COURT:  Oh, good.  He's not refuted it was his.

D2jegam1                         Gabelli - direct

1   BY MR. SAUNDERS:

2   Q.  If you look at the last paragraph under the heading

3   Mr. Market, do you see that?

4   A.  You're going to have to slow down a little bit here to let

5   me read it.

6   Q.  Sure.  Please.

7           THE COURT:  It starts with, it is our and every

8   prudent investor's job to try to determine the intrinsic value

9   of an individual company or the market as a whole.  At any

10  given point in time, intrinsic value is largely a function of

11  earnings and interest rates.  Whether stocks trade at, above or

12  below intrinsic value is a function of investor psychology.

13  Mr. Market is the code name the traditional value investor uses

14  to personify investor psychology.

15  Q.  Is that sentence an accurate reflection of your view in the

16  2001 time period?

17  A.  The sentence is accurate.

18  Q.  I'm sorry?

19  A.  The sentence is accurate about what Mr. Market is.

20  Q.  Okay.  When you refer to investor psychology in that

21  sentence, what do you mean?

22  A.  If an investor goes home, has a house and decides to drink

23  heavily and sells the house for 100,000 in a neighborhood where

24  the lowest priced houses in the last ten years have sold for

25  $500,000, that is what we call investment psychology; so that

D2jegam1                        Gabelli - direct

1   you would sell a stock and just dump it on the market where it

2   was not priced efficiently.

3   Q.  That's what you mean by investor psychology?

4   A.  That's not what I mean.  That's what I'm interpreting

5   Graham and Dodd.  This is a Graham and Dodd statement,

6   plagiarism probably.

7   Q.  This is not your statement?

8   A.  It is -- this sentence is an echoing by me of what Graham

9   and Dodd would have articulated in an extraordinarily eloquent

10  academic, and I could not improve on it.

11  Q.  All right.  Well, the preceding sentence says, and I quote,

12  whether stocks trade at, above or below intrinsic value is a

13  function of investor psychology.

14          Do you see that, sir?

15  A.  Yes, sir.

16  Q.  Does that suggest that the market -- the public market

17  price might not be an accurate reflection of intrinsic value,

18  depending upon investor psychology?

19  A.  On a given day, the market knows everything that exists to

20  the degree that that price in the public market reflects that,

21  that would reflect all of the elements.  For example, when

22  President Eisenhower got assassinated -- not assassinated, had

23  a heart attack, the market dropped sharply.  And it reflected

24  that dynamic.

25  Q.  I'm sorry.  I'm not asking you about what the market knows.

D2jegam1                    Gabelli - direct

1    I'm simply asking you whether the public market price might or

2    might not be a reflection of intrinsic value, depending upon

3    investor psychology, as you use that phrase.

4    A.  I have no idea what you're talking about.  I can't answer

5    that question.  I don't know -- you've got oranges, apples,

6    cider and grapefruits mixed up.

7            Could I read something for you?

8            THE COURT:  No.

9            THE WITNESS:  No, sorry.

10   Q.  Let me try it this way:  Are intrinsic values and equity

11   pricing the same thing?

12   A.  I don't understand the question.

13           THE COURT:  He's giving you two words and asking if

14   they're the same or different.

15           THE WITNESS:  I just lost.

16   Q.  By equity pricing, I mean equity pricing in a public

17   market.  Is equity pricing used in that sense the same as or

18   different from intrinsic value?

19   A.  At a given moment in time, Google today is trading at $801.

20   Is that the same as intrinsic value?

21           THE COURT:  That's his question.

22           THE WITNESS:  Is that your question?

23           THE COURT:  Yes.

24           THE WITNESS:  Sorry, your Honor.  Sorry.

25           THE COURT:  Is it?

D2jegam1                          Gabelli - direct

1          THE WITNESS:  At that moment in time it reflects
2     everything that's going on --
3          THE COURT:  You told us that four or five times.  Is
4     it intrinsic value?
5          THE WITNESS:  I don't use the word intrinsic value.
6          THE COURT:  You did use the word intrinsic value,
7     actually, in your article.  That's why he's asking on that.
8          THE WITNESS:  Thank you for embellishing.
9          THE COURT:  I don't think I'm embellishing.  It's your
10    article.  I'm asking you whether that's the same as intrinsic
11    value.  The $801 price, is that the same intrinsic value in the
12    example you gave on Google?
13         THE WITNESS:  Intrinsic value is largely a function of
14    earnings and interest rates.  I'm reading.  That moment in time
15    in which the stock trades at $801, that is a function of all of
16    the elements that the market knows that is public information
17    at that time with a large number of buyers and sellers.
18         THE COURT:  And now maybe you'll answer the question.
19    Is it the intrinsic value?
20         THE WITNESS:  See, I --
21         THE COURT:  You can say yes or you can say no.
22         THE WITNESS:  I could also say I don't know.
23         THE COURT:  Okay.  If that's your answer, I'll take
24    it.
25         THE WITNESS:  I can't answer it, your Honor, because

D2jegam1                          Gabelli - direct

1     it's not the way I've been trained for 50 years.

2                 THE COURT:  So the answer is I don't know?

3                 THE WITNESS:  I just can't respond to the yes or no

4     answer.

5                 THE COURT:  You already told us that.  Is it I don't

6     know?

7                 THE WITNESS:  No, I can't answer that either that way.

8                 THE COURT:  Okay.

9                 THE WITNESS:  It's just not consistent with everything

10    I've been trained for 45 years to know how to think.

11                THE COURT:  Oh.

12    BY MR. SAUNDERS:

13    Q.  All right.  Sir, would you look at page 035 and Exhibit Z

14    under the heading investor psychology, the three sentences in

15    that first paragraph.

16                THE COURT:  Which read, of course intrinsic value and

17    equities pricing are horses of two very different colors.

18    Remember the emotional Mr. Market often values stocks

19    materially above and substantially below intrinsic value.  So,

20    investor psychology will have a major impact on market trends

21    in the year ahead.

22                You do see the sentence, right?

23    A.  Yes, I do.

24                (Continued on next page)

25

D2jrgam2                          Gabelli - direct

1   Q.  Is that sentence an accurate reflection of your investment

2   philosophy or methodology?

3   A.  No.

4   Q.  It's not?

5   A.  No.

6   Q.  Do you know why that appears in this marketing brochure

7   issued by the Gabelli Asset Fund in 2001?

8   A.  I thought you indicated that it was an article --

9            THE COURT:  No, no longer.  Is this still part of the

10  article?  You tell us, is this still part of the article you

11  authored?

12           THE WITNESS:  I didn't author it completely, because I

13  wouldn't use "horses of a different color."  I believe it is,

14  your Honor.

15           THE COURT:  All the more the question is a good one.

16  This is your article.  You wrote it.  Is it inaccurate, this

17  sentence, or is it accurate?

18           THE WITNESS:  I would say it is not completely the way

19  I think.

20           THE COURT:  In what way is it accurate?  Is it

21  accurate to say intrinsic value and equities pricing are

22  different?

23           THE WITNESS:  Yes.

24  BY MR. SAUNDERS:

25  Q.  Did you ever describe Mr. Market as irrational?

1    A.  Yes, I would say that I would do that.

2    Q.  What does that mean?

3    A.  It would be like your neighbor coming home drunk and

4    selling his house $500,000 below what the house is worth for

5    the last five years in the neighborhood.

6    Q.  Is that the way you describe the public stock market?

7    A.  No.  That's the way I would describe occasionally a stock

8    or a company.  I don't comment generally on -- again, this is

9    today or the last 20 years, 10 years.

10   Q.  Let me try it again.  Did you ever describe Mr. Market as

11   irrational?

12   A.  Yes.

13   Q.  What does that mean?

14   A.  Let me try it again as well.  The analogy I like to use is

15   an individual has a home in a neighborhood --

16             THE COURT:  We are not talking about an individual.

17   We are talking about the stock market, Mr. Market.  When Mr.

18   Market is described as irrational, does that describe the stock

19   market price, the price set by the market is irrational?

20             THE WITNESS:  At a moment in time it could be.  I

21   could accept that description for a moment in time, for an

22   hour, 15 minutes, one minute, a trade.

23             THE COURT:  OK.

24   Q.  If you would look at Exhibit D, in particular page 017,

25   which is page 11 of the document.

D2jrgam2                         Gabelli - direct

 1              THE COURT:  Let's start at the beginning.  This is

 2    another annual report of Gabelli Asset Fund, December 31, 2000.

 3              MR. SAUNDERS:  Yes, your Honor.

 4              THE COURT:  Then you want to turn to page 11 of that

 5    annual report.

 6              MR. SAUNDERS:  Page 11 of the document and page 17 of

 7    the Bates numbers.

 8              THE COURT:  There is a signature there.  Do you see

 9    it?

10              THE WITNESS:  Yes, I do, your Honor.

11              THE COURT:  Do you recognize it?

12              THE WITNESS:  It is a facsimile of one of the many

13    signatures that I use that are on file for me.

14    Q.  In the second sentence under the heading "In Closing," you

15    write, "At times we may be faced with a challenge in reaching

16    our objective because of the irrationality of Mr. Market."  Do

17    you see that?

18    A.  I see the sentence, but I don't like your preamble.

19              THE COURT:  You don't like what preamble?

20              THE WITNESS:  The first several words that said I

21    wrote.

22              THE COURT:  Apparently, your signature appears at the

23    end.  "Sincerely, Mario J. Gabelli," and a facsimile of your

24    signature, right?  That much is true?

25              THE WITNESS:  I agree.  We have 23 mutual funds that

D2jrgam2                          Gabelli - direct

 1  write quarterly letters.  I edit them.  I don't microscopically

 2  edit them.  I get the flow.

 3          THE COURT:  Anyway, that sentence does appear over

 4  your signature?

 5          THE WITNESS:  Yes, it does.

 6  Q.  Is it the case that Gabelli enterprises were facing

 7  challenges in reaching their objectives because of the

 8  irrationality of Mr. Market?

 9  A.  I really don't understand the question.  Say it again

10  slowly.

11          THE COURT:  Take a look at the sentence while he

12  repeats his question.

13  Q.  I'm basically asking whether that sentence is true.

14  A.  At any moment in time.  The statement itself at any moment

15  in time is true.

16  Q.  A slightly different topic.  I'm going to show you two

17  documents.  They are similar.  One is Defendant's Exhibit G in

18  evidence and one is Defendant's Exhibit N in evidence.

19  A.  Yes, I found them.

20          THE COURT:  To make it clear, G is the annual planning

21  seminar, January 13, 2001, Greenwich library.  N is the 16th

22  annual meeting at the Pierre Hotel, May 12, 2001, so five

23  months later.

24          THE WITNESS:  Thank you, your Honor.

25          THE COURT:  You're welcome.

D2jrgam2                     Gabelli - direct

1              THE WITNESS:  Yes.

2    Q.  Mr. Gabelli, did you attend both of those meetings?

3    A.  Yes.

4    Q.  Would it be fair to say that the annual planning seminar

5    was primarily an internal meeting and that the annual meeting

6    at the Pierre Hotel was primarily an external meeting?

7    A.  Yes.

8    Q.  I want to ask you about two charts that appear in both the

9    internal presentation on the one hand and the external

10   presentation on the other hand.  In Exhibit G it's the chart

11   that says --

12             THE COURT:  What would be the Bates number on that?

13             MR. SAUNDERS:  The Bates number would be GAMCO file

14   80.0114.

15             THE COURT:  Way toward the back, right?  OK.

16   Q.  There is what I believe to be an identical chart in

17   Exhibit N, which would be page 050.

18   A.  Can I look at one at a time?

19             MR. CAPPUCCI:  Your Honor, I have to make objection

20   here.

21             THE COURT:  They are exactly identical.  Take a look

22   at them before you object.

23             MR. CAPPUCCI:  Please hear me out on my objection.  It

24   is a very lengthy document.

25             THE COURT:  It doesn't matter.  He wants him to look

1    at a chart in both.  If you would do it as I did, you would see

2    it as identical.

3              MR. CAPPUCCI:  I understand but --

4              THE COURT:  There is nothing more to say right now.

5    His only point is that the private chart appears at both the

6    private meeting and the public annual meeting.  Mr. Saunders

7    hasn't asked anything else yet.  Let's see what he does ask.

8    You might have an objection.  So far we have an identical

9    chart.

10             THE WITNESS:  Your Honor, for lack of a better term,

11   what page was it under N?

12             THE COURT:  In N it was 50, 0050.

13             THE WITNESS:  I assume it is identical.

14             THE COURT:  It is.  I checked it.  It's identical.

15   But you're welcome to check it.

16             THE WITNESS:  No, no.  Go ahead, keep going.

17             THE COURT:  0050.  Take a look.

18             THE WITNESS:  I just want to get to the page before he

19   asks a question on both.

20             THE COURT:  OK.

21   A.  OK.  Thank you.

22   Q.  My question is, what does that chart represent?  What is

23   it?

24   A.  Without seeing everything else, just looking at that chart,

25   I didn't prepare it, so I don't know what it -- my sense is I'd

D2jrgam2                        Gabelli - direct

have to read everything in the context of which it was.  If I

can describe it as a layman, as a professional, it says E73

content, connectivity, other, PMV, shares outstanding, private

market value per share, not intrinsic value but private market

value 100.

MR. CAPPUCCI:  Your Honor, may I have a moment with

counsel?

THE COURT:  Sure.

(Counsel conferred.)

MR. CAPPUCCI:  Thank you, your Honor.

Q.  Mr. Cappucci asked me to show the three pages that precede

this.  If you look at pages beginning at 042.

THE COURT:  In which one?

MR. CAPPUCCI:  In Exhibit N.

THE COURT:  N, the later one?

MR. CAPPUCCI:  I think that is easier to read.

THE COURT:  All right, 042.  The one that says

"Investment process"?

MR. SAUNDERS:  "Investment process," yes.

THE COURT:  Two words, "Investment process."

Q.  Do you see that?  Mr. Cappucci wants you to look at that

and the next few pages to familiarize yourself with what the

document is.  Let me ask you, is this an accurate description

of the Gabelli investment process?

THE COURT:  You want him to look at 042, 043, 044, 45,

D2jrgam2                      Gabelli - direct

1    46, 47, 48, 49?

2              MR. SAUNDERS:  Yes.  Up to 50 is sufficient for me.

3              THE COURT:  We just did it.  At least I did it.  I

4    don't know if the witness is finished.

5    A.  Can you repeat the question?

6              THE COURT:  He wants you to look at 42 through 49.

7    Have you had a chance to do that?

8              THE WITNESS:  Yes, ma'am.

9              THE COURT:  Have you finished going through these

10   pages, 42 to 49?

11             THE WITNESS:  Yes.

12             THE COURT:  You had a question.

13   Q.  My question is, do those pages accurately describe the

14   Gabelli investment process?

15   A.  Not word for word, but by and large.

16   Q.  By and large, OK.  On page 044, under the heading

17   "Investment process" --

18   A.  Yes.

19   Q.  -- the chart says, "Identify intrinsic value of each

20   business."

21   A.  Yes.

22   Q.  Is that the same as the private market value?

23   A.  No.  I indicated to you just 30 seconds ago that by and

24   large.  This is one of the elements that if I were to tweak it

25   or sculpture it and if I focused on it, I would change the PMV.

D2jrgam2                          Gabelli - direct

1   Q.  Is it a fair assumption that the person who wrote this

2   intended to portray the intrinsic value as the private market

3   value?

4   A.  I don't know who wrote it.

5   Q.  I didn't ask you that.

6   A.  I don't know.  I can't answer that.  I don't want to

7   speculate on that.  If it said PMV, we would have no

8   discussion.

9   Q.  Then you see the next page says "EBITDA," and the next page

10  says "PMV," which I take it means private market value.

11  A.  Yes.

12  Q.  The next page says, "Select stocks with a 2-year 50 percent

13  return potential"?

14  A.  Yes.

15  Q.  What does that mean?

16  A.  Which page, sir?

17  Q.  Page 047.

18  A.  When we started the firm -- the only way I can describe it

19  is a motion picture -- in 1977, nobody wanted stocks.  So we

20  said we wanted to generate a real rate of return of 10 percent

21  plus inflation.  We would do that by finding companies that at

22  the time, when inflation was 10 percent and taxes were like 30

23  percent on long-term capital gains, we would earn for you 50

24  percent within a 2-year time frame.  That dynamic of 1977 in

25  the different world of 2000 changed.  That statement, however,

1    was kept as part of our legacy.

2    Q.  Would it be fair to say that in your investment philosophy

3    is to invest in companies with respect to which there is a

4    catalyst that would cause the public market price to increase

5    by 50 percent over 2 years?

6    A.  No.

7    Q.  It would not be correct?

8    A.  No, not today.

9    Q.  Was it correct in 2001?

10   A.  It was correct in 1977.  By 2001 the markets were down

11   sharply.  You might be able to achieve that, but the goal was

12   to be able to generate 10 percent rates of return.  That was

13   objective number one.

14   Q.  So why is this page in the document that was used both in

15   the internal planning session and in the external meeting?

16   A.  That is a great question.  The reason for that is that the

17   scribe who prepares it, including myself, goes through lots of

18   documents, lots of meetings.  We don't sit down and spend days

19   and days.  We take what is in the library and hit buttons and

20   just reproduce them.  So to the degree that nobody objected to

21   it, it would survive.  It basically goes back to 1977, when the

22   firm was started.

23   Q.  When you saw this page, did you object to it?

24   A.  I don't even think I was looking at it.  If I wrote it or

25   spoke about it, I would not articulate it.

D2jrgam2                         Gabelli – direct

1    Q.  If you look at page 049.

2    A.  Yes.

3    Q.  Still in Exhibit N.

4    A.  Yes.

5    Q.  Do you see that, sir?

6    A.  I see it here.

7    Q.  Would you explain to the Court what that page is meant to

8    represent.

9    A.  I have no idea.  I would have to think about it.  I would

10   not use this in anything I've ever done in 40 years in terms of

11   a page like this.  Or 50 years, whatever it is.

12   Q.  You have no idea what this page represents?

13   A.  No, I didn't say that.  You recharacterized the specific

14   nature of my comments.  I said I did not use a page like this

15   nor would I use a page like this in talking and the speeches I

16   give, the television appearances I give.  I would have to

17   understand it by looking at it.

18            THE COURT:  You're looking at it.

19            THE WITNESS:  I understand, but I can't figure it out.

20            THE COURT:  You can't?

21            THE WITNESS:  No.  It takes a little while.  It says

22   buy/sell stock price.  I have no idea.

23            THE COURT:  It says at the top, "PMV versus Mr.

24   Market:  The Graham and Dodd approach."

25            THE WITNESS:  Yes.

1          THE COURT:  You still can't figure it out?

2          THE WITNESS:  No, because I don't know what the dotted

3    line is.

4          THE COURT:  If you can't figure it out, Mr. Gabelli,

5    apparently you can't.

6    Q.  Let me try to help you, Mr. Gabelli.  Does this chart make

7    sense to you if you assume that the solid line with the arrows

8    on each end is the private market value and the dotted line is

9    the public market price?

10   A.  If that were the case, this is good.

11   Q.  So that might in fact be the case?  That would explain the

12   chart then, right?

13   A.  Let me see if I understand this.  If you have a solid line

14   that says private market value and the other line is the stock

15   price, in theory you buy below the private market value and

16   sell it if it goes above.  I cannot do anything but subscribe

17   to that.

18         MR. SAUNDERS:  I have no further questions, your

19   Honor.  Thank you.

20         THE COURT:  Thank you, Mr. Saunders.

21         Mr. Cappucci?

22         MR. CAPPUCCI:  Your Honor, can we take a two-minute

23   break, please?

24         THE COURT:  Sure.

25         (Recess)

1   CROSS-EXAMINATION

2   BY MR. CAPPUCCI:

3   Q.  Mr. Gabelli, thank you.  I want to ask you, what is your

4   definition of intrinsic value?

5   A.  My definition is what the academics wrote, what I learned

6   from Roger Murray.  That is the intrinsic value is the present

7   value of the future stream of cash flow that one has in an

8   enterprise, a company.

9   Q.  When you use the term "intrinsic value," you are not

10  relating it in any to market price, is that correct?

11  A.  No.

12  Q.  When you use the term "intrinsic value," you're not

13  referring in any way to the market value of a stock less

14  inflation?  Do you know what that means?

15  A.  No.

16  Q.  Inflation?

17  A.  I understand inflation.  Private market value is intrinsic

18  value plus a take-out premium for somebody buying the entire

19  control of a company.

20  Q.  I want to get back to your usage and understanding of the

21  term "intrinsic value."  I think you're agreeing with me.  What

22  I think you're saying, and I'll ask you this, when you use the

23  term "intrinsic value," do you deem that to mean the market

24  price of a security less artificial inflation for whatever

25  reason?  Yes or no.

1  A.  I have not thought about the question or that dynamic in

2  that fashion, so I really am not in a position to really chisel

3  in an answer.

4  Q.  Have you ever heard the term "true value"?

5  A.  Yes, when I shop at a store in Scarsdale.

6  Q.  Have you ever heard the term "true value" as it would refer

7  to the market price of a security less artificial inflation?

8  A.  Not something that I have thought about or heard.

9  Q.  That's fine.

10  A.  I may have heard it, but I don't use it.

11  Q.  That's fine.  Do you recall whether you considered private

12  market value in connection with your decision to purchase

13  Vivendi securities during the relevant period?

14  A.  Can you define what the relevant period is?  We haven't

15  heard that today.

16  Q.  We are talking about October of 2000 through August of

17  2002.

18  A.  Yes.

19  Q.  Can you be more specific as to the level of involvement

20  that PMV played in your overall investment decision during that

21  period.

22  A.  We are trained to look at a motion picture of a company.

23  What is the value today, the private market value today, and

24  what are the elements that influence that over time.  It really

25  goes back to what does a Henry Kravis use in his mosaic to buy

D2jrgam2                         Gabelli - cross

1    the company and how does that change.  So it's a parfait that

2    changes over time.  So we look at it but it does not apply to a

3    lot of companies.  Not all, but a lot.

4              THE COURT:  I think his question was, did you look at

5    private market value in determining whether to purchase Vivendi

6    from 2000 to 2002?

7              THE WITNESS:  Thank you, your Honor.  It is always an

8    element in the mosaic of what I as a portfolio manager, as an

9    analyst, look at.  It is one of the many elements, not

10   necessarily always the determining element.

11   Q.  Let's talk about the other elements.  If you can just

12   briefly describe to the Court, what would you look at?  This

13   case is about your investment in Vivendi securities.  What

14   would you look at to make an investment decision in Vivendi

15   securities during this relevant period, if you recall?

16   A.  Assuming I had one client and I understood all the needs of

17   that client as opposed to the 1700 clients that we actually

18   have entrusted assets to us, we would look at the dynamics of

19   the world at large.  We would look at elements in politics.  We

20   would look at the global marketplace.  We would look at things

21   internal to the industry and then internal to the company.  So

22   the way we think is like a McKinsey thinking out over the next

23   five or ten years.  We function also as investors over a period

24   of time, and then we function like hedge funds that watch

25   everything daily.

D2jrgam2                          Gabelli - cross

1    Q.  What about your evaluation of price?  What kind of analysis

2    would you have performed with respect to price?

3    A.  The price to us is a function of the price in the open

4    market daily as opposed to private market value, which does not

5    move as frequently as the underlying value of the enterprise.

6    Q.  Is there reliance on price in any respect in an investment

7    decision?

8    A.  At a given moment of time it's like the old garment

9    district worker.  He says he has to buy right to get that extra

10   return.  He knows what his selling price is going to be in

11   theory, and even that moves.  So we have to be careful about

12   the public price when we execute an order on a given moment of

13   time, and the elements during that day and that hour and that

14   moment in which that trade is taking place.

15   Q.  At the precise moment that you decide to purchase a

16   security, and let's keep this within the relevant period, when

17   you decide to purchase a security at a specific time, what kind

18   of price assessment do you perform?  What do you think about?

19   A.  A new client comes in, gives us a portfolio.  We look at

20   how to diversify, what are the client's standards.  Then we

21   pick stock specifics that fill that mandate that also meet our

22   requirements for risk-adjusted rates of return, and then we

23   look at the price at that moment.

24   Q.  What did stock integrity?  Do you have an understanding of

25   what that means?

D2jrgam2                        Gabelli - cross

1    A.  No.  Price integrity at a given moment in time?

2    Q.  Yes, at a given moment in time.

3    A.  As a professional, I would interpret that to mean that

4    everything that is known about the stock price in a very liquid

5    stock is known by the marketplace and that stock reflects the

6    common knowledge that is available at any given moment in time.

7    Q.  Why does that happen in a marketplace?

8    A.  Why does what happen?

9    Q.  Why does the stock reflect the information in the

10   marketplace?  Why does that happen?

11   A.  It's basic supply/demand.  A large number of buyers and

12   sellers come to a marketplace where there is integrity of

13   information, integrity of the marketplace.  That is preserved

14   in the capital system.

15   Q.  During the relevant period, Vivendi ADRs, do you recall

16   what they traded on?

17   A.  I would say the New York Stock Exchange.

18   Q.  Were they heavily followed by institutions?

19   A.  Yes.

20   Q.  Was the company high profile in the news during this

21   period?

22   A.  The entertainment industry, the movie companies are, and

23   this company was, yes.

24   Q.  Were the shares actively traded, as you recall, during

25   2002?

D2jrgam2                          Gabelli - cross

1    A.  I can't be specific, but think the answer is yes.

2    Q.  So would you have an expectation that there would be

3    enhanced price efficiency as a result of the dynamics that were

4    occurring at this time with respect to Vivendi ADRs in the

5    marketplace?

6    A.  I don't know what the word "enhanced" means.  What does

7    that mean?

8    Q.  In other words, would there be more likelihood that the

9    information would be vetted and processed in the marketplace?

10   A.  The market would have a large number of buyers and sellers.

11   There was what some would describe, not me, as an efficient

12   price daily on the marketplace based on the common state of

13   knowledge.

14   Q.  Before you executed or directed a transaction in Vivendi

15   securities during the relevant period, would you have reached

16   the decision that the price was informationally efficient at

17   that moment?

18   A.  Yes.

19   Q.  Would you have reach the decision or formed a belief that

20   the price had integrity at that moment?

21   A.  The price had integrity?

22   Q.  As we have just discussed.

23   A.  Oh, yes.

24   Q.  Would you buy a stock in a company that you knew where the

25   price was inflated as a result of a management fraud?

D2jrgam2                          Gabelli - cross

1  A.  Having limited time --

2  Q.  Yes.

3  A.  -- that when I knew it was inflated and that inflation

4  still existed?  It's possible, but very unlikely.  I'd assign a

5  90-10 probability.  There would have to be a lot of other

6  circumstances.

7  Q.  Did you have any reason to believe that Vivendi shares

8  during the relevant period were inflated on the market itself?

9          THE COURT:  You're talking almost a 2-year period.  At

10  any time during those two years did you come to learn that

11  there was any inflation, artificial inflation, in that stock

12  price?  Did you come to learn that at any time in those whole

13  two years?

14          THE WITNESS:  Your Honor, I need those dates again.

15          THE COURT:  October 2000 to August 2002.

16          THE WITNESS:  Yes, I did know that that occurred,

17  because that information came out.  I only refreshed myself in

18  reading some background material for today.

19  Q.  But after corrective disclosure --

20          MR. SAUNDERS:  Could we have the witness's complete

21  answer, your Honor, please?

22          THE COURT:  Yes.

23          THE WITNESS:  I only refreshed myself from reading

24  some background material for today on a flight from wherever I

25  was yesterday to look at some time frames.  I believe that that

D2jrgam2                          Gabelli – cross

1   information concerning the individual involved who had departed

2   occurred like in the tail end of that relevant period you

3   described.  You described it as a block of time from somewhere

4   in '00 --

5              THE COURT:  October 2000 to August 2002.

6              THE WITNESS:  Right.  It was in the early part of July

7   of 2002.

8              MR. CAPPUCCI:  I'm just trying to move along, your

9   Honor.  I'm sorry for cutting you off.

10  Q.  My question is, would you have bought Vivendi ADRs during

11  the relevant period knowing or believing that further negative

12  information was about to occur which would cause a negative

13  decline in the price of the ADRs?

14             MR. SAUNDERS:  Your Honor, I'm going to object to that

15  question.

16             THE COURT:  Sustained.  That really calls for

17  speculation.

18  Q.  Did you?  Did you purchase?

19  A.  Did I buy the stock?  I did buy the stock, yes.

20  Q.  Did you buy Vivendi ADRs during the relevant period with

21  knowledge that the market price was inflated due to management

22  misrepresentations?

23  A.  No.

24  Q.  Mr. Gabelli, while you were not here, there was some

25  testimony about the access you had to management at meetings

D2jrgam2                         Gabelli – cross

 1    that you and perhaps some of your staff, including Mr.

 2    Rittenberry and your son had with Mr. Messier.  How would you

 3    describe your access to management –– and I realize this is

 4    some time ago –– during the relevant period, which is the end

 5    of 2000 to 2002?

 6    A.   Companies either call us and say we're coming into town,

 7    the management, in this particular case the management could be

 8    in from Paris, come and visit us, we are blocking out a block

 9    of time for you.  I get invited.  That's the access.  We have

10    that with many companies.  That is reasonably traditional in

11    what goes on in terms of gathering data.

12    Q.   Sir, have you had an opportunity to look back to see the

13    nature of the purchase activity was for the funds that you

14    performed services for?

15    A.   In Vivendi during what period?

16    Q.   Yes, in Vivendi.

17    A.   In what period?

18    Q.   2002.

19    A.   What I reviewed last night was early June to July, end of

20    July, or maybe even early August.  Actually, it could have been

21    even longer than that afterwards.

22    Q.   Did you find or identify any event which refreshed your

23    recollection as to why you purchased the stock within that

24    period?

25    A.   That's a broad question.  I did look at my calendar today

D2jrgam2                          Gabelli - cross

1    in terms of my travel schedule.  I was in California-Wyoming

2    the week before.  Then I went to a TV show on Monday June

3    1st -- July 1st with Maria Bartiromo.  There may have been -- I

4    started buying it that morning, perhaps getting ready for

5    Maria's show, because I knew she was sensitive about the

6    entertainment business.  In looking at some other documents,

7    there was also speculation that Mr. Messier was resigning.

8    Q.  Was that one of the factors which you believe in retrospect

9    led to an investment decision?

10   A.  That catalyst, as we discussed earlier in the day,

11   management change being a catalyst, that was an element.

12   Without being specific, that could have been one of the

13   elements in the mosaic.

14   Q.  Let me go back to PMV, if I may, for one moment.  There was

15   prior testimony yesterday by Mr. Rittenberry about the model.

16   In terms of how you used it on a daily basis, what your

17   practice would have been during this period, when you sit down

18   and decide to make an investment decision, do you have the PMV

19   model and the PMV values right next to you to compare against

20   market price?

21   A.  To describe the process of what occurs, because I did it

22   this morning for two hours before coming down here, you have a

23   large number of portfolios.  Client that are new get priority

24   first, clients that have extra cash or are under investigation

25   to look at new ideas, to sell things.  We have 1700 separately

1    managed accounts that I am responsible for.  There are on

2    average 150 stocks.  That's whatever the number of

3    combinations.  I don't keep a database.  We own over 5 percent

4    of about 130 companies for our clients.  I don't keep a

5    database at my fingertips.

6    Q.  A database of PMV?

7    A.  Of spreadsheets, of the top sheet of PMVs, on my

8    fingertips.  I rely on an ability to call people.  Or if they

9    are not in, you kind of have a broad guess, like --

10             THE COURT:  My question is, are you always interested

11   in the spread between the PMV and the public market price?

12             THE WITNESS:  Your Honor, yes, I am interested in a

13   margin of safety.  But I am also interested in the price that

14   day given all of the dynamics that are occurring.  We have a

15   morning meeting, today they probably went over 35 companies,

16   which I wasn't on.

17             THE COURT:  You do say you are interested in this

18   spread between the PMV and the public market price?

19             THE WITNESS:  We like a margin of safety.

20             THE COURT:  What is this new word that I haven't heard

21   in this trial till now?  What is this new word "margin of

22   safety"?  I thought you were interested in the discount.

23   That's what all the materials talk about, the discount between

24   the private market value and the public price.

25             THE WITNESS:  In my lexicon I call that the margin of

D2jrgam2                          Gabelli - cross

1   safety.

2              THE COURT:  That's the same as the discount?

3              THE WITNESS:  Yes.

4              THE COURT:  Good.  Thank you.

5              THE WITNESS:  That's what I would call it.

6              THE COURT:  That's helpful.

7              THE WITNESS:  Thank you, your Honor.

8   Q.  Mr. Gabelli, before her Honor asked you this question, you

9   said that PMV was not a determinant.  What does that mean?  Can

10  you please amplify that for us.

11  A.  As I indicated today, we will buy, I'm buying and will buy

12  millions of shares of Heinz that's selling at $72.18 when I

13  left the office today with Buffett and 3G buying at 72.50, when

14  our analysis would indicate it was fully priced.  There is an

15  element, a possibility, that I can get a higher rate of return

16  because someone else will top the bid.  There are occasions,

17  and that's an exception, but there are occasions which I will

18  buy a stock above its PMV.

19  Q.  What other factors are you looking at when you make an

20  investment decision?  If you can, expand upon that for the

21  Court.

22  A.  It is an entire mosaic:  What is the stock price trading

23  today? what is happening to interest rates? what it is tax

24  structure? who are the logical buyers? what are the elements

25  that they have? how many deals are being done in a given area?

1    what is going within the context of mergers and acquisitions?

2    why are central strategic buyers looking at an area? what's

3    going on in the sector where we have a core competency, where

4    we have a knowledge of a given industry.

5    Q.  Critical to that process is your reliance on price, on

6    market price, correct?

7    A.  It is an important element.  But, again, it's not the

8    determining element, just like PMV is not.

9            MR. CAPPUCCI:  We understand.  Thank you.  That's it.

10   No further questions, your Honor.

11           THE COURT:  Thank you.  Mr. Saunders.

12   REDIRECT EXAMINATION

13   BY MR. SAUNDERS:

14   Q.  Mr. Gabelli, you testified that you learned about some

15   Vivendi misstatements in July of 2002.  Did I understand that

16   correctly?

17   A.  Yes.  In refreshing myself for today, I realized that I was

18   on a show with Maria Bartiromo on Monday night.  I had just

19   flown back from the West Coast and was getting ready for the

20   dynamics.  There were subsequent events, both on that day and

21   subsequently, dealing with Mr. Messier's reign at Vivendi.

22   Q.  I think I heard you say you bought the stock in advance of

23   your appearance with Maria Bartiromo.  Bought the Vivendi

24   stock?

25   A.  Yes.  I bought it many times, obviously.  But on that

specific day, on that Monday, I believe it was July 1st -- I'd

have to have something to refresh myself.  Let's assume that I

bought stock that day and then subsequent days.

Q.  Let's assume that the appearance with Maria Bartiromo was

on July 1, 2002?

A.  Is that what you are saying?  It's in one of these books.

Can I look it up if that's what you gave me?

Q.  I'm happy to have you look it up.  Do you want to look at

your deposition?

A.  This is what you handed me.

Q.  Either way.  I think the record will show that it was on

July 1, 2002.

A.  You're a lawyer.  I trust you.

Q.  We have agreed in this case that you purchased 312,000

Vivendi ADRs on July 2, 2002.  Is that consistent with your

recollection?

A.  No.  I'd have to look at the numbers.  I didn't memorize

them.

            THE COURT:  I think your lawyer stipulated to that.

A.  If he stipulated to that, yes.  I bought it.

Q.  Did you buy those shares after you learned about what had

happened at Vivendi?

A.  I had bought shares before and after I learned about what

happened at Vivendi with Messier and the challenges with

regards to what he said publicly on liquidity and subsequently

1    to that.

2    Q.  So you bought stock, bought Vivendi stock, before that

3    happened and after that happened, right?

4    A.  Yes, sir.  That's during the relevant period.

5    Q.  Right.

6    A.  I'm still buying.

7    Q.  I'm only talking about the relevant period.

8    A.  Right.  Thank you, sir.

9    Q.  In response to one of Mr. Cappucci's statements, you said

10   that you thought that public information was incorporated into

11   the price of a stock.  Did I understand that correctly?

12   A.  I've got to tell you it's one of those -- I don't remember

13   his question or my answer today even though it was only four

14   minutes ago.

15            THE COURT:  Do you agree?

16            THE WITNESS:  Yes.  Thank you.

17   A.  Publicly known information is generally incorporated in the

18   price of a stock at a given moment in time.

19   Q.  I put in front of you a transcript of the deposition that

20   you gave in this case.

21   A.  This?

22            THE COURT:  Yes.

23            MR. SAUNDERS:  That's for the witness.  Let me give

24   one to your Honor.

25            THE COURT:  Thank you.

1    A.  As you know, I gave two depositions.  This is one of the

2    transcripts, correct?  Or is this both?

3    Q.  This is both.  They are separated by the blue sheet.

4    A.  OK.  Thank you.

5            THE COURT:  Blue sheet?  I don't have a blue sheet.

6    Mr. Saunders?

7            MR. SAUNDERS:  Your Honor, let me give you my copy

8    that does have a blue sheet.

9            THE COURT:  You may need to use it.

10           MR. SAUNDERS:  I have another copy.

11   A.  Can you show me the blue sheet?  This does not have one.

12   Q.  Take mine.

13   A.  I see.  You can see it easier.

14   Q.  Do you recall being deposed on the second day of your

15   deposition, which took place on June 25, 2007?

16   A.  I assume that's what this says after the blue sheet.  I was

17   deposed twice.  If that's the second day, that's it.  It

18   doesn't say twice, but that's it, on line 2.

19   Q.  Were you put under oath on that occasion?

20   A.  Yes.

21   Q.  Do you recall being asked the following question and giving

22   the following answer?

23           THE COURT:  Page what?

24           MR. SAUNDERS:  Page 164, your Honor, over to 165.

25           THE COURT:  Let him find it, too.  164, a few pages

1    after the blue sheet.  Do you see it?

2              THE WITNESS:  Right here.

3    Q.  You might want to start reading at line 12 on page 164.

4    A.  Slow down.  Page 164 is the one in the upper right-hand

5    corner?

6              THE COURT:  Yes, correct.  Go ahead.

7    Q.  The question was, "You testified that the information that

8    you used to determine whether Vivendi stock was undervalued

9    during the relevant time period was public information,

10   correct?"

11             Then you answered that question.

12   A.  I see the answer.

13   Q.  You talked about having access to inside information, which

14   you denied.

15             THE COURT:  Wait.  The record won't be clear.  Let's

16   read it.

17   "A.  As opposed to nonpublic, which would be that I would have

18   access to inside information.  If I had access to inside

19   information, the first thing you do is pick up the phone, call

20   the general counsel, and put it on the restricted list and

21   determine whether or not it's public or nonpublic."  You gave

22   that answer, right?

23             THE WITNESS:  I gave that answer in the question that

24   your team asked or Mr. Cappucci asked or someone asked.

25   Q.  The next question was, at line 24, "Was that public

D2jrgam2          Gabelli - redirect

1  information incorporated into the market's pricing of the

2  security during the relevant time frame?  Do you see that?

3  Your answer was, and I quote --

4  A.  Whoa.

5  Q.  Do you see that, line 24?

6  A.  Thank you.  It dropped down one.  Got it.

7           THE COURT:  The answer is?

8  Q.  "You're asking me not what I do.  You're asking me to

9  public stock price when a stock like General Motors is trading

10  at 36.  It may or may not be.  I don't know."  Was that answer

11  true at the time you gave it?

12  A.  There were many questions prior to that, and I tend to talk

13  a lot and explain a lot.  Obviously, I'm not going to say this

14  is not true, but I don't know the context in which it's true or

15  not true.  It's a statement that I would make just like I did

16  with Google earlier.

17  Q.  Let's look at the next question and answer.

18  "Q. Is it your understanding during the relevant time period

19  that public -- that the public information you were using to

20  make your investment decisions was incorporated into the public

21  market price of Vivendi securities?"  Do you recall being asked

22  that question?

23  A.  Not really.

24  Q.  And did you give the following answer to that question?

25  "A. You're getting into a philosophical debate between random

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   walk type analysis and value investing and securities analysis.

2   I assume that there are those who would follow Professor

3   Malkiel's theory of the random walk.  I don't.  And it's been

4   proven that it's an inferior methodology over an extended

5   period of time."

6         Did you give that answer to that question?

7   A.  I read it here, and I would not change that answer.  I

8   would embellish on it, but I wouldn't change it.

9   Q.  Thank you.

10        MR. CAPPUCCI:  May I have a moment, your Honor?

11        THE COURT:  Sure.

12        MR. CAPPUCCI:  I'm sorry.  I thought you were done.

13  Q.  Mr. Cappucci asked you about your decision to purchase

14  Vivendi stock during the relevant period.  Do you recall those

15  questions?

16  A.  Not all of them.

17        THE COURT:  Just now.

18  A.  Just now, more or less, but not all of them and not in

19  detail.

20  Q.  Do you actually remember what determinations preceded your

21  decision to purchase Vivendi stock during the relevant period?

22  A.  The mosaic that I follow, as a race car driver or a pilot

23  and a checklist, if I were a pilot there would be a checklist.

24  I don't have a checklist on my desk.  But trained as a

25  professional, there are things that I ask daily/weekly in terms

D2jrgam2              Gabelli - redirect

1  of the portfolio and the security that we select:  What is the

2  price in the public markets? how much do I want to own for this

3  client? and so on.  Those are the elements, if you're asking me

4  what I would look at.

5  Q.  Could you answer my question.

6  A.  I thought I did.  Could you rephrase it then.

7  Q.  Would you like it reread?

8  A.  Can you re-echo it then?

9  Q.  Do you actually remember the determinations that preceded

10 your decision to buy Vivendi stock during the relevant period?

11 A.  I think they are the same as any stock I buy.  90 percent

12 are the same.

13 Q.  Does that complete your answer?

14 A.  I don't have anything else to add.  What would you like me

15 to say?

16 Q.  Would you turn to page 166 of your deposition.  Do you

17 recall being asked this question and giving this answer under

18 oath?

19 A.  What line?

20 Q.  Line 13.

21 "Q. What determination preceded your decision to purchase

22 Vivendi securities during the relevant time period?"

23        Then there is an objection by Mr. Cappucci.  Then you

24 answer.

25 "A. The dynamics that are involved in our decision-making on

many stocks, and specifically Vivendi, is earnings per share,

EBITDA, PMV, statements that we use to gather that information.

But specifically for Vivendi at that moment on a given time,

I'd have to do a lot more analysis than I could today.  And I

couldn't reconstruct why I'm even buying General Motors this

morning."

          Did you give that answer to that question under oath?

A.  You keep coming back to under oath.  We stipulated that

every question I gave an answer to is under oath.  Why are you

trying to intimidate me by asking that question?

          THE COURT:  I don't think anybody has ever intimidated

you, Mr. Gabelli.

          THE WITNESS:  I remember one occasion.

          THE COURT:  That was a long time ago.  Let's go on.

          THE WITNESS:  You remember what you had when you were

8 years old.

          THE COURT:  Mr. Saunders, he gave that answer,

clearly.  It's in the transcript.

          MR. SAUNDERS:  I have no further questions.  I have

one piece of housekeeping that is left over from yesterday,

your Honor.  There was an exhibit that you admitted subject to

connection.

          THE COURT:  Yes.  You wanted to ask him a question.

          MR. SAUNDERS:  Yes.

Q.  In your book, Exhibit X, is that your handwriting on

D2jrgam2          Gabelli - redirect

1    Exhibit X?

2    A.  On the right-hand side, I would say it is, yes.

3           MR. SAUNDERS:  Thank you, your Honor.  I offer

4    Exhibit X.

5           THE COURT:  Mr. Cappucci.

6    RECROSS-EXAMINATION

7    BY MR. CAPPUCCI:

8    Q.  Just one question.  Mr. Saunders just asked you questions

9    about your recollection, your specific recollection about the

10   investment process which preceded investments in Vivendi

11   securities during the relevant period.  My question is, do you

12   have any reason to believe that you did not follow your routine

13   practice which you had done throughout the period?

14   A.  No.  In fact, I'm reading the sentence on line 22 of this

15   deposition, and it says, specifically at that time moment at a

16   given time after a lot more analysis than I could do today.

17   That analysis meant thinking about the elements that went into

18   my checklist as opposed to analysis in terms of understanding

19   the company's fundamentals.

20   Q.  Mr. Gabelli, if I told you that the mutual fund purchases

21   on July 2nd of '02 were made at prices between $15 and $18 per

22   ADR and the previous day close was $22, would that give you

23   some basis to say that there was a disclosure in the market-

24   place which preceded your investments?

25          MR. SAUNDERS:  Your Honor, I'm going to object to that

1   question.  There is no foundation for that question at all in

2   this record.

3          THE COURT:  Not in this record.  We have no foundation

4   of price.

5   Q.  Does that pricing information refresh your recollection as

6   to whether your transactions on July 2nd were subsequent to

7   information in the marketplace?

8   A.  I read some material this morning.  I checked the price of

9   Vivendi by day, what I was doing the Monday night, what I was

10  doing the week before, the fact that on that, not Thanksgiving,

11  Fourth of July, I then left to go somewhere else.  I looked at

12  those three days.  Clearly, it did refresh.  But it was not

13  unaided.  I read this last night.

14         MR. CAPPUCCI:  No further questions.  Thank you very

15  much.

16         MR. SAUNDERS:  Nothing, your Honor.

17         THE COURT:  Thank you, Mr. Gabelli.

18         THE WITNESS:  Thank you, your Honor.  Am I finished?

19         THE COURT:  Yes, you are.

20         (Witness excused)

21         MR. SAUNDERS:  Your Honor, we rest.

22         THE COURT:  Anything more, Mr. Cappucci?

23         MR. CAPPUCCI:  Nothing, your Honor.

24         THE COURT:  I would like to have closing arguments.

25  I'd like to take a 5-minute recess before that.  What's the

D2jrgam2

1    order here?  The burden of proof is usually the last word, so

2    you would go first, Mr. Cappucci.

3              MR. CAPPUCCI:  I went first, your Honor.

4              THE COURT:  You went first in the opening?

5              MR. CAPPUCCI:  Yes.

6              THE COURT:  I don't remember that.  But it doesn't

7    matter.  The burden of proof is on Mr. Saunders to rebut the

8    presumption, so he gets the last word.  That's the way it goes.

9    We will reconvene in five minutes.  Thank you.

10             (Recess)

11             THE COURT:  Mr. Cappucci.

12             MR. CAPPUCCI:  Your Honor, I must say I don't have

13   much by way of a closing statement.  Your Honor has sat here

14   very patiently for two days, and in view of the Court's level

15   of experience with the issues of fraud on the market, its

16   offering of many decisions in this area, citing, using the

17   fraud-on-the-market presumption in this case, having to

18   navigate through it, I am cautious about proceeding with a

19   closing statement and going through the levels of evidence.  I

20   really believe that it I will be criticized for that, so I want

21   to be brief.

22             I believe that the case presents a significant legal

23   issue on the question of what is meant by "intrinsic value."

24   The case law uses the word "intrinsic value."  This is again

25   how the case law after Basic identifies scenarios where the

D2jrgam2                    Summation - Mr.Cappucci

1    presumption is rebutted.  Counsel is pointing to a sentence

2    which the Court adopted, which is Second Circuit case law,

3    which says that the presumption may be rebutted if the investor

4    does not believe that market price is intrinsic value.

5           It is our position, your Honor, and as we have

6    painstakingly read back to Basic, read the decisions in

7    Bombardier, in Hevesi v. Citigroup and gone very far back, we

8    believe that the decisional authority when it uses the term

9    "intrinsic value" is not using the same language that our

10   client is using.

11          When the case law is referring to intrinsic value, it

12   is asking whether the investor believes the stock price is

13   inflated as a result of being manipulated.  This goes back, for

14   those of us who have been doing this a while, it goes back to

15   true value.  We had value lines of cases.  When we asked

16   questions about true value, true value was the market price of

17   the stock less inflation as a result of the fraud.

18          What Vivendi and their team has done is they found a

19   defendant who used the term "intrinsic value" as they have

20   referred to it in their documents.

21          I apologize to the Court for the painstaking effort

22   that we just went through with documents.  I would ask that you

23   please accept my client as a person who wants to be precise and

24   that he is trying to be precise in an important case.

25          (Continued on next page)

D2jegam3                        Mr. Cappucci - closing

1           MR. CAPPUCCI:  And obviously recognizing that we're in

2    the Southern District before your Honor.

3           So putting that aside, what has happened here is

4    Vivendi has found documents by an investor which used the word

5    intrinsic value.  And they're trying to say that this version

6    of intrinsic value is the intrinsic value which the case law

7    points to.  It's apples and oranges, your Honor.  It's a

8    different concept.  And I ask you, I plead with you to go back

9    to the cases.

10          But in our analysis, we found a case, a decision by

11   Judge Nickerson, back in 1989, which, in fact, made the same

12   price -- the same observation.  And that is the decision in the

13   *Ballan* case, 720 F.Supp. 241.  And I'll just read, I'll just

14   read from that decision.

15          If, however, the corporation makes public disclosures

16   that are false or misleading or fails to disclose material

17   information, the price of its securities will not reflect their

18   true value.  The corporation will have perpetrated a fraud on

19   the market.  Even investors who never knew of the misleading

20   disclosures will have been defrauded if they relied on the

21   integrity of the market price.

22          Market price, the integrity of market price.  So the

23   case law, when it's using the term intrinsic value, is not

24   looking for what an investor is defining that term.  So when

25   Mario and his investor -- and his research folks are talking

1    about intrinsic value, that's the model.  That's the PMV.  We

2    heard it at length.  We heard about the model.  It's a

3    projected model which seeks to identify value going out.  It's

4    not meant to be a construct or a substitute for price on a

5    given day.

6            They rely on price.  Mr. Gabelli said he relied on

7    price.  I have no reason to believe he didn't rely on price.

8    That's what they would do.  That's all they have.  And simply

9    because they believed the price of the stock was going up,

10   because of a valuation, that doesn't make them any different.

11   That doesn't make them atypical from most, if not all,

12   institutional investors.

13           THE COURT:  Let me tell you the question I have for

14   you, Mr. Cappucci, and it's troubling me.

15           MR. CAPPUCCI:  Sure.

16           THE COURT:  You seem to be describing what I would

17   call an irrebuttable presumption.  In other words, there's

18   false statements.  They're incorporating the price.  The price

19   is artificially inflated.  Nobody buys into a crooked crap

20   game.  So this so-called presumption of reliance sounds

21   irrebuttable because it's in the price.  It's inflated.  Why do

22   we have a reliant element that's different from a fraud

23   element, and how do you ever rebut that presumption?  Had the

24   Supreme Court wanted to tell us it was irrebuttable, they would

25   have said, if you trade in an efficient market and there's a

1    fraud, and the information is incorporated into the market

2    price, it's over.  There's nothing you can do to rebut it

3    because everybody has to trade at the market price.  You can't

4    buy the stock for any other price but the market price.  So to

5    that extent, everybody says, well, I bought at the price on

6    that day.

7             How could this be rebutted?

8             MR. CAPPUCCI:  It's a great question, your Honor.

9             THE COURT:  Well, it's one that's been troubling me.

10            MR. CAPPUCCI:  And, in fact, in fact, let's go back to

11   *Basic*.

12            THE COURT:  Okay.

13            MR. CAPPUCCI:  Because *Basic* gave us the examples.

14   They said, you have to show that the link was severed, that the

15   link was severed.  The link between the misrepresentation, the

16   fraud which has been proven here already and price.  There's no

17   question the price was inflated.

18            THE COURT:  Right.

19            MR. CAPPUCCI:  But in *Basic*, in *Basic* what happened is

20   they said, how do you take this chain apart?  How do you -- how

21   do you delink it, so to speak?  And they talked about scenarios

22   where -- and this was a transactional case where the price

23   was -- the truth was on the market, because the fact that the

24   company was in takeover.  It wasn't there, so the price wasn't

25   trading at the value it should have.

D2jegam3                         Mr. Cappucci - closing

1          So, for example, they said, look, if that information

2     was in the marketplace already, there's no link between price

3     and misrepresentation.  Similarly, if the market makers knew

4     about it and they leaked it or the company had leaked it,

5     there's no link between the misrepresentation and the purchase

6     price.  And they also said if the person buying the securities

7     knew about it.  So clearly what would break the link here would

8     be if Mr. Gabelli, in fact, knew that the company was making

9     misrepresentations and the stock price was inflated before he

10    bought it.

11          THE COURT:  Well, that certainly happened at some

12    point.  We just heard about that.

13          MR. CAPPUCCI:  But hold on.  But, your Honor, we have

14    a stipulation in this case.  We have a truth on the market

15    stipulation, which means that after every corrective

16    disclosure -- and as I told you before, six of the ten, we

17    didn't really buy much.  We bought -- and maybe it's time to

18    put up a demonstrative exhibit, if I can just put that on, just

19    to show the price chart, your Honor.  If you look at the price

20    of -- it's on the screen now.  If you look at the price of

21    Vivendi securities throughout this period, they're way, way up

22    in value at the beginning of the period in October of 2000.

23    And they really start to run down.

24          And if you look at some of the bar -- the bar lines

25    like two-thirds along the way, which is the July/August time

D2jegam3                         Mr. Cappucci - closing

1    frame, one can understand why a buyer is in there.

2            But the fact of the matter is by the time Gabelli came

3    in and made those big purchases, six of the ten corrective

4    disclosures already occurred.

5            THE COURT:  Yes.

6            MR. CAPPUCCI:  And you had new management.  He had a

7    right to rely on new management.  That didn't mean he was

8    buying into this.  He didn't -- he lost a fortune on this

9    investment.  And, in fact, the PMV model was completely wrong.

10   And we know why that happened because with the liquidity

11   crisis, those multiples were completely speculative.

12           So I think -- we're looking for a break in the chain,

13   and we just don't have it here.  They relied on price.  And,

14   your Honor, I don't like to -- you know, I don't want to --

15           THE COURT:  What do you mean, they relied on price?

16           MR. CAPPUCCI:  The integrity of the price.

17           THE COURT:  He said -- your last witness, Mr. Gabelli,

18   said it was one factor of many.

19           MR. CAPPUCCI:  Well --

20           THE COURT:  Obviously he said that the market price on

21   any particular day in his opinion reflects all the public

22   knowledge about the stock, right?  That's what he said.

23           MR. CAPPUCCI:  One of the most learned --

24           THE COURT:  Mr. Cappucci, right?  He said the price of

25   a stock reflects all the public knowledge on that day, and he

D2jegam3                        Mr. Cappucci – closing

1    believes that it was an honest price, the integrity of the

2    price.  And he said it's one element of what he considers,

3    obviously.  But he considers the margin of safety, which we now

4    learned is a discount between his PMV and the market price.  He

5    takes into account many other factors.  He's interested in

6    catalysts.  He's interested in change of management, many

7    factors.

8         MR. CAPPUCCI:  I'm going to quote a brilliant jurist,

9    who said the fact that these traders have divergent motivations

10   in purchasing shares should not defeat the fraud on the market

11   presumption absent convincing proof that price played no part

12   whatsoever in their decision-making.  Obviously, your Honor.

13        The fact is, in today's market -- and by the way, your

14   Honor, what's at stake here, Vivendi is almost 60 -- was almost

15   60 percent institutionally owned during the relevant period.

16   So what happens today is not just relevant for my client.  It

17   has implications beyond this and in other cases.  The fact is

18   in a modern securities market, with sophisticated investors,

19   they clearly are looking at a multitude of factors.

20        THE COURT:  Right.  But what troubles me is I still

21   say you're turning it into an absolute and not a rebuttable

22   presumption, because the price is false, once the falsity is

23   proved.  It's no longer an honest price because it incorporates

24   the falsity.  It's an inflated price.  And since everybody has

25   to buy at the market price, and everybody would say no matter

D2jegam3                          Mr. Cappucci – closing

 1    how many other considerations, of course I consider today's

 2    price, of course, I don't understand how this is rebuttable.

 3    I'm really seriously asking for help here, because if the

 4    Supreme Court had told me it would be irrebuttable under those

 5    circumstances, this would be an easier trial for me.

 6              MR. CAPPUCCI:  Your Honor, as I said, the Court in

 7    *Basic* pointed to a handful of examples where the chain was

 8    broken.

 9              THE COURT:  That's a long time ago.  There should be

10    40 years of jurisprudence since then.  I think it's a rare

11    event that you have a trial on this issue alone.  And whether

12    the presumption is rebutted, most of the writing is at the

13    motion to dismiss stage, the summary judgment stage.  And then

14    cases settle or they go to a jury.  And we never know what the

15    jury figured out anyway.

16              But it's pretty rare to have a nonjury trial focus

17    solely on reliance, with need to make findings of fact and

18    conclusions of law where the presumption has been rebutted.

19    Cite me a case, but I don't know if --

20              MR. CAPPUCCI:  We'd love to settle the case but --

21              THE COURT:  I didn't say settle.  I think I said cite

22    me a case.

23              MR. CAPPUCCI:  I said we would have loved to settle

24    the case.

25              THE COURT:  I heard that.  That would be great.

D2jegam3                          Mr. Cappucci - closing

1              But I said cite me a case where somebody has had to

2      make these decisions as to what information rebuts the

3      presumption.

4              MR. CAPPUCCI:  Your Honor, there are none.

5              THE COURT:  I thought so.

6              MR. CAPPUCCI:  We're a case of first impression in

7      that regard.

8              THE COURT:  That's what I thought.

9              MR. CAPPUCCI:  And I think it should come down to, you

10     know, look, in this case we have all the elements of 10(b)

11     except for reliance --

12             THE COURT:  I understand that.

13             MR. CAPPUCCI:  -- are on the table.

14             THE COURT:  This is a solely -- Mr. Cappucci, when I

15     speak, I beg you to just stop.  You've been doing this a long

16     time.  When the judge talks, you stop.  That's the way it is.

17             So I understand that.  It's a very focused trial.  All

18     the other elements of 10(b) are proved.  The sole issue here is

19     whether the presumption of reliance can be rebutted or not.  If

20     not, there's no actual reliance to fall back on, right?  You

21     say it.  We didn't --

22             MR. CAPPUCCI:  That's not our case.

23             THE COURT:  That's right.  It's solely the

24     presumption, the efficient market trading, the presumption of

25     reliance.  If it's rebutted, you lose.  If it's not rebutted,

1    you win.  That's the whole case.  And I'm just trying to

2    understand --

3              MR. CAPPUCCI:  I understand.  But, your Honor, the

4    only thing that the defendants have pointed to to perhaps

5    dilute any reliance on price is the PMV model.  And what we

6    hope the evidence has shown, and what we hope the Court

7    appreciates, is that the model is not a surrogate for market

8    price.  It's a forward -- it's a forward looking document --

9              THE COURT:  It's an expectation.  It's where the

10   trader thinks the stock will go.  Right?

11             MR. CAPPUCCI:  Right.  That's correct.  That's

12   correct.

13             THE COURT:  The trader says, the stock is going to go

14   way higher than it is now.  The chart that Mr. Saunders showed

15   the last witness said it's at 73 Euro today.  It will go to 100

16   Euro under our model.  We like that discount, and he wants to

17   call it margin of safety.  Doesn't matter what you call it.  I

18   call it spread.  But we like that, and that's why we're buying,

19   because we think it's going to go to our PMV.

20             MR. CAPPUCCI:  Right.  But, your Honor, there is --

21   they have not submitted -- other than that, there is no

22   evidence, there's no evidence --

23             THE COURT:  Other than that, Mrs. Lincoln, how was the

24   play?

25             The point is that may be the case.  What they're

D2jegam3                    Mr. Cappucci - closing

1    trying to make is the argument that if there hadn't been this

2    artificial inflation, the market value would be even lower.

3    The spread would be even bigger under their model of the PMV.

4    This was a good buy.  Something to buy.  And that's why they

5    bought.  I think there was even evidence -- Mr. Saunders will

6    tell me where -- some of their people said, I really don't care

7    what it was trading at.  We weren't interested in the market

8    price.  We were interested in our private market value and the

9    spread.  And we certainly didn't care about a short-term

10   liquidity crisis.  So what is -- it's important to know what

11   the fraud was.  I guess I can call -- the fraud was to hide the

12   information about liquidity crisis.  One of the witnesses said,

13   it wouldn't have mattered to us.  It's short term.  We're long

14   term.  Liquidity crisis can be solved.  The company comes

15   roaring back after it takes care of that problem, and we have a

16   model that says what a hypothetical purchaser would buy this

17   company at down the road.  It could be two years, five years,

18   ten years.  I understand there's no purchaser today, but this

19   is our projection.  We're analysts, and we think it's a good

20   buy.

21              MR. CAPPUCCI:  Your Honor, 10(b) -- if that were the

22   law, you would be restricting the remedy here.

23              THE COURT:  What's that?

24              MR. CAPPUCCI:  You'd be restricting the remedy.

25              THE COURT:  I don't understand what you just said.

D2jegam3                        Mr. Cappucci - closing

1          MR. CAPPUCCI:  You'd be taking a long-term approach.

2     That's not what 10(b) does.  We're looking at corrective

3     disclosure.  We're looking at corrective disclosures.

4          THE COURT:  Now you lost me.  I'm talking about what

5     the company relied on when it bought the security.

6          MR. CAPPUCCI:  I understand that.  And what I'm saying

7     is that they relied on price.  They relied on price.  And the

8     price that they relied on was inflated as a result of admitted

9     misrepresentations.

10         THE COURT:  You keep saying they're relying on price

11    as if you say it ten or twelve times, it must be true.

12    Mr. Gabelli says it's one of the many things we considered.

13    It's part of the mix --

14         MR. CAPPUCCI:  But that's --

15         THE COURT:  But that troubles me because it's got to

16    be always part of the mix.  Price is always a consideration in

17    a buy.  You can't get around that in an efficient market.  This

18    isn't the liberty media, you know, merger agreement thing.

19    This is a stock traded on the open market.

20         MR. CAPPUCCI:  I understand.

21         THE COURT:  It always has a price.  Every day it has a

22    price.  And every purchase in an efficient market has to buy at

23    the price, so I'm troubled by the presumption and how it's

24    rebutted.

25         MR. CAPPUCCI:  Right.  But, your Honor, what I'm

D2jegam3                      Mr. Cappucci - closing

1  saying is that we would submit that as long as that -- I don't

2  want to say it's a kernel, but as long as price is a part --

3          THE COURT:  When is it not?  When is it ever not in

4  trading an efficient market?

5          MR. CAPPUCCI:  In the examples --

6          THE COURT:  That's your answer, then.  You've given it

7  twice.  I have to read one case, according to you, the examples

8  on that case, then it's over.

9          MR. CAPPUCCI:  We're talking about two different

10 points.  What I'm saying is that this thing about intrinsic

11 value is a construct.  It's not -- it's apples an oranges.

12 Your Honor is making a different point as to really what we

13 relied on.  Did we rely on price?  What we were looking at this

14 for long term, but it can't be the law, your Honor, that every

15 investor who has long-term vision cannot get the benefit of --

16         THE COURT:  I didn't say that.  I never said that.  I

17 said what was kept at the fraud here.  There are different

18 kinds of frauds.  There are different kinds of frauds that are

19 hidden and cause artificial inflation.  This one had to do with

20 hiding information about a liquidity crisis.  If the

21 information had been known, would the stock still have been

22 purchased?

23         MR. CAPPUCCI:  Your Honor --

24         THE COURT:  According to your own witnesses, they

25 didn't care about a liquidity crisis.  That's all I'm pointing

D2jegam3                          Mr. Cappucci - closing

1   out.

2          MR. CAPPUCCI:  Your Honor, I think maybe you're moving

3   into causation.  I think that because today, because today the

4   rest of the case --

5          THE COURT:  No.  I think it's a test; something like

6   but for this information, would the purchaser have purchased

7   the shares if they had known of the fraud?  That's all I'm

8   trying to.  Say, something -- I'm sure the defense will quote

9   that better than I did, but that --

10          MR. CAPPUCCI:  But what I'm saying is, if you have to

11   accept the fact -- if this Court has to accept the facts that

12   during this relevant period there were eight, nine or ten price

13   corrections which took out the true value of the stock, and

14   those who bought before that full correction purchased at

15   inflated levels and were defrauded --

16          THE COURT:  Yes.

17          MR. CAPPUCCI:   -- you know, it's a very limited,

18   limited inquiry at this juncture, your Honor.

19          THE COURT:  Limited inquiry?

20          MR. CAPPUCCI:  It's a limited, limited inquiry.  And I

21   think that you're testing, and it's very wise --

22          THE COURT:  Look, even in the class action, you

23   understand there are now going to be hearings on reliance.

24   Reliance wasn't tried because it's individual.  And we allowed

25   class actions to be tried, even though reliance is an

D2jegam3                        Mr. Cappucci - closing

1   individual issue.  And we don't worry about predominance.  We

2   say we'll figure out reliance later, but it isn't over.  Even

3   though all the rest of it's proved the damages are calculated,

4   everything else, reliance is still out there.  Now we're

5   dealing with GAMCO.

6       MR. CAPPUCCI:  Well, there's a good way to stop that

7   train:  By finding for us in this case.  But the -- look, your

8   Honor --

9       THE COURT:  I don't think that's the best argument I

10  ever heard, but okay.

11      MR. CAPPUCCI:  I think -- it may have worked across

12  the street.  But I think, your Honor, again, I feel you got it.

13  And I think -- I feel like we're in good hands.  I feel that

14  you have a full taste for the breadth of the evidence.

15      THE COURT:  In this case flattery will not help.  I

16  mean, I have a dilemma.

17      MR. CAPPUCCI:  I understand that, your Honor.

18      THE COURT:  I have a dilemma, and I'm trying hard to

19  understand so that I come out with a good result.  I won't use

20  the word right because it's never right until the appellate

21  court says it's right.  But I want to come out with a good

22  result.  So I'm seriously asking questions, and I'm sure I'll

23  ask it of the other side.

24      MR. CAPPUCCI:  Just let me ask one thing.  Again, the

25  witness, who is an incredibly successful investor and a complex

1  thinker, and that's just the way he is -- he's a brilliant man.

2  Look, he's trying -- when you're asking him what he's relying

3  on, and he says, price, earnings per share, I mean, that's what

4  institutions do.  I mean --

5           THE COURT:  I understand.

6           MR. CAPPUCCI:  But it has to go -- it all goes back to

7  integrity of price.  And if they have no reason to believe

8  that that investment, that security is being manipulated, they

9  are subject, they're stand -- they're out there.  The emperor

10 has no clothes.  They are subject --

11          THE COURT:  But then you have your rebuttable

12 presumption.  Once the fraud is proved, once the fraudulent

13 information is incorporated in the price, it's absolute.

14          But I think we've been around it.  I don't want to do

15 what we did throughout parts of this trial and do it five or

16 six times.  We've discussed it.

17          MR. CAPPUCCI:  Your Honor, I appreciate the

18 opportunity to try a case before you, and I thank you for your

19 patience.

20          THE COURT:  Thank you.

21          MR. CAPPUCCI:  And we are concluded.

22          THE COURT:  Mr. Cameron?

23          MR. CAMERON:  Your Honor.  Your Honor, I do intend to

24 go through some of the record.  I have a small binder that may

25 assist the Court.  If I could pass that up.

D2jegam3                        Mr. Cameron - closing

```
 1            THE COURT:  Small binder?  There's 24 exhibits here.
 2            MR. CAMERON:  And I will endeavor not to go through
 3    all of them, but I -- in case your Honor has questions, and I
 4    do relate to some of the propositions that have come out during
 5    the course of the evidence as to how the plaintiffs here viewed
 6    the stock market price of Vivendi securities at the time they
 7    made their investment decisions and how they made those
 8    decisions generally.  So I'll come to those, your Honor.
 9            But I think the appropriate place to start here is
10    that the plaintiffs have sought to establish reliance in this
11    case in one way and in one way only:  By invoking via
12    collateral estoppel the same presumption of fraud on the market
13    that was asserted in the class action.
14            THE COURT:  That was what?
15            MR. CAMERON:  That was asserted in the class action.
16    Sorry, your Honor.
17            And that's important because it means that the GAMCO
18    plaintiffs here, both the individual investors and also the
19    mutual funds, are asserting that but for the false and
20    misleading statements made by Vivendi during the relevant
21    period, statements that under the fraud on the market
22    hypothesis were imputed into the stock price, they would not
23    have transacted in Vivendi securities, in the Vivendi ADRs that
24    are the basis of the damages claims.  And that's the basis of
25    plaintiff's assertion.
```

D2jegam3                          Mr. Cameron - closing

1          But we know, based on the record of evidence now

2     before the Court, your Honor, that that's not true.  It's not

3     correct to say that but for Vivendi's misstatements, the GAMCO

4     plaintiffs would not have transacted in Vivendi ADRs during the

5     relevant period, because the evidence in this case, your Honor,

6     demonstrates that under the investment methodology that they

7     did use, which turned on a calculation of Vivendi's private

8     market value and a comparison of their value to stock price,

9     that plaintiffs would have continued to purchase Vivendi

10    securities during the relevant period even in the absence of

11    the fraud.

12         Now, the argument that Mr. Cappucci made, and the

13    assertion that Mr. Gabelli made on the stand today, your Honor,

14    was that they would not have purchased had they known about the

15    fraud.  And we'll come to whether or not that's accurate.  But

16    that is different to saying that if those misstatements had not

17    been made, that they would not have bought those securities.

18    And that is the but-for test that is applicable here.

19         And the reason why they would have bought these

20    securities, even in the absence of those misstatements, is

21    precisely the dynamic that you were just asking Mr. Cappucci

22    about.  And that is, the price of Vivendi securities actually

23    would have dropped even further as the inflation came out and

24    would have been lower.  A lower price would have meant an

25    increased spread, whether you call it the discount or the

D2jegam3                        Mr. Cameron - closing

1   margin of safety, and would have increased the attractiveness

2   of this investment to GAMCO.

3         And as Mr. Rittenberry confirmed during his testimony,

4   the size of that discount was one of the main factors in his

5   recommendation to buy securities where their price was below

6   the private market value.

7         THE COURT:  So the only thing that troubles me in that

8   argument is that to some extent you always rely on the market

9   price, at least as part of the formula.  If the discount is too

10  small -- you know, if it's a penny -- that's not going to be a

11  value investment for Gabelli, right?  So -- or private market

12  price is higher, despite what he said, that's typically not the

13  kind of stock you would buy.  So you have to -- so market price

14  is one of the parts of the mathematical equation.  Therefore,

15  one relies on it in part at least, right?

16        MR. CAMERON:  Well, but, your Honor, yes, it is

17  obviously part of what they looked at.

18        THE COURT:  Right.

19        MR. CAMERON:  Right?  But with respect, that's not the

20  test.  The test that was laid down by the Supreme Court in

21  *Basic* and also by the Second Circuit is, as your Honor pointed

22  out in your summary judgment opinion, whether in looking at

23  price the purchaser treated stock price or viewed stock price

24  as an accurate measure of the intrinsic value of the security.

25        Now, Mr. Cappucci suggested that that's a construct,

D2jegam3                          Mr. Cameron – closing

1    that we have latched on to some words in a series of opinions,

2    but it's not.  That concept was front and center in the *Basic*

3    decision and has been referred to, I think, in five separate

4    Second Circuit Court of Appeals cases since, including the

5    *Teamsters* case that your Honor cited in your summary judgment

6    opinion.

7              THE COURT:  More than cited.  I think it was mine in

8    the district court.

9              MR. CAMERON:  Exactly.

10             MR. CAPPUCCI:  It was, your Honor.

11             THE COURT:  I thought so.

12             MR. CAMERON:  It was your opinion in the district

13   court, but what I mean is you cited it in the summary judgment

14   in this case.

15             THE COURT:  I know.

16             MR. CAMERON:  In fact, if you go and look at *Basic*,

17   it's obvious that this value concept was part of the way they

18   formulated the presumption of fraud on the market.  And, in

19   fact, in doing so, at page 244 of their opinion, they relied

20   upon the *LTV Securities Litigation* case, and I quote, the

21   market is acting as the unpaid agent of the investor, informing

22   him that given all the information available to it, the value

23   of the stock is worth the market price.  That was the basis for

24   this presumption.

25             And it's the key here, your Honor, is that it's not

D2jegam3                          Mr. Cameron - closing

1   just part of what you look at.  After all, this is but for

2   causation.  And what establishes the causation element of this?

3   What establishes the but-for part is your reliance upon the

4   stock price as the intrinsic value of the security, and that's

5   why you buy.  It's that assumption that gives investors, if you

6   like, the pass on showing that they looked at the actual

7   misstatements.

8          THE COURT:  Well, of course all investors believed

9   that the market price will change to their benefit.  Right?

10  They think it's going to go up, they're long.  If they think

11  it's going to go down, they're short.  But they always think

12  that they know where it's headed.  So is that so different from

13  Mr. Gabelli's PMV?  There's an expectation of either rise or

14  fall.  You never really think the market price is the end of

15  the story, because you're a speculator.  You're a gambler.

16  That's what the stock market is.  You think it's going to go

17  up, you think it's going to go down, you're going to make money

18  one way or the other, depending if you buy long or short.  But

19  you never think that's the absolute value, because you think

20  you know better.  You think you know what direction it's going

21  to go in.

22         MR. CAMERON:  Two points.  The first is what you just

23  said I think challenges the concept or idea of the efficient

24  market hypothesis that underlies *Basic*.

25         THE COURT:  Efficient market concept I thought was

D2jegam3                         Mr. Cameron - closing

1  that the market absorbs all of the public information and,

2  based on all that information, sets today's price.  I

3  understand that.

4          But I still say that that doesn't mean that that's

5  what the investor thinks is sort of a final value, because the

6  investor is betting it will go up or it will go down, based on

7  the investor's own training, knowledge, experience, whatever it

8  is he or she thinks they know.

9          MR. CAMERON:  But I think the question, your Honor, is

10  at the time of the transaction -- and this is the way that the

11  Supreme Court formulated the test -- is the market value of the

12  security an accurate measure of its intrinsic value?  It may go

13  up, it may go down, but the question is:  How did the investor

14  purchasing the securities regard the market price at that time?

15          THE COURT:  Surely you've heard the phrase, oh, that's

16  a good stock, it's undervalued.  You know, I'm going to buy

17  that one because I think it's trading at less than its value.

18  That's a pretty common statement.  It happens every day.  You

19  may even have bought on that idea:  Certain stock is

20  undervalued, I think I'll buy that one.

21          MR. CAMERON:  But again, your Honor, the key here is

22  how the investor looks at the stock.

23          THE COURT:  Right.

24          MR. CAMERON:  Right?

25          THE COURT:  Right.

D2jegam3                          Mr. Cameron - closing

1          MR. CAMERON:  And whether it measures the intrinsic

2     value at that time.

3          The key point, your Honor, is that that is the --

4     that, if you like, principle is what was dictated by the

5     efficient market hypothesis which underpins the *Basic*

6     decision.

7          THE COURT:  So every time the investor -- so, wait a

8     minute.  So every time the investor thinks a stock is

9     undervalued, that its intrinsic value is really higher, I'm

10    going to buy it?  It's a bargain every time the investor thinks

11    that they're no longer relying on the market price?

12         MR. CAMERON:  Well, I believe the point, your Honor,

13    is the difference between the investor thinking what might

14    happen in the future and is that stock --

15         THE COURT:  It's a little more than that.  He thinks

16    the stock is undervalued at today's price.

17         MR. CAMERON:  Well, your Honor, what your Honor is

18    doing is, I think, questioning again the efficient market

19    hypothesis that underlies *Basic*.  If the hypothesis doesn't

20    work, if the market is not pricing the value of that security,

21    then the question is, frankly, whether investors should have

22    benefit of it in the first place.  The test, the issue before

23    the Court, your Honor, is not whether the presumption should be

24    applied.

25         THE COURT:  No, of course not.

D2jegam3                        Mr. Cameron - closing

1              MR. CAMERON:  It's whether it can be rebutted --

2              THE COURT:  True.

3              MR. CAMERON:  -- under the existing law before the

4     Court.

5              THE COURT:  True.  Actually, I think all three of us

6     agree on that:  Plaintiff, defendant, Court.

7              MR. CAMERON:  And I think the question your Honor is

8     asking goes to if you like the way that the efficient -- the

9     fraud on the market presumption was established in the first

10    place.  What the Supreme Court clearly held was that the

11    market -- and the reason for the fraud on the market

12    presumption is that the market is acting as the agent of the

13    investor and pricing the value of the security.

14             THE COURT:  Okay.

15             MR. CAMERON:  And that's why, for purposes of

16    rebutting the test, your Honor, the question that is being

17    posed is --

18             THE COURT:  Okay.  So let's keep going.  So let's say

19    I won't question that any longer and the market price reflects

20    the intrinsic value of the stock.  Now we get GAMCO, who has

21    all these publicity materials that define intrinsic value as

22    the PMV.

23             MR. CAMERON:  Well, I think --

24             THE COURT:  Does that break the chain, so to speak?

25             MR. CAMERON:  Absolutely, your Honor, because, you

D2jegam3                        Mr. Cameron - closing

1    know, while it seemed unclear as to what they view the PMV as,

2    it is absolutely clear on the record, there isn't a shred of

3    evidence the other way that they did not view the stock price

4    as an accurate measure of the intrinsic value of the security.

5    And that is really unchallenged.  And the reason you have that

6    binder before you, your Honor, is that throughout GAMCO's

7    documents and throughout the testimony of their experts,

8    including the president and COO of their company and even

9    Mr. Gabelli himself, nobody once said that they purchased the

10   security relying upon the accuracy of the stock price as an

11   accurate measure of the stock's intrinsic market value.  And

12   that absolutely severs the link.  It absolutely severs the

13   link, your Honor.

14        The point here is that they thought the stock was,

15   indeed, dramatically undervalued.  You know, in the words of

16   Mr. Rittenberry -- and perhaps, you know, this gets back to the

17   question your Honor was asking -- it's not that there's some,

18   you know, sentiment that maybe things are going to go up or

19   down slightly in their view.  It was a dramatic disparity

20   between the value that they ascribed to the security and the

21   market price.

22        THE COURT:  Right.  I do understand that.  But many

23   investors, as I said before, even little people like you or me,

24   say, oh, this stock is undervalued.  That's why I'll buy it,

25   because I don't think that that's the real value.  I think it's

D2jegam3                        Mr. Cameron - closing

1     much higher and I'm going to make money.  That's a common

2     occurrence.  And so I'm saying, when that occurs, does that

3     sever the link that nonetheless, on the moment you bought, you

4     relied on the market price to the extent that you said, I'm

5     going to make money, because this price reflects all the

6     information now known, but I think that information shows that

7     the stock is undervalued?

8              MR. CAMERON:  Well, I think your Honor -- frankly, in

9     the strict words of the test that was laid down by the Supreme

10    Court, if an investor purchases not relying upon the market

11    price as a measure of the intrinsic value of the security, that

12    does sever the link.  The reason here is that it's based upon,

13    you know, the imputation of publicly available information.

14    And the point here, if they relied on something else --

15              THE COURT:  I see.

16              MR. CAMERON:  -- not publicly available information,

17    like the GAMCO investors did, here, quite surprisingly

18    actually, your Honor, because it's the first time it's been

19    asserted in this case, Mr. Gabelli said they relied not just on

20    PMV, right, but also a mosaic, I think was his word, of other

21    things, including even, for example, whether he was meeting

22    Ms. Bartiromo and she was interested in telecommunications

23    securities.

24              I mean, quite frankly, your Honor, as a side note, and

25    I only mention it as a side note, that mosaic of things that

D2jegam3                          Mr. Cameron - closing

1    they said they relied upon as part of their investment

2    decision, including mergers, activity in the sector, their

3    knowledge, is consistent with the assertion of the fraud of the

4    market presumption that they relied upon here and suggests that

5    rather than relying on the misstatements --

6              THE COURT:  But that raises the question of the word

7    solely.  You have to rely solely on the market price?

8    Mr. Cappucci quoted a decision of mine apparently where I said

9    something like, it doesn't have to be the sole information on

10   which it relies, as long as you rely on it to any extent.

11             MR. CAMERON:  Actually --

12             THE COURT:  He didn't tell me which of my many cases

13   it was.

14             MR. CAMERON:  And I haven't seen the decision, your

15   Honor, so I can't comment on your Honor's decision.

16             THE COURT:  He did quote it.  What were you quoting

17   from, Mr. Cappucci?

18             MR. CAPPUCCI:  Hold on a second.  IPO.  IPO, your

19   Honor.

20             THE COURT:  Okay.  One of the IPO decisions.

21             MR. CAPPUCCI:  Again, it's 227 F.R.D. 65 at point 22,

22   it looks like.

23             MR. CAMERON:  I note it, your Honor, because it's

24   separate to say, well, they have alleged in this case.  I don't

25   think it's determinative, and we're not relying upon that to

D2jegam3                         Mr. Cameron - closing

 1   win this issue before your Honor.  The issue is whether or not

 2   they relied on the stock price as an accurate measure of

 3   intrinsic value.

 4          THE COURT:  I know, but are you arguing sole reliance,

 5   that assumes they're relying on other things in addition to

 6   market price, that defeats the presumption?  Is that your

 7   argument?

 8          MR. CAMERON:  Well, I think actually in that sense,

 9   your Honor, you have to assess how they are relying upon the

10   stock price, because that's the proxy for the misstatements

11   that are at issue here.  It obviously has nothing to do with a

12   decision.  And that's part of the concern here, your Honor,

13   because the stock price here served no purpose at all, other

14   than just a comparator in the PMV analysis, right?  And that

15   raises the concern that your Honor --

16          THE COURT:  Well, I don't know if it's only as a

17   comparator.  He may have watched the up and down.  You know, is

18   it on a downward trend or an upward trend?  I'm sure

19   Mr. Gabelli managed to put that in his testimony somewhere,

20   that he watched the price of the stock change.

21          MR. CAMERON:  I'm actually not sure there's anything

22   in the record about that, your Honor.

23          THE COURT:  Well, maybe he didn't.

24          MR. CAMERON:  And that's part of the issue.

25          But it is clear what is in the record is that the only

D2jegam3                         Mr. Cameron - closing

1   relevance of stock price here -- and I think Mr. Cappucci even

2   mentioned this in his opening -- is that of course they relied

3   upon it, because it was for comparison purposes the book end

4   with PMV analysis.  And in that sense, your Honor, regardless

5   of where you choose to draw the line, we would say this is on

6   the wrong side of it, because it is so obviously not, you know,

7   the motivating driving force for why they decided to purchase

8   these securities.  And --

9          THE COURT:  So you think there's case law that talks

10  about a motivating factor?

11         MR. CAMERON:  I'm sorry, your Honor.

12         THE COURT:  You think there's case law that talks

13  about a motivating factor?

14         MR. CAMERON:  In that I was responding to the point

15  Mr. Cappucci made.  And I haven't seen that decision.  We think

16  the test is as stated by the Second Circuit, which is simply

17  whether or not the investor -- and, frankly, a sophisticated

18  investor like Mr. Gabelli and the GAMCO plaintiffs even more

19  appropriately should be held to that standard -- when they

20  assert the fraud on the market presumption, when they attempt

21  to prove reliance based upon the fraud on the market

22  presumption, it's even more fair to ask them the question, did

23  they rely upon the stock market price as an accurate reflection

24  of the security's intrinsic value?

25         THE COURT:  Finish the sentence about whether or not,

D2jegam3                          Mr. Cameron - closing

 1   the quote, the whether or not quote.  Could you do the whole

 2   quote?

 3              MR. CAMERON:  I'm sorry, your Honor.  Whether or not

 4   they relied upon the market price as an accurate measure of

 5   intrinsic value.

 6              THE COURT:  That's the whether-or-not rule?

 7              MR. CAMERON:  I believe that is the test.

 8              THE COURT:  That's not the but-for quote.

 9              MR. CAMERON:  Oh, I'm sorry.  The but for, your Honor,

10   is but for the misrepresentations, would they have transacted

11   in these securities?  And we say, your Honor, under the

12   investment model that they utilized, the answer is plainly yes.

13              Now, I don't know if your Honor would find it helpful

14   for me to summarize some of the evidence dealing with private

15   market value.  I think your Honor is obviously very familiar

16   with it, but let me just summarize, I think, the key points

17   that did come out.  As I think the publicity materials note,

18   and as Mr. Gabelli noted, the philosophy here is identifying

19   and buying the securities of companies where market price is

20   below PMV.  And there was some debate, certainly in front of

21   Mr. Gabelli, about whether the intrinsic or true value of the

22   securities is measured by the PMV but not the stock price.  In

23   fact, the debate was whether or not it was PMV or not.

24              And frankly, your Honor, there are some very clear

25   statements in the record by Mr. Jamieson which are in your

D2jegam3                              Mr. Cameron - closing

1  binders at Tab 4, 5 and 6, and Mr. Woodson noting that the

2  intrinsic value from the perspective of GAMCO and the mutual

3  fund plaintiffs is represented by their calculation of private

4  market value.  And he said it absolutely clearly.  He is the

5  president and chief operating officer of the GBL group of

6  companies.

7          In fact, it's the case that from Gabelli's perspective

8  the true value of these companies is what is represented by the

9  private market value?

10          Correct.

11          And the Court said, is that your understanding?

12          He said yes.  And a short while later, the ultimate

13  value is a private market value.

14          Mr. Gabelli disputed this point, but then said he

15  couldn't answer it.  And as your Honor knows, there are

16  references to PMV being equated with intrinsic value throughout

17  the company's documents.  I've given you some examples in the

18  binder at Tab 3, 8 and 2, including in the documents that the

19  company, the GAMCO companies, would publicize both internally

20  and externally to their own investors.  Mr. Rittenberry

21  testified that the calculation of PMV was independent of the

22  stock price.

23          And the key issue, your Honor, whether the stock price

24  represents a securities intrinsic market value, Mr. Jamieson,

25  again, the president and COO of the company, conceded that it

D2jegam3                        Mr. Cameron - closing

 1    was not; that it was simply how they viewed it as an

 2    acquisition price.  That was simply what you had to pay to get

 3    it as compared to the value that was represented by the PMV.

 4            And even today's examination, your Honor, I think is

 5    extremely instructive on this point.  The Court asked

 6    Mr. Gabelli, is it accurate to say intrinsic value and equity

 7    pricing are different?

 8            And the witness answered yes.

 9            And again, the Court, I think it's page 26 of today's

10    transcript, asked:  His question was, do you assume that the

11    public market price of a security is an accurate measure of its

12    intrinsic value?

13            Answer, I say they're apples and oranges.  They're

14    totally different.

15            And this is the key, your Honor, if there was ever a

16    case where this presumption should be capable of being

17    rebutted, it's this one.  They viewed them as utterly

18    different.

19            And to go back to where I started, your Honor, nobody

20    at GAMCO in their documents or in the testimony that we have

21    heard has asserted that the stock price does in fact represent

22    an accurate measure of the security's intrinsic value.

23            THE COURT:  I'm sorry.  Say that last thing again.

24    You mean in this case or forever?

25            MR. CAMERON:  In this case, the record before the

D2jegam3                          Mr. Cameron - closing

 1    Court, your Honor.

 2                 THE COURT:  Okay.

 3                 MR. CAMERON:  I think -- and just to conclude the

 4    sequence, for Vivendi, the private market value was always

 5    above the stock price throughout the relevant period, a point

 6    that Mr. Rittenberry confirmed.  And the GAMCO plaintiff's

 7    purchases of Vivendi's securities throughout the period were

 8    based upon that PMV analysis.  And there's testimony in the

 9    record from Mr. Rittenberry and Mr. Jamieson confirming that

10    that was the basis for their investments.

11                 And so, your Honor, that's why we say -- and I can go

12    to any of those, if you'd like me to, but I know you've sat

13    through this and I don't want to belabor the point.  But that's

14    why we say the link here is severed; that it is not appropriate

15    for them to rely upon the market price as a proxy for the

16    misstatements that were made by Vivendi, and at the same time,

17    when they were not relying upon that market price as an

18    accurate measure of the intrinsic value of the security in

19    making their investments.  That is not a but-for causation.

20                 Two final points, your Honor.  One, of course, is that

21    the plaintiff's purchases continued even as the fraud was being

22    revealed throughout 2002, according to their own damages expert

23    Dr. Nye.  This is a point that was noted by Mr. Saunders in his

24    opening.  And the fact is -- in fact, can we put up Tab 22.

25                 This is the chart that Mr. Saunders used in his

D2jegam3                         Mr. Cameron - closing

1   opening showing that the GAMCO plaintiffs increased their

2   holdings by nearly 200 percent after it began to be revealed

3   and the mutual fund plaintiffs increased their holdings by over

4   100 percent after that fraud began to be revealed.  And those

5   purchases aren't disputed, your Honor.

6           But what they also indicate is, again, how this

7   investor was making its investment decisions pursuant to their

8   model, which had no bearing on the fraud that was being

9   disclosed during the course of 2002.

10          And then finally, your Honor, the last point --

11          THE COURT:  Does it matter what the subject of the

12   fraud was?  The question I asked the plaintiffs, Mr. Cappucci,

13   I said the fraud that was being hidden here had to do with a

14   liquidity crisis.  And a couple of the witnesses, I think,

15   said, well, that wouldn't have mattered because it's a

16   short-term event, and our investment decision is based on, you

17   know, a two-year or long period.

18          MR. CAMERON:  Well, actually, that's my next point,

19   your Honor, precisely that issue, which is Mr. Rittenberry, as

20   you noted, described as a short-term event and was asked, how

21   would that supposed liquidity crisis impact your PMV

22   calculation?

23          I don't believe it did.

24          You don't think it did?

25          No.

D2jegam3                          Mr. Cameron - closing

1          I take it that if it did not affect your PMV

2     calculation, then a liquidity crisis would similarly not affect

3     your buy, sell or hold recommendation?

4          No, not necessarily.

5          So, again, your Honor, when we come back to the

6     question of but-for causation, but for these misstatements,

7     would they have transacted, that, again, goes to the answer,

8     yes.  And that is, again, why the plaintiffs here cannot

9     establish reliance, your Honor.  And that's why in Vivendi's

10    submission the link is severed.  The plaintiffs cannot show

11    reliance, and that's why the damage claim should be filed.

12         THE COURT:  Thank you.

13         MR. CAPPUCCI:  Your Honor, just one point.  At the

14    prices paid.

15         THE COURT:  I know, you've added that, and you've

16    cited an Eastern District case, then maybe a Southern District

17    case, and then some out-of-circuit cases.  Vivendi spent time

18    in their brief saying that the Eastern District case relied on

19    a circuit case that didn't say what it said.  And the Southern

20    District case which I looked at was really, I'm sorry to say, a

21    bit of a misquote because the use of ellipses took out the key

22    portion of it.  So most of the law is really out of circuit on

23    that, but I don't know that that's a key point.  I know you

24    made the argument.

25         Okay.  I think we're done.  Thank you.

D2jegam3                          Mr. Cameron – closing

1          MR. CAPPUCCI:  Thank you so much, your Honor.

2          MR. SAUNDERS:  Thank you, your Honor.

3          MR. CAPPUCCI:  Your Honor does not want any post-trial

4     briefing?

5          THE COURT:  I don't think it's necessary, given the

6     pretrial.  Anybody disagree?

7          MR. SAUNDERS:  No, your Honor.

8          MR. CAPPUCCI:  I think we owe you, though, the

9     Woodson --

10          THE COURT:  I would take that.

11          (Adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                     INDEX OF EXAMINATION

 2   Examination of:                          Page

 3   MARIO J GABELLI

 4   Direct By Mr. Saunders . . . . . . . . . . . 158

 5   Cross By Mr. Cappucci  . . . . . . . . . . . 209

 6   Redirect By Mr. Saunders . . . . . . . . . . 221

 7   Recross By Mr. Cappucci  . . . . . . . . . . 230

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```